# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

CALEB BARNETT, et al.,

       *Plaintiffs-Appellees*,

v.

KWAME RAOUL, et al.,

       *Defendants-Appellants*.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Nos. 24-3060, 24-3061, 24-3062, 24-3063 (consol.)

## PLAINTIFFS-APPELLEES' RESPONSE TO DEFENDANTS-APPELLANTS' MOTION TO STAY INJUNCTION PENDING APPEAL

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ iii

INTRODUCTION ................................................................. 1

BACKGROUND ................................................................. 3

ARGUMENT .................................................................... 7

I.     The State's Motion Inexcusably Violates The Federal Rules ......................... 7

II.    The State Is Not Significantly Likely To Succeed On The Merits ................. 9

     A.    The State Identifies No Reason to Disturb the District Court's Conclusion that the Firearms and Magazines PICA Bans Are "Arms" ................................................................. 10

     B.    The District Court Correctly Concluded That the State Failed to Identify Any Historical Tradition in This Country of Banning Ubiquitous, Non-Militaristic Arms ...................................... 17

III.    The Remaining Factors Do Not Support Staying The District Court's Injunction Pending Appeal .............................................. 20

CONCLUSION ................................................................. 22

# TABLE OF AUTHORITIES

## Cases

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
910 F.3d 106 (3d Cir. 2018) ..............................................................17

*Auto Driveaway Franchise Sys., LLC
v. Auto Driveaway Richmond, LLC*,
928 F.3d 670 (7th Cir. 2019) .............................................................9

*Bevis v. City of Naperville*,
85 F.4th 1175 (7th Cir. 2023) ...................................1, 2, 5, 10, 11, 12, 13, 14, 18

*Classic Components Supply, Inc. v. Mitsubishi Elecs. Am., Inc.*,
841 F.2d 163 (7th Cir. 1988) .............................................................7

*Cremation Soc'y of Ill., Inc. v. Int'l Bhd. of Teamsters Loc. 727*,
869 F.3d 610 (7th Cir. 2017) .............................................................8

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ...........................................................................20

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) .......................................................20, 21

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024) ........................................................17

*Hinrichs v. Bosma*,
440 F.3d 393 (7th Cir. 2006) .............................................................7

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) ..............................................................10, 13, 17

*Ocean State Tactical, LLC v. Rhode Island*,
95 F.4th 38 (1st Cir. 2024) ...............................................................17

*Rakovich v. Wade*,
834 F.2d 673 (7th Cir. 1987) .........................................................8, 9

*United States v. Alvarado*,
326 F.3d 857 (7th Cir. 2003) ............................................................13

*United States v. Howard*,
   67 F.4th 876 (7th Cir. 2023) ..................................................................16

*United States v. Nichols*,
   847 F.3d 851 (7th Cir. 2017) .................................................................13

**Statutes**

720 ILCS 5/24-1.10 ........................................................................................5

720 ILCS 5/24-1.9 ...................................................................................3, 4, 5

**Rule**

Fed. R. App. P. 8 ............................................................................................8

**Other Authority**

State Defs.' Br. in Opp'n, *Harrel v. Raoul*, No. 23-877
   (filed Apr. 15, 2024) ..............................................................................1

## INTRODUCTION

In *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023), this Court held that weapons "that are not possessed for lawful purposes" and/or are "exclusively or predominantly useful in military service" do not qualify as "Arms" within the meaning of the Second Amendment. *Id.* at 1194. Applying that standard, the Court concluded that the firearms and magazines the Protect Illinois Communities Act ("PICA") bans likely fit that bill. *Id.* at 1194-97. But, in doing so, the Court took pains to "stress[]" that it had taken "just a preliminary look at the subject," *id.* at 1197—a point the state emphasized in successfully resisting Supreme Court review, *see* State Defs.' Br. in Opp'n at 16-18, *Harrel v. Raoul*, No. 23-877 (filed Apr. 15, 2024). Indeed, the *Bevis* Court expressly declined to "rule out the possibility that the plaintiffs will find other evidence" that demonstrates that its preliminary views were mistaken. 85 F.4th at 1197. And the Court noted in particular that evidence regarding the construction, function, and application of the firearms and magazines PICA bans, plus "[b]etter data on" their "firing rates," might draw a "sharper distinction" between the weapons PICA bans and those traditionally reserved for military service—and, in fact, "might change the analysis" altogether. *Id.*

That is precisely what happened. On remand, the parties developed the more comprehensive record that this Court contemplated—and one of the most comprehensive records in any Second Amendment challenge post-*Bruen*. After

reviewing the voluminous record and hearing four days of live testimony, the district court found as a matter of fact that the firearms and magazines PICA bans "are Arms that ordinary people would keep at home for purposes of self-defense," as opposed to "weapons that are not possessed for lawful purposes"; are "not … exclusively or predominantly useful in military service"; and thus not only are "Arms" under the Second Amendment, but cannot be banned consistent with this Nation's historical tradition of firearm regulation.  *Id.* at 1194; *see* Mot.App.100-59.

Specifically, the district court found that: features that render a rifle, pistol, or shotgun an "assault weapon" under PICA are useful for civilian self-defense and commonly chosen for that reason, Mot.App.100-03; ordinary people do in fact keep rifles, pistols, and shotguns that PICA bans at home for self-defense and other lawful purposes, Mot.App.100-03; and the same is true of the ammunition magazines PICA outlaws, Mot.App.104-05.  The court further found as a matter of fact that the common arms PICA outlaws are not exclusively or predominantly used by the military or useful for military purposes, Mot.App.107-13.  In particular, the district court found (and the state does not dispute) that no military in the world uses for combat *any* of the firearms PICA bans, in large part because they lack the functional capacity that militaries require in several important respects.  Mot.App.107-08.

The state now tries to wish away all of those facts.  Indeed, it not only cherry-picks evidence from the record that the district court found lacking, but elides much

of the district court's thorough decision, in favor of just faulting the court for reaching a different conclusion in the final analysis than this Court did in the preliminary one. But the whole reason this Court remanded in *Bevis* was for fact-finding on precisely the issues the district court addressed. The state had its chance to prove its case. It failed. There is no reason to give the state a reprieve and allow it to continue violating the Second Amendment any longer.

## BACKGROUND

Under PICA, it is "unlawful for any person within [Illinois] to knowingly manufacture, deliver, sell, import, or purchase or cause to be manufactured, delivered, sold, imported, or purchased by another, an assault weapon." 720 ILCS 5/24-1.9(b). It is unlawful even to "possess an assault weapon" unless registered with the state during the brief window that option was available. *Id.* 5/24-1.9(c).

PICA defines "assault weapons" exceedingly broadly. First, it bans any "semiautomatic rifle" with "the capacity to accept a detachable magazine" that has "one or more of the following": "a pistol grip," "any feature capable of functioning as a protruding grip that can be held by the non-trigger hand," a folding or telescoping stock, a "flash suppressor," or a "shroud." *Id.* 5/24-1.9(a)(1)(A). Second, it bans "all AR type[]" rifles ("including" 43 named variants) explicitly, plus all "copies, duplicates, variants, or altered facsimiles with the capability of any such weapon." *Id.* 5/24-1.9(a)(1)(J). Third, PICA bans all semiautomatic shotguns with

"one or more of" a list of features similar to the list for semiautomatic rifles, including semiautomatic shotguns with "a pistol grip" or that accept a detachable magazine. *Id.* 5/24-1.9(a)(1)(F). Fourth, it bans nearly 100 more rifles and deems them all—and any "copies, duplicates, variants, or altered facsimiles with the capability of any such weapon"—as "assault weapons." *Id.* 5/24-1.9(a)(1)(J). All in all, PICA bans nearly a thousand rifles and shotguns, including all of the most popular models.

PICA further defines "assault weapon" to include any semiautomatic pistol "that has the capacity to accept a detachable magazine" and one of a list of features similar to the features listed for rifles. *Id.* 5/24-1.9(a)(1)(C). It also bans any "semiautomatic pistol that has a fixed magazine with the capacity to accept more than 15 rounds." *Id.* 5/24-1.9(a)(1)(D). And PICA goes on to ban these common pistols twice more: banning "all AR type[]" pistols ("including" 13 named variants) and approximately 40 more semiautomatic pistol models by name; and banning all "copies, duplicates, variants, or altered facsimiles with the capability of any such weapon." *Id.* 5/24-1.9(a)(1)(K). In a final catchall, "[a]ny firearm that has been modified to be operable as an assault weapon as defined in this Section," plus any part that can convert any firearm into one, is banned. *Id.* 5/24-1.9(a)(1)(H)-(I).[1]

---

[1] The already-long list of banned arms is not static: The State Police can add to it annually. 720 ILCS 5/24-1.9(d)(3).

In addition to banning many of the most common firearms in America, Illinois now bans any magazine with "a capacity of … more than 10 rounds of ammunition for long guns and more than 15 rounds of ammunition for handguns," which PICA dubs a "[l]arge capacity ammunition feeding device." *Id.* 5/24-1.10(a). Current owners may continue to possess now-prohibited arms and magazines, but only subject to onerous restrictions. *Id.* 5/24-1.9(d); *id.* 5/24-1.10(d).[2]

Plaintiffs challenged PICA under the Second Amendment and sought a preliminary injunction, which the district court granted. Dkt.101. On appeal, this Court reversed, holding that Plaintiffs were not likely to succeed on the merits because the firearms and magazines PICA bans likely are "exclusively or predominantly useful in military service," rather than "possessed for lawful purposes," and so likely do not qualify as "Arms" under the Second Amendment. *Bevis*, 85 F.4th at 1194-97. This Court also highlighted a few historical analogues in support of its estimation that PICA fits within the Nation's history of regulating "weapons and accessories" meant for "military or law-enforcement use" rather than for "personal use." *Id.* at 1201-02. Notably, though, the Court expressly declined to "rule out the possibility that the plaintiffs will find other evidence" that demonstrates its preliminary views were mistaken. *Id.* at 1197.

---

[2] PICA's ban has limited exceptions for special groups, none of which any Plaintiff-Appellee belongs to. 720 ILCS 5/24-1.9(e).

On remand, the parties conducted months of discovery and developed a comprehensive factual record spanning thousands of pages and culminating in four days of live testimony and more than 400 pages of post-trial briefing. Dkts.247-255. The district court then issued a nearly 170-page decision granting plaintiffs a permanent injunction barring the state from enforcing PICA. Mot.App.1.

After "considering *all* of the evidence," the court concluded that the firearms and magazines PICA bans are "Arms" presumptively protected by the Second Amendment because they are: (1) "in common use" for self-defense and other lawful purposes, rather than "dangerous and unusual," Mot.App.100-05; (2) not "exclusively or predominantly useful in military service," or at the very least, subject to "dual use" by citizens and the military, Mot.App.107-13; and (3) not predominantly "possessed for unlawful purposes," Mot.App.114-18. "After an exhaustive review of the statutes and arguments provided by the Government," the court also held that "the nation's history and tradition of firearms regulation does *not* support a statute as far-reaching as PICA," which—based on the factual record that the parties developed and that was not before this Court in *Bevis*—prohibits law-abiding citizens from possessing firearms and magazines that are not predominantly used or useful in military service but are arms that ordinary people both would and do keep at home for self-defense and other lawful purposes. Mot.App.151. The district court thus entered an order permanently enjoining application of PICA.

The district court *sua sponte* stayed its injunction for 30 days. Mot.App.167. The state not only quickly appealed, but filed a motion with this Court seeking a stay of the injunction pending appeal. Despite the explicit requirements of the Federal Rules, the state did not seek such relief from the district court in the first instance or argue that doing so would be impracticable. Nor did it provide notice to the plaintiffs before filing its motion.

## ARGUMENT

A stay pending appeal is an extraordinary remedy that should issue only in exceptional circumstances. *Classic Components Supply, Inc. v. Mitsubishi Elecs. Am., Inc.*, 841 F.2d 163, 165 (7th Cir. 1988). That is especially true when the order sought to be stayed is a permanent injunction, as the Court is essentially being asked to second-guess (on a highly truncated timeline) the extensive record, briefing, and argument the district court considered after a trial on the merits. The party seeking a stay must show that "it has a significant probability of success on the merits[;] that it will face irreparable harm absent a stay; and that a stay will not injure the opposing party and will be in the public interest." *Hinrichs v. Bosma*, 440 F.3d 393, 396 (7th Cir. 2006). The state has not made, and cannot make, that showing.

## I.  The State's Motion Inexcusably Violates The Federal Rules.

The state's motion fails at the starting gate. In its rush to overturn the district court's thoughtful decision, the state failed to comport with the rules governing stay

motions. "Rule 8(a) of the Federal Rules of Appellate Procedure requires that a motion for a stay pending appeal be presented initially in the district court." *Rakovich v. Wade*, 834 F.2d 673, 674 (7th Cir. 1987). To file such a motion in this Court, the movant must demonstrate that "application to the district court for such relief is not practicable, or [that] the district court has denied the application." *Id.* at 675.

This Court can deny the state's motion on that basis alone. The state did not move for a stay "first in the district court," and the district court has not said that it would deny such a request. Fed. R. App. P. 8(2)(A)(i). To the contrary, the district court stayed its injunction *sua sponte* for 30 days, Mot.App.167, suggesting that it would have appropriately considered the merits of a motion for a stay pending appeal had the state bothered to ask. Instead, the state rushed to this Court seeking relief it should have first sought below. The state has not even tried to show that seeking that relief from the district court first "would be impracticable." Fed. R. App. P. 8(2)(A)(i). Nor could it; the 30 days the district court gave the state provided ample time to seek a stay pending appeal. In any event, it has forfeited any chance to do so now. *See, e.g.*, *Cremation Soc'y of Ill., Inc. v. Int'l Bhd. of Teamsters Loc. 727*, 869 F.3d 610, 617 n.2 (7th Cir. 2017) ("[W]e do not consider arguments raised for the first time in the reply brief.").

In its haste to appeal and seek a stay, the state also violated basic notice rules. Under Federal Rule of Appellate Procedure 8(2)(C), the party requesting a stay "must give reasonable notice of the motion to all parties." The state provided *no* notice of its motion to *any* party. Accordingly, this Court should deny the state's motion for a stay and instruct the state "to file [its] motion in the district court," *Rakovich*, 834 F.2d at 673, as it routinely does when appellants fail to follow the Federal Rules.

That approach would be particularly appropriate in light of this Court's recent order directing the parties to file memoranda as to whether this case should be remanded for the district court to enter a revised judgment. *See* CA7.Dkt.3. While plaintiffs agree with the state that this Court has appellate jurisdiction, *see, e.g.*, *Auto Driveaway Franchise Sys., LLC v. Auto Driveaway Richmond, LLC*, 928 F.3d 670, 679 (7th Cir. 2019), a limited remand for the district court to amend its judgment would ensure that the state has ample time to file its stay motion where it belongs: in the district court.

## II.   The State Is Not Significantly Likely To Succeed On The Merits.

The state's motion also fails on the merits. Both *Bruen* and *Bevis* directed the district court to evaluate and answer two questions:  whether the firearms and magazines PICA bans are "Arms" presumptively protected by the Second Amendment; and, if so, whether the state satisfied its burden of demonstrating that

its ban on long-lawful arms is consistent with the Nation's history of firearms regulation. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17, 24 (2022); *Bevis*, 85 F.4th at 1194. The parties developed an extensive record on each issue, and after trial, the district court rendered judgment in plaintiffs' favor on both fronts. The state identifies no legitimate basis to disturb the court's decision in its truncated stay briefing. At this juncture, this Court should stay its own hand, not the district court's.

**A.    The State Identifies No Reason to Disturb the District Court's Conclusion that the Firearms and Magazines PICA Bans Are "Arms."**

The district court correctly determined that, under *Bevis*, the firearms and magazines PICA bans are "Arms" presumptively protected by the Second Amendment. Mot.App.60-61, 100-06. The record demonstrated beyond doubt not only that these weapons are "Arms that ordinary people *would* keep at home for purposes of self-defense," but that they are *in fact* "possessed for lawful purposes" by millions of Americans. *Bevis*, 85 F.4th at 1194 (emphasis added); *see* Mot.App.100-06; Dkt.253 ¶¶35-152 & pp.62-64. The record also demonstrated conclusively that the banned weapons are *not* "exclusively or predominantly useful in military service." *Bevis*, 85 F.4th at 1194; *see* Mot.App.107-13; Dkt.253 ¶¶238-49 & pp.64-66. While *Bevis* concluded otherwise in its "preliminary" analysis, 85 F.4th at 1195, the Court did not "rule out the possibility that the plaintiffs w[ould] find other evidence" that demonstrate its preliminary views were mistaken, *id.* at

10

1197. And that is just what happened. The more complete record before the district court—including a thorough evaluation of firearm design, development, construction, rate of fire, penetration, velocity, and more, by firearms-engineering, self-defense, and military experts alike—refuted *Bevis*'s preliminary estimation, just as this Court contemplated it might. *See, e.g.*, Mot.App.100-18; Dkt.253 ¶¶153-237 & pp.65-66.

What is more, although it is undisputed that no military in the world uses semiautomatic-only firearms as combat service weapons, the district court also found that the weapons PICA bans are at the very least "dual use" weapons that are highly useful for self-defense in addition to whatever military purposes they could serve. Mot.App.112-13; *see also, e.g.*, Mot.App.77-80; Dkt.253 ¶¶238-49 (further record evidence supporting "dual use" finding). The state remarkably makes no mention of, and mounts no challenge to, the district court's "dual use" finding. Yet *Bevis* made clear that "dual use" weapons are entitled to "Second Amendment protection." 85 F.4th at 1195 n.8. That should be the end of the matter.

In any event, the arguments the state *does* advance are unavailing. The state begins by accusing the district court of having "failed to faithfully apply" this Court's *Bevis* framework in determining whether the relevant weapons are "Arms," but the state fails to describe where the district court went wrong. Mot.8-9. Indeed, apart from chiding the court for noting (in dicta) that it found *Bevis* a bit "confusing,"

Mot.App.53-54 nn.19-20, the best the state can do is fault the court for attempting to "harmonize" that decision with *Bruen* and *Heller*, Mot.8. That is a feature, not a bug, as the district court is bound by both Seventh Circuit and Supreme Court precedent. If anyone is being unfaithful to *Bevis*, it is the state, which repeatedly faults the district court for reaching different final conclusions than *Bevis*'s preliminary ones once the court had a full record to consider. But, in doing so, the state conveniently ignores that *Bevis* explicitly "stress[ed]" that it had taken "just a preliminary look" at the issues and conceded that "[b]etter data" and evidence "might change the analysis" altogether. 85 F.4th at 1197. The district court cannot be wrong just because it reached a conclusion that *Bevis* expressly said it could well reach on a full record.

The state's smattering of other critiques fare no better. The state faults the district court for examining whether the weapons at issue are in "common use" for self-defense. Mot.9. But *Bevis* could not have been clearer that, to qualify as an "Arm," a bearable instrument *both* (1) must not be "exclusively or predominantly useful in military service," *and* (2) must be something "that ordinary people would keep at home for purposes of self-defense," as opposed to something "not possessed for lawful purposes." *Id.* at 1194. The state does not explain how the court was supposed to answer the second part of that inquiry without taking this Court at its word and considering whether people actually possess for lawful purposes the

12

firearms and magazines that the state hastily banned after *Bruen*. Nor does it identify any basis to reject the district court's extensive findings confirming that these not only are weapons that "an ordinary person *would* keep at home for self-defense," but are *in fact* overwhelmingly chosen by ordinary people for "lawful purposes." Mot.App.100-03 (emphasis added); *see Bevis*, 85 F.4th at 1197.

Indeed, while the state accuses the court of relying on purportedly problematic studies and "numbers alone," Mot.9, that is doubly wrong. The district court relied on an estimation of common use that *the state's expert* supplied (which told that tens of millions of Americans possess the firearms PICA bans), as well as undisputed data from an Illinois retailer who testified at trial, and both live and written testimony from self-defense and military experts. Mot.App.100-03. And that is to say nothing of the mountain of evidence in the rest of the record, conveniently ignored by the state, confirming that the weapons Illinois has banned are "unquestionably in common use today" for lawful purposes. *See Bruen*, 597 U.S. at 32; *see, e.g.*, Dkt.253 ¶¶35-152. Based on that voluminous record, it is highly unlikely that this Court would "disturb" the district court's common-use determination that is so amply "supported by the record." *See, e.g.*, *United States v. Nichols*, 847 F.3d 851, 857, 861 (7th Cir. 2017); *see also United States v. Alvarado*, 326 F.3d 857, 862 (7th Cir. 2003) ("[T]he district court's choice of whom to believe is almost never

vulnerable to a finding of clear error.").  And to fault the court for engaging in that analysis would make nonsense of *Bevis*.

The state likewise identifies no basis to reject the district court's finding that the arms Illinois has banned are distinct from military weapons like the M16 that are "exclusively or predominantly useful in military service."  *Bevis*, 85 F.4th at 1194. The state accuses the district court of failing to consider the evidence in concluding that the AR-15 and the M16 are "not at all the same weapon."  Mot.10.  In fact, the district court issued a nearly 170-page decision that discussed the parties' arguments and evidence in great detail.  *See, e.g.*, Mot.App.86-100, 107-11.  The district court even cited the very evidence of "muzzle velocity, rate of fire, accuracy, and projective penetration" that the state mysteriously claims the court never reviewed. Mot.App.107.  The court also relied, for example, on evidence demonstrating that "military-issue weapons" like the M16 and M4 are "subject to exact standards of military specificity and rigorous quality-insurance inspections," whereas semiautomatic-only firearms like "the AR-15" are not.  Mot.App.110.  And it considered the undisputed evidence that the AR-15 (unlike the M16 and M4) "has *never* been used by any military force on the planet."  Mot.App.107.

To be sure, the district court also homed in on the fact that military weapons like the M16 have automatic firing capabilities, whereas civilian weapons like the AR-15 do not.  Mot.10.  But as the now-complete record demonstrates, the "select-

fire" distinction is far more significant than *Bevis* appreciated—and perhaps even determinative. Not only does that distinction require a "[t]otally different build" for the two firearms, Dkt.253 ¶¶158, 193-200; it is the primary reason the miliary chooses select-fire firearms like the M16 for their infantry instead of semiautomatic-only firearms like the AR-15. Select-fire capability is a prerequisite for military general service rifles. Indeed, the military experts confirmed at trial that automatic fire is critical for combat purposes, Mot.App.65-66, 76-77; Dkt.253 ¶¶175-180, that they witnessed use of automatic fire in combat, Dkt.251 ¶181, and that they trained using automatic fire, Dkt.253 ¶¶183-85. And the state's effort to downplay the importance of automatic fire to military service was contradicted at trial *by one of its own military experts*. *See, e.g.*, Dkt.253 ¶¶187-91 (citing state's military expert testimony that he "would not want to take the [automatic] option away" from any "squad"). Simply put, the district court came to the commonsense—and record-backed—conclusion that a firearm cannot be "exclusively or predominantly useful in military service" if it in fact is not used in military service because it lacks a feature the military considers critical.

Instead of conducting a "faithful application of *Bevis* to the trial-court record," Mot.10-11, the state cherry-picks its favorite averments—even though the district court found them wanting after a live trial—and ignores the extensive evidence that the plaintiffs produced, *see, e.g.*, Dkt.253 ¶¶153-237. To give just a few examples,

the "maximum effective rate" of an M16 is more than 200% higher than the AR-15's, *see* Dkt.253 ¶206; the AR15 and M16 *do not* fire all the same caliber ammunition, *see* Dkt.253 ¶¶209-10; and because range, penetration, muzzle velocity, and muzzle energy are influenced by the projectile and the barrel (not the type of firearm), the state's analysis on those fronts is ill-conceived, *see* Dkt.253 ¶¶211-20; *see also*, *e.g.*, Dkt.253 ¶¶221-37 & pp.64-66 (discussing the same as to pistols, shotguns, and firearm features, which the state ignores on appeal). In all events, even if there were some room for disagreement on the margins about how similar or dissimilar the banned firearms may be to fully automatic firearms like the M16, the district court's well-supported factual finding that the multitude of weapons PICA bans are not reserved or predominantly useful for military use is—just like its finding on common use—unlikely to be overturned on appellate review. The state thus identifies no basis to disturb the district court's conclusion that the multitude of firearms Illinois has banned are "Arms" presumptively protected by the Second Amendment.

Finally, the state has little to say specifically about the district court's findings on the magazines Illinois has banned; it instead just argues (in a footnote) that magazines are not covered by the Second Amendment at all. *See* Mot.13 n.5. Multiple circuits have rejected that argument (which the state at any rate forfeited, *see United States v. Howard*, 67 F.4th 876, 880 (7th Cir. 2023)). *See, e.g.*, *Hanson*

*v. District of Columbia*, 120 F.4th 223, 232-33 (D.C. Cir. 2024); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 116-17 (3d Cir. 2018); *cf. Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024). And rightly so: "To hold otherwise," as the D.C. Circuit aptly put it, "would allow the government to sidestep the Second Amendment with a regulation prohibiting possession at the component level." *Hanson*, 120 F.4th at 232. The state thus identifies no basis to disturb the district court's threshold conclusion as to magazines either.

**B.     The District Court Correctly Concluded That the State Failed to Identify Any Historical Tradition in This Country of Banning Ubiquitous, Non-Militaristic Arms.**

Because the district court correctly determined that the firearms and magazines PICA bans are "Arms" under the Second Amendment, the state bore the burden to prove that its sweeping ban on common, non-militaristic arms fits within the Nation's historical tradition of firearm regulation. *See Bruen*, 597 U.S. at 28. The district court correctly concluded that the state failed to satisfy that burden. After conducting an "exhaustive review of the statutes and arguments provided by the Government," the court found that "the nation's history and tradition of firearms regulation does *not* support a statute as far-reaching as PICA." Mot.App.131-57.

The state once again accuses the district court of failing to faithfully follow *Bevis*. Mot.14. But the district court did not depart from *Bevis*'s conclusion that

there is a historical tradition of restricting access to arms that are "used exclusively by the military" or "essentially reserved to the military." 85 F.4th at 1195 n.8, 1199, 1202. It just concluded that PICA does not fit within that tradition because—based on the more fulsome record the parties developed—the arms Illinois has banned do not fit that bill. *See id.* at 1201 ("[W]e find the distinction between military and civilian weaponry to be useful for *Bruen*'s second step, too."). Again, *Bevis* explicitly contemplated that the district court may well reach that conclusion once it had a full record. *See id.* at 1202 (reiterating that "everything we have said … is a preliminary assessment"). The bare fact that the district court did *what this Court expressly contemplated it may do* does not begin to satisfy the state's burden of proving that it is substantially likely to prevail on appeal.

Because the arms Illinois has banned are *not* essentially reserved for the military (and thus not covered by the historical tradition *Bevis* purported to identify in its preliminary review), the state bore the burden of identifying some *other* historical tradition that could justify its law. It failed to do so at trial, and it fails to do so in its motion. The state's reliance on bans on *fully automatic* firearms, Mot.16-17, is misplaced, as *Bevis* concluded only that those laws reflect a tradition of banning arms that are "used exclusively by the military," 85 F.4th at 1199, which the trial court found the arms banned here are not. If anything, *Bevis*'s assessment of those laws only undermines the state's effort to demonstrate a historical tradition of

banning semiautomatic firearms. While many laws restricting *fully automatic* firearms took hold during the Prohibition Era, only a handful of states and D.C. imposed any restrictions on *semi*automatic arms—and most were repealed or replaced with laws regulating only fully automatic machine guns. *See* Dkt.253 pp.78-81.

As for the few laws the state provided that *Bevis* did not already put into the military-use box, the district court explained in detail why they failed to demonstrate a historical tradition that would justify PICA. For example, several of the statutes the state cited were not bans on the "possession of firearms," and thus did not match the mechanics of how PICA burdens the Second Amendment right. Mot.App.149-51; *see also* Dkt.253 pp.83-85. The state's own expert admitted that one regulated only "brandishing," three related only to "sensitive places," and "all the other laws concerned concealed carry," not sale, possession, or even open carry. Dkt.185-4 ¶92 n.127. As to the territorial laws, one "concerned brandishing," and the other two regulated only the "carry of weapons," not their sale or possession. *Id.* ¶92 n.128. The various municipal laws cited likewise did not ban sale or possession. *Id.* ¶93 (listing ordinances "punishing the carrying of concealed weapons"). These laws thus plainly flunk the "how" test.

In short, the district court did not rest its decision on "the *Bevis* dissent" or demand a "dead ringer or a historical twin." Mot.15. On the contrary, the court

trudged through all the historical evidence the state supplied, Mot.App.131-148, and determined that it failed to satisfy the Supreme Court's guiding "how" and "why" inquiries, Mot.App.149-157.  The state identifies no reason to think it is substantially likely to persuade this Court to cast all that detailed analysis aside.

## III. The Remaining Factors Do Not Support Staying The District Court's Injunction Pending Appeal.

As one would expect in a contest between law-abiding citizens' ability to exercise constitutional rights and the state's interest in enforcing a novel restriction on those recently-vindicated rights, the remaining factors strongly favor leaving the district court's injunction—and the status quo that prevailed in Illinois for decades until PICA came along—in place.  Indeed, it is the square law of this Circuit that "[i]nfringements of" "the right to possess firearms for protection" inflict irreparable injury. *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011).  The state argues that those constitutional injuries do not matter because plaintiffs can "obtain a wide range" of other weapons for self-defense.  Mot.19-20.  But the Supreme Court has expressly rejected the argument "that it is permissible to ban the possession of [one type of protected firearm] so long as the possession of other firearms … is allowed." *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008).

The state warns of untold "tragedies" that might befall the public if the district court's injunction is not stayed.  Mot.18-19.  But unlike the state's infringement on plaintiffs' constitutional rights—which is real and ongoing—the state supplies

nothing but conjecture to support its submission that violence and mass shootings would suddenly skyrocket if this Court allows Illinois to return to the status quo that prevailed there for decades. That is unsurprising, as the record evidence demonstrates that the weapons Illinois has chosen to ban are decidedly not the primary tool for criminal misuse or mass shootings. *See, e.g.*, Mot.App.114 ("[T]he use of these weapons in such horrific massacres is the *exception*, not the rule"). The state's bald speculation simply does not suffice to overcome the district court's well-evidenced and well-reasoned judgment. *See, e.g.*, *Ezell*, 651 F.3d at 690 (no relief where "City's claimed harm to the public interest is based entirely on speculation").

Finally, the district court's injunction is not unbounded, as the state suggests. Mot.18-19. It applies only to PICA's enforcement against citizens in Illinois who wish to exercise their Second Amendment rights. *See* Mot.App.160-67. To the extent there is any issue with the clarity of the district court's injunction, that supports only this Court's suggestion for a limited remand so that the district court may explicate its judgment. *See* CA7.Dkt.3. The district court would undoubtedly extend the 30-day stay it has already entered if such a remand were to take place, so that does nothing to show that the equitable factors tilt in favor of granting the state's premature motion for a stay in this Court.

## CONCLUSION

The Court should deny Defendants-Appellants' motion.

Respectfully submitted,

s/Paul D. Clement

ANDREW A. LOTHSON
SWANSON, MARTIN & BELL, LLP
330 N. Wabash, Suite 3300
Chicago, IL 60611
alothson@smbtrials.com

GARY C. PINTER
SWANSON, MARTIN & BELL, LLP
103 W. Vandalia Street, Suite 215
Edwardsville, IL 62025
(618) 655-3131

PAUL D. CLEMENT
ERIN E. MURPHY
MATTHEW D. ROWEN
NICHOLAS A. AQUART[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

[*] Supervised by principals of the firm who are members of the Virginia Bar

*Counsel for Plaintiffs-Appellees Caleb Barnett, et al.*

DAVID G. SIGALE
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547

DAVID H. THOMPSON
PETER A. PATTERSON
WILLIAM V. BERGSTROM
COOPER & KIRK, PLLC
1523 New Hampshire Ave. NW
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601

*Counsel for Plaintiffs-Appellees Dane Harrel, et al.*

MARK L. SHAW, ESQ.
JENNIFER CRAIGMILE NEUBAUER, ESQ.
MICHAEL A. DANFORTH, ESQ.
SHAW LAW LTD.
33 North County Street, Suite 300
Waukegan, Illinois 60085
(T): (847) 244-4696
(F): (847) 244-4673

SEAN A. BRADY, ESQ.
C.D. MICHEL, ESQ.
KONSTADINOS T. MOROS, ESQ.
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802

*Counsel for Plaintiffs-Appellees Federal Firearms Licensees of Illinois, et al.*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1. This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 5,191 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

2. This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

November 27, 2023

<u>s/Paul D. Clement</u>
Paul D. Clement

## CERTIFICATE OF SERVICE

I hereby certify that on November 27, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Paul D. Clement</u>
Paul D. Clement