Nos.  24-3060, 24-3061, 24-3062, 24-3063

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

———————————

**Caleb Barnett, et al.**

*Plaintiffs-Appellees,*

v.

**Kwame Raoul, et al.,**

*Defendants – Appellants.*

———————————

On Appeal from the United States District Court
For the Southern District of Illinois, Case Nos. 3:23-cv-00209-SPM,
3:23-cv-00141-SPM, 3:23-cv-00192-SPM, 3:23-cv-00215-SPM
The Honorable Stephen P. McGlynn

BRIEF OF MARCH FOR OUR LIVES FOUNDATION AS
AMICUS CURIAE IN SUPPORT OF APPELLANTS

Caesar A Tabet
Jordan E. Wilkow (Counsel of Record)
Tabet DiVito & Rothstein LLC, 7th Floor
Chicago, IL 60604
(312) 762-9450
ctabet@tdrlaw.com
jwilkow@tdrlaw.com

*Attorneys for Amicus Curiae*

Save As     Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-3060

Short Caption: Caleb Barnett, et al. v. Kwame Raoul, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

March For Our Lives Foundatioin

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Tabet DiVito & Rothstein LLC

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    None.

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    None.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Jordan E. Wilkow    Date: 05-12-2025

Attorney's Printed Name: Jordan E. Wilkow

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ✔    **No** ☐

Address: 209 S. LaSsalle Street, 7th Floor

Chicago, IL 60604

Phone Number: (312) 762-9463    Fax Number: (312) 762-9451

E-Mail Address: jwilkow@tdrlaw.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-3060

Short Caption: Caleb Barnett, et al. v. Kwame Raoul, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

March For Our Lives Foundatioin

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Tabet DiVito & Rothstein LLC

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

None.

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None.

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Caesar A. Tabet      Date: 05-12-2025

Attorney's Printed Name: Caesar A. Tabet

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: 209 S. LaSsalle Street, 7th Floor

Chicago, IL 60604

Phone Number: (312) 762-9480      Fax Number: (312) 762-9451

E-Mail Address: ctabet@tdrlaw.com

# TABLE OF CONTENTS

TABLE OF POINTS AND AUTHORITIES..................................................ii

INTEREST OF *AMICUS CURIAE* .............................................. 1

ARGUMENT ...................................................................... 3

I.  THE COVERED WEAPONS ARE NOT "ARMS" FOR PURPOSES
    OF THE SECOND AMENDMENT .................................... 3

    A.  Like M16 Machineguns, the Covered Weapons Are Not
    "Arms" under the Second Amendment.................................... 3

    B.  The Legislature Reasonably Disregarded the Immaterial
    Distinctions Between M16s and the Covered Weapons
    Identified by the District Court ................................. 4

    C.  The District Court Misapplied this Court's Precedents to
    Conclude that the Covered Weapons Are in Common Use
    and Therefore Are Not "Military-Grade"................................. 6

    D.  The District Court's Conclusion that the Covered Weapons
    Are "Dual Use" Weapons under *Bevis* Was Legal Error...................... 10

II. EVEN IF THE COVERED WEAPONS ARE "ARMS" UNDER THE SECOND
    AMENDMENT, PICA IS CONSTITUTIONAL BECAUSE IT IS
    CONSISTENT WITH THE HISTORY AND TRADITION OF FIREARMS
    REGULATION IN THIS COUNTRY ............................................ 12

    A.  PICA Satisfies *Bruen*'s "How" Requirement ........................ 12

    B.  PICA Satisfies *Bruen*'s "Why" Requirement ........................ 13

    C.  The District Court Erred in Holding that PICA is Not
    Relevantly Similar to this Country's History and Tradition
    of Firearms Regulation .......................................... 14

III. HIGHLAND PARK, ILLINOIS – JULY 4, 2022 ........................... 17

CONCLUSION.................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bevis v. City of Naperville, Illinois,*
  85 F. 4th 1175 (7th Cir. 2023)........................................................................*passim*

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ............................................................ 9, 11, 14, 19

*Friedman v. City of Highland Park, Illinois,*
  784 F. 3d 406 (7th Cir. 2015) ........................................................*passim*

*Garland v. Cargill,*
  602 U.S. 406 (2024) ....................................................................... 8

*New York State Rifle & Pistol Assoc., Inc. v. Bruen,*
  597 U.S. 1 (2022) ...........................................................................*passim*

*United States v. Rahimi,*
  602 U.S. 680 (2024) .....................................................................*passim*

**Statutes**

18 U.S.C. § 922(g)(8) ..................................................................... 19, 20

Protect Illinois Communities Act, 720 ILCS 5/24-1 ...........................*passim*

National Firearms Act of 1934 ..................................................... 8

## INTEREST OF *AMICUS CURIAE*

*Amicus Curiae* March For Our Lives Foundation ("MFOL") is a non-profit organization of young people from across the country that seeks to promote civic engagement in support of sensible gun regulation and give voice to those who have been harmed by gun violence.[1]  On February 14, 2018, a gunman armed with an AR-15-style assault weapon murdered 17 people at Marjory Stoneman Douglas High School in Parkland, Florida.  Of the 17 killed, 14 were high school students.  MFOL formed in the wake of that tragedy, and it immediately began organizing the largest single day of protest against gun violence in the nation's history.  Seven years later, MFOL has established itself as one of the foremost authorities at the intersection of youth-led activism and advocacy for gun violence prevention, and thousands of young people have formed MFOL chapters across the country, including in Illinois.  In the nationwide effort to enact sensible gun regulation, MFOL serves as a platform for the indispensable voice of the younger generations, and it is a key resource for those who want to see an end to gun violence in this country.

Unlike previous generations, this nation's youth have come of age at a time when mass shootings in presumptively "safe" places are all too common.  Although they did not ask for it, and although no one would have wished it upon them, today's youth have obtained a unique perspective on the tragic scourge of gun violence in this country.  Taking account of their voices and experiences is therefore vital to

---

[1] All of the parties have consented to the filing of this brief.  No counsel for a party authored this brief in whole or in part, and no person or entity, other than *Amicus* and their counsel, has contributed money that was intended to fund preparing or submitting this brief.

1

understanding the unprecedented nature of the problem. As platforms for young people affected by gun violence, *Amicus* is uniquely positioned to provide the Court with this important perspective.

On July 4, 2022, the city of Highland Park, Illinois joined the long list of communities to suffer a mass shooting when a gunman wielding a semi-automatic assault rifle and perched on the roof of a building opened fire on the City's Fourth of July parade. MFOL has reached out to survivors of this tragedy, young people and parents of young children who are grappling with the horrific violence they encountered and struggling to find comfort in what can be done about it. MFOL has conducted extensive interviews, and it has provided a means for these individuals to engage in the civic process and share their experiences.

Informed by these important insights, this brief provides an important and unique perspective on two crucial questions in this appeal. First, are the weapons regulated by the Protect Illinois Communities Act, 720 ILCS 5/24-1 ("PICA"), "Arms" for purposes of the Second Amendment, particularly in view of their shared characteristics with the military's constitutionally regulated M16 machineguns? And second, is the regulation imposed by PICA relevantly similar to the history and tradition of firearms regulation in this country with respect to "how" and "why" it burdens law-abiding citizens' right to armed self-defense?

*Amicus* MFOL respectfully submits that its perspective, as shaped by these young Highland Park citizens' stories, will inform the Court's analysis and assist in its determination of PICA's constitutionality.

2

**ARGUMENT**

The District Court held that the weapons covered by PICA are "Arms" for purposes of the Second Amendment, that the restriction imposed by PICA is not consistent with this country's historical tradition of firearms regulation, and that PICA is therefore unconstitutional. For the reasons set forth below, the District Court's holdings were incorrect as a matter of law, and the judgment of the District Court should be reversed.

## I. THE COVERED WEAPONS ARE NOT "ARMS" FOR PURPOSES OF THE SECOND AMENDMENT.

### A. Like M16 Machineguns, the Covered Weapons Are Not "Arms" under the Second Amendment.

As this Court observed in its opinion reversing the District Court's order granting Plaintiffs' motion for a preliminary injunction, it is well-settled that it is constitutional for legislatures to reserve to the military the M16 machinegun, and that such weapons therefore are not "Arms" protected by the Second Amendment. *Bevis v. City of Naperville, Illinois*, 85 F. 4th 1175, 1193 (7th Cir. 2023) (citing *District of Columbia v. Heller*, 554 U.S. 570, 624 (2008)); *see also Friedman v. City of Highland Park, Illinois*, 784 F. 3d 406, 407-08 (7th Cir. 2015). That is a critical point because, as this Court has already preliminarily held, the AR-15s and AK-47s covered by PICA are materially indistinct from the military's M16s.

Specifically, and as detailed below, (*infra*, 17-26), M16s and the covered weapons are both equally capable of creating the battlefield carnage that occurred in Highland Park, Illinois on July 4, 2022. They both enable catastrophic injury to large

numbers of people in just moments, overwhelming emergency medical response with widespread, devastating casualties as one would expect to find in a war zone. (*Id.*)

That is no surprise, considering that M16s and the covered weapons both: (i) fire the same size ammunition; (ii) have the same wounding capacity; (iii) have the same range and penetration capability; (iv) function identically in semiautomatic mode, including with the same muzzle velocity, rate of fire, and accuracy; (v) share the same core design; and (vi) rely on the same patented operating system. (SA95-96, 107-08.) *See also Bevis*, 85 F. 4th at 1195-96.

In sum, as this Court held at the preliminary injunction stage, because the covered weapons are materially indistinct from the M16, they too are not "Arms" for purposes of the Second Amendment. *Id.* at 1195-97 (citing *Heller*, 554 U.S. at 624). They are therefore beyond the reach of the Second Amendment, and they may be constitutionally regulated. *Id.*

## B. The Legislature Reasonably Disregarded the Immaterial Distinctions Between M16s and the Covered Weapons Identified by the District Court.

To hold otherwise, the District Court relies on two purportedly relevant distinctions between M16s and the covered weapons: (1) M16s are capable of automatic fire and the covered weapons are not; and (2) M16s are subject to more exacting procurement and quality assurance standards than weapons (like the covered weapons) available in the civilian market. (SA108-11.) In fact, and as evidenced by Highland Park's experience, (*infra*, 17), neither distinction is relevant.

It is undisputed that M16s are rarely – if ever – operated in "automatic mode." (SA107-08.) The District Court's analysis thus holds that two virtually

indistinguishable weapons – identical in their ability to create the devastation noted above and described below – are nevertheless treated entirely differently by the Second Amendment: the People may properly vote to regulate the use of one, but not the other.  And why?  The District Court's implausible answer is that one possesses a single, rarely used feature that the other does not.  (SA108.)  Indeed, even more implausible is the District Court's conclusion that only the weapon that is subject to *more* rigorous quality control standards may be restricted.  (SA110.)

At bottom, it cannot be that, for an M16 to gain the benefit of full Second Amendment protection, one need only remove a single rarely used feature and build it more cheaply.  On its face, it was reasonable for the legislature to discount these two distinctions as immaterial, and conclude instead that the material considerations are the many other bases on which the two weapons are similar – in particular, their shared capacity to cause catastrophic injury to large numbers of people in just moments, so as to overwhelm any emergency medical response.  (*See supra*, 3-4; *infra*, 17.)  *See Bevis*, 85 F. 4th at 1195 ("the legislature was entitled to conclude" that AR-15s "are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense"). [2]

---

[2] Citing to the Supreme Court's decision in *Garland v. Cargill*, 602 U.S. 406, 415 (2024), the District Court also held that "an AR-15 categorically *cannot* be a machinegun." (SA108.)  But *Cargill* was a statutory – not a constitutional – case, *Cargill*, 602 U.S. at 410, and whether the AR-15 is a "machinegun" under the National Firearms Act of 1934 is plainly not the issue here.  The question is whether a legislature could reasonably conclude that the AR-15 is sufficiently similar to a machinegun such that, like machineguns, AR-15s can also be regulated consistent with the Second Amendment.  *See Bevis*, 85 F. 4th at 1195.

5

**C.    The District Court Misapplied this Court's Precedents to Conclude that the Covered Weapons Are in Common Use and Therefore Are Not "Military-Grade."**

Nevertheless, the District Court concluded that AR-15s *must* be materially distinct from M16s because "the only way to square the military-grade exception in *Friedman* with the 'common use' requirement in *Bruen*" is "a determination that, [unlike M16s], the semiautomatic AR-15 rifle available for purchase by civilians is, by design and clear definition, *not* a 'military-grade' weapon." (SA111.)  *See also New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 597 U.S. 1, 21 (2022); *Friedman*, 784 F. 3d at 409.  In other words, because, in the District Court's estimation, AR-15s and the like satisfy *Bruen*'s "common use" requirement, (SA100-02), they are protected by the Second Amendment and therefore do not (*cannot*) join M16s in what the District Court called "the military-grade exception in *Friedman*[.]" [3]  (SA111.)

But the purported tension between *Bruen* and *Friedman* identified by the District Court derives solely from the District Court's faulty "common use" analysis. (*See* SA100-02.)  Indeed, in holding that the covered weapons are "in common use," the District Court employed the very same circular reasoning that this Court has repeatedly warned against, first in *Friedman* itself, and then again in this case at the preliminary injunction stage.  *Friedman*, 784 F. 3d at 409; *Bevis*, 85 F. 4th at 1190, 1198.

---

[3] It is more accurate to attribute the existence of this "exception" to *Heller*, where *Friedman* located it.  *See Friedman*, 784 F. 3d at 407-08 (citing *Heller*, 554 U.S. at 624-25).

6

As this Court has held, to determine whether a given weapon is in "common use" for purposes of Second Amendment analysis, "the relevant question is what are the modern analogues to the weapons people [commonly] used for individual self-defense in 1791, and perhaps as late as 1868." *Bevis*, 85 F. 4th at 1199. Such "modern analogues" are the weapons that satisfy the "common use requirement." *Id*. And AR-15s, like the military's constitutionally regulated M16, with their shared ammunition, wounding capacity, range and penetration capability, rate of fire, and capacity to create the battlefield devastation witnessed in Highland Park, (SA95-96, 107-08; *infra* 17-26), plainly are *not* "the modern analogues" to the muskets or Colt revolvers that people commonly used for self-defense in 1791 or 1868 respectively. *Bevis*, 85 F. 4th at 1199. Under *Bevis*, the covered weapons are not in "common use."[4]

The District Court concluded that the covered weapons *are* in "common use," and therefore distinct from M16s. (SA100-02.) But the District Court's analysis was premised on its belief that whether weapons are in "common use" under *Bruen* turns on whether the weapons are commonly used now, at the time of litigation. As this Court has made clear, that is tautological because, on that reasoning, the ban under review may cause the weapon to fail the "common use" requirement simply by removing it from the market, and "it would be absurd to say that the reason why a

---

[4] As this Court observed, "[t]here is no consensus on whether the common-use issue belongs" as part of the "Arms" analysis or the "history and tradition" analysis. *Bevis*, 85 F. 4th at 1198. This Court assumed without deciding that it is part of the "history and tradition" analysis, *id*.; the District Court placed it in its "Arms" analysis, (SA100-02).

particular weapon can be banned is that there is a statute banning it[.]" *Friedman*, 784 F. 3d at 409; *Bevis*, 85 F. 4th at 1190, 1198.

To illustrate, consider that, while there is no dispute that the Constitution permits restriction of military weapons, all are also agreed that it does not *require* restriction of military weapons. Under *Heller*, regulation of such weapons is simply a constitutionally permissible option. With that point in mind, suppose a new "military" weapon is introduced to the civilian market, and the legislature, having no obligation to do otherwise, does not immediately move to restrict the public's access to it. *Cf. Bevis*, 85 F. 4th at 1198. Following its introduction into the market, many such weapons are then purchased by law-abiding citizens for self-defense. On the District Court's understanding, that would satisfy *Bruen*'s "common use" requirement, the "military-grade exception" could not apply, and the weapons would enjoy Second Amendment protection.

But that cannot be right because, on that view, the very same weapons were *not* protected by the Second Amendment at the time they were introduced to the market, at which point the common use requirement was not (yet) satisfied and, apparently, the "military-grade exception" *would* apply. Whether a weapon falls within the scope of Second Amendment protection cannot turn simply on whether and when a legislature has seen fit to restrict access to it. *See Friedman*, 784 F. 3d at 409; *Bevis*, 85 F. 4th at 1198-99. Functionally, that would inject a "use it or lose it" element into legislatures' authority under the Second Amendment that would incentivize hasty, overinclusive regulation lest the opportunity to regulate be lost

8

forever – plainly at odds with the Second Amendment's fundamental purpose. *Cf.*
*United States v. Rahimi*, 602 U.S. 680, 739-40 (2024) (Barrett, J., concurring) (it is a
mistake to "assume that founding-era legislatures maximally exercised their power
to regulate, thereby adopting a "use it or lose it" view of legislative authority").

To the contrary, as this Court has made clear, whether AR-15s and the like
satisfy the "common use requirement" for purposes of Second Amendment analysis
has little to do with whether they are commonly and lawfully used at the time of
litigation, which is in large part merely a function of when the restriction was enacted
relative to when the weapons became publicly available. *Bevis*, 85 F. 4th at 1199; *see*
*also Friedman*, 784 F. 3d at 409. Rather, "the idea of 'common use' cannot be severed
from the historical scope of the common-law right that the Second Amendment was
designed to protect against encroachment." *Bevis*, 85 F. 4th at 1199. Therefore, as
noted above, "the relevant question is what are the modern analogues to the weapons
people [commonly] used for individual self-defense in 1791, and perhaps as late as
1868." *Id. Those* are the weapons that satisfy the "common use requirement."

The difficulty that the District Court had "squar[ing] the military-grade
exception in *Friedman* with the 'common use' requirement in *Bruen*" (such that it had
no choice but to conclude that, unlike M16s, AR-15s are not military-grade), (SA111),
derives solely from its having ignored this critical point in its "common use" analysis.
(*See* SA100-02.) But on the proper analysis set forth above, the covered weapons, like
the military's M16s, are *not* in "common use," they *are* "military-grade," and they are
beyond the scope of the Second Amendment's protection. There is no tension between

*Friedman*'s "military-grade exception" and *Bruen*'s "common use requirement," particularly as applied to the covered weapons.

### D.    The District Court's Conclusion that the Covered Weapons Are "Dual Use" Weapons under *Bevis* Was Legal Error.

Next, the District Court also reasoned that, even if the covered weapons and M16s *are* materially indistinct, AR-15s are still "useful for civilian offensive or defensive use in confrontation[.]" (SA112-13.)  Seizing on a footnote in this Court's decision at the preliminary injunction stage, the District Court concluded that the covered weapons are therefore still protected by the Second Amendment as "dual use" weapons. (*Id.* (citing *Bevis*, 85 F. 4th at 1198, n. 8).)  This analysis too is plainly flawed.

First, there is no basis for the District Court's conclusion that a weapon that is "reserved to the military" and not protected by the Second Amendment can gain Second Amendment protection as a "dual use" weapon simply because, in a court's judgment, it is also "useful for civilian offensive or defensive use in confrontation." (*See* SA112-13.)  This Court certainly held no such thing.  The "dual use" footnote, on which the District Court places so much weight, states only that some weapons that are *not* essentially reserved to the military may be "dual use," in that "private parties have a constitutionally protected right to 'keep and bear' them and the military [also] provides them to its forces."  *Bevis*, 85 F. 4th at 1198, n. 8.  Indeed, this Court expressly distinguished such "dual use" weapons from those weapons "that may be essentially reserved to the military."  *Id.*

The District Court's contention that, where a given weapon *is* essentially reserved to the military, a legislature can nevertheless lose the ability to constitutionally regulate it if a court determines the weapon is also "useful for civilian offensive or defensive use in confrontation" turns the reasoning in Footnote 8 on its head.  Nothing in this Court's opinion at the preliminary injunction stage, (in Footnote 8 or elsewhere), supports the District Court's analysis.

Second, under the District Court's reasoning, it would be difficult to escape the conclusion that the M16 must also be a "dual use" weapon, and that, *contra Heller*, 554 U.S. at 624, it therefore enjoys Second Amendment protection as well.  Indeed, the M16 possesses the very same attributes that led the District Court to conclude that the AR-15 is "useful for civilian offensive or defensive use in confrontation." (SA112-13; *see also* S95-96, 107-08.)  *See also Bevis*, 85 F. 4th at 1195-96.  The only distinctions are that it also includes an automatic fire *option*, and that its production is subject to more exacting quality control standards.  Plainly, neither distinction undermines the weapon's usefulness for civilian offensive or defensive confrontation. Yet we know that the M16 is beyond Second Amendment protection.  *Bevis*, 85 F. 4th at 1193 (citing *Heller*, 554 U.S. at 624).  Once again, the answer, as is clear on the face of Footnote 8, is that the category of "dual use" weapons definitionally *excludes* weapons essentially reserved to the military.  *Bevis*, 85 F. 4th at 1198, n. 8.  That means M16s (and materially indistinct AR-15s) are not dual use weapons, and the fact that they may also be useful for "civilian offensive or defensive confrontation" is irrelevant.  *See Bevis*, 85 F. 4th at 1198 ("[h]owever popular machineguns might have

11

been…because their characteristics were military in nature, the decision to reserve them to military use was within the power of the legislature").

For all of these reasons, the District Court erred in holding that the covered weapons are "Arms" within the meaning of the Second Amendment.

## II. EVEN IF THE COVERED WEAPONS ARE "ARMS" UNDER THE SECOND AMENDMENT, PICA IS CONSTITUTIONAL BECAUSE IT IS CONSISTENT WITH THE HISTORY AND TRADITION OF FIREARMS REGULATION IN THIS COUNTRY.

As this Court recognized, *Bruen* made clear that even "Arms" under the Second Amendment may be regulated, "as long as the regulation is 'part of an enduring American tradition of state regulation' [of firearms]." *Bevis*, 85 F. 4th at 1199 (citing *Bruen*, 597 U.S. at 69). To determine whether a given regulation satisfies this requirement, *Bruen* instructs courts to assess "how" the regulation "burden[s] a law-abiding citizen's right to armed self-defense," and "why" the regulation does so, and to then compare that to how and why regulations at the time of the Founding and throughout our nation's history burdened the same right. *Bevis*, 85 F. 4th at 1199 (citing *Bruen*, 597 U.S. at 29). Here, it is clear that PICA is consistent with this country's history and tradition of firearms regulation, that it is therefore a constitutional restriction on firearms, and that the District Court erred in holding otherwise.

### A.    PICA Satisfies *Bruen*'s "How" Requirement.

How does PICA burden the right to armed self-defense? First, with respect to the millions of law-abiding citizens who already own one or more of the covered weapons, the answer is "not at all." These citizens are entitled to continue possessing

12

the covered weapons, "subject only to a registration requirement that is no more onerous than many found in history." *Bevis*, 85 F. 4th at 1199. Nothing in the record demonstrates that this requirement in any way limits or otherwise burdens these citizens' ability to use the weapon for self-defense.

Nor does PICA burden in any way the right to armed self-defense of any of the many law-abiding citizens described by the Act as "trained professionals," to whom its restrictions do not apply. These individuals include peace officers, qualified active and retired law enforcement officers, prison wardens, members of the Armed Services, Reserves, or Illinois National Guard, nuclear facility guards, and licensed private security personnel. *Id*. at 1183 (citing 720 ILCS 5/24-1.9(e)). PICA does not burden these individuals' right to armed self-defense whether or not they owned a covered weapon prior to its enactment.

PICA burdens other law-abiding citizens' right to armed self-defense only by preventing them from defending themselves with the particular weapons covered by the statute – "militaristic" weapons that are uniquely capable of creating the battlefield carnage described below. (*Infra*, 17-26.) And as this Court demonstrated, there is a long history and tradition in this country of regulations that burden law-abiding citizens' right to armed self-defense by limiting their ability to defend themselves with "especially dangerous weapons of the time," and instead reserving those weapons to the military. *Bevis*, 85 F. 4th at 1199, 1201.

## B.    PICA Satisfies *Bruen*'s "Why" Requirement.

Why does PICA burden the right to armed self-defense? As this Court concluded, to the limited extent PICA burdens law-abiding citizens' right to armed

self-defense, it does so "to protect Illinois communities." *Id.* at 1200. And this Court demonstrated that there is a long history and tradition in this country of legislatures burdening law-abiding citizens' right to armed self-defense by reserving especially dangerous weapons to the military for the sake of protecting their communities. *Id.* at 1201.

### C. The District Court Erred in Holding that PICA is Not Relevantly Similar to this Country's History and Tradition of Firearms Regulation.

The District Court appeared to allow that PICA satisfies the "why" test as to whether the regulation is "part of an enduring American tradition of state regulation" of firearms. (SA153 (acknowledging that PICA, like the long tradition of Arms regulations in this country, was "clearly" enacted to "prevent[] death or injury from firearms").) But the District Court rejected this Court's preliminary holding that PICA also satisfies the "how" test. The rigid analysis that the District Court applied to reach this conclusion, however, was specifically rejected by the Supreme Court in *Rahimi*. *Rahimi*, 602 U.S. at 700-01. Indeed, the District Court's analysis aligns squarely with the analysis of the lone dissent in *Rahimi*, who the 8-justice majority held had mistakenly read *Bruen* to "require a historical twin rather than a historical analogue." *Id.* at 701 (internal quotations omitted).

Here, for example, the District Court concluded that burdening the right to armed self-defense by restricting the *possession* of certain weapons (as does PICA) is not "relevantly similar," *see id.* at 692, to a historical tradition of burdening the right to armed self-defense by restricting the *discharge* of certain weapons. (SA151-53.) But why? The District Court does not say. (*See id.*)

14

In practice, both regulations constrain the ability to defend oneself with a covered weapon to the same extent. Surely it would be cold comfort for a law-abiding citizen who wishes to use an AR-15 for self-defense to be told that he or she may possess the weapon, but may not fire it. Whether achieving the goal by restricting the ability to "possess" the firearm or restricting the ability to "use" it, there is a common tradition of limiting the right to defend oneself with especially dangerous weapons in an effort to keep communities safe. To be sure, a restriction on possessing a weapon is "by no means identical" to a restriction on discharging a weapon, but as *Rahimi* made clear, "it does not need to be." *Rahimi*, 602 U.S. at 698.

Similarly, the District Court discounts the numerous analogous regulations cited by the government because only 4% of the regulations "entirely restricted the sale and/or possession of entire classes of weapons." (SA151-52.) But why should it be that only regulations that "entirely" restrict an "entire" class of weapon are relevant? Indeed, PICA itself does not entirely restrict the sale and/or possession of entire classes of weapons. The sub-class of covered weapons that are already in the possession of law-abiding citizens (apparently numbering in the millions) is not restricted by PICA at all. Neither is the sub-class of covered weapons that are currently owned (or will be owned in the future) by the many individuals described as "trained professionals" and noted above. (*Supra*, 13.)

Notably, in requiring so tight a fit between PICA and the country's historical tradition of Arms regulation, the District Court employs the analysis urged by the *dissent* in *Rahimi* and *rejected* by the Court. *See Rahimi*, 602 U.S. at 753 (Thomas,

15

J., dissenting).  (*See* SA151-53; *see also* SA19-45 (detailing the analyses of dissenting opinions in *Heller* and *Bruen* and disapproving of any reliance on such analyses as having been rejected by the Court).  In *Rahimi*, the Court held that historical surety and "going armed" laws established a tradition in this country of burdening the right to self-defense of individuals who "pose a clear threat of physical violence to another" by disarming the "threatening individual."  *Rahimi*, 602 U.S. at 698.  The Court held that the challenged statute, 18 U.S.C. § 922(g)(8), (which imposed a "prohibition on the possession of firearms by those found by a court to present a threat to others"), "fits neatly within the tradition the surety and going armed laws represent."  *Id*.

Importantly, the Court came to this conclusion despite the fact that the statute under review was "by no means identical to these founding era regimes[.]"  *Id*.  In other words, *notwithstanding* that "[s]urety laws were, in a nutshell, a fine on certain behavior [and] imposed a far less onerous burden" than Section 922(g)(8), *see id*. at 753 (Thomas, J., dissenting), the Court concluded that they were still "relevantly similar" to the statute.  *Id*. at 698.  And *notwithstanding* that going armed laws prohibited "only carrying certain weapons" in "a particular manner" and in "particular places," while Section 922(g)(8) prevented "a covered person from carrying any firearm…in any manner, in any place, at any time, and for any reason," *see id*. at 770 (Thomas, J., dissenting), the Court, again, concluded that they were still "relevantly similar" to the statute.  *Id*. at 698.

It is just so here.  Only by insisting on the more rigid analysis and tighter level of generality employed by the dissent and *rejected* by the Court in *Rahimi* can the

District Court dismiss as insufficiently similar the historical regulations identified by the Government and by this Court in its ruling at the preliminary injunction stage. Historical restrictions on the discharge of certain weapons are no less relevantly similar to the restriction in PICA than historical surety and going armed laws are relevantly similar to Section 922(g)(8) in *Rahimi*. The District Court's analysis mistakenly required a "historical twin" to save PICA, and it is was error to hold that PICA is unconstitutional on that basis.

* * *

In sum, there is no dispute that the military's M16 machineguns are not "Arms" within the meaning of the Second Amendment. The weapons at issue here are materially indistinct, and therefore they are not "Arms" either. But even if they were, there is a long history and tradition in this country of burdening law-abiding citizens' right to armed self-defense by limiting their ability to defend themselves with such weapons for the purpose of reducing the likelihood of tragedies like that visited upon Highland Park. Consistent with this Court's preliminary conclusion, PICA does not offend the Second Amendment, and the decision below should be reversed.

## IV.   HIGHLAND PARK, ILLINOIS – JULY 4, 2022.

As set forth above, two critical points in assessing PICA's constitutionality are: (i) the extent to which covered weapons such as AR-15s are materially indistinct from constitutionally regulated weapons such as the military's M16s; and (ii) the extent to which the covered weapons are "especially dangerous." *Amicus* submits that

consideration of the mass shooting that occurred in Highland Park, Illinois on July 4, 2022, helpfully informs that analysis. It makes plain the battlefield devastation that AR-15-style semi-automatic weapons (used by the shooter that day) are capable of creating. With their common ammunition, penetration and wounding capacity, range, rate of fire and accuracy, AR-15s and the military's M16s are both "especially dangerous," and equally capable of causing catastrophic injury to large numbers of people in just moments, overwhelming emergency medical response with widespread, devastating casualties as one would expect to find in a war zone. With this object in mind, *Amicus* respectfully shares the experiences of 12 citizens of Highland Park, Illinois, on July 4, 2022.

**Samantha (Sammi) Verhey, 35**. Sammi Verhey grew up in Highland Park, and, after moving away for a short time, returned with her husband, Max, and their four-year-old daughter and one-year-old son to raise their family there. Attending Highland Park's Fourth of July parade was one of her childhood family traditions, and, with the parade having been suspended for the prior two years due to the COVID pandemic, July 4, 2022 was her first opportunity to resume that family tradition with her own children. Their son and daughter would participate in the children's "pre-parade"—Sammi spent weeks tailoring their costumes—and her parents, Kris and Wayne, would join them as well.

**Abby Kisicki, 23**. Highland Park native Abby Kisicki has feared the possibility of encountering a mass shooting for as long as she can remember. She and her twin sister, Carrie, attended Highland Park's Fourth of July parade as children;

their favorite spot was by the train tracks, and they would collect candy and chip clips from friendly local businesses.  On the morning of July 4, 2022, Abby did not particularly feel like going to the parade.  Ultimately, though, she decided to join her mother, Nancy, and her father, Mark, to take in the festivities.  Rather than settle in near the train tracks, they broke with their family tradition and found a place near the middle of Port Clinton Square.  The parade's vulnerability to a mass shooting crossed her mind, but that was not uncommon for her.

**Shane Selig, 30**.  Shane Selig grew up about 30 minutes south of Highland Park in Chicago, and he moved to Highland Park in March 2021.  It was the first time he lived somewhere where he did not feel compelled to keep his garage door closed and his doors locked.  Because his mother had lived in Highland Park before he did, Shane had relationships with the community before moving to town.  These included joining the City's volunteer Community Emergency Response Team ("CERT"), and volunteering as a CERT member at prior Highland Park Fourth of July parades.  He was on duty as a CERT member on July 4, 2022, his first activation in two years.  Riding his bike to the parade that morning, Shane expected to assist in ways typical of his past experiences as a CERT member: controlling the crowd, handing out band-aids, and making sure children did not dart out in front of the parade line.

**Ashbey Beasley, 46**.  Ashbey Beasley moved to Highland Park in 2017, right after her six-year-old son was born.  One of her favorite things about Highland Park is the community events, and she believes its Fourth of July parade is one of its best.  On July 4, 2022, though, she was having a hard time getting the rest of her family

excited for the day.  Her husband would opt out, and her son was not interested.

Despite his protests, however, Ashbey ultimately insisted that her son accompany

her to town, wanting him to have his first opportunity to walk in the parade and pass

out candy to his friends.  She was confident that he would love it.

### July 4, 2022 – 10:14 a.m.

When Sammi first heard a rapid series of loud pops, she did not know what to

make of it.  She remembers thinking that fireworks in the middle of the day did not

make sense.  Then she saw a look of horror on the face of a woman standing on the

corner of Central Avenue and Second Street.  She immediately knew that there was

grave danger, and that she and her family had to get out.

Abby was just getting settled at the parade when she first heard a wave of loud

pops.  She assumed it was the sound of Navy reenactors firing blanks into the air, a

feature of the parade in years past.  But then she heard a second wave of pops, and

she saw people begin to run.  At that point for her, the world went silent.

Shane was riding his bike west on Central Avenue when he heard what he

thought was a car backfiring or a firecracker.  Turning his bike around toward the

noise, he saw someone fall to the ground in obvious distress.  He quickly abandoned

his bike and started running in that direction.  As he got closer, he saw that the

person was bleeding.  Then he saw that brain matter was coming out of the person's

head.  Before he could process what was in front of him, he became conscious of more

victims around him, the rapid loud pops continuing.

Ashbey and her son were set to begin walking in the parade when she became

confused by the sound of fireworks in the middle of the day.  Then she saw the entire high school football team sprinting toward her, in the opposite direction of the parade route.  And then she heard screaming.  She saw mothers and fathers pulling and holding young children, frantically running toward her.  She heard someone yell, "There's been a shooting!"  And she and her son began to run too.

Struggling to get away from the frenzied crowd amid the incessant pops, Sammi had not only their two children to account for, but also her elderly parents.  Fortunately, their son was still in his stroller, and she began running with it as fast as she could.  Max grabbed their daughter's arm and followed, but they were outpacing Sammi's parents, and the gap between them quickly widened.

Abby started to run as fast as she could.  She remembers thinking, "I have to run," repeatedly as she sprinted through the throughway behind where she was sitting and past a pediatrician's office.  She tripped down some steps and scraped her knee, but she picked herself up and kept running.

Shane was aware that the police were focused on finding the shooter, and the firefighters were struggling to get through the crowd.  Then he realized that he and the other CERT members were the only emergency response officials immediately available to assist people in need of medical attention.  He had been given a first-aid kit with three pieces of gauze in it.

Ashbey's only thought now was getting home.  They lived nearby, but home was toward the shooting.  Running through the crowd with her son, they saw adult men falling to the ground, tripping in panic and fear.  They saw other adults sobbing

hysterically, and they heard panicked voices yelling about the number of shooters, that the shooter had been caught, and that the shooter was coming.

Sammi remembers a brief and welcome respite when the rapid pops suddenly stopped. She immediately felt relief and was able to regain her focus, thinking she and her family were finally safe. She started to double back to collect her mother and her father, and then the rapid pops resumed. She later learned that the shooter had just emptied one 30-round magazine, pausing briefly to load another.

Reaching First Street, Abby saw streams of people running, holding children's hands and pushing strollers. Most striking to her was that the crowd of fleeing, frightened people was full of people she knew – she saw friends, neighbors, and acquaintances, and they all looked shell-shocked or stricken. As she turned down First Street, she realized that her mother and father had not kept up and were no longer with her.

A man approached Shane with a huge red spot on his shirt – he had been shot. Shane pulled him down to the ground, and he did what he could to stop the bleeding with his bare hands, placing his fingers so deep into the wound that he could feel the man's heart. To one side, another man had been shot in the leg, and Shane began cutting off clothing to use as a tourniquet to stop the bleeding. The man's mother asked if her son's life was at risk because her daughter had also been shot, and she was running between them. Shane began to administer CPR to yet another victim, and he remembers that a police officer held a riot shield over Shane's head in an effort to protect him from any further gunfire.

Ashbey could see that fear and panic was beginning to overcome her six-year-old son. He stopped running and laid himself out on the ground, and Ashbey heard him pleading not to die. She crouched down and asked him over and over to get up and promised to keep him safe. When her son finally did get up, he began to jump up and down yelling, "I don't want to die!"

By now, Max had run ahead of Sammi with their daughter, west on Central Avenue. She saw them run into a gas station, and she followed with her son and her mother. Leaving them with Max, Sammi ran back out to assist her father, who by then was just reaching the parking lot. Sammi and her family would remain in the gas station for the next two hours, unsure whether sitting or fleeing was the safer option.

Running down First Street, Abby finally crouched down at the corner of First and Laurel Avenue to take a break. She was breathing hard, suddenly conscious that she had been running for her life. At that point she found some close family friends who brought her along with them to seek shelter. Finally safe, she was able to reach her mother by phone and learned that her mother was no longer in harm's way, but her father was missing.

Shane came across a woman lying on the ground. A bullet's entrance wound in her clavicle was small, but he found that the internal damage it caused was catastrophic. Finding a diaper bag that had been left behind, Shane quickly looked for something to use to stop the bleeding. But as a firefighter handed him a stack of triage cards, Shane knew that she could no longer be helped. He had to stop other

23

people, who Shane later learned were members of the woman's family, from continuing to attempt to resuscitate her.

When Ashbey and her son finally met Ashbey's husband and got into his car, she heard her son let out a gut-wrenching scream, and he collapsed in the back seat. When they returned home, her son slammed the door and said, "I'm never going to a parade again!" Ashbey saw her husband start to sob on the driveway.

In less than 90 seconds, 83 shots were fired into the crowd from a semi-automatic assault rifle. The shooter had to pause to reload his weapon only twice. Seven people were killed, 48 more were injured. Hundreds of lives were irreparably harmed and changed forever.

## Aftermath

Sammi has remained on edge since July 4, particularly when at public gatherings. Her four-year-old has suffered from severe separation anxiety and is in counseling. Sammi prays that her 1-year-old was not traumatized, but realizes they will not know for some time. She is deeply troubled by the seemingly unprecedented nature of the threat of mass shootings, and she believes that the nature of the shooter's weapon enabled much of the devastation that was caused that day. She takes great comfort in knowing that the people in her state responded to this threat by banning the sale and possession of such weapons in Illinois. *See Friedman v. City of Highland Park, Illinois*, 784 F. 3d 406, 412 (2015) ("[i]f a ban on semiautomatic guns and large-capacity magazines reduces the perceived risk from a mass shooting, and makes the public feel safer as a result, that's a substantial benefit").

Abby frequently thinks of what she witnessed on July 4. Her father turned up safe and uninjured – she later learned that he had run back toward the shooting when he realized that Abby was not with them, terrified that he would find her injured there. But Abby often finds herself imagining alternative realities in which her parents had been fatally harmed. She feels outrage at the scale and speed with which the shooter was able to indiscriminately take so many innocent lives. She is fiercely proud of her state's assault weapons ban, and would feel profound hurt, vulnerability, sadness, and loss if it were no longer enforced. *See id*.

Shane was alarmed to learn that the shooter lived near him, at the same cross streets. He continues to experience episodes of profound sadness over the enormity of the event and the loss of life. A single shooter was able to create a war zone in just seconds. He saw dozens of people injured in the blink of an eye, immediately overwhelming any reasonable emergency medical response. The injuries he saw the weapon cause, moreover, were not merely debilitating – they were catastrophic. Were PICA enjoined, he would feel less safe, as if the community were being forced to tempt fate and invite another tragedy. *See id*.

Ashbey and her son have been deeply impacted by the trauma they experienced on July 4. On one occasion, her son told Ashbey that his "head hurt because it was so full of thoughts" and then immediately vomited. Her son says he feels "really sad" and "angry" whenever he thinks about the parade, and Ashbey fears for her son's recovery from the trauma. Ashbey herself is struggling, finding that she now scans rooftops and looks for exits while out in public. She believes the threat of mass

25

shootings is unlike anything her parents or grandparents had to confront, and that serious action is required from the government to address it. Ashbey takes comfort in the fact that the people of her state chose to limit access to assault weapons and high-capacity magazines, and she has discussed the significance of the law with her son. Were enforcement of the law suspended, she would feel less safe, and enjoining the law now, of all times, would feel to her like a slap in the face. *See id*.

* * *

Particularly in the face of the war zone-like carnage described above, it was plainly reasonable for the legislature to discount any formal distinctions between the covered weapons and constitutionally regulated M16s as immaterial, and to conclude instead that the material considerations are their shared capacity to create such devastating, widespread harm in so little time. And it was plainly reasonable for the legislature to then conclude on that basis that the covered weapons "are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for self-defense." *See Bevis*, 85 F. 4th at 1195. It was also plainly reasonable for the legislature to conclude that AR-15s and the like are "especially dangerous weapons." Whether because the covered weapons are not "Arms" under the Second Amendment, or because the legislature took action that is consistent with the country's tradition of limiting public access to especially dangerous weapons, PICA does not violate the Second Amendment, and the decision below should be reversed.

26

## **CONCLUSION**

For the foregoing reasons, this Court should reverse the judgment of the District Court.

Dated: May 12, 2025                    Respectfully submitted,

**MARCH FOR OUR LIVES FOUNDATION**

*/s/  Jordan E. Wilkow*
Caesar A. Tabet
Jordan E. Wilkow
TABET DIVITO & ROTHSTEIN LLC
209 S. LaSalle St., 7th Floor
Chicago, IL 60604
(312) 762-9450
ctabet@tdrlaw.com
jwilkow@tdrlaw.com

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32 because this document contains 7,550 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 12-point Century Schoolbook style font.

Dated: May 12, 2025

/s/  *Jordan E. Wilkow*

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2025, the brief of *amicus curiae* March For Our Lives Foundation was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: May 12, 2025                    Respectfully submitted,

                                        /s/  *Jordan E. Wilkow*