Nos. 24-3060, 24-3061, 24-3062, 24-3063 (consol.)

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

CALEB BARNETT, BRIAN NORMAN,
HOOD'S GUNS & MORE, PRO GUN
AND INDOOR RANGE, and NATIONAL
SHOOTING SPORTS FOUNDATION, INC.,

Plaintiffs-Appellees,

v.

KWAME RAOUL, Attorney General of the
State of Illinois, and BRENDAN F. KELLY,
Director of the Illinois State Police,

Defendants-Appellants.

Appeal from the United States District Court
for the Southern District of Illinois,
Case Nos. 3:23-cv-00209-SPM, 3:23-cv-00141-SPM,
3:23-cv-00192-SPM, 3:23-cv-00215-SPM
Hon. Stephen P. McGlynn, Judge Presiding

————

**BRIEF OF THE CITY OF CHICAGO AS *AMICUS CURIAE***
**IN SUPPORT OF APPELLANTS AND REVERSAL**

————

Mary B. Richardson-Lowry
Corporation Counsel
 of the City of Chicago
2 N. LaSalle Street, Suite 580
Chicago, Illinois 60602
(312) 744-3173

MYRIAM ZRECZNY KASPER
 Deputy Corporation Counsel
SUZANNE LOOSE
 Chief Assistant Corporation Counsel
ELIZABETH MARY TISHER
 Assistant Corporation Counsel

# TABLE OF CONTENTS

———

                                                                        **Page**

**TABLE OF AUTHORITIES** ........................................................................... ii

**STATEMENT OF INTEREST OF THE *AMICUS CURIAE*** .................................. 1

**ARGUMENT** ............................................................................................. 2

**I.**    **Assault Weapons and LCMs Are Not Materially Different From Machineguns.** ........................................................................... 3

    **A.**    **Assault weapons and LCMs are extraordinarily lethal.** ............. 5

    **B.**    **Assault weapons and LCMs devastate major cities.** ................... 10

    **C.**    **Assault weapons and LCMs pose unique challenges to law enforcement.** ........................................................................ 14

**II.**    **The Challenged Laws Are Consistent with the Historical Tradition of Regulating Weapons That Strike Terror in Public Places.** ................... 17

    **A.**    **Historical regulations seek to quell terror in public places.** ........................................................................ 18

    **B.**    **Modern restrictions on assault weapons and LCMs apply the same principles as the "going armed" laws.** ......................... 20

    **C.**    **The district court erred in concluding that the "going armed" laws are not an appropriate analog.** ................................ 23

    **D.**    **Historical tradition supports restrictions on assault weapons and LCMs in both public and private spaces.** ............. 24

**CONCLUSION** ......................................................................................... 26

# TABLE OF AUTHORITIES

———

**CASES**                                                                      **Page(s)**

*Aymette v. State,*
    21 Tenn. (2 Hum.) 154 (1840) ........................................................................ 19

*Bevis v. City of Naperville,*
    85 F.4th 1175 (7th Cir. 2023) ........................................................ 2, 3-4, 5, 8

*Bianchi v. Brown,*
    111 F.4th 438 (4th Cir. 2024) ........................................................................ 25

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ................................................................................... 3, 19

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
    597 U.S. 1 (2022) ............................................................................................ 17

*Sir John Knight's Case,*
    3 Mod. 117, 87 Eng. Rep. 75 (K.B. 1686) ................................................... 18

*State v. Huntly,*
    25 N.C. (3 Ired.) 418 (1843) ......................................................................... 19

*United States v. Rahimi,*
    602 U.S. 680 (2024) ................................................... 17, 18, 19, 23-24, 24-25

**OTHER AUTHORITIES**

Brady United, *Assault Weapons & Large-Capacity Magazines* ................................... 8

Champe Barton et al., *AR-15s Are Used in America's Deadliest Shootings. Why Is It So Hard for Police to Defend Against Them?*, The Trace, July 18, 2024 ....... 14, 15, 16

Elzerie de Jager et al., *Lethality of Civilian Active Shooter Incidents With & Without Semiautomatic Rifles in the United States*, Nat'l Libr. of Med., Sept. 11, 2018 ......... 7

Emma Bowman & Ayana Archie, *This is How Handguns & Assault Weapons Affect the Human Body*, WBEZ Chi., June 6, 2022 ............................................................. 6

Erik Verduzco & Jeffrey Collins, *4 Officers Killed in North Carolina Were at Disadvantage as Shots Rained From Above, Police Say*, AP News, Apr. 30, 2024 ........................................................................................................................ 15

Frank Main & Tom Schuba, *Handguns Turned into Machine Guns Keep Fueling Killings in Chicago*, Chi. Sun-Times, Oct. 11, 2024 ................................................... 12

Jens Ludwig & Jacob Miller, *A Lethal Shift in America's Gun Violence Crisis*, Governing, Apr. 29, 2024 ............................................................................................. 11

Jermont Terry et al., *Two Killed, Seven Injured in Washington Park Shooting*, CBS Chi., Sept. 14, 2022 ................................................................................................. 12-13

Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under* Heller, 116 Nw. U. L. Rev. 139 (2021) ......................................................................................................... 19, 19-20, 23

Judith Weinstein et al., *The Public Health Crisis of Gun Violence*, Chi. Health, Oct. 12, 2024 ........................................................................................................................ 21

Lenny Bernstein et al., *Mass Violence Takes Toll On Americans' Psyches*, Wash. Post, May 27, 2022 .................................................................................................. 20-21

Manny Ramos & Sophie Sherry, *10 Shot, 1 Fatally, When Pair of Shooters Open Fire Along Lively Business District in Chatham*, Chi. Sun-Times, June 12, 2021 ........................................................................................................................... 13

Mark A. Frassetto, *To the Terror of the People: Public Disorder Crimes and the Original Public Understanding of the Second Amendment*, 43 S. Ill. U. L.J. 61 (2018) .......................................................................................................................... 18

Mark Konkol et al., *Back of the Yards Gunmen Wanted Revenge for Earlier Shooting*, DNA Info, Sept. 24, 2013 .................................................................... 21-22

Matt Masterson, *2 Teens Killed, 2 Wounded in Shooting Outside Benito Juarez High School*, WTTW, Dec. 16, 2022 .................................................................................... 12

Mick Dumke, *The Shot That Brought the Projects Down, Part One of Five*, Chi. Reader, Oct. 12, 2012 ................................................................................................. 14

Mitch Dudek et al., *For Those Living in the East Garfield Park Neighborhood Where 14 Were Shot, Guns & Violence Are a Daily Ordeal*, Chi. Sun-Times, Nov. 1, 2022 ........................................................................................................................... 12

Mitch Smith, *A Chicago Neighborhood Faces a New Fear: Assault-Style Rifles*, N.Y. Times, May 11, 2017 ............................................................................................... 21, 22

N. Kirkpatrick et al., *The Blast Effect*, Wash. Post, Mar. 27, 2023 ................. 5, 6, 7, 9

Rita Oceguera, *In Chicago, the Odds of Surviving a Shooting Are Getting Worse*, The Trace, Sept. 26, 2024 .................................................................... 10-11, 11, 11-12

Robert Klemko, *The Policing Paradox*, Wash. Post, Mar. 27, 2023 .............. 13-14, 16

Saul Cornell, *The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928*, 55 U.C. Davis L. Rev. 2545 (2022).................................. 18-19

Silvia Foster-Frau et al., *Terror on Repeat: A Rare Look at the Devastation Caused by AR-15 Shootings*, Wash. Post, Nov. 16, 2023.................................................. 10, 20

Silvia Foster-Frau & Holly Bailey, *A Tragedy Without End*, Wash. Post, Mar. 27, 2023 ........................................................................................................ 6-7, 9

Stephanie Zimmermann, *How High-Capacity Magazines for Weapons Have Become a Mass-Market Item*, Chi. Sun-Times, Oct. 28, 2022.................................................. 8

Todd C. Frankel et al., *The Gun That Divides a Nation*, Wash. Post, Mar. 27, 2023 ............................................................................................................. 7-8

Violence Policy Center, *Mass Shootings in the United States Involving Large Capacity Ammunition Magazines*, Sept. 26, 2024................................................ 22-23

William Blackstone, *Commentaries on the Laws of England* (1769)..................... 3, 18

Zara Abrams, *Stress of Mass Shootings Causing Cascade of Collective Traumas*, Am. Psych. Ass'n, Oct. 27, 2023 ................................................................... 20

## STATEMENT OF INTEREST OF THE *AMICUS CURIAE*

———

The City of Chicago, the third largest city in the United States, faces a serious problem of firearms violence that has grown worse with the increased proliferation of assault weapons and large-capacity magazines ("LCMs").[1]  The Chicago Police Department ("CPD") has recovered a growing number of assault weapons and LCMs and has seen a nearly 50% increase in deaths over the last decade from shootings as a result.

Chicago has a population of more than 2.7 million and tens of millions of visitors each year.  It is home to numerous public gathering places, like schools, places of worship, restaurants, nightclubs, theaters, sports arenas, public parks, and other large venues, where hundreds of thousands of people gather for festivals, parades, rallies, and other special events every year.  Public spaces like these have become targets for mass shootings carried out with assault weapons and LCMs. Most infamously, 21 children and teachers were killed and 17 wounded at Robb Elementary School in Uvalde, Texas, in 2022; 58 people were killed and hundreds more wounded at a concert in Las Vegas in 2017; 50 people were killed and 53 wounded at Pulse Nightclub in Orlando in 2016; 28 children and teachers were killed at Sandy Hook Elementary School in Newtown, Connecticut, in 2012; and in our own backyard, seven people were killed and 46 wounded at a July 4th parade in

---

[1]  All parties have consented to the filing of this brief.  The brief is submitted under Fed. R. App. P. 29(a)(2).  No counsel for a party authored this brief in whole or in part, no counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief, and no person other than *amicus curiae* and its counsel made a monetary contribution to its preparation or submission.

suburban Highland Park in 2022.  Many more have been killed or injured on city streets, in public parks, near schools, and at vigils and other community events across Chicago.

Chicago has an interest in this litigation because enforcement of the Protect Illinois Communities Act ("the Act") in Chicago and across the state guards against the presence of assault weapons and LCMs in Chicago, which in turn helps protect the safety and peace of mind of Chicago residents.  Chicago's interest is particularly acute because it has ordinances that similarly ban assault weapons and LCMs, Municipal Code of Chicago, Ill. §§ 8-20-075, 8-20-085, and those ordinances are also the subject of litigation, *Herrera v. City of Chicago*, No. 23-cv-532 (N.D. Ill.). *Herrera* was consolidated with the present cases in *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023), and remains pending in the district court.  Chicago, thus, has a strong interest in ensuring that it and other state and local governments can maintain effective regulations in response to increasing firearm danger.

## ARGUMENT

———

Assault weapons and LCMs are weapons of war.  In the hands of civilians, they have led to unimaginable carnage, pose a grave threat to law enforcement, instill terror, disrupt public life, undermine democracy, and impose significant costs on communities and local governments.  While these effects are felt nationwide, major cities have particularly suffered.  In Chicago, access to assault weapons and LCMs has resulted in a rash of attacks in public places across the city.  Regulation of these weapons is critical.

2

Bans on assault weapons and LCMs, like those in the Act, do not run afoul of the Second Amendment.  Assault weapons and LCMs are extraordinarily lethal and not materially different from their military counterparts, like the machineguns the Supreme Court has recognized may be banned.  The State's ban on their sale and possession is wholly consistent with the nation's historical tradition of regulating weapons to abate public terror.

## I.     Assault Weapons and LCMs Are Not Materially Different From Machineguns.

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Court observed that the term "Arms" applies to weapons that are "not specifically designed for military use" and "not employed in a military capacity."  *Id.* at 581.  In fact, the Court wrote, it would be "startling" to read the Second Amendment as protecting "those weapons useful in warfare," as that would mean federal restrictions on machineguns "might be unconstitutional," *id.* at 624, a proposition the Court squarely rejected when it averred that "weapons that are most useful in military service – M-16 rifles and the like – may be banned," *id.* at 627.  Such a "limitation," the Court explained, "is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"  *Id.* (quoting William Blackstone, *Commentaries on the Laws of England* 148-49 (1769)).

Consistent with *Heller*, this court, in ruling that plaintiffs were not entitled to a preliminary injunction, held that "Arms protected by the Second Amendment do not include weapons that may be reserved for military use."  *Bevis*, 85 F.4th at 1194.  Weapons reserved for military use, the court explained, are those that bear

"characteristics" that are "military in nature," *id.* at 1198, and are "capable of inflicting" the same sort of "grisly damage" as weapons used in the military, *id.* at 1199. Applying that to the assault weapons and LCMs covered by the Act, this court concluded that they "are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense." *Id.* at 1195. As for the AR-15, the court explained that it "is almost the same gun as the M16," *id.*; both accept the same ammunition, deliver the same kinetic energy, and have the same muzzle velocity and effective range, *id.* at 1196. And although AR-15s and M16s have different rates of fire, the court found that distinction not "relevant," in part because an AR-15 can easily be modified to achieve the same rate of fire as an M16. *Id.* This court thus concluded that the two firearms are, in all material respects, "indistinguishable." *Id.* at 1197.

The district court, notwithstanding *Bevis*, held "that an AR-15 is, frankly, not at all the same weapon as the M16." SA108. But the district court did not examine the features of an AR-15 – or any other instrument covered by the Act.[2] Rather, the court concluded that none can be categorized as "military-grade," SA112, because none were "selected, procured, tested, [or] issued to military members for use in combat," SA111. Worse still, the court wholly discounted the type of damage AR-15-

---

[2] In fact, the district court enjoined the entire Act without even discussing the other firearms covered. For example, the court recognized that plaintiffs failed to present evidence regarding magazines holding more than 30 rounds, SA115, and bump stocks and other devices that increase the rate of fire, SA116, yet enjoined them anyway, SA165. Moreover, the court recognized that the State could "lawfully ban .50 caliber weapons and ammunition, belt-fed weapons, and grenade launchers," SA118, yet enjoined those too, SA165.

style weapons can inflict, reasoning that they are not "dangerous" because, unlike machineguns – which are "not designed to necessarily hit individual targets," SA65 – AR-15s are easy to "control to neutralize discrete, identified aggressors," SA67. In fact, the court reasoned, it is the *lethality* of the AR-15 that makes it a wise choice for self-defense. SA113. On the district court's view, then, assault weapons and LCMs are entitled to Second Amendment protection precisely because they are better at killing people than the machineguns used by the military.

The district court's decision cannot stand. Not only does it flout *Bevis*, but it ignores that the very features that would make assault weapons and LCMs effective weapons of war pose extreme dangers to the public and to law enforcement. It also ignores the impacts that assault weapons and LCMs have on our day-to-day lives – in schools, houses of worship, theaters, concert venues, grocery stores, parks, and the myriad other shared spaces where we socialize, celebrate, work, learn, and exercise our rights to assemble and speak freely.

**A.    Assault weapons and LCMs are extraordinarily lethal.**

As this court recognized, an AR-15-style rifle fires the same ammunition, delivers the same kinetic energy, and has the same muzzle velocity and effective range as an M16. *Bevis*, 85 F.4th at 1196. These are the very features that make these weapons extraordinarily lethal. For one, the size of the bullet combined with the muzzle velocity allows the bullet to travel the length of "six football fields" in one second. N. Kirkpatrick et al., *The Blast Effect*, Wash. Post, Mar. 27, 2023.[3]

___

[3]  https://www.washingtonpost.com/nation/interactive/2023/ar-15-damage-to-

When the bullet strikes the body, it releases an extraordinary amount of kinetic energy – three times more than a Thompson machinegun and up to 19 times more than a handgun. R. 185-3 ¶ 36. And while bullets from a handgun "typically pierce straight through a target," taking a linear path, Emma Bowman & Ayana Archie, *This is How Handguns & Assault Weapons Affect the Human Body*, WBEZ Chi., June 6, 2022, a bullet from an AR-15 will rotate as it travels through the body – a process called "tumbling" or "yawing," R. 185-1 ¶¶ 42-43.[4] The impact can create cavities 11-12.5 times "the diameter of the projectile," *id.* ¶ 43, and transfer kinetic energy to the body that "ripples and tears through tissue and organs," R. 185-3 ¶ 13. That "blast effect," Kirkpatrick, *supra*, can even cause "[i]njuries to blood vessels, nerves, or organs not struck by the bullet," R. 185-1 ¶ 43; bullets can also fragment, causing even "greater injury to adjacent tissue and organs," R. 185-3 ¶ 18.

In short, the AR-15 "works with [such] brutal efficiency" that it can "literally tear apart" a victim's body and "eviscerate multiple people in seconds." Kirkpatrick, *supra*. A single bullet from an AR-15 "lands with a shock wave intense enough to blow apart a skull and demolish vital organs," while multiple bullets "cause a cascade of catastrophic damage." *Id.* Trauma surgeons describe wounds like those "seen on a battlefield," including "missing body parts" and "pulverize[d] bones." Silvia Foster-Frau & Holly Bailey, *A Tragedy Without End*, Wash. Post, Mar. 27,

---

human-body/ (last visited May 14, 2025).

[4] https://www.npr.org/2022/06/06/1103177032/gun-violence-mass-shootings-assault-weapons-victims (last visited May 14, 2025).

2023; Kirkpatrick, *supra*.[5]  LCMs "increase this destructive potential by increasing the number of rounds someone can fire without having to reload, thereby increasing the number of bullets that can be fired during a given time period."  R. 185-3 ¶ 41.

As devastating as assault weapons are to adults, they are even worse for children, who "have smaller torsos, relatively more compressed/adjacent vital organs, and smaller blood reserves."  R. 185-3 ¶ 48.  At Sandy Hook Elementary School, "not a single child" struck by a bullet from an AR-15 survived, and at Robb Elementary School, approximately 80% of the children struck by an AR-15 bullet succumbed to their wounds.  *Id.*  Children who do survive face "surgical challenges, recurring operative procedures, and long-term recovery and disability that is often significantly more complex and difficult to manage than for older victims."  *Id.*

This extraordinary lethality makes AR-15-style rifles the "weapon of choice" for perpetrators of mass shootings.  Kirkpatrick, *supra*; *see also* R. 190-1 at 48.  The "high-velocity bullets," coupled with LCMs, "enabl[e] active shooters to wound and kill more people per incident."  Elzerie de Jager et al., *Lethality of Civilian Active Shooter Incidents With & Without Semiautomatic Rifles in the United States*, Nat'l Libr. of Med., Sept. 11, 2018.[6]  And the "dampened recoil" makes "it easier to keep steady aim on a target."  Todd C. Frankel et al., *The Gun That Divides a Nation*,

---

[5]  https://www.washingtonpost.com/nation/interactive/2023/sutherland-springs-shooting-survivors-ar-15-scars/?itid=co_enhanced_ar15_3 (last visited May 14, 2025).

[6]  https://pmc.ncbi.nlm.nih.gov/articles/PMC6143093/ (last visited May 14, 2025).

Wash. Post, Mar. 27, 2023.[7]  Plus, the long effective range allows perpetrators to perch on rooftops or in upper-story windows and unload hundreds of rounds before being spotted by the police.  R. 185-2 ¶¶ 57-58.  It is also easy to "pop in" and "pop [ ] back out" LCMs to keep up the barrage of gunfire, Stephanie Zimmermann, *How High-Capacity Magazines for Weapons Have Become a Mass-Market Item*, Chi. Sun-Times, Oct. 28, 2022, and to modify rifles with bump stocks and other devices that double the rate of fire, R. 185-1 ¶ 124; *see Bevis*, 85 F.4th at 1196, as occurred in the Las Vegas shooting, R. 185-1 ¶ 117.[8]  All in all, "over three-quarters of the mass shootings resulting in 10 or more deaths involved assault weapons and/or LCMs," R. 190-1 at 44, and when these weapons are used, "nearly 14 times as many people are injured, and twice as many people are killed," Brady United, *Assault Weapons & Large-Capacity Magazines*.[9]

Moreover, semiautomatic fire is at least as devastating as automatic fire – if not more.  According to the U.S. military, "semiautomatic fire is more accurate" and "more efficient," allowing the shooter to "hit more targets more quickly" than with a machinegun, R. 222-3 ¶ 19, and it "remain[s] the preferred method of killing" enemy combatants, R. 222-2 ¶ 14.  And all of this makes the district court's conclusion that *lack of control* is what makes a weapon dangerous, SA65, SA67, almost absurd.  It

---

[7]  https://www.washingtonpost.com/nation/interactive/2023/ar-15-america-gun-culture-politics/ (last visited May 14, 2025).

[8]  https://chicago.suntimes.com/2022/10/28/23409121/guns-high-capacity-magazines-extended-melissa-lulik (last visited May 14, 2025).

[9]  https://www.bradyunited.org/resources/issues/what-are-assault-weapons-and-high-capacity-magazines (last visited May 14, 2025).

is the *ability to control* the weapon to target and kill as many people as possible, as quickly as possible, that makes assault weapons arguably even more dangerous and more suitable to military use.

There is no clearer proof of the devastation that these weapons cause than accounts of mass shootings. In one instance, at Sandy Hook Elementary School, the perpetrator fired 80 rounds from an AR-15 into a small bathroom where two teachers and 15 students were hiding; first responders found them all dead, "piled on top of one another." Kirkpatrick, *supra*. Their wounds – which included "destroyed" organs – "were not survivable." *Id.* At Stoneman Douglas High School, the perpetrator fired 139 rounds from an AR-15. *Id.* One student was struck 13 times; two bullets "tore [his] chest apart" and another four "obliterated [his] head." *Id.* "Blood and brain splatter were found on his upper body and the walls." *Id.* At the First Baptist Church in Sutherland Springs, Texas, the perpetrator used an AR-15-style rifle to fire 450 rounds "within minutes." Foster-Frau & Bailey, *supra*. First responders described the aftermath as a "war zone," "like a bomb went off," with "pieces of people everywhere." *Id.* Photographs taken in the aftermath of the Robb Elementary School shooting – where the perpetrator used an AR-15 to gun down children as they huddled in the corners of their classrooms – capture pools of blood, walls pocked with bullet holes, shoes strewn across the floor, and body bags lining the hallways. *Id.*

While these are just a handful of the mass shootings that have devastated the nation in recent years, one thing is clear about *all* mass shootings involving AR-

15-style assault weapons: "When a gunman fires an AR-15 . . . a seemingly safe, familiar place instantly transforms into a hellscape of chaos, destruction and mass death." Silvia Foster-Frau et al., *Terror on Repeat: A Rare Look at the Devastation Caused by AR-15 Shootings*, Wash. Post, Nov. 16, 2023.[10]  The AR-15-style weapons perpetrators use to inflict this damage may not have been issued by the military, but the carnage they leave behind is no different from that encountered on the battlefield.  In keeping with this court's sorting of weapons into military and non-military categories, assault weapons and LCMs unequivocally fall on the military side of the line.

### B.    Assault weapons and LCMs devastate major cities.

Assault weapons and LCMs have also profoundly transformed the nature of the harm caused during violent incidents in major cities.  In Chicago, the "the odds that a shooting will result in a fatality" have "risen markedly in recent years." R. 185-9 ¶ 8.  In 2010, "the likelihood of someone dying in a shooting incident" was 12.65%.  *Id.*  By 2023, "that figure had risen to 18.89%," *id.* – nearly a 50% increase. In other words, "184 more people died in Chicago in 2023 in shooting incidents than would have died if the shooting lethality rate remained at its 2010 level," *id.* ¶ 11, and between 2010 and 2023, 1,581 additional people died than would have died had the lethality rate remained unchanged, *id.* ¶ 12.  In short, "fewer Chicagoans are surviving."  Rita Oceguera, *In Chicago, the Odds of Surviving a Shooting Are*

---

[10]  https://www.washingtonpost.com/nation/interactive/2023/ar-15-force-mass-shootings/ (last visited May 14, 2025).

*Getting Worse*, The Trace, Sept. 26, 2024.[11]  The reason is simple: "[a]ccess to deadlier firearms."  *Id.*

In the five years leading up to the General Assembly's adoption of the Act, CPD recovered more than 3,500 assault weapons.  R. 54-8 ¶ 13 (*Herrera*).[12]  And these numbers reflect an upward trend.  *Id.*  In 2022, CPD recovered 1,713 assault weapons, a five-fold increase from 2018.  *Id.*  "Demand for assault weapons" has "risen in recent years," *id.*, in large part because gang members are procuring more assault weapons to intimidate rivals "or to respond in kind to shootings involving assault weapons," *id.* ¶ 14.  LCMs have also become "ubiquitous."  Oceguera, *supra*.  Between 2010 and 2023, CPD saw a six-fold increase in magazines holding more than 15 rounds, as well as a six-fold increase in the subset of those holding more than 30 rounds.  R. 185-9 ¶ 34; Oceguera, *supra*; Jens Ludwig & Jacob Miller, *A Lethal Shift in America's Gun Violence Crisis*, Governing, Apr. 29, 2024.[13]  This, unsurprisingly, has led to assailants firing more shots.  The number of shooting scenes in which CPD recovered 20 or more shell casings "skyrocketed" from 31 in 2010 (1.68% of total incidents) to 1,033 in 2021 (12.69% of total incidents), R. 185-9 ¶ 33, and CPD recovered 65,313 shell casings in 2023, up from 9,153 in 2010, *id.* ¶ 30.  Making matters worse, assailants are modifying their firearms with "auto

---

[11]  https://www.thetrace.org/2024/09/chicago-fatal-shootings-data-gun-access/ (last visited May 14, 2025).

[12]  We cite the record in *Herrera v. City of Chicago*, No. 23-cv-532 (N.D. Ill.), as R. ___ (*Herrera*).

[13]  https://www.governing.com/policy/a-lethal-shift-in-americas-gun-violence-crisis (last visited May 14, 2025).

sears" or "switches," which enable automatic fire. Oceguera, *supra*. And the combination of extended magazines and switches has risen at an "alarming" rate, resulting in more mass shootings with higher fatality rates. Frank Main & Tom Schuba, *Handguns Turned into Machine Guns Keep Fueling Killings in Chicago*, Chi. Sun-Times, Oct. 11, 2024; *see also* R. 185-9 ¶¶ 35-38.[14]

This proliferation of deadly weapons has led to mass shootings on city streets, in parks, near schools, and at community gatherings. For example, in December 2022, an assailant fired an assault weapon into a group of students outside a high school, killing two and injuring two others. Matt Masterson, *2 Teens Killed, 2 Wounded in Shooting Outside Benito Juarez High School*, WTTW, Dec. 16, 2022; R. 54-8 ¶ 12 (*Herrera*).[15] In October 2022, an assailant fired an assault weapon into a group "gathered for a vigil and balloon release," striking 11 adults and three children in just three seconds. Mitch Dudek et al., *For Those Living in the East Garfield Park Neighborhood Where 14 Were Shot, Guns & Violence Are a Daily Ordeal*, Chi. Sun-Times, Nov. 1, 2022; R. 54-8 ¶ 10 (*Herrera*).[16] In September 2022, assailants with "high-powered" firearms shot at each other in a neighborhood park, striking nine people, two fatally, playing softball across a large field. Jermont Terry

---

[14] https://chicago.suntimes.com/the-watchdogs/2024/10/11/machine-guns-handguns-switches-sears-extended-capacity-magazines-tommy-gun-larry-snelling-al-capone (last visited May 14, 2025).

[15] https://news.wttw.com/2022/12/16/1-killed-3-wounded-shooting-outside-benito-juarez-high-school (last visited May 14, 2025).

[16] https://chicago.suntimes.com/crime/2022/10/31/23434159/multiple-people-shot-in-east-garfield-park (last visited May 14, 2025).

et al., *Two Killed, Seven Injured in Washington Park Shooting*, CBS Chi., Sept. 14, 2022.[17]  And in June 2021, ten people were shot, one fatally, when two assailants fired assault weapons into a gathering in "a lively commercial district."  Manny Ramos & Sophie Sherry, *10 Shot, 1 Fatally, When Pair of Shooters Open Fire Along Lively Business District in Chatham*, Chi. Sun-Times, June 12, 2021; R. 54-8 ¶ 30 (*Herrera*).[18]

These examples illustrate how assault weapons and LCMs allow assailants to fire numerous rounds into crowds in a matter of seconds – killing and injuring innocent bystanders in much the way that the military would kill and injure an onslaught of enemy combatants.  And with assault weapons and LCMs, people may be no safer inside.  AR-15-style rifles were designed "to kill or incapacitate enemy combatants at distances of hundreds of yards, not dozens of feet," and thus they "pose a serious risk of over-penetration in most home construction materials." R. 185-1 ¶ 180.  Bullets fired by an AR-15 can easily penetrate sheet rock and wooden studs and blow up water jugs placed three feet behind a wall.  *Id.* ¶¶ 180-82.  In densely populated cities where buildings abut one another and apartments share walls, this risk of over-penetration is significant.

In short, all of the features that would make assault weapons suitable for the battlefield have dire consequences for major cities.  The district court lauded AR-15-

---

[17]  https://www.cbsnews.com/chicago/news/washington-park-mass-shooting-51st-champlain/ (last visited May 14, 2025).

[18]  https://chicago.suntimes.com/2021/6/12/22530678/shooting-75th-street-lens-bbq-chatham-roderick-sawyer (last visited May 14, 2025).

style rifles for their ability to "neutralize" discrete targets, SA67, but the individuals

being "neutralized" are often innocent bystanders and young children in urban

neighborhoods, not enemy combatants on the battlefield.  When seven-year-old

Dantrell Davis was fatally shot on his way to school by a sniper with "a high-

powered rifle" from the tenth floor of an apartment building, the heinous act sent

shockwaves throughout Chicago – and the nation.  Mick Dumke, *The Shot That

Brought the Projects Down, Part One of Five*, Chi. Reader, Oct. 12, 2012.[19]  More

than thirty years later, Dantrell's death continues as a symbol of the innocent lives

lost – and those we will continue to lose – as the result of the proliferation of deadly

assault weapons within our communities.

## C.     Assault weapons and LCMs pose unique challenges to law enforcement.

Assault weapons pose "an exceptional challenge" to law enforcement and are

"fundamentally reshaping the way the American police respond to lethal threats."

Champe Barton et al., *AR-15s Are Used in America's Deadliest Shootings. Why Is It

So Hard for Police to Defend Against Them?*, The Trace, July 18, 2024.[20]  Officers

are "increasingly encountering" these weapons, *id.*, and face a disproportionate risk

of being killed by one, R. 185-2 ¶ 54.  Not only are officers responding to mass

shootings "more likely than not" to encounter an AR-15 or similar weapon, Barton,

*supra*, but these weapons have also "flooded" the "neighborhoods and communities"

---

[19]  https://chicagoreader.com/blogs/the-shot-that-brought-the-projects-down-part-one-of-five/ (last visited May 14, 2025).

[20]  https://www.thetrace.org/2024/07/police-ar-15-rifle-trump-shooting-uvalde/ (last visited May 14, 2025).

patrolled by local police, Robert Klemko, *The Policing Paradox*, Wash. Post, Mar. 27, 2023.[21]  Indeed, the number of assault weapons recovered from crime scenes nationwide "surged" from 18,000 to 28,000 between 2018 and 2022.  Barton, *supra*.  Simply put, assault weapons are becoming "a favorite among criminals."  *Id.*

Despite the growing use of assault weapons in criminal activity, most police officers neither "carry assault weapons in the course of performing their job duties," nor "train with them."  R. 54-8 ¶ 16 (*Herrera*).  "This means that most of the time, the officers first responding to an active shooter incident involving an assault weapon will usually have weaker firepower than the assailant."  *Id.*  That was the case in Charlotte, North Carolina, where, in 2024, while serving a warrant at a suspect's home, eight officers were shot – four fatally – when the suspect unloaded "several rounds" from his AR-15-style rifle "within a matter of seconds" from a second-floor window.  Erik Verduzco & Jeffrey Collins, *4 Officers Killed in North Carolina Were at Disadvantage as Shots Rained From Above, Police Say*, AP News, Apr. 30, 2024.[22]

On top of that, "the high velocity of bullets fired by assault weapons" enables them "to defeat standard protective equipment."  R. 54-8 ¶ 17 (*Herrera*).  In fact, in nearly 25% of the incidents in which officers were slain by assault rifles in the line of duty, the "bullet penetrated the officer's body armor."  R. 185-2 ¶ 54.  Even "[t]he

---

[21] https://www.washingtonpost.com/nation/interactive/2023/police-ar-15-gun-control/ (last visited May 14, 2025).

[22] https://apnews.com/article/officers-killed-charlotte-north-carolina-warrant-64a4a9c849b721631cd2f8872945e08d (last visited May 14, 2025).

highest level of protective equipment," R. 54-8 ¶ 17 (*Herrera*), which includes ballistic helmets and bullet-proof vests outfitted with ceramic or metal trauma plates, *id.* ¶ 18, "would not ensure that officers are protected," *id.* ¶ 21. The "equipment still leaves some parts of the body vulnerable," *id.*, and "many assault weapons are able to fire rounds that pierce even ceramic and metal-plated vests and body armor," R. 185-2 ¶ 51. Heavy-duty protective gear is also expensive, bulky, limits mobility, and requires specialized training, R. 54-8 ¶¶ 19-20 (*Herrera*), which "would be a huge logistical and financial undertaking," *id.* at 22. And most local governments do not have the resources for that training, or for equipment that could help with such responses, like armored vehicles, explosives, robots, and drones. R. 185-2 ¶¶ 50, 56.

Moreover, equipping officers with the gear and training necessary to protect against assault weapons would interfere with policing in other significant ways. Arming officers with AR-15s and outfitting them with heavy-duty vests and body armor during "their daily beats" would make them "appear to look more like members of an occupying military" than officers "who wish to protect and serve." R. 54-8 ¶ 23 (*Herrera*). This would complicate an officer's ability to gain the public's trust and to deescalate situations peacefully, *id.*, and it would replace community policing with "a weapons-centered" approach more akin to a "police state," Barton, *supra*, or "urban warfare," Klemko, *supra*. And, of course, spending more resources on equipment and training diverts resources from other policing efforts. Indeed, CPD has already been forced to redirect resources from routine policing "to securing

16

public events."  R. 54-8 ¶¶ 24-25 (*Herrera*).

No other type of firearm since the machineguns of the 1920s has had such profound effects on law enforcement.  The district court's conclusion that AR-15-style assault weapons are "not at all the same" as their military counterparts, SA108, ignores this reality.  The lethal encounters that law enforcement officers have with assault weapons, and the challenges police departments face protecting their citizens from these dangerous weapons, show that these weapons – like the machineguns on which they were modeled – can, and should, be banned.

## II.     The Challenged Laws Are Consistent with the Historical Tradition of Regulating Weapons That Strike Terror in Public Places.

As the Court explained in *United States v. Rahimi*, 602 U.S. 680 (2024), in ascertaining whether a restriction is consistent with the Second Amendment, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition."  *Id.* at 692.  To that end, courts must engage in analogical reasoning, to determine whether the "new law is 'relevantly similar' to laws that our tradition is understood to permit."  *Id.* (quoting *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 29 (2022)).  Importantly, a law need not have "a 'historical twin,'" *id.* (quoting *Bruen*, 597 U.S. at 30); rather, analogical reasoning "demands a wider lens," to reveal "a principle, not a mold," *id.* at 740 (Barrett, J., concurring).

There are many important principles to be pulled from historical weapons regulations.  We focus on one here: since the founding, lawmakers have imposed stringent restrictions on firearms and other weapons that, by their very nature,

17

strike terror in public places.  And nothing strikes such terror more than assault weapons and LCMs.  Indeed, these weapons are so extraordinarily lethal that even the mere possession of them in private spaces threatens the public peace.

### A.     Historical regulations seek to quell terror in public places.

As *Rahimi* explains, the Second Amendment right is properly limited by the prohibition on "'riding or going armed, with dangerous or unusual weapons, to terrify the good people of the land.'"  602 U.S. at 697 (brackets omitted) (quoting Blackstone, *supra*, at 149).  "The act of 'going armed to terrify the King's subjects' was recognized at common law as a 'great offence,'" *id.* at 693-94 (brackets omitted) (quoting *Sir John Knight's Case*, 3 Mod. 117, 118, 87 Eng. Rep. 75, 76 (K.B. 1686)), and was codified in the Statute of Northampton of 1328, *id.* at 694.  These "going armed" or "affray laws" were "incorporated into American jurisprudence through the common law," *id.* at 697, and, accordingly, "formed the basis for Anglo-American public carry regulation during the seventeenth and eighteenth centuries," Mark A. Frassetto, *To the Terror of the People: Public Disorder Crimes and the Original Public Understanding of the Second Amendment*, 43 S. Ill. U. L.J. 61, 62 (2018).

Under these laws, "a passive" threat to the public was all that was required to show a breach of the peace.  Frassetto, *supra*, at 68.  "The act of traveling with an offensive weapon by its very nature provoked a 'fear of the people' – there was no need to establish a specific intent to terrify or prove that an action was an actual breach of the peace to meet this terror requirement."  Saul Cornell, *The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928*, 55 U.C. Davis L.

Rev. 2545, 2556 (2022).  The "going armed" laws protected not only "physical safety," but citizens' freedom to gather peacefully in public places; riding armed to "fairs and markets was an offense to the crown itself."  Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under* Heller, 116 Nw. U. L. Rev. 139, 165 (2021); *see State v. Huntly*, 25 N.C. (3 Ired.) 418, 419, 421 (1843) ("riding upon the public highway" with double-barreled shotgun "attack[s] directly that public order and sense of security"); *Aymette v. State*, 21 Tenn. (2 Hum.) 154, 159 (1840) (legislature has authority to prohibit individuals armed with "drawn swords, guns, and fixed bayonets" from entering theater or church and "break[ing] up" these "public assemblages").

In sum, the going armed laws sought to protect citizens' freedom to gather in shared public places.  The "fairs" and "markets" were "important sites of community life" where citizens should be able to gather without fear.  Blocher & Siegel, *supra*, at 165.  So were churches, theaters, and other places of "public assemblage."  *See Aymette*, 21 Tenn. (2 Hum.) at 159.  *Heller* recognized this longstanding tradition of protecting public life from threats of gun violence, by confirming the ability of lawmakers to ban "the carrying of firearms in sensitive places."  554 U.S. at 626. *Rahimi*, too, confirmed that historical tradition includes laws "barring people from misusing weapons" to "menace others."  602 U.S. at 693.  In these ways, the Court has affirmed "that a constitutional democracy has authority to regulate guns to promote public safety and to protect against weapons threats which it can exercise to protect valued civic activities and the ability of all citizens to live free of terror

19

and intimidation."  Blocher & Siegel, *supra*, at 176.

**B.    Modern restrictions on assault weapons and LCMs apply the same principles as the "going armed" laws.**

The same principles animating the laws preventing "terror to the people" apply to modern bans on assault weapons and LCMs.  These militaristic weapons strike an unprecedented level of terror in the public.  They are far deadlier than weapons of the founding era and have pervaded the collective consciousness.  Zara Abrams, *Stress of Mass Shootings Causing Cascade of Collective Traumas*, Am. Psych. Ass'n, Oct. 27, 2023.[23]  "Public mass shootings are particularly high-visibility events that are quite shocking to the public and unsettling to the sense of public safety."  R. 54-4 ¶ 58 (*Herrera*).  Public mass shootings are also "seemingly random and unpredictable," causing feelings of "helplessness."  R. 54-13 at 18 (*Herrera*).  Mass shootings perpetrated with assault weapons and LCMs "are particularly terrifying because of the limited ability that organizations, communities, and law enforcement have to counter them."  R. 185-2 ¶ 24.  These weapons give "assailants the power to instantly turn everyday American gathering places into zones of gruesome violence," Foster-Frau et al., *supra*, and we feel powerless to stop it.

Mass shootings also "cause profound social damage."  R. 54-4 ¶ 58 (*Herrera*).  Roughly 80% of adults "report feeling stressed about mass shootings," while nearly half "fear becoming a victim of" one.  R. 54-13 at 19 (*Herrera*).  Many adults say they no longer "go anywhere without worrying about being shot" and have "made

---

[23] https://www.apa.org/monitor/2022/09/news-mass-shootings-collective-traumas (last visited May 14, 2025).

changes in their lives due to their fear of a mass shooting." Lenny Bernstein et al.,
*Mass Violence Takes Toll On Americans' Psyches*, Wash. Post, May 27, 2022.[24]  They
now avoid shopping malls, movie theaters, and large community events.  R. 54-13 at
19 (*Herrera*).  As for youth, 75% "report mass shootings [as] being a primary source
of stress," *id.*, while more than half "say they worry about a shooting at school,"
Judith Weinstein et al., *The Public Health Crisis of Gun Violence*, Chi. Health, Oct.
12, 2024.[25]  After each school shooting, increasingly more students report "feeling
too unsafe to attend school" and exhibit symptoms of post-traumatic stress disorder,
anxiety, and depression.  R. 54-13 at 19 (*Herrera*).

      In Chicago, the fear and stress of assault weapons and LCMs has fallen
particularly hard on certain neighborhoods.  Over one nine-month period, there
were 33 shootings with assault rifles in the neighboring communities of Brighton
Park and Back of the Yards.  Mitch Smith, *A Chicago Neighborhood Faces a New
Fear: Assault-Style Rifles*, N.Y. Times, May 11, 2017.[26]  During one particularly
violent five-day stretch, 13 people were shot in Brighton Park, including ten during
a memorial service.  *Id.*  And this violence followed two earlier mass shootings with
assault rifles – a 2016 shooting of four people near a Brighton Park elementary
school, *id.*, and a 2013 shooting at a basketball tournament in a Back of the Yards

---

[24] https://www.washingtonpost.com/health/2022/05/26/mass-shootings-trauma-
effects/ (last visited May 14, 2025).

[25] https://chicagohealthonline.com/the-public-health-crisis-of-gun-violence/ (last
visited May 14, 2025).

[26] https://www.nytimes.com/2017/05/11/us/guns-chicago-violence-rifles.html (last
visited May 14, 2025).

park, Mark Konkol et al., *Back of the Yards Gunmen Wanted Revenge for Earlier Shooting*, DNA Info, Sept. 24, 2013.[27]  In the latter, the victims included a three-year-old boy who was shot in the head.  *Id.*  The local alderman remarked of the spate of violence: "People are walking around traumatized. . . .  It's like they have that glazed look, like they're not sure what to expect, not certain of what's going to come out from behind the shadows at any given moment."  Smith, *supra*.

Like historical laws, modern restrictions seek to quell terror and restore the safety and security of public life.  While founding-era laws are not twins with assault weapon and LCM bans, that does not diminish the relevance of the analog; it merely reflects that the unprecedented physical and psychological trauma rendered by assault weapons and LCMs has necessitated a more robust response.  While quelling public terror has always been a major goal of weapons regulation, the ever-present threat of devastation from mass shootings that plagues our public lives today was unheard of in the founding era.  R. 190-1 at 43.  In recent years, mass shootings with assault weapons and LCMs have claimed hundreds of lives, injured thousands more, and infiltrated nearly every type of public space important to community life – parks, schools, houses of worship, theaters, nightclubs, concert halls, shopping centers, polling places, and outdoor gathering spaces for parades, festivals, protests, rallies, and other events.  Violence Policy Center, *Mass Shootings in the United States Involving Large Capacity Ammunition Magazines*, Sept. 26,

---

[27]  https://www.dnainfo.com/chicago/20130924/back-of-yards/two-men-charged-back-of-yards-mass-shooting-but-not-gunmen/ (last visited May 14, 2025).

2024; R. 190-1 at 43-57.[28]  Like the early laws that sought to protect fairs, markets,

churches, and other "public assemblages," the challenged laws secure "people's

freedom and confidence to participate in every domain of our shared life, from

attending school to shopping, going to concerts, gathering for prayer, voting,

assembling in peaceable debate, counting electoral votes, and participating in the

inauguration of a President."  Blocher & Siegel, *supra*, at 141.

### C.  The district court erred in concluding that the "going armed" laws are not an appropriate analog.

The district court concluded "that the nation's history and tradition of

firearms regulation does *not* support a statute as far-reaching as [the Act]," SA151,

because none of the early laws imposed the type of "sweeping prohibitions" that the

Act imposes here, SA153.  But *Rahimi* rejected that line of reasoning when it held

that "a challenged regulation" need "not precisely match its historical precursors."

602 U.S. at 692.  There, the challenged law prohibited individuals subject to

domestic violence restraining orders from possessing firearms, even in the home.

*Id.* at 684.  The Court identified two historical analogs: surety laws, which required

individuals suspected of future misbehavior to post a bond, *id.* at 696, and "going

armed" laws, which, we explain above, "prohibited 'riding or going armed, with

dangerous or unusual weapons, to terrify the good people of the land," *id.* at 697

(brackets omitted).  The Court pulled the relevant principle from these laws – from

the nation's founding, "firearm regulations have included provisions barring people

from misusing weapons to harm or menace others," *id.* at 693 – and concluded that

---

[28]  https://www.vpc.org/fact_sht/VPCshootinglist.pdf (last visited May 14, 2025).

the challenged law "fits neatly within [this] tradition," *id.* at 698.

The Court arrived at this conclusion over the objections of Justice Thomas, who found the modern law too "burdensome" compared to the surety and going armed laws, neither of which impose broad prohibitions on the possession of firearms. *Rahimi*, 602 U.S. at 760, 762 (Thomas, J., dissenting). As for the going armed laws, Justice Thomas believed that, because they prohibited only carrying certain weapons in a particular manner in public, they were not analogous to the "public and private ban" imposed by the challenged law. *Id.* at 770 (Thomas, J., dissenting). But the Court adopted a more "common sense" approach; the historical prohibitions on "going armed" justified requiring a "threatening individual [to] be disarmed," notwithstanding any burden on individual rights. *Id.* at 698.

The district court did not take a common sense approach; it followed the *Rahimi* dissent's lead instead, demanding from the State a near twin. That was error. In the same way the "going armed" laws supported disarming dangerous individuals in *Rahimi*, they support banning individuals from possessing dangerous, military-grade weapons here. In other words, the historical laws "confirm what common sense suggests," 602 U.S. at 698 – when extraordinarily lethal weapons are being used to strike terror in the public, claiming innocent lives and causing profound and long-lasting social and psychological damage, those weapons may be banned.

### D. Historical tradition supports restrictions on assault weapons and LCMs in both public and private spaces.

As Justice Barrett explained, courts must not "assume[ ] that founding-era

legislatures maximally exercised their power to regulate." *Rahimi*, 602 U.S. at 739-

40 (Barrett, J., concurring). Just because the founders did not ban possession of

certain dangerous weapons does not mean they considered such a ban unlawful.

While early lawmakers may have believed narrower prohibitions on carrying

dangerous and unusual weapons in public would quell fear, that response is

inadequate today. "The ripples of fear reverberating throughout our nation in the

wake of horrific mass shootings . . . stem from a crisis unheard of and likely

unimaginable at the founding." *Bianchi v. Brown*, 111 F.4th 438, 463 (4th Cir.

2024) (upholding state law banning assault weapons). Indeed, mass shootings and

the weapons used to perpetrate them are unprecedented, as is our constant

exposure through social and mass media to these harrowing events. We have also

made significant advances in understanding individual and collective trauma. A

person need not carry or brandish an assault weapon or LCM in public in order to

strike fear; even mere possession of assault weapons and LCMs in private spaces

threatens the public peace. As long as these weapons are in wide circulation, the

possibility of a mass shooting will loom. Restrictions must reach both public *and*

private spaces to effectively address the extreme terror they create.

Plus, assault weapons and high-capacity magazines are so extraordinarily

lethal, they can cause devastating injuries to the public from private spaces. For

example, perpetrators of mass shootings can conceal themselves on rooftops or in

interior rooms – like the Las Vegas shooter, who fired more than 1,000 rounds in

minutes from a room on the 32nd floor of a hotel. Indeed, many public spaces where

25

Americans gather are particularly vulnerable to mass shootings from windows and rooftops. In major cities, like Chicago, tall buildings tower over parks and beaches that host concerts, festivals, rallies, and other special events and are crowded daily with locals and tourists. At major events, like Lollapalooza, as many as 400,000 attendees pack into Grant Park in the shadow of Michigan Avenue's high rises. While an individual walking into the festival brandishing an assault rifle would certainly cause a panic, an equally significant threat comes from the possibility that a perpetrator could be perched undetectably on an upper floor of a high rise. And this threat is not unique to major cities. Suburbs and small towns host parades, festivals, and concerts along their main streets, where a perpetrator could just as easily be hiding in an upper story window or on the rooftop of a commercial building, as occurred in Highland Park.

Finally, even when used for self-defense in the home, assault weapons and LCMs pose a substantial risk to public safety. As we explain above, their bullets can penetrate walls, risking the lives of neighbors or passersby. And because these weapons are extraordinarily lethal, an errant bullet is more likely to be fatal. For all these reasons, restrictions on assault weapons and LCMs must reach public *and* private spaces to effectively address the unique and extreme physical devastation and psychological terror they create.

## CONCLUSION

———

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

Mary B. Richardson-Lowry
Corporation Counsel
  of the City of Chicago


s/ Elizabeth Mary Tisher

BY:   ELIZABETH MARY TISHER
      Assistant Corporation Counsel
      2 N. LaSalle Street, Suite 580
      Chicago, Illinois 60602
      (312) 744-3173
      elizabeth.tisher@cityofchicago.org
      appeals@cityofchicago.org

## CERTIFICATE OF COMPLIANCE

_____

     In accordance with Fed. R. App. P. 32(g)(1), I certify that the foregoing brief complies with the type-volume limitation provided by Fed. R. App. P. 29(a)(5) and Cir. R. 29.  This brief contains 6,895 words, beginning with the words "Statement of Interest of the *Amicus Curiae*" and ending with the words "Respectfully submitted" in the Conclusion section, as recorded by the word count of the Microsoft Word word processing system used to prepare the brief.

     s/ Elizabeth Mary Tisher

     ELIZABETH MARY TISHER, Attorney

## CERTIFICATE OF SERVICE

_____

     I certify that on May 14, 2025, I electronically filed the attached Brief of *Amicus Curiae* with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

     s/ Elizabeth Mary Tisher

     ELIZABETH MARY TISHER, Attorney