Nos. 24-3060, 24-3061, 24-3062, 24-3063

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

———————————

CALEB BARNETT, ET AL.,
*Plaintiffs-Appellees*,

*v.*

KWAME RAOUL, ET AL.,
*Defendants-Appellants.*

———————————

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

———————

**BRIEF FOR AMICI CURIAE NEW JERSEY, MASSACHUSETTS, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, THE DISTRICT OF COLUMBIA, HAWAI'I, MARYLAND, MICHIGAN, MINNESOTA, NEVADA, NEW YORK, OREGON, RHODE ISLAND, VERMONT, AND WASHINGTON IN SUPPORT OF APPELLANTS AND REVERSAL**

———————

MATTHEW J. PLATKIN
   *Attorney General of New Jersey*
Jeremy M. Feigenbaum
   *Solicitor General*
Tim Sheehan
   *Assistant Attorney General*
Christopher J. Ioannou
   *Deputy Attorney General*
25 Market St, PO Box 080
Trenton, NJ 08625
(862) 350-5800
jeremy.feigenbaum@njoag.gov

ANDREA JOY CAMPBELL
   *Attorney General of Massachusetts*
Grace Gohlke
   *Assistant Attorney General*
One Ashburton Place
Boston, MA 02108
(617) 963-2527
grace.gohlke@mass.gov

(*Additional counsel on signature page*)

# **TABLE OF CONTENTS**

INTERESTS OF AMICI ............................................................................1

SUMMARY OF THE ARGUMENT ........................................................2

ARGUMENT ..........................................................................................3

    I. To Promote The Safety And Well-Being Of Their Residents, Jurisdictions Impose A Range of Restrictions, Including Prohibitions, On Dangerous Weapons And Accessories Not Commonly Used For Self-Defense. ..................................................................3

    II. Illinois's Restrictions On LCMs And Assault Weapons Comport With The Second Amendment. .............................................................7

        A. Neither LCMs Nor Assault Weapons Are Presumptively Protected By The Second Amendment. ..............................................8

        B. Illinois's Law Fits Well Within American Regulatory Traditions. 18

CONCLUSION ......................................................................................26

# TABLE OF AUTHORITIES

**Cases**

*Aymette v. State*,
   21 Tenn. 154 (1840) ............................................................................21

*Bevis v. City of Naperville*,
   85 F.4th 1175 (7th Cir. 2023) ...................................................... passim

*Bianchi v. Brown*,
   111 F.4th 438 (4th Cir. 2024) ....................................................... passim

*Brumback v. Ferguson*,
   No. 22-cv-3093, 2023 WL 6221425 (E.D. Wash. Sept. 25, 2023).......................10

*Capen v. Campbell*,
   134 F.4th 660 (1st Cir. 2025)......................................................19

*Capen v. Campbell*,
   708 F. Supp. 3d 65 (D. Mass. 2023) ..................................................11

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ................................................................... passim

*Duncan v. Bonta*,
   133 F.4th 852 (9th Cir. 2025) .................................................... passim

*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir. 2015) .................................................................16

*Garland v. Cargill*,
   602 U.S. 406 (2024) .........................................................................14

*Hanson v. District of Columbia*,
   120 F.4th 223 (D.C. Cir. 2024) ............................................... 17, 19, 26

*Harrel v. Raoul*,
   144 S. Ct. 2491 (2024) ........................................................................2

*Hartford v. Ferguson*,
   676 F. Supp. 3d 897 (W.D. Wash. 2023)...........................................18

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) .................................................................................2

*Nat'l Ass'n for Gun Rights v. Lamont,*
  685 F. Supp. 3d 63 (D. Conn. 2023) .....................................................17

*NYSRPA, Inc. v. Bruen,*
  597 U.S. 1 (2022) ............................................................................. passim

*Ocean State Tactical, LLC v. Rhode Island,*
  95 F.4th 38 (1st Cir. 2024) .............................................................. passim

*Ocean State Tactical, LLC v. Rhode Island,*
  646 F. Supp. 3d 368 (D.R.I. 2022) .................................................8, 10

*Rupp v. Bonta,*
  723 F. Supp. 3d 837 (C.D. Cal. 2024) ......................................... 14, 17

*State v. Reid,*
  1 Ala. 612 (1840) .......................................................................................25

*United States v. Cox,*
  906 F.3d 1170 (10th Cir. 2018)...............................................................9

*United States v. Morrison,*
  529 U.S. 598 (2000) .................................................................................1

*United States v. Peterson,*
  127 F.4th 941 (5th Cir. 2025) .........................................................9, 10

*United States v. Rahimi,*
  144 S. Ct. 1889 (2024) ..................................................................... passim

*United States v. Salerno,*
  481 U.S. 739 (1987) .................................................................................1

**Statutes**

1750 Mass. Acts 544, chap. 17, § 1 .......................................................22

1771-72 Mass. Province Laws 167, ch. 9 .............................................20

1772 N.Y. Laws 682, ch. 1549 ...............................................................20

1782 Mass. Acts 119, ch. 46 ..................................................................20

1784 N.Y. Laws 627 .............................................................................20

18 U.S.C. § 921 .......................................................................................4

18 U.S.C. § 922 .......................................................................... 4, 5, 23

1819 Ind. Acts 39 ..................................................................................21

1821 Maine Laws 98, ch. 25 .................................................................20

1821 Tenn. Acts ch. 13 ..........................................................................21

1825 N.H. Laws 73, ch. 61 ...................................................................20

1832 Conn. Acts 391, ch. 25 .................................................................20

1837 Ga. Acts. 90, § 1 ...........................................................................21

1852 Tenn. Acts 246, ch. 169 ...............................................................20

1881 Ark. Acts 191, no. 96, § 3 ............................................................21

1882 Mass. Acts 212, ch. 269 ...............................................................20

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling,
    Purchasing, Possessing and Carrying of Certain Firearms, § 3 ...........22

1933 Cal. Stat. 1169 ..............................................................................24

720 Ill. Comp. Stat. 5/24-1(11) ..........................................................3, 7

720 Ill. Comp. Stat. 5/24-1(14)-(16) ..................................................3, 7

720 Ill. Comp. Stat. 5/24-1.10(a)-(c) ..................................................3, 7

720 Ill. Comp. Stat. 5/24-1.9(a)-(c) ....................................................3, 7

Act of May 4, 1917, ch. 145, 1917 Cal. Sess. Laws 221 ......................22

An Act to Control the Possession, Sale, Transfer, and Use of Pistols and Other
    Dangerous Weapons in the District of Columbia, Pub. L. No. 72-275, 47 Stat.
    650 (1932) .........................................................................................24

An Act to Prevent the Sale of Pistols, ch. 96, § 1, 1879 Tenn. Acts 135-36...........21

An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, ch. 235, § 5711, 1923 Vt. Acts and Resolves 930 .......................................................24

An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, 1927 Mich. Pub. Acts 888 ....................................................24

An Act to Regulate the Sale, Possession and Transportation of Machine Guns, no. 18, §§ 1-2, 1931 Ill. Laws 452-53....................................................................24

Ch. 101, § 1, 1838 Va. Acts 76 ...................................................................................21

Ch. 1052 §§ 1, 4, 1927 R.I. Pub. Laws 256 ...............................................................24

Ch. 137, §§ 1-2, 1837-38 Tenn. Acts 200..................................................................21

Ch. 190, § 1, 1933 Minn. Laws 231............................................................................24

Ch. 77, § 1, 1839 Ala. Laws 67 .................................................................................21

Ch. 77, § 2, 1837 Ala. Laws 7 ...................................................................................21

Ch. 96, 1934 Va. Acts 137-40....................................................................................24

Fla. Act of Aug. 8, 1868 ............................................................................................22

Fla. Rev. Stat., tit. 2, pt. 5 2425 (1892).....................................................................22

George Brooks Young, General Statutes of the State of Minnesota in Force January 1, 1889, (Vol. 2, 1888) ............................................................................................22

Ill. Act of Apr. 16, 1881, chap. 38 (1885) .................................................................22

Mass. Gen. Law, chap. 194........................................................................................22

Mass. Gen. Stat., chap. 164 (1873) § 11 ...................................................................22

National Firearms Act of 1934, ch. 757, Pub. L. No. 73-474, 48 Stat. 1236 .........23

No. 24 § 1, 1838 Fla. Laws 36...................................................................................21

No. 80, § 1, 1932 La. Acts 336...................................................................................24

Public Safety and Recreational Firearms Use Protection Act, Pub. L. No. 103-322,

108 Stat. 1996-2010 ...................................................................................4

Public Safety and Recreational Firearms Use Protection Act, Pub. L. No. 103-322, 108 Stat. 1998-2000 ...........................................................................5

W. Ball, Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D. 1837, § 13 ....................................21

**Court Rules**

Fed. R. App. P. 29 ...................................................................................1

## INTERESTS OF AMICI

The *Amici* jurisdictions—New Jersey, Massachusetts, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawai'i, Maryland, Michigan, Minnesota, Nevada, New York, Oregon, Rhode Island, Vermont, and Washington— have compelling interests in public safety and crime prevention. In furtherance of those interests, and pursuant to FRAP 29(a)(2), *Amici* submit this brief to explain why Illinois's regulation of large-capacity magazines (LCMs) and assault weapons within its borders is wholly consistent with the Second Amendment.

There are few interests more paramount to state and local governments than protecting public safety, including "the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000); *see also United States v. Salerno*, 481 U.S. 739, 755 (1987). *Amici* bear the solemn responsibility of ensuring the safety of the public and private spaces—schools, grocery stores, houses of worship, and commercial centers—that make up the fabric of daily life in a free and democratic society. *Amici* and their law enforcement officers work every day to promote residents' health, welfare, and security, including by taking steps to curb the threats of mass shootings and other forms of gun violence that harm our residents and inhibit their exercise of constitutionally protected freedoms.

Exercising their police powers in service of these goals, *Amici* have adopted

1

a range of measures that regulate weapons and weapon accessories, while ensuring that residents have access to weapons for individual self-defense. Although these regulations differ in substance, *Amici* share the firm conviction that the Constitution allows States and municipalities to address gun violence in a manner that is adapted to their local needs and is consistent with our Nation's historical traditions. In accordance with these objectives, this Court should hold that Illinois's decision to restrict access to "militaristic weapon[s]" and instruments "capable of inflicting … grisly damage" comports with the Constitution. *Bevis v. City of Naperville*, 85 F.4th 1175, 1199 (7th Cir. 2023), *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024).

## SUMMARY OF THE ARGUMENT

The Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *United States v. Rahimi*, 602 U.S. 680, 691 (2024) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). Recognizing that "reasonable firearms regulations" can coexist comfortably with the Second Amendment, *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality op.), jurisdictions have adopted a variety of restrictions on weapons and accessories that are not in common use for self-defense. This case concerns one such law: Illinois prohibits the sale, purchase and possession of LCMs, defined as ammunition magazines capable of holding more than 10 rounds for long guns (or 15 rounds for handguns), and assault weapons. *See* 720 Ill. Comp. Stat.

2

5/24-1(11), (14)-(16), 1.9(a)-(c), 1.10(a)-(c). Like similar laws around the country, Illinois's law restricts a targeted subset of weapons and accessories while preserving the right to use firearms for lawful self-defense.

This Court should find Illinois's restrictions constitutional. Neither LCMs nor assault weapons merit Second Amendment protection under the Constitution's original understanding. And Illinois's restrictions on LCMs and assault weapons are "consistent with the principles that underpin our regulatory tradition." *Rahimi* 602 U.S. at 692 (citing *NYSRPA, Inc. v. Bruen*, 597 U.S. 1, 26-31 (2022)). From the earliest days of our Nation through Reconstruction and to the present, States and the federal government have restricted weapons and instruments that pose particular dangers to public safety, once they have circulated within the civilian market and the danger becomes clear. This unbroken tradition amply justifies Illinois's measured restrictions on LCMs and assault weapons today. *See Bevis*, 85 F.4th at 1202.

## **ARGUMENT**

### I.     **To Promote The Safety And Well-Being Of Their Residents, Jurisdictions Impose A Range of Restrictions, Including Prohibitions, On Dangerous Weapons And Accessories Not Commonly Used For Self-Defense.**

The Second Amendment "extends only to certain types of weapons." *Heller*, 554 U.S. at 623-25. Governments retain latitude to regulate specific categories of weapons and accessories, including by restricting the public carry, possession, and sale of weapons that are not commonly used for self-defense and that pose a threat

to our communities. Indeed, the Supreme Court has recognized the constitutionality of laws banning categories of bearable weapons—among them, "short-barreled shotguns," and "M-16 rifles and the like"—because certain "type[s] of weapon[s]" are simply "not eligible for Second Amendment protection" in the first place. *Id.* at 621-23, 625, 627 (emphasis removed).

Consistent with that guidance, States and the federal government have long adopted laws that impose restrictions, including prohibitions, on particularly lethal weapons that are not suitable for or commonly used in self-defense. Like the federal government from 1994 to 2004,[1] ten States and the District of Columbia prohibit the purchase and possession of certain semiautomatic assault weapons.[2] Although state definitions of the prohibited weapons differ, they typically encompass weapons like AR-15- and AK-47-style rifles that inflict catastrophic injuries and have distinct combat capabilities, rendering them uniquely suited to, and devastating when used in, mass shootings.[3] Fourteen jurisdictions ban automatic-fire machineguns, subject to limited exceptions,[4] while 27 States and the federal government ban machineguns manufactured after May 19, 1986, require registration of machineguns owned before

---

[1] Public Safety and Recreational Firearms Use Protection Act, Pub. L. No. 103-322, 108 Stat. 1996-2010, codified at 18 U.S.C. §§ 921 (a), 922 (v) (2000).

[2] *See* Appendix Table 1.

[3] *See id.*

[4] *See* Appendix Table 2.

that date, or impose other restrictions.[5] Nine States and the District of Columbia also prohibit short-barreled shotguns or rifles,[6] while the federal government and 23 other States impose restrictions on those weapons.[7] Four jurisdictions prohibit high-caliber rifles,[8] five prohibit guns hidden in canes and other covert weapons,[9] and 19 ban grenades, rocket launchers, or other hand-held destructive devices.[10]

States and the federal government likewise regulate accessories that cannot by themselves be used for offensive or defensive purposes but nevertheless enhance the lethality of weapons. Fourteen States and the District of Columbia restrict the capacity of ammunition magazines that may be used with semiautomatic weapons, while allowing for possession and sale of smaller-capacity magazines.[11] Eleven of these jurisdictions set a capacity limit at 10 rounds; others set a higher capacity limit.[12] Twenty jurisdictions ban bump stocks, trigger cranks, binary triggers, rapid-

---

[5] *See* Appendix Table 3.

[6] *See* Appendix Table 4.

[7] *See* Appendix Table 5.

[8] *See* Appendix Table 6.

[9] *See* Appendix Table 7.

[10] *See* Appendix Table 8.

[11] *See* Appendix Table 9. From 1994 to 2004, the federal government also banned handgun and long-gun magazines capable of holding more than 10 rounds. *See* Public Safety and Recreational Firearms Use Protection Act, Pub. L. No. 103-322, 108 Stat. 1998-2000, codified at 18 U.S.C. §§ 921 (a), 922(w) (2000).

[12] *See* Appendix Table 9.

fire trigger activators, or other devices used to approximate an automatic rate of fire with a semiautomatic weapon.[13] Silencers or suppressors, used to muffle the sound of a gun when it fires, are banned in eight States and the District of Columbia[14] and subject to restrictions or registration requirements by the federal government and 20 more States.[15]

      States and the federal government also restrict the type and size of ammunition that can be purchased or possessed. While all States allow for robust access to ammunition, at least 26 jurisdictions prohibit especially dangerous forms. Twenty-one jurisdictions and the federal government prohibit the possession or sale of armor-piercing bullets, a type of ammunition designed to penetrate metal or armor.[16] Nine prohibit ammunition designed to explode, detonate, or segment upon impact.[17] Multiple jurisdictions prohibit certain large-caliber ammunition, usable with .50- or .60-caliber weapons[18]; hollow-point bullets, which are designed to mushroom upon impact with a target[19]; and Flechette shells, which are small, sharpened, fin-

---

[13] *See* Appendix Table 10.

[14] *See* Appendix Table 11.

[15] *See* Appendix Table 12.

[16] *See* Appendix Table 13.

[17] *See* Appendix Table 14.

[18] *See* Appendix Table 15.

[19] *See* Appendix Table 16.

stabilized steel projectiles.[20] Others ban certain forms of shotgun ammunition: "Dragon's breath" shells, which simulate a flamethrower by creating an incendiary effect when fired, or bolo shells, which typically contain at least two metal-ball projectiles connected by a braided-steel cable.[21]

All told, across our country today, States and the federal government impose a variety of restrictions, including prohibitions, on a diverse array of especially dangerous weapons, accessories, and ammunition. Illinois's law is of a piece with this tapestry of regulation and, as discussed below, fits well within a long history of governmental efforts to deter violence and promote public safety.

## II.    Illinois's Restrictions On LCMs And Assault Weapons Comport With The Second Amendment.

Against the backdrop of state regulation of unusually dangerous weapons and accessories, and in light of mounting deaths and injuries from mass shootings, the Illinois Legislature chose to restrict assault weapons and LCMs, while preserving broad access to firearms commonly used for self-defense. *See* 720 Ill. Comp. Stat. 5/24-1(11), (14)-(16), 1.9(a)-(c), 1.10(a)-(c). That choice was constitutional.

Under *Bruen* and *Rahimi*, courts evaluate Second Amendment challenges by making two inquiries. *See Bevis*, 85 F.4th at 1191-92. First, courts must ask whether

_____

[20] *See* Appendix Table 17.

[21] *See* Appendix Table 18.

the Second Amendment right is even implicated—*i.e.*, whether its "plain text covers an individual's conduct" and thus presumptively protects that conduct. *Bruen*, 597 U.S. at 17. If it does not, "the regulated activity is categorically unprotected." *Id.* at 18. Second, even if the conduct is presumptively protected, courts ask if the restriction nevertheless "is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 681. Under either step, Illinois's restrictions prove valid.

### A.     Neither LCMs Nor Assault Weapons Are Presumptively Protected By The Second Amendment.

To begin, plaintiffs' proposed conduct—to possess and carry assault weapons and LCMs—is not protected by the Second Amendment. *See Bruen*, 597 U.S. at 17, 24. That is so for two reasons. First, LCMs are not bearable "Arms" under the Second Amendment's text as historically understood. Second, neither LCMs nor assault weapons are commonly used or suitable for lawful self-defense, as required for presumptive Second Amendment protection. *See id.* at 32.

1. LCMs do not fit the "normal and ordinary" definition of Arms. *Heller*, 554 U.S. at 576-77. As defined at the Founding, Arms are "weapons of offence" that are "use[d] in wrath to cast at or strike another." *Id.* at 581 (quoting historical dictionaries). But LCMs "cannot reasonably be described" as such an item. *Duncan v. Bonta*, 133 F.4th 852, 867 (9th Cir. 2025) (en banc); *accord Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 386-87 (D.R.I. 2022), *aff'd on*

8

*other grounds*, 95 F.4th 38 (1st Cir. 2024). Like silencers, LCMs by themselves are "benign, useless in combat for either offense or defense." *Duncan*, 133 F.4th at 867. So just as a silencer is a "firearm accessory" rather than "a weapon," LCMs themselves are not "'bearable arm[s]' protected by the Second Amendment." *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018); *accord United States v. Peterson*, 127 F.4th 941, 946-47 (5th Cir. 2025).

Instead, LCMs are akin to the "ammunition containers" that the Founding and Reconstruction generations understood to be "accoutrements," not arms. *Duncan*, 133 F.4th at 867. Illinois's expert analyzed "the historical use of the terms *arms* and *accoutrements*" during the Founding and Reconstruction, Doc. 185-10 ¶2, and found that the use of "'Arms' as a stand-alone term refers to weapons," and "almost never includes ammunition or ammunition storage containers," *id.* ¶34. Such ammunition containers—then known as "cartridge boxes," as the word "magazine" was not so used until the 1860s—were instead "viewed as accoutrements, the ancillary equipment associated with soldiering, or service in the military." *Id.* ¶¶25-37. As devices holding ammunition, LCMs "thus fall clearly within the category of accessories, or accoutrements, rather than arms." *Duncan*, 133 F.4th at 867. And although there is a "corollary right to possess accessories"—like bullets or triggers— "that are necessary for the ordinary operation of a protected weapon," LCMs are "not necessary to operate any firearm." *Id.* at 867-68; *cf. Peterson*, 127 F.4th at 947

("The use of a suppressor … is not necessary to the use of a firearm."). As Illinois's expert explained, "[m]agazine capacity does not affect the operability of a firearm." Doc. 185-1 ¶111.

As such, "the Second Amendment's plain text does not encompass a right to possess [LCMs]." *Duncan*, 133 F.4th at 868; *Ocean State Tactical*, 646 F. Supp. 3d at 384-88; *Or. Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 911-13 (D. Or. 2023), *appeal filed*, No. 23-35478 (9th Cir.); *Capen v. Campbell*, 708 F. Supp. 3d 65, 88-89 (D. Mass. 2023), *aff'd on other grounds*, 134 F.4th 660 (1st Cir. 2025); *Brumback v. Ferguson*, No. 22-cv-3093, 2023 WL 6221425, at *8-10 (E.D. Wash. Sept. 25, 2023).

2. As *Bevis* already held, neither assault weapons nor LCMs are protected by the Second Amendment for another reason: these items are not in common use for lawful self-defense. *See* 85 F.4th at 1195-97. As this Court explained, "[b]oth Supreme Court decisions and historical sources indicate that the Arms the Second Amendment is talking about are weapons in common use for self-defense." *Id.* at 1192; *see Bruen*, 597 U.S. at 32 (Amendment protects firearms "'in common use' today for self-defense" (quoting *Heller*, 554 U.S. at 627)). The "Arms" entitled to protection do not include weapons "that are not possessed for lawful purposes" by civilians, such as those "weapons that are exclusively or predominantly useful in military service." *Bevis*, 85 F.4th at 1194. *Heller* itself "placed such weapons of

crime and war in explicit contradistinction to the handgun, 'the quintessential self-defense weapon,' which it emphasized was squarely within the ambit of the Second Amendment," and held that "'weapons that are most useful in military service,' such as 'M-16 rifles and the like,' can be 'banned.'" *Bianchi v. Brown*, 111 F.4th 438, 451 (4th Cir. 2024) (en banc) (quoting *Heller*, 554 U.S. at 627, 629), *cert. petition pending sub nom. Snope v. Brown*, No. 24-203 (U.S. 2024). That describes the restricted assault weapons and LCMs, which "are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense." *Bevis*, 85 F.4th at 1195.

That conclusion is strengthened by the record here. The "intertwined origins" of assault weapons like the AR-15 "and its military version, the M16, show that these weapons were intended for offensive combat applications rather than individual self-defense." *Compare Bianchi*, 111 F.4th at 454, *with* Doc. 185-1 ¶¶26-54. And the AR-15 has "not strayed far" from its "military origin": it "continues to use the same internal piston firing system and the same ammunition as the M16," with bullets "leav[ing] the muzzle at a similar velocity," "hav[ing] a similar effective area target range," and "deliver[ing] a similar amount of kinetic energy upon impact." *Compare Bianchi*, 111 F.4th at 454-55, *and Bevis*, 85 F.4th at 1195-96, *with* Doc. 185-1 ¶¶58, 103, 191. The assault-weapon attachments that Illinois's law prohibits are likewise "combat-functional": they "include a flash suppressor that conceals the shooter's

11

position and facilitates night combat operations," a "pistol grip that enables fast reloading and accuracy during sustained firing," and "a barrel shroud to protect the shooter's hands from excessive heat during sustained firing." *Bianchi*, 111 F.4th at 455 (identifying "combat-functional features that the AR-15 and M16 share"). LCMs, for their part, "increase the weapon's effective rate of fire and are most useful in prolonged firefights with enemy combatants." *Compare id.*, *and Ocean State Tactical, LLC v. Rhode Island* ("*OST*"), 95 F.4th 38, 46-49 (1st Cir. 2024), *cert. petition pending*, No. 24-131 (U.S. 2024), *with* Doc. 185-1 ¶108. Indeed, these militaristic characteristics are central to assault weapons' and LCMs' "phenomenal lethality," which cause "catastrophic damage" to the body. *Compare Bianchi*, 111 F.4th at 455, *with* Doc. 194-1 ¶¶35-44, *and* Doc. 185-3 ¶¶12-48. As one of the State's medical experts concluded, "an AR-15 style weapon is capable of significantly more destruction" than other firearms, and LCMs "only increase this destructive potential by increasing the number of rounds someone can fire without having to reload." Doc. 185-3 ¶¶40-41.

Given that catastrophic potential, it is little wonder that assault weapons and LCMs are disproportionately used in mass shootings, particularly ones resulting in high numbers of fatalities. AR-15s, for example, "are disproportionately used in mass shootings: one recent examination found that although AR-platform rifles constituted about 5% of the firearms in the United States, they were used in 25% of

mass shootings." *Bianchi*, 111 F.4th at 456; *see also* Doc. 185-8 ¶42 (finding that 24% of mass shootings involved assault weapons). And the State's expert found that 63% of mass shootings involved LCMs. Doc. 185-8 ¶43. Over the last four years, over half of all high-fatality mass shootings—those resulting in six or more deaths— involved assault weapons, and all such shootings involved LCMs. Doc. 190-1 at 39- 40 & Figs. 12-13.

On the other side of the ledger, neither LCMs nor assault weapons are typically used for self-defense. "[C]ivilian self-defense rarely—if ever—calls for the rapid and uninterrupted discharge of many shots, much less more than ten." *Compare OST*, 95 F.4th at 45, *and Bianchi*, 111 F.4th at 458-59, *with* Doc. 185-8 ¶¶5-30. In fact, the State's statistical expert found that, on average, shooters in self- defense incidents fire only 2.2 shots. Doc. 185-8 ¶11. As for assault weapons, record evidence shows that "only one" active-shooter incident "out of 456 in the past 23 years (0.2%) is known to have involved an armed civilian intervening with an assault weapon" in self-defense. Doc. 190-1 at 52. Said differently, assault weapons like the AR-15 and LCMs are "both ill-suited and disproportionate to self-defense," *Bianchi*, 111 F.4th at 461, which is precisely why this Court has already concluded that they, like the M-16, are "not protected by the Second Amendment" and thus "may be regulated or banned," *Bevis*, 85 F.4th at 1197.

There is no basis in this record to depart from *Bevis*'s holding. *See* 85 F.4th at 1197. While the District Court focused on the automatic-fire capability of M-16s, *see* SA108-09, that hardly shows that AR-15s are commonly used for self-defense. For one, the court simply sidestepped *Bevis*'s finding stressing "how easy it is to modify the AR-15 by adding a 'bump stock' ... thereby making it, in essence, a fully automatic weapon." 85 F.4th at 1196 (noting bump stock devices enable "rates of fire between 400 to 800 rounds per minute"); *Bianchi*, 111 F.4th at 456 ("[T]he AR-15's rate of fire can 'be easily converted to ... mimic military-grade machine guns' with devices like bump stocks, trigger cranks, and binary triggers.").[22] For another, the presence or absence of automatic fire is hardly dispositive of military use because "M-16s in automatic mode do[] not appear to be common" in the military. *Rupp v. Bonta*, 723 F. Supp. 3d 837, 852-53 (C.D. Cal. 2024), *appeal filed*, No. 24-2583 (9th Cir.). Even "[t]he U.S. Army Field Manual instructs that semiautomatic fire is '[t]he most important firing technique during fast-moving, modern combat' because it 'is the most accurate technique of placing a large volume of fire on ... multiple, or moving targets.'" *Compare Bianchi*, 111 F.4th at 456, *with* Doc. 222-3 ¶22. The mere fact of the M16's automatic capability thus "pales in significance compared to

---

[22] The court's citation to *Garland v. Cargill*, 602 U.S. 406 (2024) is puzzling, as *Cargill* itself emphasized that "[s]hooters have devised techniques for firing semiautomatic firearms at rates approaching those of some machineguns." *Id.* at 411; *see also id.* at 429 (Alito, J., concurring) ("[A] semiautomatic rifle with a bump stock can have the same lethal effect as a machinegun").

the plethora of combat-functional features that makes the [M16 and AR-15] so similar." *Bianchi*, 111 F.4th at 456. Plaintiffs fall short of establishing that the AR-15 is "materially different from the M16," *Bevis*, 85 F.4th at 1197—let alone is in common use for self-defense.

The District Court's heavy reliance on assault weapons' "circulation" to find common use was erroneous. *See* SA101-02. *Bevis* was clear that Second Amendment protection extends only to "weapons in common use for self-defense," and not to weapons reaching a certain number in circulation. *See* 85 F.4th at 1192, 1197-98 (rejecting challengers' argument based on "numbers alone"). That is compelled by precedent, which holds that whether a specific weapon falls within the Second Amendment right turns on whether it is in common *use* for self-defense, not common *ownership*. *See Bruen*, 597 U.S. at 38 (referring to "commonly *used* firearms for self-defense"); *id.* at 70 (describing "right to bear commonly *used* arms in public"); *see also Heller*, 554 U.S. at 636 (striking down an "absolute prohibition of handguns held *and used* for self-defense") (emphases added). Courts thus must consider whether the weapon actually "facilitate[s] armed self-defense," which is "the central component of the Second Amendment right." *Bruen*, 597 U.S. at 28-29; *see also Bianchi*, 111 F.4th at 459-60 (rejecting view that "so long as enough law-abiding citizens own a type of firearm, that type of firearm cannot be prohibited" as "misread[ing] *Heller* and *Bruen*"); *OST*, 95 F.4th at 51 (explaining the Supreme

15

Court "has not suggested that the constitutionality of arms regulations is to be determined based on the ownership rate of the weapons at issue, regardless of its usefulness for self-defense"); *Duncan*, 133 F.4th at 882-83 (similar).

Moreover, an ownership-tally approach to constitutional analysis is hopelessly circular. The quantity of a weapon in circulation depends in large part on whether and when prohibitive legislation was enacted; had governments banned AR-15s the moment they became commercially available, their circulation numbers would be negligible. *See OST*, 95 F.4th at 50-51. But "[i]t would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned." *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015); *see also Bevis*, 85 F.4th at 1198-99. Such a position would "ignore[] the reality that weapons may well proliferate before lawmakers comprehend that they are ill-suited or disproportionate to self-defense," and "foreclose the ability of legislators to assess these characteristics and to enhance their knowledge through observation and experience." *Bianchi*, 111 F.4th at 460-61; *see also OST*, 95 F.4th at 50. And if a tally were all that was needed to secure protection for a firearm, manufacturers could "secure constitutional immunity for their products" by flooding the market with "a sufficient quantity before legislatures

16

can react"—a wholly illogical proposition. *Bianchi*, 111 F.4th at 461; *see also Duncan*, 133 F.4th at 882-83.[23]

The District Court also failed to appreciate the import of its position, which would yield a conclusion that *Heller* found "startling": that the Second Amendment somehow protects machineguns. 554 U.S. at 624-25. After all, the evidence suggests that civilians legally own hundreds of thousands of machineguns. *See Duncan*, 133 F.4th at 882-83. Under an ownership-tally approach, that alone would suffice for constitutional protection—an untenable position the Supreme Court has rejected. *See Heller*, 554 U.S. at 624. Multiple circuits—including this one—have likewise rightly rejected this numerical approach. *See Bevis*, 85 F.4th at 1190; *Bianchi*, 111 F.4th at 459-61; *OST*, 95 F.4th at 51; *Duncan*, 133 F.4th at 882-83; *Hanson v. District of Columbia*, 120 F.4th 223, 232-34 (D.C. Cir. 2024).

Assault weapons and LCMs are not actually in common use for self-defense, or suitable for that purpose. This Court should adhere to its opinion in *Bevis*—which joined a chorus of courts post-*Bruen* that have come to the same conclusion. *See, e.g.*, *Bianchi*, 111 F.4th at 441-42; *Rupp*, 723 F. Supp. 3d at 862; *Nat'l Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63, 103 (D. Conn. 2023), *appeal filed*, No. 23-

---

[23] Indeed, if one "looked to numbers alone, the federal [assault-weapons] ban would have been constitutional before 2004, but unconstitutional thereafter," when "these weapons began to occupy a more significant share of the market." *Bevis*, 85 F.4th at 1199. That result "lacks both textual and historical provenance," *id.*, and is illogical. *See Bianchi*, 111 F.4th at 461.

1162 (2d Cir.); *Hartford v. Ferguson*, 676 F. Supp. 3d 897, 903-904 (W.D. Wash. 2023).

**B.     Illinois's Law Fits Well Within American Regulatory Traditions.**

While this Court rightly concluded that the identical challenge in *Bevis* could "be resolved at the first step of the *Bruen* framework," this Court went on "for the sake of completeness" to hold that the ban on assault weapons and LCMs is also "consistent with the history and tradition of firearms regulation" at *Bruen*'s second step. 85 F.4th at 1197-98. If the Court likewise reaches *Bruen's* second step here, it should conclude, just as it did in *Bevis*, that there exists a longstanding tradition of restrictions that are relevantly similar to Illinois's modern enactment. Indeed, laws limiting unusually dangerous weapons are "part of an enduring American tradition of state regulation," *id.* at 1199 (quoting *Bruen*, 597 U.S. at 69): from the earliest days of our republic through today, governments have restricted access to uniquely dangerous weapons that pose an inordinate public safety risk once those weapons emerged in the commercial market. That is what Illinois has done here.

To determine whether a statute satisfies the inquiry's second step, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. That is, the Court's task is to "ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Id*. The

Supreme Court has identified "at least two metrics" for analyzing whether historic and modern regulations are relevantly similar when considering historical principles: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. This inquiry does not demand a "historical twin" or a "dead ringer" to modern regulations. *Rahimi*, 602 U.S. at 692.

Indeed, *Rahimi* held that "some courts have misunderstood the methodology" that governs Second Amendment challenges by requiring too close a fit between the historical and modern restrictions, improperly insisting on "a law trapped in amber." *Id.* at 691. But, properly understood, the Second Amendment "permits more than just those regulations identical to ones" within our nation's early history. *Id.* at 691-92. And in cases like this one—involving "unprecedented societal concerns" and "dramatic technological changes"—the analysis of historical principles should be undertaken with an even "more nuanced approach." *Bruen*, 597 U.S. at 27, 30. *See also Rahimi*, 602 U.S. at 740 (Barrett, J., concurring) (explaining "[h]istorical regulations reveal a principle, not a mold"); *Bianchi*, 111 F.4th at 463 (applying "nuanced approach" to challenge to assault-weapons restriction where "[r]apid advancements in gun technology" have created "mass carnage" unknown to "our forebears"); *Hanson*, 120 F.4th at 240-42 (same); *Duncan*, 133 F.4th at 872-74 (same); *Capen v. Campbell*, 134 F.4th 660, 668-69 (1st Cir. 2025) (same).

Laws restricting assault weapons and LCMs fall well within our tradition. As

this Court has explained, there is a "long-standing tradition of regulating the especially dangerous weapons of the time, whether they were firearms, explosives, Bowie knives, or other like devices." *Bevis*, 85 F.4th at 1199. From the colonial period on, States and municipalities adopted measures that, like Illinois's law, sought to restrict the firepower of weapons in order to promote public safety.[24] *Compare Duncan*, 133 F.4th at 876-77, *and OST*, 95 F.4th at 49, *with* Doc. 247-1 tbl.1. These restrictions addressed the "risks posed by the aggregation of large quantities of gunpowder, which could kill many people at once if ignited," meaning "founding-era communities may well have responded to today's unprecedented concern about LCM [and assault-weapon] use just as" Illinois did. *OST*, 95 F.4th at 49.

Similarly, States and the federal government have adopted measures that, like Illinois's law, regulate novel and unusually dangerous weapons that contribute to crime without utility for self-defense. This tradition has followed a predictable pattern: first, new weapons technologies were developed; second, they spread into society and created a public safety threat; and third, governments enacted regulations

---

[24] *See, e.g.,* 1782 Mass. Acts 119, ch. 46 (fining any person who "shall take into any [house or building] within the Town of Boston, any … Fire-Arm, loaded with, or having Gun-Powder."); Act of Apr. 13, 1784, ch. 28, 1784 N.Y. Laws 627, 627 (restricting home storage of gunpowder to "four stone jugs or tin cannisters" of seven pounds each); 1882 Mass. Acts 212, ch. 269 (requiring registration of gunpowder in excess of one pound stored in buildings); 1771-72 Mass. Province Laws 167, ch. 9 (requiring gunpowder to be stored in public magazines); *see also* 1832 Conn. Acts 391, ch. 25; 1825 N.H. Laws 73, ch. 61; 1821 Maine Laws 98, ch. 25; 1772 N.Y. Laws 682, ch. 1549; 1852 Tenn. Acts 246, ch. 169.

to dampen weapons-related criminality and violence. *See Bianchi*, 111 F.4th at 462 ("[T]he arc of weapons regulation in our nation has mimicked a call and response composition, in which society laments the harm certain excessively dangerous weapons are wreaking, and the state, pursuant to its police power, legislates in kind."). Indeed, in the early nineteenth century, States increasingly began imposing restrictions on weapons like Bowie knives[25] and pocket pistols[26] that contributed to rising murder rates. *See Aymette v. State*, 21 Tenn. 154, 158 (1840) (in upholding law banning sale and concealed carry of Bowie knives, distinguishing between protected weapons and "weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin"). Many of the laws prohibited concealed carry of these weapons, and some, like Arkansas's and Tennessee's postbellum statutes regulating pocket pistols, likewise banned sales. *See An Act to Prevent the Sale of Pistols*, ch. 96, § 1, 1879 Tenn. Acts 135-36; 1881 Ark. Acts 191, no. 96, § 3. *See also OST*, 95 F.4th at 46 (discussing "the severe

---

[25] *See, e.g.*, 1837 Ga. Acts. 90, § 1; Ch. 77, § 2, 1837 Ala. Laws 7, 7; No. 24 § 1, 1838 Fla. Laws 36, 36; Ch. 137, §§ 1-2, 1837-38 Tenn. Acts 200; Ch. 101, § 1, 1838 Va. Acts 76, 76; Ch. 77, § 1, 1839 Ala. Laws 67, 67. "Designed for the express purpose of fighting, dirks and Bowie knives generally had longer blades than ordinary knives, crossguards to protect users' hands, and clip points that made it easier to stab an opponent." *Bianchi*, 111 F.4th at 465.

[26] *See, e.g.*, 1819 Ind. Acts 39; 1821 Tenn. Acts ch. 13, p. 15; W. Ball, Revised Statutes of the State of Arkansas, Adopted at the Oct. Sess. of the General Assembly of Said State, A.D. 1837, § 13, 280 (1838); Ch. 101, § 1, 1838 Va. Acts 76, 76.

restrictions placed on Bowie knives by forty-nine states and the District of Columbia in the nineteenth century once their popularity in the hands of murderers became apparent"); Doc. 185-5 ¶¶64-74 (same).

This era also saw continued regulation of clubs and other blunt weapons, including slung shots.[27] For example, as early as 1750, Massachusetts enacted a law authorizing the dispersal or seizure of groups of twelve or more people armed with "clubs or other weapons." 1750 Mass. Acts 544, chap. 17, § 1. The history of 19th century regulation included laws in several states that prohibited the manufacture, sale, and/or possession of slung shots, including New York and Vermont in 1849, Massachusetts in 1850, Florida in 1868, Illinois in 1881, and Minnesota in 1888.[28] Later, additional states similarly prohibited possession of items like slung shots, billy clubs and bludgeons.[29] *See also Bianchi*, 111 F.4th at 466-67 & nn.5-10 (citing multiple restrictions on "excessively dangerous weapons such as Bowie knives,

---

[27] A slung shot is a hand-held weapon comprising "a weight fastened to the end of a chain or rope that can be swung around to apply blunt force to an opponent." *Bianchi*, 111 F.4th at 467 n.9.

[28] 1849 N.Y. Laws 403-04; 1849 Vt. Acts & Resolves 26; Mass. Gen. Law, chap. 194, §§ 1, 2 as codified in Mass. Gen. Stat., chap. 164 (1873) § 11; Fla. Act of Aug. 8, 1868, as codified in Fla. Rev. Stat., tit. 2, pt. 5 2425 (1892); Ill. Act of Apr. 16, 1881, chap. 38 (1885) 88, § 1; George Brooks Young, General Statutes of the State of Minnesota in Force January 1, 1889, Page 1006, Image 1010 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.

[29] *See, e.g.,* Act of May 4, 1917, ch. 145, §§ 1, 2, 5, 1917 Cal. Sess. Laws 221, 221-22; 1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.

dirks, sword canes, metal knuckles, slungshots, and sand clubs"); Doc. 185-5 ¶¶75-83 (same).

During the 1920s and 1930s, the Nation witnessed a new wave of regulation of emergent weapons that threatened public safety. Restrictions of this era "include[] bans on sawed-off shotguns … [and] restrictions on machine guns, most of which have been effectively banned nationally since 1986." *OST*, 95 F.4th at 46. Sawed-off shotguns were regulated federally in 1934, "after they became popular with the 'mass shooters of their day'—notorious Prohibition-era gangsters like Bonnie Parker and Clyde Barrow." *Id.* at 47.[30] Machineguns were also first regulated by Congress in 1934, *id.* at 50, and "have been effectively banned nationally since 1986," *id.* at 46.[31] *See also Bianchi*, 111 F.4th at 470 ("At least 29 states enacted anti-machine-gun laws between 1925 and 1934[.]") & n.14 (citing state statutes).

During these decades, a number of jurisdictions also banned or restricted high-capacity semiautomatic weapons after they began to proliferate, typically in the same legislation that banned machineguns. *See Heller*, 554 U.S. at 624 (noting it "would be [] startling" if "the National Firearms Act's restrictions on machineguns … might

---

[30] *See, e.g.*, National Firearms Act of 1934, ch. 757, Pub. L. No. 73-474, 48 Stat. 1236.

[31] *See, e.g.*, National Firearms Act of 1934; 18 U.S.C. § 922 (o).

be unconstitutional").[32] In the same era, regulations limiting magazine capacity were also common: many states imposed some limitation, typically restricting the number of rounds to between five and eighteen.[33]

This tradition of regulating unusually dangerous weapons is relevantly similar to the challenged Illinois statute in how and why the enactments burden the right to armed self-defense. These laws target only specific dangerous weapons commonly used for criminal and other violent purposes, rather than standard weapons of lawful civilian self-defense, after those weapons have circulated in the civilian market and the threats to public safety have become clear. The same tradition allows restrictions on machineguns, just as it allows for restrictions on assault weapons and LCMs— and just as it allowed, e.g., restrictions on Bowie knives and slingshots. To be sure, the technical features of a Bowie knife and an assault weapon are not identical. But that is not the test: a demand that a modern restriction on a weapon be identical to a historical restriction would result in a "law trapped in amber," precisely what the

---

[32] *See* An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, no. 372 § 3, 1927 Mich. Pub. Acts 888, 888-89; Ch. 1052 §§ 1, 4, 1927 R.I. Pub. Laws 256, 256-57; An Act to Control the Possession, Sale, Transfer, and Use of Pistols and Other Dangerous Weapons in the District of Columbia, Pub. L. No. 72-275, 47 Stat. 650, 650 (1932); Ch. 190, § 1, 1933 Minn. Laws 231, 232; Ch. 96, 1934 Va. Acts 137-40.

[33] *See, e.g.*, 1933 Cal. Stat. 1169, 1170; No. 80, § 1, 1932 La. Acts 336, 337; An Act to Regulate the Sale, Possession and Transportation of Machine Guns, no. 18, §§ 1-2, 1931 Ill. Laws 452-53; An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, ch. 235, § 5711, 1923 Vt. Acts and Resolves 930.

Court in *Rahimi* rejected, 602 U.S. at 691, and would leave States powerless to respond to advancements in weapons technology—no matter how lethal. The rule is just the opposite: a modern law survives when, generally, historical laws, "[t]aken together," support the relevant principle. *Id.* at 698; *see id.* at 739 (Barrett, J., concurring) ("To be *consistent* with historical limits, a challenged regulation need not be an updated model of a historical counterpart."). That standard is met here.[34]

Further, as this Court has already confirmed, the purpose of Illinois's law is also relevantly similar to the purpose of this tradition of regulation: to enhance public safety in the face of new weapon technology that has threatened, or already inflicted, significant harm on residents. *See Bevis*, 85 F.4th at 1200 ("Historical regulations show that at least since the Founding there has been an unbroken tradition of regulating weapons to advance similar purposes."). The Bowie-knife restrictions of the early 1800s, for example, were intended "to promote personal security, and to put down lawless aggression and violence." *State v. Reid*, 1 Ala. 612, 617 (1840). And early twentieth-century regulation of machineguns and semiautomatic weapons

---

[34] *Rahimi* thus only bolsters this Court's previous analysis in *Bevis*, where it held the "long-standing tradition of regulating the especially dangerous weapons of the time" matched the "how" of Illinois's law banning sale and possession of assault weapons and LCMs. *Bevis*, 85 F.4th at 1199. Indeed, the historical evidence in this case presents a far closer fit than the evidence that *Rahimi* relied on. *See* 602 U.S. at 698 (upholding federal ban on possession by individuals subject to domestic-violence restraining orders based on historical surety and going-armed laws, even though such laws were not possession bans); *see also id.* at 767-72 (Thomas, J., dissenting) (describing the differences between the historical statutes and modern law).

stemmed from concern over their "uniquely destructive capabilities," especially in the hands of "emergent Prohibition-fueled gangster organizations of the 1920s." Doc. 185-5 ¶¶14-22. The same concerns animate Illinois's law here.

At bottom, as this Court and every other circuit to consider the question has concluded, there exists "a strong tradition of regulating those weapons that were invented for offensive purposes and were ultimately proven to pose exceptional dangers to innocent civilians." *Bianchi* 111 F.4th at 471; *Bevis*, 85 F.4th at 1197-1202; *Duncan*, 133 F.4th at 878-82; *Hanson*, 120 F.4th at 234-42; *OST*, 95 F.4th at 43-52. Illinois's choice to restrict access to assault weapons and LCMs is consistent with the principles underpinning a long tradition of relevantly similar historical antecedents, and comports fully with the Second Amendment. This Court should not become the first circuit to hold to the contrary.

## CONCLUSION

This Court should reverse the decision below, vacate the permanent injunction, and order that judgment be entered for Appellants.

Respectfully submitted,

MATTHEW J. PLATKIN
*Attorney General of New Jersey*

/s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum
*Solicitor General*
25 Market St. PO Box 080

ANDREA JOY CAMPBELL
*Attorney General of Massachusetts*

/s/ Grace Gohlke
Grace Gohlke
*Assistant Attorney General*
One Ashburton Place

26

Trenton, NJ 08625                    Boston, MA 02108
(862) 350-5800                       (617) 963-2527
jeremy.feigenbaum@njoag.gov          grace.gohlke@mass.gov

Date: May 14, 2025

ROB BONTA                            PHILIP J. WEISER
*Attorney General*                   *Attorney General*
*State of California*                *State of Colorado*
1300 I Street                        1300 Broadway, 10th Floor
Sacramento, CA 95814                 Denver, CO 80203

WILLIAM TONG                         KATHLEEN JENNINGS
*Attorney General*                   *Attorney General*
*State of Connecticut*               *State of Delaware*
165 Capitol Avenue                   820 N. French Street
Hartford, CT 06106                   Wilmington, DE 19801

BRIAN L. SCHWALB                     ANNE E. LOPEZ
*Attorney General for the*           *Attorney General*
*District of Columbia*               *State of Hawaiʻi*
400 6th Street, NW, Suite 8100       425 Queen Street
Washington, D.C. 20001               Honolulu, HI 96813

ANTHONY G. BROWN                     DANA NESSEL
*Attorney General*                   *Attorney General*
*State of Maryland*                  *State of Michigan*
200 Saint Paul Place                 P.O. Box 30212
Baltimore, MD 21202                  Lansing, MI 48909

KEITH ELLISON                        AARON D. FORD
*Attorney General*                   *Attorney General*
*State of Minnesota*                 *State of Nevada*
102 State Capitol                    100 North Carson Street
75 Rev. Dr. Martin Luther            Carson City, NV 89701
King Jr. Blvd.
St. Paul, MN 55155

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

NICHOLAS W. BROWN
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

DAN RAYFIELD
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

This Amicus Curiae brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because this brief contains 6,430 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This Amicus Curiae brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum
Solicitor General
New Jersey Attorney General's Office

Date: May 14, 2025

## <u>CERTIFICATE OF SERVICE</u>

On May 14, 2025, the undersigned caused this brief to be filed with the Clerk of the United States Court of Appeals for the Seventh Circuit via electronic filing. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum
Solicitor General
New Jersey Attorney General's Office

Date: May 14, 2025

# APPENDIX

This Appendix is included pursuant to Fed. R. App. P. 28(f).

## Table 1: Assault Weapon Restrictions

The following jurisdictions restrict the possession or sale of assault weapons as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **California** | Cal. Penal Code §§ 30500-30515, 30600, 30605. |
| **Connecticut** | Conn. Gen. Stat. §§ 53-202a-202c. |
| **Delaware** | Del. Code tit. 11, §§ 1465-1466(a). |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(3A), 7-2502.01, 7-2502.02(a)(6). |
| **Hawaii** | Haw. Rev. Stat. Ann. §§ 134-1, 134-4, 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1.9. |
| **Maryland** | Md. Code Ann., Crim. Law §§ 4-301, 4-303. |
| **Massachusetts** | Mass. Gen. Laws ch. 140, §§ 121, 131M. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(w), -5(f) |
| **New York** | N.Y. Penal Law §§ 265.00(22), 265.02(7). |

| | |
|---|---|
| **Washington** | Wash. Rev. Code §§ 9.41.0001, 9.41.010(2), 9.41.240 (2023 Wash. Sess. Laws, ch. 162, § 1). |

## Table 2: Laws Banning Automatic Weapons

The following jurisdictions ban automatic weapons as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **California** | Cal. Penal Code § 32625. |
| **Colorado** | Colo. Rev. Stat. § 18-12-102. |
| **Delaware** | Del. Code tit. 11, §§ 1444(a)(5), (b)(1). |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(10), 7-2502.01, 7-2502.02(a)(2). |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(7)(i). |
| **Iowa** | Iowa Code §§ 724.1(a), 724.3. |
| **Louisiana** | La. Rev. Stat. Ann. §§ 40:1751 to 40:1752. |
| **Massachusetts** | Mass. Gen. Laws ch. 140, §§ 121, 131(o); Mass. Gen. Laws ch. 269, § 10(c). |

| | |
|---|---|
| **Minnesota** | Minn. Stat. § 609.67. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(*i*), -5(a) |
| **New York** | N.Y. Penal Law § 265.02(2). |
| **Rhode Island** | R.I. Gen. Laws § 11-47-8(a). |
| **Wisconsin** | Wis. Stat. § 941.26(1g)(a). |

### **Table 3: Laws Requiring Registration of Pre-1986 Automatic Weapons**

The following jurisdictions require that all automatic weapons manufactured before 1986 be registered with a licensing agency as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **Federal** | 18 U.S.C. §§ 921(a)(24), 922(o); 26 U.S.C. § 5845(b). |
| **Alaska** | Alaska Stat. Ann. §§ 11.61.200(a)(3), (h)(1)(C). |
| **Arizona** | Ariz. Rev. Stat. Ann. §§ 13-3101(A)(8)(a)(iii), 13-3102(A)(3). |
| **Connecticut** | Conn. Gen. Stat. § 53-202. |
| **Florida** | Fla. Stat. §§ 790.001(9), 790.221. |

| Georgia | Ga. Stat. §§ 16-11-121(2), 16-11-122, 16-11-124(4). |
|---|---|
| **Indiana** | Ind. Code Ann. §§ 35-47-5-8 to 35-47-5-8-10. |
| **Kansas** | Kan. Stat. Ann. § 21-6301(a)(5). |
| **Maine** | Me. Rev. Stat. Ann. tit. 17-A, §§ 1051-1052. |
| **Maryland** | Md. Code Ann. §§ 4-401 to 4-405. |
| **Michigan** | Mich. Comp. Laws §§ 750.224(1)(a), (3)(c). |
| **Missouri** | Mo. Rev. Stat. § 571.020(1.6)(a). |
| **Montana** | Mont. Code Ann. §§ 45-8-302 to 45-8-304. |
| **Nebraska** | Neb. Rev. Stat. § 28-1203. |
| **Nevada** | Nev. Rev. Stat. Ann. § 202.350(1)(b). |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(i), 2C:39-5(a), 2C:39-9(a). |
| **North Carolina** | N.C. Gen. Stat. § 14-288.8. |
| **North Dakota** | N.D. Cent. Code § 62.1-05-01. |
| **Ohio** | Ohio Rev. Code Ann. §§ 2923.11(K)(1), 2923.17. |

| | |
|---|---|
| **Oregon** | Or. Rev. Stat. § 166.272. |
| **Pennsylvania** | 18 Pa. Cons. Stat. Ann. § 908. |
| **South Carolina** | S.C. Code Ann. §§ 16-23-230 to 16-23-250. |
| **South Dakota** | S.D. Codified Laws §§ 22-1-2(8), (23), 22-14-6. |
| **Tennessee** | Tenn. Code Ann. §§ 39-17-1302(a)(3), (d). |
| **Texas** | Tex. Penal Code §§ 46.01(9), 46.05(a)(1)(B). |
| **Virginia** | Va. Code §§ 18.2-288 to 18.2-298. |
| **Washington** | Wash. Rev. Code §§ 9.41.010(29), 9.41.190. |
| **West Virginia** | W. Va. Code § 61-7-9. |

### Table 4: Laws Banning Short-Barreled Shotguns or Rifles

The following jurisdictions ban possession of short-barreled shotguns or short-barreled rifles as part of their firearm safety laws.

| Jurisdiction | Jurisdictional Law |
|---|---|
| **California** | Cal. Penal Code §§ 33210, 33215. |
| **Colorado** | Colo. Rev. Stat. § 18-12-102. |
| **Delaware** | Del. Code tit. 11, §§ 1444(a)(4), (b)(1). |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(15), (17), 7-2502.01, 7-2502.02(a)(1), (a)(3). |
| **Hawaii** | Haw. Rev. Stat. Ann. §§ 134-1, 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(7)(ii). |
| **Massachusetts** | Mass. Gen. Laws ch. 140, § 121; Mass. Gen. Laws ch. 269, § 10(c). |
| **Minnesota** | Minn. Stat. § 609.67. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(o), 2C:39-3(b). |
| **Rhode Island** | R.I. Gen. Laws §§ 11-47-2(15) to 11-47-2(16), 11-47-8(b). |

## Table 5: Laws Restricting Short-Barreled Shotguns or Rifles

The following jurisdictions restrict the possession of short-barreled shotguns or short-barreled rifles as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **Federal** | 18 U.S.C. §§ 921(a)(6), 921(a)(8), 922(a)(4). |
| **Alaska** | Alaska Stat. Ann. §§ 11.61.200(a)(3), (h)(1)(D). |
| **Arizona** | Ariz. Rev. Stat. Ann. §§ 13-3101(A)(8)(a)(iv), 13-3102(A)(3). |
| **Connecticut** | Conn. Gen. Stat. § 53a-211. |
| **Florida** | Fla. Stat. §§ 790.001(10)-(11), 790.221. |
| **Georgia** | Ga. Stat. §§ 16-11-121(4)-(5), 16-11-122, 16-11-124(4). |
| **Iowa** | Iowa Code § 724.1C. |
| **Kansas** | Kan. Stat. Ann. § 21-6301(a)(5). |
| **Michigan** | Mich. Comp. Laws § 750.224b. |
| **Missouri** | Mo. Rev. Stat. § 571.020(1.6)(b). |
| **Montana** | Mont. Code Ann. § 45-8-340. |

| Nebraska | Neb. Rev. Stat. § 28-1203. |
|---|---|
| Nevada | Nev. Rev. Stat. Ann. § 202.275. |
| New Jersey | N.J. Stat. Ann. §§ 2C:39-1(i), 2C:39-5(a), 2C:39-9(a). |
| North Carolina | N.C. Gen. Stat. § 14-288.8. |
| North Dakota | N.D. Cent. Code § 62.1-02-03. |
| Ohio | Ohio Rev. Code Ann. §§ 2923.11(K)(1), 2923.17. |
| Oregon | Or. Rev. Stat. § 166.272. |
| Pennsylvania | 18 Pa. Cons. Stat. Ann. § 908. |
| South Carolina | S.C. Code Ann. §§ 16-23-230 to 16-23-250. |
| South Dakota | S.D. Codified Laws §§ 22-1-2(8), (46), 22-14-6. |
| Texas | Tex. Penal Code §§ 46.01(10), 46.05(a)(1)(C). |
| Washington | Wash. Rev. Code §§ 9.41.010(41)-(42), 9.41.190. |
| Wisconsin | Wis. Stat. § 941-28. |

## Table 6: Laws Banning 50-Caliber and Other High-Caliber Rifles

The following jurisdictions ban possession of rifles designed to shoot 50-Caliber and other High-Caliber ammunition.

| Jurisdiction | Jurisdictional Law |
|---|---|
| California | Cal. Penal Code §§ 30530, 30600, 30610. |
| District of Columbia | D.C. Code Ann. §§ 7-2501.01(8A), 7-2502.01, 7-2502.02(a)(7). |
| Illinois | 720 Ill. Comp. Stat. 5/24-1(a)(15)-(16), 5/24-1.9. |
| New Jersey | N.J. Stat. Ann. §§ 2C:39-1(c)(3), (5), 2C:39-3(a). |

## Table 7: Laws Banning Covert Weapons

The following jurisdictions ban possession of covert and hidden firearms as part of their firearm safety laws.

| Jurisdiction | Jurisdictional Law |
|---|---|
| Alabama | Ala. Code § 13A-11-54. |
| California | Cal. Penal Code § 24410. |
| Massachusetts | Mass. Gen. Laws ch. 140, § 131N. |
| New Jersey | N.J. Stat. Ann. §§ 2C:39-1(hh), 2C:39-3(m). |
| New York | N.Y. Penal Law § 265.02(6). |

39

## **Table 8: Laws Banning Destructive Devices**

The following jurisdictions ban the possession of grenades, rocket launchers, bombs, and other destructive devices as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **California** | Cal. Penal Code §§ 16460, 18710. |
| **Colorado** | Colo. Rev. Stat. § 18-12-109(2)(a). |
| **Connecticut** | Conn. Gen. Stat. § 53-80(a). |
| **Delaware** | Del. Code Ann. tit. 11, §§ 1444(a)(1), (b)(1). |
| **District of Columbia** | D.C. Code § 22-4515a. |
| **Florida** | Fla. Stat. §§ 790.001(4), 790.161. |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(7)(iii). |
| **Iowa** | Iowa Code §§ 101A.1(2A), 724.1(1)(c), 724.3. |
| **Massachusetts** | Mass. Gen. Laws ch. 266, § 102(c). |
| **Minnesota** | Minn. Stat. § 609.668. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(c)(1), 2C:39-3(a). |

| | |
|---|---|
| **New York** | N.Y. Penal Law § 265.02(2). |
| **Oregon** | Or. Rev. Stat. § 480.070. |
| **Pennsylvania** | 18 Pa. Cons. Stat. Ann. §§ 908(a), (c). |
| **Rhode Island** | R.I. Gen. Laws §§ 11-47.1-21. |
| **Utah** | Utah Code Ann. § 76-10-306(3). |
| **Virginia** | Va. Code Ann. § 18.2-85. |
| **Wisconsin** | Wis. Stat. § 941.26(2)(c). |

## Table 9: Laws Restricting Magazine Capacity

The following jurisdictions restrict the quantity of rounds able to be fired from a single magazine as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **California** | Cal. Penal Code §§ 16740, 32310. |
| **Colorado** | Colo. Rev. Stat. §§ 18-12-301, 302, 303. |
| **Connecticut** | Conn. Gen. Stat. § 53-202w(a)(1). |
| **Delaware** | Del. Code Ann. tit. 11, §§ 1468, 1469(a). |

| | |
|---|---|
| **District of Columbia** | D.C. Code § 7-2506.01(b). |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8(c). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1.10. |
| **Maryland** | Md. Code Ann., Crim. Law § 4-305(b). |
| **Massachusetts** | Mass. Gen. Laws ch. 140, §§ 121, 131M. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(y), 2C:39-3(j). |
| **New York** | N.Y. Penal Law § 265.02(8). |
| **Oregon** | 2022 Oregon Ballot Measure 114, § 11. |
| **Rhode Island** | R.I. Gen. Laws §§ 11-47.1-2, 11-47.1-3. |
| **Vermont** | Vt. Stat. Ann. Tit. 13, § 4021. |
| **Washington** | Wash. Rev. Code §§ 9.41.010(22), 9.41.370. |

## Table 10: Laws Banning Bump Stocks or Similar Devices

The following jurisdictions ban the possession or sale of bump stocks, trigger cranks, trigger activators, and other devices designed to artificially increase the rate of fire for semi-automatic weapons as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **California** | Cal. Penal Code § 32900. |
| **Connecticut** | Conn. Gen. Stat. § 53-206g. |
| **Delaware** | Del. Code tit. 11, §§ 1444(a)(6), (b)(2). |
| **District of Columbia** | D.C. Code Ann. § 22-4514(a). |
| **Florida** | Fla. Stat. § 790.222. |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8.5. |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(14). |
| **Iowa** | Iowa Code § 724.29. |
| **Maryland** | Md. Code Ann., Crim. Law §§ 4-301, 4-305.1(a). |
| **Massachusetts** | Mass. Gen. Laws ch. 140, §§ 121, 131(o); Mass. Gen. Laws ch. 269, § 10(c). |
| **Michigan** | Mich. Comp. Laws § 750.224e. |

| | |
|---|---|
| **Minnesota** | Minn. Stat. § 609.67. |
| **Nevada** | Nev. Rev. Stat. Ann. § 202.274. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(ee)-(ff), 2C:39-3(*l*). |
| **New York** | N.Y. Penal Law § 265.02(2). |
| **Pennsylvania** | 18 Pa. Cons. Stat. Ann. §§ 908(a), (c). |
| **Rhode Island** | R.I. Gen. Laws §§ 11-47-2(3), (19), 11-47-8(d), 11-47-8.1. |
| **Vermont** | Vt. Stat. Ann. tit. 13, § 4022. |
| **Virginia** | Va. Code Ann. § 18.2-308.5:1. |
| **Washington** | Wash. Rev. Code §§ 9.41.010(5), 9.41.220. |

## Table 11: Laws Banning Silencers

The following jurisdictions ban the possession or sale of silencers, suppressors, and other accessories designed to mitigate the sound of discharging a weapon as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **California** | Cal. Penal Code § 33410. |
| **Delaware** | Del. Code tit. 11, §§ 1444(a)(3), (b)(1). |
| **District of Columbia** | D.C. Code Ann. § 22-4514(a). |
| **Hawaii** | Haw. Rev. Stat. Ann. §§ 134-1, 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(6). |
| **Massachusetts** | Mass. Gen. Laws ch. 269, § 10A. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(g), 2C:39-3(c). |
| **New York** | N.Y. Penal Law § 265.02(2). |
| **Rhode Island** | R.I. Gen. Laws § 11-47-20. |

## Table 12: Laws Restricting Silencers

The following jurisdictions restrict the possession of silencers, suppressors, and other accessories designed to mitigate the sound of discharging a weapon as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
| --- | --- |
| **Federal** | 18 U.S.C. § 921(a)(3); 26 U.S.C. §§ 5841(a), 5845(a)(7), 5861. |
| **Alaska** | Alaska Stat. §§ 11.61.200(a)(3), (c), (h)(1)(B). |
| **Arizona** | Ariz. Rev. Stat. Ann. §§ 13-3101(A)(8)(a)(ii), 13-3102(A)(3), 17-251. |
| **Colorado** | Colo. Rev. Stat. § 18-12-102. |
| **Connecticut** | Conn. Gen. Stat. § 53a-211. |
| **Georgia** | Ga. Code Ann. §§ 16-11-121(7), 16-11-122. |
| **Iowa** | Iowa Code § 724.1B. |
| **Kansas** | Kan. Stat. Ann. § 21-6301(a)(4). |
| **Michigan** | Mich. Comp. Laws §§ 750.224(1)(b), (3)(c). |
| **Missouri** | Mo. Rev. Stat. § 571.020(1.6)(c). |
| **Montana** | Mont. Code Ann. § 45-8-337. |

| | |
|---|---|
| **Nevada** | Nev. Rev. Stat. Ann. § 202.350(1)(b). |
| **North Carolina** | N.C. Gen. Stat. § 14-288.8. |
| **North Dakota** | N.D. Cent. Code § 62.1-05-01. |
| **Ohio** | Ohio Rev. Code Ann. §§ 2923.11(K)(5), 2923.17(A), (C)(5). |
| **Oregon** | Or. Rev. Stat. § 166.272. |
| **Pennsylvania** | 18 Pa. Cons. Stat. § 908. |
| **South Dakota** | S.D. Codified Laws §§ 22-1-2(8), (17), 22-14-6. |
| **Vermont** | Vt. Stat. Ann. tit. 13, § 4010. |
| **Washington** | Wash. Rev. Code § 9.41.250(1)(c). |
| **Wisconsin** | Wis. Stat. § 941-298. |

## **Table 13: Laws Banning Armor-Piercing Ammunition**

The following jurisdictions ban the possession of ammunition designed to penetrate body armor or vehicle armor as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **Federal** | 18 U.S.C. §§ 921(a)(17)(B)-(C), 922(a)(7)-(8). |
| **Alabama** | Ala. Code § 13A-11-60(a). |
| **California** | Cal. Penal Code §§ 16660, 30315, 30320. |
| **Connecticut** | Conn. Gen. Stat. §§ 53-202*l*(a)(1), (b)-(c). |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(13A)(A)(i), 7-2506.01(a)(3). |
| **Florida** | Fla. Stat. §§ 790.31(1)(a), (2)(a)-(c). |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-2.1, 5/24-2.2. |
| **Indiana** | Ind. Code Ann. § 35-47-5-11.5. |
| **Kansas** | Kan. Stat. Ann. § 21-6301(a)(6). |
| **Kentucky** | Ky. Rev. Stat. Ann. §§ 237.060(7), 237.080. |

| | |
|---|---|
| **Louisiana** | La. Rev. Stat. Ann. §§ 40:1810-40:1812. |
| **Maine** | Me. Rev. Stat. Ann. tit. 17-A, § 1056. |
| **Michigan** | Mich. Comp. Laws § 750.224c. |
| **Nevada** | Nev. Rev. Stat. Ann. § 202.273. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(gg), 2C:39-3(f). |
| **North Carolina** | N.C. Gen. Stat. § 14-34.3. |
| **Oklahoma** | Okla. Stat. tit. 21, §§ 1289.19-1289.22. |
| **Rhode Island** | R.I. Gen. Laws § 11-47-20.1. |
| **South Carolina** | S.C. Code Ann. § 16-23-520. |
| **Texas** | Tex. Penal Code §§ 46.01(12), 46.05(a)(2). |
| **Virgin Islands** | V.I. Stat. tit. 14, §§ 2256(b)-(c). |

## Table 14: Laws Banning Explosive Ammunition

The following jurisdictions ban the possession of high-explosive incendiary ammunition designed to explode or impart energy upon contact via a charge as part of their firearm safety laws.

| Jurisdiction | Jurisdictional Law |
|---|---|
| **California** | Cal. Penal Code § 30210. |
| **Florida** | Fla. Stat. §§ 790.31(1)(b), (2)(a)-(c). |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(11), 5/24-3.1(a)(6). |
| **Iowa** | Iowa Code §§ 724.1(1)(f), 724.3. |
| **Missouri** | Mo. Rev. Stat. § 571.020(1.4). |
| **New York** | N.Y. Penal Law § 265.01(7). |
| **Tennessee** | Tenn. Code Ann. § 39-17-1304(b). |
| **Virgin Islands** | V.I. Stat. tit. 14, §§ 2256(b)-(c). |

## **Table 15: Laws Banning Large-Caliber Ammunition**

The following jurisdictions ban the possession of large-caliber ammunition as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **California** | Cal. Penal Code § 18735. |
| **Connecticut** | Conn. Gen. Stat. §§ 53-202*l*(a)(2), (b)-(c). |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(13A)(A)(iii), 7-2506.01(a)(3). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(11), 5/24-1.9(a)(6), (b), (c) (possession ban effective Jan. 1, 2024). |

## **Table 16: Law Banning Hollow-Point Bullets**

The following state bans the possession of hollow-point and other ammunition designed to expand on impact as part of its firearm safety laws.

| *State* | *State Law* |
|---|---|
| **New Jersey** | N.J. Stat. Ann. § 2C:39-3(f). |

## **Table 17: Laws Banning Flechette Ammunition**

The following states ban the possession of flechette shells, or other ammunition that can be fired in a firearm and that expels two or more pieces of fin-stabilized solid metal wire or two or more solid dart-type projectiles, as part of their firearm safety laws.

| *State* | *State Law* |
|---|---|
| **California** | Cal. Penal Code §§ 16570, 30210. |
| **Florida** | Fla. Stat. §§ 790.31(1)(f), (2)(a)-(c). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-2.1, 5/24-2.2. |

## **Table 18: Laws Banning Dragon's Breath and Bolo Shells**

The following states ban the possession of "Dragon's Breath" shells (ammunition that when fired produces sparks and flames simulating a flamethrower) and bolo shells (ammunition containing two or more large lead balls connected by a wire, that when used may sever a target's limb, as part of their firearm safety laws).

| *State* | *State Law* |
|---|---|
| **Florida** | Fla. Stat. §§ 790.31(1)(d)-(e), (2)(a)-(c). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-2.1, 5/24-2.2. |
| **Iowa** | Iowa Code §§ 724.1(1)(f), 724.2, 724.3. |