Nos. 24-3060, 24-3061, 24-3062, 24-3063 (cons.)

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

CALEB BARNETT, et al.,

Plaintiffs-Appellees,

v.

KWAME RAOUL, et al.,

Defendants-Appellants.

Appeal from the United States District Court
for the Southern District of Illinois
Nos. 23-cv-00209-SPM, 23-cv-00141-SPM, 23-cv-00192-SPM, 23-cv-00215-SPM
The Honorable Stephen P. McGlynn, Judge Presiding
————

**BRIEF OF AMICUS CURIAE COOK COUNTY**
**IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL**
————

EILEEN O'NEILL BURKE
State's Attorney of Cook County
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-4366
jonathon.byrer@cookcountysao.org

CATHY MCNEIL STEIN
Chief, Civil Actions Bureau
JESSICA M. SCHELLER
Division Chief, Civil Actions Bureau
JONATHON D. BYRER
Supervisor of Civil Appeals & Special Projects
PRATHIMA YEDDANAPUDI
Assistant State's Attorneys
*Of Counsel*

# TABLE OF CONTENTS

_____

TABLE OF AUTHORITIES ............................................................................... ii

INTEREST OF AMICUS CURIAE ........................................................... 1

ARGUMENT ................................................................................................ 2

    I.    **The District Court Applied The Wrong Legal Standard When Evaluating Common Use.** ........................................................ 2

    II.   **Assault Weapons Are Not "Arms" Within The Scope Of The Second Amendment Because They Are "Dangerous."** ................................... 10

CONCLUSION ........................................................................................ 23

CERTIFICATES OF COMPLIANCE & SERVICE ............................................. vii

## POINTS AND AUTHORITIES

———————

**Cases**

*Alden v. Maine*,
527 U.S. 706 (1999) ............................................................... 5

*Bailey v. United States*,
516 U.S. 137 (1995) ............................................................... 6

*Benjamin v. Bailey*,
662 A.2d 1226 (Conn. 1995) ............................................... 18

*Bevis v. City of Naperville*,
85 F.4th 1175 (7th Cir. 2023) ................................... 1, 8, 13

*Bianchi v. Brown*,
111 F.4th 438 (4th Cir. 2024) (en banc) ............... 2, 11, 22

*Calvillo-Silva v. Home Grocery*,
19 Cal. 4th 714 (1998) ........................................................ 20

*Cockcroft v. Smith*,
11 Mod. 43 (King's Bench 1705) ...................................... 16

*Day v. State*,
37 Tenn. 496 (1858) ............................................................ 19

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .....................................................passim

*English v. State*,
35 Tex. 473 (1872) .............................................................. 10

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) ............................................... 9

*Harrel v. Raoul*,
144 S. Ct. 2491 (2024) ........................................................ 11

*Katko v. Briney*,
183 N.W.2d 657 (Iowa 1971) ............................... 19, 20, 21

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) ................................................................... 13

*Moriarty v. Glueckert Funeral Home,*
   155 F.3d 859 (7th Cir. 1998) ...................................................... 10

*New York State Rifle & Pistol Ass'n v. Bruen,*
   597 U.S. 1 (2022) .............................................................passim

*Ocean State Tactical, LLC v. Rhode Island,*
   95 F.4th 38 (1st Cir. 2024) ........................................................... 8

*People v. Brown,*
   235 N.W. 245 (Mich. 1931) ........................................................ 18

*People v. Persce,*
   97 N.E. 877 (N.Y. 1912) ............................................................ 18

*Reg. v. Nailor,*
   Foster Crown Cases 278 (Old Bailey 1704) ................................. 17

*Rex v. Dewhurst,*
   (King's Bench 1820) .................................................................. 14

*Staples v. United States,*
   511 U.S. 600 (1994) .................................................................... 8

*State v. Duke,*
   42 Tex. 455 (Tex. 1874) ............................................................ 18

*State v. Huntly,*
   25 N.C. 418 (1843) ............................................................ 4, 5, 6

*State v. Reid,*
   1 Ala. 612 (1840) ...................................................................... 18

*State v. Wells,*
   1 N.J.L. 486 (N.J. 1790) ..................................................... 16, 17

iii

*United States v. Freed*,
    401 U.S. 601 (1971) ................................................................. 8

*United States v. Miller*,
    307 U.S. 174 (1939) ................................................................. 8

*United States v. Rahimi*,
    144 S. Ct. 1889 (2024) ...................................................... 4, 6, 8

*Vermont Fed. of Sportsmen's Clubs v. Birmingham*,
    No. 2:23-cv-710, 2024 U.S. Dist. LEXIS 126857 (D. Vt. July 2, 2024) ............ 3

*Wilson v. Cook County*,
    937 F.3d 1028 (7th Cir. 2019) ................................................... 1

## Statutes, Ordinances, & Rules

720 ILCS 5/24-1 ...................................................................... 19

Code of City of Ann Arbor Michigan § 6:613 ............................................ 7

Code of Ordinances of Cook County, Ill. § 54-210, et. seq. ............................ 1

Corpus Juris Civilis, Dig. 48, 49 ..................................................... 12

English Declaration of Rights of 1689, 1 W. & M., ch. 2, § 7 .......................... 14

Mich. Comp. Laws § 750.236 ............................................................ 19

Offenses Against the Person Act 1861, 24 & 25 Vict ................................... 19

Repeal of Obsolete Statutes Act 1856, act 19 & 20 Vict. c. 64 ........................ 13

Spring Gun Act 1827, 7 & 8 Geo. 4, ch. 18 ............................................ 19

Statute Made at Westminster in the Seventh Year 1383 ................................. 13

Statute of the Twentieth Year 1396-97 ................................................ 13

## Other Authorities

1 Nathan Dane, A GENERAL ABRIDGMENT & DIGEST OF AMERICAN LAW
(Boston 1823) ........................................................................................ 17

1 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND
(Oxford 2016) ........................................................................................ 14

3 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND
(Oxford 2016) ........................................................................................ 15

4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND
(Oxford 2016) ..................................................................................passim

7 Nathan Dane, A GENERAL ABRIDGMENT & DIGEST OF AMERICAN LAW
(Boston 1823) ........................................................................... 17, 18, 22

BLACK'S LAW DICTIONARY (8th ed. 2008) ..................................................... 3

Cass Sunstein, *Precautions Against What? The Availability Heuristic & Cross-Cultural Risk Perception*, 57 ALA. L. REV. 75, 87 (2005) ............................... 9

David Lockmiller, SIR WILLIAM BLACKSTONE (U.N.C. Press 1938) ............................ 5

Ed Tangen, *Spring Guns*, 1 AM. J. POLICE SCI. 307 (1930) ........................................ 19

Eric Ruben, *An Unstable Core: Self-Defense & the Second Amendment*,
108 CALIF. L. REV. 63 (2020) ................................................................ 16-17

George Cameron Stone, A GLOSSARY OF THE CONSTRUCTION, DECORATION, & USE OF ARMS & ARMOR IN ALL COUNTRIES & IN ALL TIMES (1934) ........................................ 13

Henry A. Chaney, *Nathan Dane*, THE GREEN BAG, Vol. III 548 (1891) ................... 17

House of Commons Debates, March 23, 1827, vol. 17, cc19-34 ........................... 20, 21

John Ayliffe, A NEW PANDECT OF ROMAN LAW (1734) ............................................. 12

1 John MacDonnell, REPORTS OF STATE TRIALS, NEW SERIES
(London 1888) ........................................................................................ 14

Joseph Keble, AN ASSISTANCE TO THE JUSTICES OF THE PEACE, FOR THE EASIER PERFORMANCE OF THEIR DUTY (1689) .......................................................... 5

Joyce Lee Malcolm, TO KEEP & BEAR ARMS (Cambridge 1994) ................................ 14

Miller Christy, *Man Traps & Spring-Guns*, OUTING, vol. XLI, issue 6 (1903) .................................................................................... 19-20

Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) ................................................................................ 12, 13

Stephen Halbrook, *To Bear Arms for Self-Defense*, 21 FEDERALIST SOC'Y REV. 46 (2020) ....................................................... 14

Rev. Sydney Smith, *Man Traps & Spring Guns*, THE EDINBURGH REVIEW, Vol. 35, Issue 70 (1821) ................................................................... 21

Thomas A. Green, *The Jury & The English Law Of Homicide, 1200-1600*, 74 MICH. L. REV. 413 (1976) ........................................................ 15

V.F. Nourse, *Self-Defense & Subjectivity*, 68 U. CHI. L. REV. 1235 (2001) .............. 15

William Hawkins, A TREATISE OF THE PLEAS OF THE CROWN (8th ed. London 1824) .................................................... 15, 16 n.3

William Lambarde, EIRENARCHA (1579) ................................................... 5

## INTEREST OF AMICUS CURIAE[1]

_____

Cook County, Illinois, is a home-rule unit of local government, and is also home to more than five million residents, thousands of businesses, and many major tourist attractions and events. Every day, Cook County welcomes thousands of individuals who come to the County to work, visit family and friends, or enjoy the attractions within the County and the City of Chicago.  The Cook County State's Attorney's Office is the second largest prosecutor's office in the United States, and is the entity endowed with authority to prosecute misdemeanor and felony criminal activity within Cook County, as well as the authority to represent Cook County in judicial proceedings before this court.

Cook County has a substantial interest in this litigation, having in 2006 passed the Blair Holt Assault Weapons Act prohibiting the possession of assault weapons and large-capacity magazines. Code of Ordinances of Cook County, Ill. §§ 54-210, *et seq*.  This court upheld that Act in *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019), and more recently rejected preliminary injunctive relief against that Act, as well as the materially identical statute enacted by the State of Illinois – the very statute at issue in the present appeal – in *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023). This court also recently heard oral argument in an appeal from

_____

[1] All parties have consented to the filing of this brief.  No counsel for a party authored this brief, in whole or in part, and no party or its counsel made a monetary contribution intended to fund its preparation or submission.  No person other than amicus curiae and its counsel made a monetary contribution to fund this brief's preparation or submission.

a final judgment upholding the constitutionality of that Act. *Viramontes v. Cook County*, No. 24-1437 (7th Cir. Nov. 12, 2024). As a result of that litigation, the County has independently conducted extensive historical research regarding questions central to this litigation – namely, the historical understanding of "common use" and the historical connection between the Second Amendment right and the narrow, proportionate right of self-defense recognized at English common law. The en banc Fourth Circuit recently recognized that connection in another case upholding an assault-weapon regulation against Second Amendment challenge. *Bianchi v. Brown*, 111 F.4th 438, 452 (4th Cir. 2024) (en banc). The County thus has a strong interest in ensuring that this court has an opportunity to consider the fruits of its research when determining whether to endorse the Fourth Circuit's position.

## ARGUMENT

————

### I.   The District Court Applied The Wrong Legal Standard When Evaluating Common Use.

*New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), adopted a two-step approach to Second Amendment challenges to firearm regulations. At the first step, the plaintiff must show that the regulation falls within the plain text of the Second Amendment – specifically, that the regulated weapon is an "arm," defined as a weapon commonly used for lawful purposes such as self-defense. *Id.* at 32. If not, the regulation passes scrutiny. If so, the regulation is presumptively invalid unless

2

the government demonstrates its consistency with this nation's historical traditions. *Id.* at 24.

Under *Bruen*, the plaintiff bears the initial burden of demonstrating that his challenge falls within that Amendment's text. *See* 597 U.S. at 24. For present purposes, then, the determinative question at this step is whether assault weapons constitute "arms" for purposes of that text. The Supreme Court has instructed that "arms" "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). But as indicated by the Court's inclusion of the term "prima facie" – a term used when a legal standard is only *presumptively* satisfied, absent more evidence, *e.g.*, BLACK'S LAW DICTIONARY 1228 (8th ed. 2008) – the fact that a weapon is *literally* a bearable arm does not conclusively establish that it is *legally* an arm for purposes of the Second Amendment. To the contrary, it was settled by the time of Blackstone that possession of "dangerous or unusual weapons" could be strictly regulated. 4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND, 148 (Oxford 2016). Reflecting this fact, *Bruen* discussed whether a weapon is "'in common use' today for self-defense," not in its lengthy analysis of history, but in the earlier section of its opinion analyzing the Second Amendment's *text*. 597 U.S. at 32; *accord Vermont Fed. of Sportsmen's Clubs v. Birmingham*, No. 2:23-cv-710, 2024 U.S. Dist. LEXIS 126857, at *14 (D. Vt. July 2, 2024) (noting that *Bruen* "discussed the 'common use' issue as part of its consideration of whether handguns were presumptively protected by the Second

3

Amendment"). Unless the Court in *Bruen* – having just announced a two-step text-then-history analysis – inexplicably misapplied its own analysis by addressing a historical inquiry at the textual step of that analysis, that is strong indication that the Court considered common-use part of the textual inquiry.

Because the parties in *Bruen* did not dispute that the ordinary handguns at issue in that case were commonly used for self-defense, 597 U.S. at 32, *Bruen* refrained from addressing what constitutes "common use." But both *Bruen* and the Court's subsequent decision in *United States v. Rahimi* specifically endorsed as representative of American legal traditions an early decision of the North Carolina Supreme Court in *State v. Huntly*, 25 N.C. 418 (1843) (per curiam). 144 S. Ct. 1889, 1901 (2024); *Bruen*, 597 U.S. at 51 (describing *Huntly* as "more telling" of early American law of affray than other sources). That is significant because *Huntly* directly addressed the legal standard governing common use. After quoting Blackstone's statement that the Statute of Northampton codifying the English law of affray applied to "dangerous or unusual weapons," *Huntly* noted that the ancient definition of affray reached only "armor or weapons not usually *worn*." 25 N.C. at 421 (emphasis added). As a result, the court rejected the notion that the particular firearm at issue in that case, "or any other gun, cannot in this country come under the description of 'unusual weapons'" merely because "there is scarcely a man in the community who does not own and occasionally use a gun of some sort." *Id.* at 422. This, the court explained, is because the question was not whether the weapon was unusual to *own*, but whether it was unusual "wherewith to be *armed and clad*." *Id.*

4

(emphasis added). As a result, the gun at issue in that case was "unusual" because "[n]o man amongst us carries it about with him, as one of his every day accoutrements--as a part of his dress." *Id.*

*Huntly* did not stand alone in its understanding of what constituted an "unusual" weapon for purposes of the law of affray. Multiple eminent legal scholars long ago recognized that the question whether a weapon could be considered unusual for purposes of the law of affray was governed by its public use. *E.g.*, Joseph Keble, An Assistance To The Justices of The Peace, For The Easier Performance Of Their Duty 147 (1689) ("[I]f a man shall shew himself furnished with Armour or Weapon which is not usually worn, it will strike a fear upon others that be not armed*"); accord* William Lambarde, Eirenarcha 134 (1579). It is also in accord with how Blackstone – and thus the framers for whom he was the primary source on English law, *Alden v. Maine*, 527 U.S. 706, 715 (1999) – would also have understood that term. Blackstone was proficient in Latin, David A. Lockmiller, Sir William Blackstone 8 (U.N.C. Press 1938), which features prominently throughout his writings. As a result, he would have known that "usual" is a direct lineal descendent of the Latin term *usus*, which meant "make use of, profit by, take advantage of." Reflecting that lineage, the original definition of "usual" was "accordant with *usage*." https://www.merriam-webster.com/dictionary/ usual (emphasis added).

This understanding of the term "use" is, unsurprisingly, wholly consistent with the Supreme Court's firearms precedent. Interpreting a federal law

prohibiting the "use" of a firearm during a drug trafficking offense, the Court unanimously agreed that use "must connote more than mere possession of a firearm." *Bailey v. United States*, 516 U.S. 137, 143 (1995). The reason for this was straightforward: while passive "use" of a gun is not wholly outside the farthest bounds of the English language, all of the ordinary definitions of use "imply action and implementation." *Id.* at 145. Thus, "use" does not reach mere "intended use, as when [one] places a firearm with the intent to use it later if necessary," *id.* at 146, and the Court specifically rejected the notion that use encompassed "placement of a firearm to provide a sense of security or to embolden," or "mere possession" of a weapon to "embolden or comfort" its owner, *id.* at 149. While *Bailey* did not purport to interpret the Second Amendment, the fact that the Court itself recognized that the ordinary meaning of the term "use" implies action, not passive possession, in the context of a firearm is strong indication that *Heller* did not employ the term "use" in accordance with an uncommon meaning it had already unanimously rejected.

Focus on the commonness of actual open, public use of a firearm, rather than on mere ownership, best respects the common-use principle's origins in the law of affray. As noted in *Rahimi*, the purpose of criminalizing affray was to prevent activity that would naturally bring terror to the general populace and, by so doing, increase the chance that said terror would escalate into actual violence. 144 S. Ct. at 1901 (quoting *Huntly*, 25 N. C. at 421-22). But the mere fact that something is commonly *owned*, standing alone, says next to nothing about whether the general populace would naturally respond with terror to seeing that same item *borne* in

public. For example, it is beyond dispute that chainsaws are arms in the most literal sense of the word because they can be used "in wrath to cast at or strike another," *Heller*, 554 U.S. at 581 (cleaned up), and are commonly owned by millions of Americans. But no one would think that commonplace regulations of chainsaws in urban areas, *e.g.*, Code of City of Ann Arbor Michigan § 6:613, contradict the Second Amendment's plain text and thus are presumptively unconstitutional unless supported by historical analogues. That reflects that members of the general public would (for obvious reasons) naturally respond with terror at the sight of an individual "armed and clad" with a chainsaw while strolling down Michigan Avenue in Chicago, à la Leatherface or Patrick Bateman, because that is exceedingly uncommon *despite* the commonality of ownership. It also reflects that the common public uses to which a particular weapon is put will often directly inform whether terror at the sight of that weapon is a natural, inherent reaction of the populace, as well as whether it is fair to presume that the act of carrying that arm conveys with it the evil intent necessary to show an affray.

An illustrative example of these principles in action is the Thompson machine gun: no matter how commonly that weapon might have been *owned*, the common public *use* of that arm was to commit heinous, high-profile crimes like the 1929 St. Valentine's Day Massacre. Given that common use, the sight of such a firearm being wielded in public would naturally evoke feelings of terror in the general populace. Thus, the Supreme Court had no trouble determining in *Heller* that such weapons "may be banned." 554 U.S. at 627. Similarly, grenades are not

7

commonly used in public for any lawful purposes, and the Court has repeatedly concluded that their use is not an "innocent act." *Staples v. United States*, 511 U.S. 600, 610 (1994) (quoting *United States v. Freed*, 401 U.S. 601, 609 (1971)); *accord Bevis,* 85 F.4th at 1195. The Court reached the same conclusion for short-barrel shotguns, *United States v. Miller*, 307 U.S. 174, 182 (1939), most commonly used by criminals. And so too with the Bowie knife – though it has lawful uses, as a machete or hunting knife, those uses took place largely in isolated frontier or rural areas; the known *public* uses of the Bowie knife were overwhelmingly criminal. *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 46 (1st Cir. 2024) (noting Bowie knife's "popularity in the hands of murderers").

That those incidents might have been relatively rare in comparison to crimes committed with other weapons is simply irrelevant. Focusing on the mere *number* of crimes committed with a particular weapon, rather than the *nature* of those crimes, forgets that the common-law origins of the common-use analysis are rooted, not in sterile statistics, but in the psychology of human terror. Again, the common-use analysis was derived from the English law of affray, *Heller*, 554 at 627 (citing 4 Blackstone, *supra*, at 148-49), which asks whether sight of a weapon in public would naturally cause terror in the populace, *Rahimi*, 144 S. Ct. at 1901. And as this court recognized in *Friedman v. City of Highland Park*, the salience of even relatively infrequent events like mass shootings plays a crucial role in the public's fear of such

events. 784 F.3d 406, 412 (7th Cir. 2015).[2]  This is the natural result of what is known in psychology as the availability heuristic, which describes the natural functioning of the human mind to assess the risk of an event (and, thus, the appropriate fear of that event) "by asking whether examples can readily come to mind. If people can easily think of such examples, they are far more likely to be frightened than if they cannot."  *E.g.*, Cass Sunstein, *Precautions Against What? The Availability Heuristic & Cross-Cultural Risk Perception*, 57 ALA. L. REV. 75, 87 (2005) (footnote omitted).  Thus, it is simply irrelevant that assault weapons are not *more commonly* used to inflict mass slaughter, since the slaughters they have been used to inflict are events of such extraordinary salience that they are more easily recalled and thus naturally instill terror in the public despite their relative infrequency. By contrast, the lack of salience of murders committed with ordinary handguns, though much more common, at least partially explains why the carriage of ordinary handguns in public does not naturally instill such terror.

Notably, the district court did not consider whether individuals are commonly armed and clad with any of the assault weapons regulated by Illinois law, nor whether the sight of individuals armed and clad with such weapons would naturally instill terror in the populace.  Rather, it concocted its own test, which inquires only

---

[2]  That salience effect explains why people to this day naturally react with fear at the thought of a nuclear attack, despite the fact that nuclear weapons have been used on civilian populations only twice in the entire course of human history, over three quarters of a century ago.  And even if that terror might be irrational, to some extent, because the risk is statistically slight, the question for purposes of affray is whether the terror is the *natural* effect of an event in the heat of the moment, not whether it is objectively reasonable in the cold light of subsequent self-reflection.

9

whether a weapon "is or has been available for purchase, possession, and usage by law-abiding citizens for self-defense." SA 191 (bolding omitted). That was serious legal error. Most obviously, the district court's test is irreconcilable with *Rahimi* and *Huntly*, as well as the common-law origins of the common-use test in the law of affray, as explained above. That test is also absurd – by the district court's reckoning, a gun is commonly used if it has literally never been used for anything, but merely sat on a dusty store shelf, "available for purchase." That is lightyears from the historical understanding of common use, and even farther from common sense.

The district court's application of the incorrect legal standard when evaluating common use is, standing alone, enough to demonstrate clear error here. *E.g.*, *Moriarty v. Glueckert Funeral Home*, 155 F.3d 859, 864 (7th Cir. 1998) ("when the district court employs the wrong legal standard in assessing the facts, its findings are clearly erroneous"). This court should thus reverse on that ground alone.

## II. Assault Weapons Are Not "Arms" Within The Scope Of The Second Amendment Because They Are "Dangerous."

Even assuming, for sake of argument, that assault weapons are commonly used, they are still not protected "arms." As Blackstone explains, ancient English law prohibited "dangerous *or* unusual weapons," 4 Blackstone, *supra*, at 149 (emphasis added); *accord*, *e.g.*, *English v. State*, 35 Tex. 473, 476 (1872) ("Blackstone says, the offense of riding or going round with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the

10

land."), so assault weapons also fall outside the Second Amendment's prima facie definition of "arms" if they are "dangerous." While the Supreme Court has recognized that the Second Amendment "extends only to certain types of weapons," based on "the character of the weapon," *Heller*, 554 U.S. at 622, and that there is a historical tradition of prohibiting the carrying of "dangerous" weapons under which militaristic "weapons that are most useful in military service--M-16 rifles and the like--may be banned," *id.* at 627, its precedent "leaves open" the question how to determine whether a weapon is "dangerous," *Harrel v. Raoul*, 144 S. Ct. 2491, 2492 (2024) (Thomas, J., statement).

History answers the question the Supreme Court has left open, and teaches that the Framers understood "dangerous" weapons to encompass what are best termed "militaristic" weapons – weapons fundamentally incompatible with longstanding principles of moderate, proportionate self-defense. Indeed, the en banc Fourth Circuit has recognized that the Second Amendment "emphatically does not stretch to encompass excessively dangerous weapons ill-suited and disproportionate to" ordinary self-defense. *Bianchi*, 111 F.4th at 452; *accord id.* at 451 ("What brings all the weapons beyond the scope of the Second Amendment together, and what separates them from the handgun, is their ability to inflict damage on a scale or in a manner disproportionate to the end of personal protection.").

Historically, such militaristic weapons were treated differently from ordinary weapons. Ancient Roman law, for example, made loss of a soldier's arms an offense

punishable by death, CORPUS JURIS CIVILIS, Dig. 49.16.3, but it was understood that this law applied not to ordinary weapons like "clubs" or "stones," despite their utility in war, but rather only to "those Weapons which are used for the sake of hurting another," John Ayliffe, A NEW PANDECT OF ROMAN LAW 195 (1734). Reflecting this distinction, ancient Roman law made it unlawful for an individual to "collect[ ] arms or weapons at his home or on his farm or at his country house," but only if they were not "customary for hunting or a journey by land or sea." CORPUS JURIS CIVILIS, Dig. 48.6.1, and further prohibited the possession of missile weapons in public, *id.* Dig. 48.6.3.1. Similarly, the laws of ancient Athens provided that "every Athenian was finable who walked about the city in armour."  4 Blackstone, *supra*, at 149.

This special treatment of military weapons was adopted by English law as well.  As Blackstone explained, the ancient Athenian prohibition on "armour" was reflected in the Statute of Northampton, which codified the "offence of *riding or going armed*, with dangerous or unusual weapons, [a]s a crime against the public peace, by terrifying the good people of the land," and made it punishable by "pain of forfeiture of the arms, and imprisonment."  4 Blackstone, *supra*, at 149.  That is significant because English law of Blackstone's time did not use the term "armour" in its popular modern sense – *i.e.*, to refer to a literal suit of armor, or a tank.  To the contrary, "in English statutes, *armor* is used for the whole apparatus of war." Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) ("Armor").

Subsequent English statutes provided that "no Man shall ride in Harness within the Realm . . . neither with Launcegay," because doing so was "contrary to the Form of the Statute of Northampton thereupon made." Statute Made at Westminster in the Seventh Year 1383; *accord* Statute of the Twentieth Year 1396-97. Both "harness" and "launcegays" were intrinsically military in nature – the former was literally "the furniture of a military man, or offensive, as a casque, cuirass, helmet, girdle, sword, buckler, etc.," Webster, *supra* ("H'arness"), the latter a "light lance" that was "carried in place of the war lance in the fourteenth century," George Cameron Stone, A GLOSSARY OF THE CONSTRUCTION, DECORATION, & USE OF ARMS & ARMOR IN ALL COUNTRIES & IN ALL TIMES 410 (1934). These prohibitions remained English law for centuries, until well after the ratification of the Second Amendment. *See* Repeal of Obsolete Statutes Act 1856, act 19 & 20 Vict. c. 64.

While this evidence confirms this court's conclusion in *Bevis* that there is a long tradition of prohibiting ownership of "militaristic" weapons on the basis of their dangerousness, 85 F.4th at 1199, that still leaves open the question *Bevis* left unresolved – namely, how to distinguish such weapons from ordinary weapons of self-defense protected by the Second Amendment. To answer that question, one must examine the right of self-defense recognized at English common law, since *Heller* repeatedly emphasized that "self-defense" is "the *central component* of the right" to keep and bear arms codified by the Second Amendment. 554 U.S. at 599; *accord id.* at 628 ("the inherent right of self-defense has been central to the Second Amendment right"); *see generally McDonald v. City of Chicago*, 561 U.S. 742 (2010)

13

(repeatedly emphasizing centrality of "self-defense" to Second Amendment right); *accord* Joyce Lee Malcolm, To Keep & Bear Ams 162 (Cambridge 1994) (explaining that first goal of Second Amendment was "to guarantee the individual's right to have arms for self-defence").

This reflects that the English Declaration of Rights of 1689, which "has long been understood to be the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593, only guaranteed individuals "Arms *for their Defence . . . as allowed by Law*," 1 W. & M., ch. 2, § 7 (emphasis added).  That italicized language did not, however, make the right subject to legislative enactment via statutory law – a caveat that would have effectively swallowed the right – but rather made it coterminous with the underlying natural, common-law right of self-defense it protected.  *See* Stephen Halbrook, *To Bear Arms for Self-Defense*, 21 Federalist Soc'y Rev. 46, 50 (2020) (explaining that Declaration "referred to the common law, not to any statute that might be passed that would negate the right"). Or as Blackstone put it, this language made clear that the right to bear arms was "a public allowance, under due restrictions, of the natural right of resistance and self-preservation." 1 Blackstone, *supra*, at 139; *accord Rex. v. Dewhurst* (King's Bench 1820), in 1 John MacDonnell, Reports Of State Trials, New Series 601-02 (London 1888) (Bayley, J.) (Blackstone meant that the Declaration granted individual the "right to protect himself in his house" and "when he is going singly or in a small party upon the road where he is traveling").

Turning to that right, English common law divided self-defense into two broad categories: (1) "justified" self-defense, when "the defendant prevented a felony"; and (2) "excused" self-defense, when "the defendant was in the midst of a fight." V.F. Nourse, *Self-Defense & Subjectivity*, 68 U. CHI. L. REV. 1235, 1244 (2001). The former has no bearing here, since it focused solely on the actions of the slain – namely, whether the felony being prevented was punishable by death. *Id.* But excusable homicide focused on the actions of the killer and – reflecting the reality of the time that "death could result from even a superficial wound" – was by the thirteenth century "defined as slaying out of literally vital necessity . . . as a last resort." Thomas A. Green, *The Jury & The English Law Of Homicide, 1200-1600*, 74 MICH. L. REV. 413, 420 (1976); *accord* William Hawkins, A TREATISE OF THE PLEAS OF THE CROWN 87 (8th ed. London 1824) (self-defense requires "inevitable necessity," where defender "has no other possible means of preserving his life").

Crucially, excused self-defense at English common law also took into consideration the nature of the weapon used by the defender. As Blackstone explains, while self-defense "is justly called the primary law of nature," the fact remains that "care must be taken, that the resistance does not exceed the bounds of mere defence and prevention; for then the defender would himself become an aggressor." 3 Blackstone, *supra*, at 4. Thus, the acts that constitute excusable homicide end at "the bounds of moderation, either in the manner, *the instrument*, or the quantity," so an act otherwise permissible by the law becomes "manslaughter at least, and in some cases (according to the circumstances) murder" if a person uses a

weapon or implement unsuited for an otherwise-lawful task. 4 *id.* at 183–84 (emphasis added).[3] In fact, Chief Justice Holt explained as early as 1705 that the moderation principle was a central component of English self-defense, holding that self-defense is inapplicable to "*excessive*" force because the law only protected the use of weapons that are actually "necessary for a man's defense." *Cockcroft v. Smith*, 11 Mod. 43 (King's Bench 1705). As Chief Justice Holt further explained, the law of self-defense did not give a man the right "in case of a small assault, [to] give a violent or unsuitable return." *Id.* This was because "hitting a man with a little stick on the shoulder, is not reason for him to draw a sword and cut and hew the other." *Id.*

This understanding of the limits of self-defense carried over into American criminal law. The literal *first* reported American decision regarding self-defense rejected that defense specifically because it was not "necessary for the prisoner to avail himself of the instrument" — there, a club — "which occasioned the death. On his own confession, much less would have been sufficient," making his actions "clearly manslaughter." *State v. Wells*, 1 N.J.L. 486, 493 (N.J. 1790). In other words, "[t]he court expressly linked its determination of unnecessary, disproportionate force to the specific arm chosen by the defendant." Eric Ruben, *An Unstable Core: Self-Defense & the Second Amendment*, 108 CALIF. L. REV. 63, 89

---

[3] Notably, the identity of the particular weapon used by the defendant was also a common-law component of the crime of manslaughter – use of "a hammer, or such like instrument" was not manslaughter, while "discharging a pistol" was, because the latter is a "dangerous weapon." Hawkins, *supra*, at 90.

(2020). In doing so, *Wells* relied on a decades-old English case, *Reg. v. Nailor*, FOSTER CROWN CASES 278 (Old Bailey 1704), which rejected a plea of self-defense – despite the fact that the defendant was pinned on the ground such that "he could not escape nor avoid the blows" of his attacker – because his use of a penknife to wound and ultimately kill an unarmed attacker was not necessary given the threat he faced. *Wells*, 1 N.J.L. at 492.

The decision in *Nailor* would feature prominently in the seminal work of Nathan Dane, the "Father of American Jurisprudence," and author of the "first great compend of American law." Henry A. Chaney, *Nathan Dane*, THE GREEN BAG, Vol. III 548 (1891). As Dane explains in that treatise, the early task faced by American judges and lawyers following the Revolutionary War was to examine the "political" and "moral" principles of the English legal system that had just been cast off, in order to "select[ ] from the English laws, in force in a monarchy, once feudal, those parts of them adopted here, and remaining in force in our republic." 1 Nathan Dane, A GENERAL ABRIDGMENT & DIGEST OF AMERICAN LAW iii (Boston 1823). And one of the principles of English law that remained consistent with the values of this new republic was the principle of moderate self-defense. As Dane explains, the law of self-defense required proof that the defendant have "killed his adversary through mere necessity, in order to avoid immediate death." 7 *id.* at 230. In addition, Dane notes the significance placed on the specific weapon being used, explaining that the claim of self-defense in *Nailor* failed because the defendant "used a *dangerous* weapon, and hence presumed[ly] he meant to kill." *Id.* (emphasis added). This was

significant because the law requires that "I must increase my force no more or faster than the case or [the attacker's] force requires," and thus prohibits the use of a "deadly weapon" against one who "barely commits a trespass." *Id.* For example, pulling up a "hedge stake" and killing another for damaging a fence is "murder," because it is "an act of violence much beyond the proportion of the provocation," when the use of a different "instrument not likely to kill" in the same circumstances would only be "manslaughter." *Id.*

As all this history demonstrates – indeed, as Dane *specifically explained* – a particular weapon is "dangerous," and thus not a prima facie "arm" for purposes of the Second Amendment's text, if it is fundamentally incompatible with the common-law right to moderate, proportional self-defense that the Second Amendment meant to protect. Such weapons, being unsuitable for moderate self-defense, are militaristic weapons "most useful in military service" and thus "may be banned," just like the M16 machine gun, *Heller*, 554 U.S. at 627, and implements of war like grenade launchers, tanks, and nuclear arms that are also clearly unsuitable for moderate, proportionate self-defense. Even before *Heller*, it was well settled that a particular weapon's suitability for self-defense was a central consideration when determining whether that weapon may be banned. *See*, *e.g.*, *Benjamin v. Bailey*, 662 A.2d 1226, 1232 (Conn. 1995); *People v. Brown*, 235 N.W. 245, 247 (Mich. 1931); *People v. Persce*, 97 N.E. 877, 879, (N.Y. 1912); *State v. Duke*, 42 Tex. 455, 458-459 (Tex. 1874); *State v. Reid*, 1 Ala. 612, 622 (1840). In fact, legislatures specifically made it unlawful to use certain "dangerous and bloody weapons" even in self-

defense, by enacting laws stating that a "particular instrument is prohibited in the exercise of that right." *E.g., Day v. State*, 37 Tenn. 496, 501 (1858).

The example of these principles in application most familiar to lawyers is the longstanding prohibition on spring guns, also known as trap guns. Such guns were "especially in vogue" in England in the latter half of the eighteenth century, when the practical impossibility of personally guarding large tracts of land against poachers. Miller Christy, *Man Traps & Spring-Guns*, OUTING, vol. XLI, issue 6, at 729 (1903); *accord* Ed Tangen, *Spring Guns*, 1 AM. J. POLICE SCI. 307, 307 (1930) (noting that spring guns "were much used in England against poachers and trespassers"). Despite the popularity of spring guns at a time when "[t]he Englishman's right to be armed was in its heyday," Malcolm, *supra*, at 165, Parliament in 1827 banned the use of spring guns, with a limited exception for home defense between sunset and sunrise, Spring Gun Act 1827, 7 & 8 Geo. 4, ch. 18 (recodified as Offenses Against the Person Act 1861, 24 & 25 Vict., ch. 100, § 31). American law followed suit – to this day, states criminalize spring guns, *e.g.*, 720 ILCS 5/24-1(a)(5); Mich. Comp. Laws § 750.236, and the rule against their use is so well-settled at common law that law students study the famed spring gun case, *Katko v. Briney*, 183 N.W.2d 657 (Iowa 1971).

The bans on spring guns are particularly informative of the centrality of self-defense principles to the analysis because they were not based on spring guns' unusual lethality or other destructive potential – after all, spring guns were largely similar to ordinary handguns and rifles, only modified to fire remotely. *See* Christy,

*supra*, at 730-31 (providing images of spring guns). Rather, they were based on spring guns' fundamental incompatibility with moderate self-defense, in two critical respects. First, by their very nature, spring guns risked injury to innocents: a child who entered a garden to cut a stick, another gathering nuts, another "in pursuit of a straying peacock," a maid killed in her employer's house, and a gardener killed in his employer's garden. Christy, *supra*, at 729-30. The problem, it was realized, was that spring guns – while effective criminal deterrents – "did not possess the power to discriminate between a depredator and the owner of the property they were intended to protect" and "maimed or killed him just as promptly and impartially as [they] would have killed a trespasser and a thief." *Id.* at 730. Indeed, the debates over the 1827 spring-gun ban confirmed that Parliament was deeply concerned with injury to innocents, with one member notably comparing the use of a spring gun to firing a military weapon – "a cannon" – in the middle of a street to rid it of criminals. House of Commons Debates, March 23, 1827, vol. 17, cc19-34 (comments of William Smith). That concern remains a driving force behind the rule against spring guns that persists in American law. *See Katko*, 183 N.W.2d at 661 (noting instances in which innocent policeman and small boy were killed by spring guns); *see also Calvillo-Silva v. Home Grocery*, 19 Cal. 4th 714, 733 (1998) (noting "indiscriminate violence" spring guns inflict).

Second, spring guns were incompatible with the common-law principle that an individual cannot "us[e] more force than is absolutely necessary" in his defense, due to "the sacred regard which our law every where exhibits for the life and safety

of man—its tardiness and reluctance to proceed to extreme violence." Rev. Sydney Smith, *Man Traps & Spring Guns*, THE EDINBURGH REVIEW, Vol. 35, Issue 70, at 417 (1821); *accord id.* at 414 ("You cannot shoot a man that comes on your land, because you may turn him off by means less hurtful of him . . ."); *id.* at 412-13 (also noting limits of English law). This fear was echoed by Parliament when banning spring guns, with one proponent noting the "anxious caution the law surrounds the life of man, even where the person slain has been the original aggressor; how minutely it exacts, that the object of attack shall not have exceeded the limits of a just and necessary defence." House of Commons Debates, *supra* (comments of Sir Edmund Carrington). This concern, too, underlies American laws against spring guns, which are outlawed specifically because their use is inconsistent with lawful self-defense. *See Katko*, 183 N.W.2d at 660.

Applying that principle here, it should be immediately clear that assault weapons are, by their very nature, fundamentally incompatible with moderate, proportionate self-defense. Such weapons are very powerful and effective at a long range, meaning they are more likely to travel easily through walls, vehicles, body armor, and the human body, regardless of whether the shooter intends to do so. They are capable of producing astonishing harm to the human body: decapitation, exploded limbs and organs, and lethal wounds the size of soda cans. Their use in response to an attack reflects a *maximization* of force to ensure that the attacker is not merely driven off, but slain. Further, given the effective range of assault weapons when compared to the population density of Cook County, there are few, if

any, places where one could safely discharge them without knowingly or unknowingly endangering the bodily safety of a third party.  At common law, the use of such extraordinary force "equivalent to a deliberate act of slaughter" would not have constituted lawful self-defense, 4 Blackstone, *supra*, at 199-200, so the possession of the weapon designed solely to exert such force would not have been protected either.

The excessiveness of the force exerted by assault weapons is only compounded by their recognized capacity for inflicting indiscriminate harm on innocents.  *See Bianchi,* 111 F.4th at 459 ("its all too frequent use in terrorism, mass killing, and police murder shows that the AR-15 offers firepower ill-suited and disproportionate to fulfilling the Second Amendment's purpose of armed self-defense").  And because the exercise of lawful self-defense is the central purpose for which the Second Amendment was adopted, assault weapons' incompatibility with lawful self-defense renders them dangerous, militaristic weapons that fall outside the protections of that Amendment's plain text.  *See id.*

In concluding that the Illinois assault-weapons ban is unconstitutional, the district court never considered assault weapons' compatibility with principles of moderate, proportionate self-defense. To the contrary, it declared that a weapon is not "dangerous" if it is able to "neutralize discrete, identified aggressors," SA 67 – an inquiry incompatible with historical precedents and unheard of at common law. *See*, *e.g.*, 7 Dane, *supra*, at 230. This, too, was legal error warranting reversal.

## CONCLUSION

—————

This court should reverse the judgment of the district court.

Respectfully submitted,

EILEEN O'NEILL BURKE
State's Attorney of Cook County

BY:    /s Jonathon D. Byrer
JONATHON D. BYRER
Supervisor of Civil Appeals & Special Projects
CATHY MCNEIL STEIN
Chief, Civil Actions Bureau
JESSICA M. SCHELLER
PRATHIMA YEDDANAPUDI
Assistant State's Attorneys
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-4366
jonathon.byrer@cookcountysao.org

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 29

———————————————

In accordance with Fed. R. App. P. 32(g), I certify that this brief complies with the type-volume limitation set forth in Seventh Circuit Rule 29 because it contains 6,109 words, beginning with the words "INTEREST OF AMICUS CURIAE" and ending with "respectfully submitted" on page 23.  In preparing this certificate, I relied on the word count of the word-processing system used to prepare the brief, which was Microsoft Word.

s/ Jonathon D. Byrer
JONATHON D. BYRER, Attorney

## CERTIFICATE OF SERVICE

———————————————

I certify that on May 14, 2025, I electronically filed the attached Brief of Amicus Curiae Cook County with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Jonathon D. Byrer
JONATHON D. BYRER, Attorney