Nos. 24-3060, 24-3061, 24-3062, 24-3063 (consol.)

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

CALEB BARNETT, et al.,

*Plaintiffs-Appellees*,

v.

KWAME RAOUL AND BRENDAN F. KELLY,

*Defendants-Appellants.*

Appeal from the United States District Court for the Southern District of Illinois
Case Nos. 3:23-cv-00209-SPM, 3:23-cv-00141-SPM,
3:23-cv-00192-SPM, 3:23-cv-00215-SPM
The Honorable STEPHEN P. MCGLYNN, Judge Presiding

## BRIEF OF *AMICI CURIAE*
## GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE AND BRADY CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF DEFENDANTS-APPELLANTS

*Of Counsel*:

Esther Sanchez-Gomez
Leigh Rome
William T. Clark
GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE
268 Bush Street #555
San Francisco, CA 94104
(415) 433-2062
esanchezgomez@giffords.org
lrome@giffords.org
wclark@giffords.org

Jennifer B. Loeb
*Counsel of Record*
FRESHFIELDS US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
(202) 777-4500
jennifer.loeb@freshfields.com

(*Additional Counsel on Next Page*)

Douglas N. Letter
Shira Lauren Feldman
Tess Fardon
BRADY CENTER TO PREVENT GUN VIOLENCE
840 First Street, NE, Suite 400
Washington, DC 20002
(202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org
tfardon@bradyunited.org

Aaron R. Marcu
Brandt Henslee
Daniel Hodgkinson
Taylor Jachman
FRESHFIELDS US LLP
3 World Trade Center
175 Greenwich Street, 51st Floor
New York, NY 10007
(212) 277-4000
aaron.marcu@freshfields.com
brandt.henslee@freshfields.com
daniel.hodgkinson@freshfields.com
taylor.jachman@freshfields.com

*Counsel for Amici Curiae*

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-3060 (consol.)

Short Caption: Caleb Barnett et al v. Kwame Raoul and Brendan F. Kelly

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Amici Curiae Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Freshfields US LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Jennifer B. Loeb    Date: 05/14/2025

Attorney's Printed Name: Jennifer B. Loeb

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ✔    **No** ☐

Address: 700 13th Street NW, 10th Floor, Washington, DC 20005

Phone Number: (202) 777-4500    Fax Number:

E-Mail Address: jennifer.loeb@freshfields.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>24-3060 (consol.)</u>

Short Caption: <u>Caleb Barnett et al v. Kwame Raoul and Brendan F. Kelly</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Amici Curiae Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Freshfields US LLP</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    <u>None</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    <u>None</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>/s/ Aaron R. Marcu</u>    Date: <u>05/14/2025</u>

Attorney's Printed Name: <u>Aaron R. Marcu</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** [ ]  **No** [✔]

Address: <u>3 World Trade Center, 175 Greenwich Street, 51st Floor, New York, NY 10007</u>

Phone Number: <u>(212) 277-4000</u>    Fax Number: _____

E-Mail Address: <u>aaron.marcu@freshfields.com</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>24-3060 (consol.)</u>

Short Caption: <u>Caleb Barnett et al v. Kwame Raoul and Brendan F. Kelly</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Amici Curiae Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence</u>

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Freshfields US LLP</u>

(3)     If the party, amicus or intervenor is a corporation:

     i)      Identify all its parent corporations, if any; and
<u>None</u>

     ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
<u>None</u>

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
<u>N/A</u>

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
<u>N/A</u>

Attorney's Signature: <u>/s/ Brandt Henslee</u>      Date: <u>05/14/2025</u>

Attorney's Printed Name:  <u>Brandt Henslee</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address:  <u>3 World Trade Center, 175 Greenwich Street, 51st Floor, New York, NY 10007</u>

Phone Number: <u>(212) 277-4000</u>      Fax Number: <u> </u>

E-Mail Address: <u>brandt.henslee@freshfields.com</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>24-3060 (consol.)</u>

Short Caption: <u>Caleb Barnett et al v. Kwame Raoul and Brendan F. Kelly</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Amici Curiae Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Freshfields US LLP</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    <u>None</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    <u>None</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>/s/ Daniel Hodgkinson</u>    Date: <u>05/14/2025</u>

Attorney's Printed Name:  <u>Daniel Hodgkinson</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☑

Address:  <u>3 World Trade Center, 175 Greenwich Street, 51st Floor, New York, NY 10007</u>

Phone Number: <u>(212) 277-4000</u>    Fax Number: <u> </u>

E-Mail Address: <u>daniel.hodgkinson@freshfields.com</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>24-3060 (consol.)</u>

Short Caption: <u>Caleb Barnett et al v. Kwame Raoul and Brendan F. Kelly</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Amici Curiae Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Freshfields US LLP</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    <u>None</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    <u>None</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>/s/ Taylor Jachman</u>    Date: <u>05/14/2025</u>

Attorney's Printed Name: <u>Taylor Jachman</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☒

Address: <u>3 World Trade Center, 175 Greenwich Street, 51st Floor, New York, NY 10007</u>

Phone Number: <u>(212) 277-4000</u>    Fax Number: <u> </u>

E-Mail Address: <u>taylor.jachman@freshfields.com</u>

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-3060 (consol.)

Short Caption: Caleb Barnett et al v. Kwame Raoul and Brendan F. Kelly

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Amicus Curiae Giffords Law Center to Prevent Gun Violence

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Freshfields US LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

None

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Esther Sanchez-Gomez      Date: 05/14/2025

Attorney's Printed Name: Esther Sanchez-Gomez

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** [ ]  **No** [✔]

Address: 268 Bush Street #555, San Francisco, CA 94104

Phone Number: (415) 433-2062      Fax Number:

E-Mail Address: esanchezgomez@giffords.org

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-3060 (consol.)

Short Caption: Caleb Barnett et al v. Kwame Raoul and Brendan F. Kelly

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Amicus Curiae Giffords Law Center to Prevent Gun Violence

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Freshfields US LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Leigh Rome    Date: 05/14/2025

Attorney's Printed Name: Leigh Rome

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 268 Bush Street #555, San Francisco, CA 94104

Phone Number: (415) 433-2062    Fax Number:

E-Mail Address: lrome@giffords.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>24-3060 (consol.)</u>

Short Caption: <u>Caleb Barnett et al v. Kwame Raoul and Brendan F. Kelly</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Amicus Curiae Giffords Law Center to Prevent Gun Violence</u>

_____

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Freshfields US LLP</u>

_____

(3)   If the party, amicus or intervenor is a corporation:

   i)      Identify all its parent corporations, if any; and

   <u>None</u>

   ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   <u>None</u>

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   <u>N/A</u>

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   <u>N/A</u>

Attorney's Signature: <u>/s/ William T. Clark</u>                    Date: <u>05/14/2025</u>

Attorney's Printed Name:   <u>William T. Clark</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** [ ]   **No** [✔]

Address:   <u>268 Bush Street #555, San Francisco, CA 94104</u>

_____

Phone Number: <u>(415) 433-2062</u>                    Fax Number: _____

E-Mail Address: <u>wclark@giffords.org</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-3060 (consol.)

Short Caption: Caleb Barnett et al v. Kwame Raoul and Brendan F. Kelly

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   ☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Amicus Curiae Brady Center to Prevent Gun Violence

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Freshfields US LLP

(3)     If the party, amicus or intervenor is a corporation:

   i)     Identify all its parent corporations, if any; and

   None

   ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   None

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Douglas N. Letter                Date: 05/14/2025

Attorney's Printed Name:  Douglas N. Letter

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐   **No** ☑

Address: 840 First Street, NE Suite 400, Washington, DC, 20002

Phone Number: (202) 370-8100                Fax Number:

E-Mail Address: dletter@bradyunited.org

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>24-3060 (consol.)</u>

Short Caption: <u>Caleb Barnett et al v. Kwame Raoul and Brendan F. Kelly</u>

　　To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

　　The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]　　**PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)　　The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Amicus Curiae Brady Center to Prevent Gun Violence</u>

(2)　　The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Freshfields US LLP</u>

(3)　　If the party, amicus or intervenor is a corporation:

　　i)　　Identify all its parent corporations, if any; and

　　<u>None</u>

　　ii)　　list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

　　<u>None</u>

(4)　　Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)　　Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>/s/ Shira Lauren Feldman</u>　　　　Date: <u>05/14/2025</u>

Attorney's Printed Name:  <u>Shira Lauren Feldman</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).　**Yes** [ ]　**No** [✔]

Address:  <u>840 First Street, NE Suite 400, Washington, DC, 20002</u>

Phone Number: <u>(202) 370-8100</u>　　　　Fax Number: <u>　　　　　　　</u>

E-Mail Address: <u>sfeldman@bradyunited.org</u>

rev. 12/19 AK

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>24-3060 (consol.)</u>

Short Caption: <u>Caleb Barnett et al v. Kwame Raoul and Brendan F. Kelly</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Amicus Curiae Brady Center to Prevent Gun Violence</u>

_____

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Freshfields US LLP</u>

_____

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

        <u>None</u>

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>None</u>

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/ Tess Fardon</u>      Date: <u>05/14/2025</u>

Attorney's Printed Name: <u>Tess Fardon</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address: <u>840 First Street, NE Suite 400, Washington, DC, 20002</u>

_____

Phone Number: <u>(202) 370-8100</u>      Fax Number: _____

E-Mail Address: <u>tfardon@bradyunited.org</u>

rev. 12/19 AK

# **TABLE OF CONTENTS**

I.      INTEREST OF *AMICI CURIAE* ...................................................................1

II.     INTRODUCTION ........................................................................................2

III.    ARGUMENT .................................................................................................3

        A.      *Bruen* and *Rahimi* Require Courts to Consider Empirical Research. .....................3

        B.      Because the Challenged Laws Address Unprecedented Societal and
                Technological Conditions, *Bruen* Requires Nuanced Analysis. ............................4

                1.      The Frequency, Lethality, and Geographic Concentration of Mass
                        Shootings Are Novel Societal Concerns. ......................................................4

                2.      The Rise of Mass Shootings Coincides with Unimaginable and
                        Unprecedented Societal Concerns. ............................................................5

                3.      Advances in Gun Technology Have Combined with Societal
                        Changes to Create the Perfect Storm for Mass Shootings. .........................8

                4.      *Bruen* Requires Nuance When Analyzing Historical Analogues to
                        the Challenged Laws. ............................................................................10

        C.      The District Court's Common Use Analysis is Flawed, and the Common
                Use Standard Does Not Apply Here. ....................................................................12

        D.      Assault Weapons Are Uniquely Dangerous and Not "Quintessential Self-
                Defense" Weapons Protected by the Second Amendment. ...................................15

                1.      The Firearms listed in the Challenged Laws Are Dangerous and
                        Unusual Weapons. ................................................................................16

                2.      The Regulated Features Render Weapons Even More Dangerous
                        and Unusual. ........................................................................................19

        E.      The Regulation of LCMs Likewise Does Not Burden the Individual Right
                to Self-Defense........................................................................................................21

IV.     CONCLUSION..............................................................................................23

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
    910 F.3d 106 (3d Cir. 2018)........................................................................1

*Barnett v. Raoul*,
    756 F. Supp. 3d 564 (S.D. Ill. 2024).............................................. *passim*

*Bevis v. City of Naperville*,
    85 F.4th 1175 (7th Cir. 2023) ...................................................... *passim*

*Bianchi v. Brown*,
    111 F.4th 438 (4th Cir. 2024) ............................................11, 15, 17, 18

*Capen v. Campbell*,
    708 F. Supp. 3d 65 (D. Mass. 2023) ...................................................15

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*,
    108 F.4th 194 (3d Cir. 2024) ....................................................15, 19, 22

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)....................................................1, 15, 16, 17

*Duncan v. Bonta*,
    133 F.4th 852 (9th Cir. 2025) ...........................................................21, 22

*Garland v. Cargill*,
    602 U.S. 406 (2024)..............................................................................12

*Georgia v. Public.Resource.Org, Inc.*,
    590 U.S. 255 (2020)..............................................................................12

*Hanson v. District of Columbia*,
    120 F.4th 223 (D.C. Cir. 2024)...................................................4, 5, 13

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) ...........................................................15

*Kolbe v. Hogan*,
    849 F.3d 114 (4th Cir. 2017) ...............................................................16

*Libertarian Party of Erie Cnty. v. Cuomo*,
    970 F.3d 106 (2d Cir. 2020)...................................................................1

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)..........................................................................................1

*Md. Shall Issue v. Hogan*,
  353 F. Supp. 3d 400 (D. Md. 2018) ................................................................1

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  597 U.S. 1 (2022).................................................................................. *passim*

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
  804 F.3d 242 (2d Cir. 2015)...........................................................................20

*Ocean State Tactical, LLC v. Rhode Island*,
  95 F.4th 38 (1st Cir. 2024)............................................................................10

*Peruta v. Cnty. of San Diego*,
  824 F.3d 919 (9th Cir. 2016) ...........................................................................1

*Richmond Boro Gun Club, Inc. v. City of New York*,
  97 F.3d 681 (2d Cir. 1996)............................................................................19

*Rupp v. Becerra*,
  401 F. Supp. 3d 978 (C.D. Cal. 2019) .............................................................1

*Rupp v. Bonta*,
  723 F. Supp. 3d 837 (C.D. Cal. 2024) ....................................................13, 21

*Stimmel v. Sessions*,
  879 F.3d 198 (6th Cir. 2018) ...........................................................................1

*United States v. Rahimi,*
  602 U.S. 680 (2024)..........................................................................2, 3, 4, 12

*Worman v. Healey*,
  922 F.3d 26 (1st Cir. 2019)............................................................................22

**Statutes**

Ill. Pub. Act 102-1116 § 1 (codified at 720 ILL. COMP. STAT. 5/24-1.9–1.10)..................... *passim*

**Other Authorities**

159 Cong. Rec. S2743 (daily ed. Apr. 17, 2013)..........................................23

*1866 Yellowboy Rifle History*, Uberti USA, https://tinyurl.com/3x2wjth3 ....................................9

*Are Ar-15 Magazines Interchangeable? Which Ones Are*, Neckbone Armory
  https://tinyurl.com/hppuzpb2 ..........................................................................8

Bonnie Berkowitz & Chris Alcantara, *Mass Shooting Statistics in the United States*, Wash. Post (May 9, 2021), https://tinyurl.com/537ww9z4 ............................................ 4

Cameron McWhirter & Zusha Elinson,
*American Gun: The True Story of the AR-15* (2023) ....................................... 19, 23

Carla Astudillo et al., *What we know, minute by minute, about how the Uvalde shooting and police response unfolded*, Texas Tribune (July 28, 2022),
https://tinyurl.com/mr4eyjfu ..................................................................... 10

Christopher Ingraham, *What 'Arms' Looked Like When The 2nd Amendment Was Written*, Wash. Post (June 13, 2016), https://tinyurl.com/mu5ety64 ....................... 8

Claude Werner, *The Armed Citizen - A Five Year Analysis*, Guns Save Lives
(Mar. 12, 2012), https://tinyurl.com/bdemd7ya ............................................... 22

Dan Alex, *Winchester Model 1866 Lever-Action Repeating Rifle*, Military Factory
(Mar. 12, 2019), https://tinyurl.com/p88kcaye ................................................ 9

Decl. of Robert Spitzer, *Nat'l Ass'n for Gun Rts. v. Campbell*, No. 1:22-cv-11431,
ECF 21-10 (D. Mass. Jan. 31, 2023) ............................................................. 9

*Dep. of H. Wayne Carver II, M.D, Pozner v. Fetzer*,
No. 18-cv-3122 (Wis. Cir. Ct. Dane Cty. May 21, 2019),
http://tinyurl.com/dzu8ybwu ...................................................................... 18

*Dr. Guerrero's Testimony at Oversight Hearing on Gun Violence Crisis*, House
Comm. on Oversight and Reform (June 8, 2022),
https://tinyurl.com/y98a4wed ..................................................................... 18

Expert Report of Louis Klarevas, *Gates et al. v. Polis*, No. 1:22-1866, ECF 74-11
(D. Colo. Sept. 11, 2023) ........................................................................... 8

*Investigative Report on the Role of Online Platforms in the Tragic Mass Shooting in Buffalo on May 14, 2022*, Off. of the N.Y. State Att'y Gen. (Oct. 18, 2022) ..................... 6

Jake Bleiberg et al., *Source: Investigators examine ideology of Texas gunman*, AP
News (May 8, 2023), https://tinyurl.com/3ywej7aa ........................................... 7

James Miller, *The 5 Best AR-15 Pistols Reviewed: Reports from Range*,
Minuteman Review (Apr. 7, 2023), https://tinyurl.com/5n9as9ye ........................... 8

Jason R. Silva, *Global mass shootings: comparing the United States against developed and developing countries*, 47 Int'l J. Compar. & Applied Crim.
Just. 317 (2023) ...................................................................................... 5

Justin Peters, *The NRA Claims the AR-15 Is Useful for Hunting and Home Defense. Not Exactly*, Slate (June 12, 2016), https://tinyurl.com/4sm9jm3z ......................... 18

*Keeping hot barrels accurate*, AP (Aug. 10, 2018), https://tinyurl.com/3e9td6m5 ..................... 19

Kevin Michalowski, *The Statistically Perfect Gunfight*, USCCA (Feb. 25, 2019),
https://tinyurl.com/3upbexr9 .......................................................................................... 22

*Key Points About Assault Weapons*, Violence Policy Center (2017)
https://tinyurl.com/4h4naw8z ..................................................................................... 19, 20

Louis Klarevas et al., *The Effect of Large-Capacity Magazine Bans on High-
Fatality Mass Shootings, 1990-2017*, 109 AJPH 1754, 1755 (2019) ..................................... 21

*Marjory Stoneman Douglas High School Public Safety Commission Report*, Fla.
Dep't of Law Enforcement (Jan. 2, 2019), https://tinyurl.com/mvs34fky ............................. 21

Mark Berman & Todd C. Frankel, *High-capacity magazine bans could save lives.
Will they hold up in court?*, Wash. Post (Mar. 27, 2023),
https://tinyurl.com/dkzjskxs ........................................................................................ 9, 21

Matthew McConaughey, Remarks at White House Press Briefing
(June 7, 2022), https://tinyurl.com/445pnczn ...................................................................... 18

Michael Jensen et al., *Use of Social Media By US Extremists,* Nat'l Consortium
for the Study of Terrorism and Responses to Terrorism (2019),
https://tinyurl.com/3s9nmbbc ........................................................................................... 6

Michael Shurkin, *A Brief History of the Assault Rifle*, The Atlantic (June 30,
2016), https://tinyurl.com/vjac8a3b ................................................................................. 17

N. Kirkpatrick et al., *The Blast Effect*, Wash. Post (2023),
http://tinyurl.com/2kutwsea .................................................................................... 16, 17, 18

Pablo Barberá, *Social Media, Echo Chambers, and Political Polarization*,
Cambridge Univ. Press (Aug. 24, 2020), https://tinyurl.com/bdds6wf9 ............................... 6

*Past Summary Ledgers*, Gun Violence Archive, https://tinyurl.com/y5s7ax23 ........................... 5

Peter M. Rhee et al., *Gunshot wounds: A review of ballistics, bullets, weapons,
and myths,* 80 J. of Trauma and Acute Care Surgery 6, 856 (2016) ......................................... 9

*Pop Culture: 1800*, U.S. Census Bureau (Dec. 14, 2023),
https://tinyurl.com/78cxvafx ........................................................................................... 7

*Pop Culture: 2020*, U.S. Census Bureau (Dec. 14, 2023),
http://tinyurl.com/bdcts694 ........................................................................................... 7

*Rifle Marksmanship M16A1, M16A2/3, M16A4, and Carbine*, U.S. Dep't of the
Army (2003), https://tinyurl.com/3reu38px ...................................................................... 17

Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN (Oct. 5, 2017), https://tinyurl.com/bddjjm27 ................................................................... 21

Sara Swann, *The history of the AR-15 and how it became a symbol of American gun culture,* Poynter (June 29, 2022), https://tinyurl.com/5bffkafr ........................................ 16

Sarah Zhang, *What an AR-15 Can Do to the Human Body*, WIRED (June 17, 2016), https://tinyurl.com/5d5prxmt ........................................................................... 17

Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?,* 49 Hastings Const. L.Q. 145, 168-69 (2022), https://tinyurl.com/zx2dvsmc .............................................. 11

Serge F. Kovaleski & Mike Baker, *Gunman in 2017 Las Vegas Shooting Was Angry at Casinos, New F.B.I Files Show*, N.Y. Times (Mar. 30, 2023) http://tinyurl.com/ykxj889u ...................................................................................... 8

Stephen W. Hargarten, *The Bullets He Carried*, 21 West. J. Emerg. Med. 1036 (2020) ................................................................... 9

*TC 3-22.9 Rifle and Carbine Manual*, U.S. Dep't of the Army (May 2016), https://tinyurl.com/2p963dxd ................................................................................. 10

Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice*, Rolling Stone (Feb. 22, 2018), https://tinyurl.com/4nedm6fa. ................................................................................. 17

Tim Reid, *'Copycat' mass shootings becoming deadlier, experts warn after New York attack,* Reuters  (May 15, 2022), https://tinyurl.com/bdzbf8us ........................................ 7

*What is your par time for an AR-15 emergency reload?*, AR15.com  (Nov. 22, 2010), https://tinyurl.com/3csjs7kd ...................................................................... 9

*Winchester Model 1866 Short 38 Special Lever Action Rifle*, Winchester Gun Store, https://tinyurl.com/yc3cv2zc .................................................................... 9

# I.     INTEREST OF *AMICI CURIAE*

*Amici Curiae* Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence (together, "*Amici*") respectfully submit this brief[1] in support of the opening brief of Defendant-Appellants Illinois Attorney General Kwame Raoul, Illinois State Police Director Brendan F. Kelly, and Illinois Governor JB Pritzker, ECF 31 ("Defendants' Brief").

Giffords Law Center is a nonprofit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their communities. Brady is the nation's longest-standing non-partisan, nonprofit organization dedicated to reducing gun violence through education, research, legal advocacy, and political action.

Through partnerships with researchers, public health experts, and community organizations, *Amici* conduct research for, draft, and defend laws, policies, and programs proven to reduce gun violence. Giffords Law Center and Brady have filed numerous *amicus* briefs in cases involving the constitutionality of firearms regulations,[2] and judges have regularly cited the organizations' research and expertise.[3]

---

[1] In accordance with Federal Rule of Appellate Procedure 29(a), all parties have consented to this filing. No party's counsel authored any part of this brief, and no one other than *Amici* contributed to its preparation or submission.

[2] *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008); *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106 (2d Cir. 2020).

[3] *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 121–22 (3d Cir. 2018); *Stimmel v. Sessions*, 879 F.3d 198, 208 (6th Cir. 2018); *Peruta v. Cnty. of San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (en banc) (Graber, J., concurring); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 990 (C.D. Cal. 2019); *Md. Shall Issue v. Hogan*, 353 F. Supp. 3d 400, 403–05 (D. Md. 2018).

## II.     INTRODUCTION

The Illinois laws being challenged in this case, Ill. Pub. Act 102-1116 § 1 (codified at 720 ILL. COMP. STAT. 5/24-1.9–1.10) (the "Challenged Laws"), which regulate possession of assault firearms and large capacity magazines ("LCMs"), are constitutional under the test announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) and clarified in *United States v. Rahimi*, 602 U.S. 680 (2024). *Bruen* instructs that when a law regulates conduct covered by the plain text of the Second Amendment, courts reviewing the law's constitutionality must determine if the "regulation is consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 17. In cases like this one, which "implicat[e] unprecedented societal concerns or dramatic technological changes," *Bruen* and *Rahimi* require a "nuanced approach" to historical analysis to avoid putting a "regulatory straightjacket" on governments seeking to protect the public from dangerous firearms. *Id.* at 27, 30; *see also Rahimi*, 602 U.S. at 691 ("[O]ur recent Second Amendment cases . . . were not meant to suggest a law trapped in amber."). The Challenged Laws are constitutional under this test because they are relevantly similar to historical regulations that were designed to address pressing public safety concerns of their times.

This Court, however, need not perform this historical analysis because Plaintiffs' challenge fails at *Bruen*'s threshold first step: the weapons and weapon accessories governed by the Challenged Laws are not covered by the plain text of the Second Amendment because they are uniquely dangerous and not quintessential, or even suitable, self-defense weapons. They are weapons of war designed to kill large numbers of people quickly and are therefore drastically more lethal than firearms of the 1700s or 1800s.

In addition, the lower court's formulation of the "common use" test is inherently flawed. It is based on a misinterpretation of two dissents and a presumption in a third case made merely for the sake of argument.

### III.    ARGUMENT

### A.    *Bruen* and *Rahimi* Require Courts to Consider Empirical Research.

In *Bruen*, the Supreme Court articulated a new test for determining whether a regulation is constitutional under the Second Amendment: a reviewing court must first determine whether the regulated conduct is covered by the plain text of the Second Amendment. 597 U.S. at 24. If the conduct is covered, the burden shifts to the government to demonstrate that the regulation is "consistent with this Nation's historical tradition" of firearms regulation. *Id*. at 34.

In *Rahimi*, the Supreme Court further explained that Second Amendment jurisprudence is "not meant to suggest a law trapped in amber, . . . [and] the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." 602 U.S. at 691–92. Consequently, a modern regulation need not be the "twin" of a historical regulation. *Bruen*, 597 U.S. at 30. The Court has further recognized that, while it is sometimes "relatively simple" to analogize modern regulations to historical laws, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 27; *see Bevis v. City of Naperville*, 85 F.4th 1175, 1191 (7th Cir. 2023). The Court identified two important—but non-exclusive—considerations for determining if historical and modern regulations are relevantly similar: "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29 (emphases added).

Comparing the motivations (the "whys") and the implementations (the "hows") of modern and historical laws requires courts to consider relevant empirical research on prevailing conditions in American society. *Rahimi*, 602 U.S. at 692. Such research helps courts contextualize modern

and historical laws and the prevailing societal backdrop against which those laws were passed, as *Bruen* requires. *Id.*; *see also id.* at 702 (Sotomayor, J., concurring) ("[T]he Court's interpretation [of *Bruen*] permits a historical inquiry calibrated to reveal something useful and transferable to the present day.").

*Bruen*'s analysis of historical analogues thus requires that gun-safety regulations be viewed in light of prevailing societal conditions. Empirical research provides indispensable evidence of these conditions. *See, e.g.*, *Hanson v. District of Columbia*, 120 F.4th 223, 240 (D.C. Cir. 2024) (citing data from the Gun Violence Archive to illustrate increasing frequency of mass shootings). As Justice Barrett emphasized in *Rahimi*, the Second Amendment does not "force[] 21st-century regulations to follow late-18th century policy choices." 602 U.S. at 739 (Barrett, J., concurring).

**B.    Because the Challenged Laws Address Unprecedented Societal and Technological Conditions, *Bruen* Requires Nuanced Analysis.**

Over the past 200 years, unprecedented societal changes and advances in firearms technology have caused a dramatic rise in the frequency and lethality of mass shootings. This uniquely modern danger motivated the Illinois legislature to pass the Challenged Laws, which, like copious regulations spanning our Nation's history, were designed to protect the public.[4]

**1.    The Frequency, Lethality, and Geographic Concentration of Mass Shootings Are Novel Societal Concerns.**

In recent years, the United States has seen an exponential rise in public mass shootings. A *total* of 25 mass shootings occurred between 1900 and 1965.[5] In astonishing contrast, there were

---

[4] *See* Defs. Br. at 6, 36–37.

[5] *See* Bonnie Berkowitz & Chris Alcantara, *The terrible numbers that grow with each mass shooting*, Wash. Post (May 9, 2021), https://tinyurl.com/537ww9z4.

502 mass shootings in the United States in 2024 alone, and a total of more than 3,200 just since 2020—an average of nearly two per day.[6]

This societal threat is remarkable not just because of its swift rise to epidemic proportions in the United States, but also because of the disproportionately high rate of mass shootings in this country relative to the rest of the world. A recent comprehensive study analyzing the number of mass shooting incidents and fatalities in 36 developed countries found that half of those countries did not have a single mass shooting between 1998 and 2019; only ten had more than one mass shooting; and only five had more than two.[7] The United States suffered the greatest number of mass shooting fatalities of all developed countries—more than **12 times** as many mass shootings as the country with the second-highest count.[8] The United States makes up 33% of the population of developed countries, yet accounts for 73% of all mass shooting incidents and 62% of mass shooting fatalities.[9] And as noted above, mass shootings have skyrocketed in the United States even since the data analyzed in that study was collected.

Together, these figures demonstrate that mass shootings are strikingly more prevalent in modern-day America than at any time in our history or in any comparable place in the world. *See Hanson*, 120 F.4th at 241.

### 2. The Rise of Mass Shootings Coincides with Unimaginable and Unprecedented Societal Concerns.

Several modern societal phenomena have contributed to the surge in mass shootings in the United States during the 21st century, making the prevention of gun violence especially

---

[6] *See Past Summary Ledgers*, Gun Violence Archive, https://tinyurl.com/y5s7ax23.

[7] Jason R. Silva, *Global mass shootings: comparing the United States against developed and developing countries*, 47 Int'l J. Compar. & Applied Crim. Just. 317, 331 (2023).

[8] *Id.*

[9] *Id.*

imperative. The proliferation of social media platforms and transformative urbanization are two poignant examples.

a.    Social Media

Social media platforms create a means of communication exponentially faster, farther-reaching, and more difficult to regulate than anything the Founders could have imagined in their wildest dreams. Numerous studies correlate social media use with increases in anti-social behavior, mental health disorders, extremism, and, ultimately, mass shootings. Social media plays an important role in the radicalization of American extremists;[10] a mounting body of evidence demonstrates that content algorithms limit users' exposure to contrary viewpoints, creating "echo chambers" that intensify biases.[11]

Many perpetrators of mass shootings have been inspired by violent and extremist discourse online. Just one example is the May 2022 Tops Buffalo shooting, in which a gunman armed with a semiautomatic rifle shot 13 people—killing ten—and broadcast the massacre live on social media.[12] The New York Attorney General reported that the gunman's "path towards becoming a white supremacist terrorist began upon viewing on the 4chan [social media] website a brief clip of a [] mass shooting."[13] The Buffalo shooter posted material on social media as well, including a racist manifesto, "with the explicit goal of provoking future mass shootings."[14] The shooting

---

[10] *See, e.g.,* Michael Jensen et al., *Use of Social Media By US Extremists,* Nat'l Consortium for the Study of Terrorism and Responses to Terrorism (2019), https://tinyurl.com/3s9nmbbc.

[11] *See* Pablo Barberá, *Social Media, Echo Chambers, and Political Polarization*, Ch.3 in *Social Media and Democracy*, Cambridge Univ. Press (Aug. 24, 2020), https://tinyurl.com/bdds6wf9.

[12] *See generally Investigative Report on the Role of Online Platforms in the Tragic Mass Shooting in Buffalo on May 14, 2022*, Off. of the N.Y. State Att'y Gen. (Oct. 18, 2022).

[13] *Id.* at 3.

[14] *Id.* at 15.

6

"appear[ed] to be the latest in a line of 'copycat' gunmen carrying out deadlier mass shootings inspired by previous attackers."[15] Likewise, on May 7, 2023, another mass shooter killed eight people in Allen, Texas after being influenced by white supremacist materials he found on social media.[16]

### b.    Urbanization

Since the Founding, American society has also been radically transformed by urbanization. In 1800, the United States averaged 6.1 people per square mile.[17] By 2020, the population had increased by 1,500% to an average of 93 people per square mile.[18]

This explosion in population density has profoundly changed how people associate. Public gatherings are more frequent and much larger than was possible before extensive urbanization. People gather, for instance, in schools that accommodate thousands of students, tightly packed public transportation, crowded night clubs, sports stadiums, concert halls, movie theaters, and parades. Even in rural areas, modern transportation allows large crowds to gather easily, such as at high school football games. These gatherings create vulnerable scenarios where mass shooters can massacre large numbers of victims in mere moments. At the Route 91 Music Festival in Las

---

[15] Tim Reid, *'Copycat' mass shootings becoming deadlier, experts warn after New York attack*, Reuters (May 15, 2022), https://tinyurl.com/bdzbf8us.

[16] Jake Bleiberg et al., *Source: Investigators examine ideology of Texas gunman*, AP News (May 8, 2023), https://tinyurl.com/3ywej7aa.

[17] *Pop Culture: 1800*, U.S. Census Bureau (Dec. 14, 2023), https://tinyurl.com/78cxvafx.

[18] *Pop Culture: 2020*, U.S. Census Bureau (Dec. 14, 2023), http://tinyurl.com/bdcts694. Because these figures are an average of the population density of the entire country, the numbers drastically understate the impact of population density in *urban and suburban* areas, where most mass shootings occur.

Vegas in 2017, for example, a single shooter killed 60 concertgoers and injured hundreds more in just 11 minutes.[19]

### 3. Advances in Gun Technology Have Combined with Societal Changes to Create the Perfect Storm for Mass Shootings.

Against the backdrop of these and other societal changes, advances in gun technology allow even an inexperienced shooter to kill more people more quickly than ever before. The United States did not experience a single mass shooting resulting in double-digit fatalities from the founding of the Republic, until 1949.[20] The second did not occur until 1966, 17 years later.[21] Today, such mass shootings occur regularly.[22]

Moreover, modern firearms are far more lethal than their Founding-era precursors. The typical Revolutionary-era musket: (i) held just one round at a time; (ii) had a maximum accurate range of 55 yards; (iii) had a muzzle velocity of roughly 1,000 feet per second; and (iv) took a "skilled shooter" half a minute to load a single shot.[23] By contrast, a typical AR-15 rifle (i) can hold 30 rounds[24] (30 times more); (ii) can shoot accurately from around 400 yards[25] (seven times

---

[19] Serge F. Kovaleski & Mike Baker, *Gunman in 2017 Las Vegas Shooting Was Angry at Casinos, New F.B.I. Files Show*, N.Y. Times (Mar. 30, 2023) http://tinyurl.com/ykxj889u.

[20] *See* Expert Report of Louis Klarevas ¶¶ 16–17, *Gates et al. v. Polis*, No. 1:22-1866, ECF 74-11 (D. Colo. Sept. 11, 2023).

[21] *Id.*

[22] *See, e.g.*, *supra* at 6, *infra* at 18 (Buffalo and Uvalde shootings).

[23] Christopher Ingraham, *What 'arms' looked like when the 2nd Amendment was written*, Wash. Post (June 13, 2016), https://tinyurl.com/mu5ety64.

[24] *See Are AR-15 Magazines Interchangeable? Which Ones Are*, Neckbone Armory, https://tinyurl.com/hppuzpb2; *see also* Ingraham, *supra* note 22.

[25] James Miller, *The 5 Best AR-15 Pistols Reviewed: Reports from Range*, Minuteman Review (Apr. 7, 2023), https://tinyurl.com/5n9as9ye.

as far); (iii) produces a muzzle velocity of around 3,251 feet per second[26] (over three times faster); and (iv) can be reloaded with full magazines in as little as three seconds.[27] *See Bevis v. City of Naperville*, 85 F.4th 1175, 1196 (7th Cir. 2023) (discussing the extreme lethality of the AR-15, which has a firing rate of 300 rounds per minute and delivers the same kinetic energy, muzzle velocity, and effective range as the U.S. Army's M16 automatic rifle)). One study calculated that "the number of bullets and their energy fired by the Sandy Hook shooter equaled an estimated 171 late 1700s militiamen storming the school."[28]

Even the leading repeating firearm of the Civil War era was a far cry from modern weapons. The 1866 Winchester rifle had a magazine capacity of 11 to 15 rounds,[29] a maximum range of around 100 yards (one-fourth of an AR-15), a muzzle velocity of 1,100 feet per second (one-third of an AR-15),[30] required the shooter to manually manipulate a large lever under the rifle before each shot,[31] and could fire only ten shots per minute.[32] Using a modern semiautomatic assault rifle, a shooter can fire 40 rounds in as little as nine seconds,[33] which the U.S. Army defines

---

[26] Peter M. Rhee et al., *Gunshot wounds: A review of ballistics, bullets, weapons, and myths*, 80 J. Trauma & Acute Care Surgery 853, 856 (2016).

[27] *What is your par time for an AR-15 emergency reload?*, AR15.com, (Nov. 22, 2010), https://tinyurl.com/3csjs7kd.

[28] Stephen W. Hargarten, *The Bullets He Carried*, 21 West. J. Emerg. Med. 1036 (2020).

[29] *Winchester Model 1866 Short 38 Special Lever Action Rifle*, Winchester Gun Store, https://tinyurl.com/yc3cv2zc.

[30] Dan Alex*, Winchester Model 1866: Lever-Action Repeating Rifle*, Military Factory (Mar. 12, 2019), https://tinyurl.com/p88kcaye.

[31] *See* Decl. of Robert Spitzer ¶ 48, *Nat'l Ass'n for Gun Rts. v. Campbell*, No. 1:22-cv-11431, ECF 21-10 (D. Mass. Jan. 31, 2023).

[32] *1866 Yellowboy Rifle History*, Uberti USA, https://tinyurl.com/3x2wjth3 ("The gun's . . . rate of 10 or more shots per minute was a game changer.").

[33] *See* Mark Berman & Todd C. Frankel, *High-capacity magazine bans could save lives. Will they hold up in court?*, Wash. Post (Mar. 27, 2023), https://tinyurl.com/dkzjskxs.

as "rapid semiautomatic fire."[34] Modern semiautomatic weapons are "more accurate and capable of quickly firing more rounds than their historical predecessors. And they are substantially more lethal." *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 44 (1st Cir. 2024).

Current events too frequently illustrate how, with modern technology, a lone individual can murder scores of people in minutes before he can be located and stopped. On May 24, 2022, a lone gunman armed with an AR-15-style weapon fired over 100 rounds in two and a half minutes inside an elementary school in Uvalde, Texas, "likely murder[ing] most of his innocent victims before any responder set foot in the building."[35] The ratifiers of the Second Amendment could not have imagined such rapid, indiscriminate carnage.

### 4.  *Bruen* Requires Nuance When Analyzing Historical Analogues to the Challenged Laws.

The above discussion demonstrates that the Illinois legislature contended with realities that legislatures of the past did not face: mass shootings occurring more frequently than ever before (and at all), structural shifts in society, and rapid advances in gun technology.[36] *See Ocean State*, 95 F.4th at 44 (finding "no direct precedent for the contemporary and growing societal concern that [semiautomatic weapons] have become the preferred tool for murderous individuals intent on killing as many people as possible, as quickly as possible"). These drastic societal and technological changes require this Court to employ a nuanced analysis under *Bruen* when comparing the "hows" and "whys" of the Challenged Laws with those of historical laws.

---

[34] *TC 3-22.9 Rifle and Carbine Manual*, U.S. Dep't of the Army, §§ 8-19–20, (May 2016), https://tinyurl.com/2p963dxd.

[35]  Carla Astudillo et al., *What we know, minute by minute, about how the Uvalde shooting and police response unfolded*, Texas Tribune (July 28, 2022), https://tinyurl.com/mr4eyjfu.

[36] *See* Defs.' Br. at 44–49.

To analogize past and present "hows," this Court must determine whether the Challenged Laws impose a "burden on the right of armed self-defense" that is "comparable" to that imposed by historical laws. *Bruen*, 597 U.S. at 29; *Bevis*, 85 F.4th at 1199–1200. The Illinois legislature chose to restrict the use and sale of specific, particularly dangerous and lethal firearms and accessories, while preserving residents' right to protect themselves with countless legal firearms.[37] This is consistent with our Nation's "strong tradition of regulating excessively dangerous weapons once it becomes clear that they are exacting an inordinate toll on public safety and societal wellbeing." *Bianchi v. Brown*, 111 F.4th 438, 446 (4th Cir. 2024), *petition for cert. filed sub nom. Snope v. Brown*, No. 24-203 (U.S. Aug. 21, 2024); *see infra* § II.D. "This is enough," this Court has correctly reasoned, "to satisfy the 'how' question *Bruen* identified." *Bevis*, F.4th at 1199–200.

The motivation behind the Challenged Laws—their "why"—is, fundamentally, to promote public safety.[38] Gun regulations at the Founding and throughout our history had the same motivation.[39] "Limitations on [the] right to self-defense have been recognized in common law since before our nation's founding. . . . [I]t is not just the rights to life and liberty of the defender that matter, but also those of other members of society. Else, how could we have any society at all?" *Bianchi*, 111 F.4th at 449. There is thus a strong and easily discernible link between the past and present "whys."

Employing *Bruen*'s nuanced approach, the Challenged Laws are relevantly similar to many historical weapons regulations and are thus consistent with our nation's tradition of firearm

---

[37] *See id.* at 6–11 (describing "instruments" covered by the Challenged Laws).

[38] *See id.* at 6, 36–37.

[39] *See* Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 Hastings Const. L.Q. 145, 168–69 (2022), https://tinyurl.com/zx2dvsmc.

regulation. As the Supreme Court recognized in *Rahimi*, "[I]f laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons [are permissible]." 602 U.S. at 692. The Challenged Laws are thus constitutional under *Bruen*.

### C.    The District Court's Common Use Analysis is Flawed, and the Common Use Standard Does Not Apply Here.

The District Court created a wholly new (and unsupported) definition of "common use" as presumptively encompassing, among other things: (i) "any [semiautomatic firearm that] is or has been available for purchase, possession, and usage by law-abiding citizens for self-defense, provided that it is not otherwise 'dangerous and unusual;'" and (ii) "features (like magazines) and nonessential features . . . like the various attachments prohibited by [the Challenged Laws]." *Barnett v. Raoul*, 756 F. Supp. 3d 564, 614 (S.D. Ill. 2024) ("*Barnett I*"). Despite perfunctorily referencing *Bevis*, the lower court jettisoned this Court's well-reasoned common use analysis, basing its definition on a misinterpretation of the dissents in *Cargill* and *Bevis*, and a presumption in a third case, *Hanson*, made merely for the sake of argument.

The District Court's flawed reasoning should not be endorsed by this Court. First, the dispute in *Cargill* did not even involve the Second Amendment, and Justice Sotomayor's dissent did not discuss common use (neither, for that matter, did the majority opinion). *See Garland v. Cargill*, 602 U.S. 406, 413 (2024) ("The question in this case is whether a bump stock transforms a semiautomatic rifle into a 'machinegun'"). Second, regarding Judge Brennan's dissent in *Bevis*, the Supreme Court has made clear that "dissents . . . carry no legal force." *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 273 (2020) ("comments in a dissenting opinion about legal principles and precedents are just that: comments in a dissenting opinion") (cleaned up). Third, *Hanson* does not support the District Court's reasoning as to the meaning of common use.

In *Hanson*, the D.C. Circuit simply "presume[d] for present purposes that" LCMs were in common use, and then, as *Heller* did, dedicated the "bulk" of its opinion to "an extended analysis" of historical analogues. 120 F.4th at 233–34; *see id*. at 242–43.

Relying on this illusory support, the District Court deployed its own novel definition, finding that the regulated weapons are in common use for three primary reasons: (1) they "are ideally suited for self-defense in the home," (2) they are "commonly available" for purchase, and (3) there are "millions of [these] weapons in circulation in the United States." *Barnett I*, 756 F. Supp. 3d at 626–27. None of these reasons survives scrutiny.

The first purported ground fails because, to be in common use, firearms must actually be *used for lawful self-defense*, not merely be hypothetically suitable for that purpose. *Bevis*, 85 F.4th at 1193 ("[T]he definition of 'bearable Arms' extends only to weapons in common use for a lawful purpose. That lawful purpose . . . is at its core the right to individual self-defense."). As this Court has already found, the weapons regulated by the Challenged Laws are not in common use because "the weapons used for self-defense are the ones that *Heller*, *McDonald*, *Caetano*, and *Bruen* had in mind—not a militaristic weapon such as the AR-15, which is capable of inflicting . . . grisly damage," *Bevis*, 85 F.4th at 1199, and not large capacity magazines, which "can [also] lawfully be reserved for military use," *id*. at 1197.

Moreover, the regulated weapons are not "ideally" suited for self-defense in the home (or even well-suited for that purpose). They are dangerous and unusual weapons that are difficult to maneuver indoors and potentially fatal to others living in the same dwelling. It is therefore unsurprising that empirical evidence shows these weapons are not, in fact, used for self-defense. *See Rupp v. Bonta*, 723 F. Supp. 3d 837, 855 (C.D. Cal. 2024) ("because lawful self-defense

requires imminent harm, it generally occurs 'up close'; at that range, it is difficult to use an assault rifle.").

The second and third grounds also fail. Firearms are not in common use simply because they are "commonly available" or because many are "in circulation."[40] Again, to be in common use, firearms must actually be *used for lawful self-defense*, and this Court has found that the regulated weapons are not. Notably, Plaintiffs produced to the District Court no reputable evidence showing that assault weapons or high capacity magazines are actually used for lawful self-defense, much less commonly used for that purpose.

Further, this Court has recognized that using firearm availability or ownership statistics to determine common use is inherently flawed and "would have anomalous consequences." *Bevis*, 85 F.4th at 1199. As this Court explained in *Friedman v. City of Highland Park*:

> [R]elying on how common a weapon is at the time of litigation would be circular . . . Machine guns aren't commonly owned for lawful purposes today because they are illegal; semi-automatic weapons with large-capacity magazines are owned more commonly because, until recently (in some jurisdictions), they have been legal. Yet it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity.

784 F.3d 406, 409 (7th Cir. 2015).

Many courts outside this Circuit have likewise rejected the idea that widespread circulation satisfies *Heller*'s common use standard. Indeed, even on remand, the D.C. Circuit in *Heller* accepted that millions of semiautomatic rifles and LCMs had been manufactured and purchased, but found this insufficient because it could not "be certain whether these weapons are commonly

---

[40] While the District Court recited this Court's admonition against "bas[ing] [an] assessment of the constitutionality of these laws on numbers alone," it still largely based its determination on the claim that there are "still millions of weapons in circulation in the United States (and, by definition, in Illinois) that the Illinois Government has rendered illegal" and by "considering the volume of sales over the past 20 years." *Barnett I*, 756 F. Supp. 3d at 627.

used or are useful *specifically for self-defense*." *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) (emphasis added).

Put succinctly, "[a] law's constitutionality cannot be contingent on the results of a popularity contest." *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 213 (3d Cir. 2024) ("*DSSA*") (Roth, J., concurring); *Capen v. Campbell*, 708 F. Supp. 3d 65, 78 (D. Mass. 2023) ("Such a rule would lead to a host of absurd results. . . . the constitutionality of the regulation of different firearms would ebb and flow with their sales receipts. . . . an entirely novel weapon that achieved rapid popularity could be rendered beyond the reach of regulation if innovation and sales outstripped legislation."), *aff'd*, 134 F.4th 660 (1st Cir. 2025).

Finally, *Heller* stands only for the proposition that an "entire class" of arms cannot be "banned" if it is in common use for lawful self-defense. *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008). In stark contrast to the total ban on handgun possession in the home challenged in *Heller*, the Challenged Laws here regulate specific, enumerated, especially dangerous firearms, features, and accessories that the Illinois legislature determined pose a particular threat to society.[41]

### D. Assault Weapons Are Uniquely Dangerous and Not "Quintessential Self-Defense" Weapons Protected by the Second Amendment.

The Supreme Court has expressly recognized that the Second Amendment does not bestow a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Bruen*, 597 U.S. at 21. Indeed, the Court has endorsed the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 626–27. The Second Amendment "emphatically does not stretch to encompass excessively dangerous weapons ill-suited and disproportionate to [self-defense]." *Bianchi*, 111 F.4th at 452.

---

[41] *See* Defs.' Br. at 6 (the Challenged Laws regulate weapons "ill-suited for civilian self-defense but uniquely dangerous as offensive weapons.").

The Challenged Laws fit squarely in the historical tradition of prohibiting "dangerous and unusual weapons." They regulate only a limited subset of semi-automatic assault rifles with features that convert them into dangerous military-style firearms designed for war.

1. **The Firearms listed in the Challenged Laws Are Dangerous and Unusual Weapons.**

A review of the paradigmatic assault rifle, the AR-15, shows how the weapons enumerated in the Challenged Laws are dangerous and unusual. The AR-15 traces its origins to a military-grade rifle designed in the late 1950s.[42] It is functionally the same as the M16, an automatic weapon designed for military combat that is not protected by the Second Amendment. *Heller*, 554 U.S. at 627. The M16's gas-impingement system, which propels bullets "at a speed that would cross six football fields in a second,"[43] was of particular interest to the U.S. military. The AR-15 "is simply the semiautomatic version of the M16 rifle used by our military and others around the world." *Kolbe v. Hogan*, 849 F.3d 114, 139–40 (4th Cir. 2017).

Contradicting this Court's view that weapons such as the AR-15 do not "enjoy Second Amendment protection" because "the AR-15 is almost the same gun as the M16 machinegun," *Bevis,* 85 F.4th at 1195, the District Court asserted that the "AR-15 is, frankly, not at all the same weapon as the M16 rifle," *Barnett I*, 756 F. Supp. 3d at 630.

The District Court underestimated the lethality of an AR-15. The AR-15 is not rendered appropriate for civilian use merely because it fires semi-automatically rather than automatically, as the M16 can. Notably, it is "easy . . . to modify the AR-15 . . . [to] mak[e] it, in essence a fully automatic weapon." *Bevis*, 85 F.4th at 1196. And in any event, this distinction "between the M16

---

[42] *See* Sara Swann, *The History of the AR-15 and How It Became a Symbol of American Gun Culture*, Poynter (June 29, 2022), https://tinyurl.com/5bffkafr.

[43] N. Kirkpatrick et al., *The Blast Effect*, Wash. Post (2023), http://tinyurl.com/2kutwsea.

and AR-15 . . . pales in significance compared to the plethora of combat-functional features that makes the two weapons so similar." *Bianchi*, 111 F.4th at 456. Indeed, the U.S. Army Field Manual instructs soldiers that *semi*automatic fire is "[t]he most important firing technique during modern, fast-moving combat," emphasizing that it is "surprising how devastatingly accurate rapid [semiautomatic] fire can be."[44]

Due to the AR-15's "phenomenal lethality," versions of it have been the U.S. military's standard-issue assault rifle since the Vietnam War.[45] Indeed, virtually all of the world's armies now use assault rifles that are variants of the AR-15.[46] Thus, "these assault weapons and high-capacity magazines are much more like machineguns and military-grade weaponry than . . . firearms that are used for individual self-defense." *Bevis,* 85 F.4th at 1195.

Due to this lethality and firepower, assault weapons devastate victims' bodies in ways starkly distinct from modern handguns—the "quintessential self-defense weapon." *Heller*, 554 U.S. at 629. Though any bullet can kill when it hits a vital organ, according to one trauma surgeon, the energy of a bullet fired from an AR-15 "is so massive . . . your body will literally tear apart."[47] Another trauma surgeon explains that wounds inflicted by a 9mm handgun "look[] like a bad knife cut," but wounds inflicted by a semiautomatic rifle "look[] like a grenade went off in there."[48] Assault rifles cause internal damage and gaping exit wounds that drastically reduce a victim's

---

[44] *Rifle Marksmanship M16A1, M16A2/3, M16A4, and M4 Carbine*, U.S. Dep't of the Army, §§ 7-7, 7-8 (2003), https://tinyurl.com/3reu38px.

[45] Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice*, Rolling Stone (Feb. 22, 2018), https://tinyurl.com/4nedm6fa.

[46] Michael Shurkin, *A Brief History of the Assault Rifle*, The Atlantic (June 30, 2016), https://tinyurl.com/vjac8a3b.

[47] Kirkpatrick, *supra* note 43.

[48] Sarah Zhang, *What an AR-15 Can Do to the Human Body*, WIRED (June 17, 2016), https://tinyurl.com/5d5prxmt.

chance of survival.[49] Not a single one of the 20 children and six adults killed by a shooter armed with an AR-15 at Sandy Hook Elementary "had survivable or even treatable injuries."[50]

AR-15-style weapons cause even more catastrophic damage when impacting the smaller bodies of children. A pediatrician in Uvalde, Texas, recalled seeing children "whose bodies had been so pulverized, decapitated by the bullets fired at them, over and over again, whose flesh had been so ripped apart, that the only clue as to their identities were the blood-spattered cartoon clothes still clinging to them."[51] "Many children were left not only dead, but hollow."[52] "That degree of destruction . . . is possible only with a high-velocity weapon."[53]

While assault weapons are horrifyingly effective at massacring school children, concert-goers, and spectators at parades, they are "ill-suited and disproportionate to" use in self-defense. *Bianchi*, 111 F.4th at 452. Similar to a ".50 caliber sniper rifle," which the District Court found was "large" and "cumbersome" and thus "has limited use in close-quarters situation," *Barnett I*, 756 F. Supp. 3d at 628, the size of assault weapons makes them "tough to maneuver" in indoor spaces like the home.[54] Moreover, their power causes them to "overpenetrate, sending bullets through the walls of your house," endangering family members and bystanders.[55]

---

[49] *Id.*

[50] *Dep. of H. Wayne Carver II, M.D.* at 23, *Pozner v. Fetzer*, No. 18-cv-3122 (Wis. Cir. Ct. Dane Cty. May 21, 2019), http://tinyurl.com/dzu8ybwu.

[51] *Dr. Guerrero's Testimony at Hearing on Gun Violence Crisis*, H. Comm. on Oversight and Reform (June 8, 2022), https://tinyurl.com/y98a4wed.

[52] Matthew McConaughey, Remarks at White House Press Briefing (June 7, 2022), https://tinyurl.com/445pnczn.

[53] Kirkpatrick, *supra* note 43.

[54] Justin Peters, *The NRA Claims the AR-15 Is Useful for Hunting and Home Defense. Not Exactly*, Slate (June 12, 2016), https://tinyurl.com/4sm9jm3z.

[55] *Id.*

### 2.      The Regulated Features Render Weapons Even More Dangerous and Unusual.

Assault weapons are not weapons of lawful self-defense. They are weapons of war. And the features regulated by the Challenged Laws—such as pistol grips, forward grips, and detachable magazines—are "designed to increase lethality and allow shooters to inflict severe damage over great distances." *DSSA*, 108 F.4th at 214 (Roth, J., concurring). Weapons with these features are thus far "outside the scope of 'Arms' presumptively protected by the Second Amendment." *Id.*

Pistol grips[56] attach just behind the trigger and enable the shooter to place his shooting hand beneath the gun. Modern pistol grips were modeled after the Nazi *Sturmgewehr* to "give the shooter another 'crutch' to steady the gun" during rapid, prolonged firing.[57] Pistol grips also enable a shooter to fire from the hip rather than the shoulder. This is inherently less accurate and thus utterly useless for lawful purposes such as hunting or self-defense, but allows a shooter to indiscriminately spray fire into a crowd. *See Richmond Boro Gun Club, Inc. v. City of New York*, 97 F.3d 681, 685 (2d Cir. 1996) ("[P]istol grips are designed to make such spray firing from the hip particularly easy.").

Forward grips[58] can be held by the shooter's non-trigger hand, enabling them to exert leverage on the gun with both hands, reducing recoil and maintaining greater control during rapid, prolonged firing.[59] Further, "when shooting a semi-auto rifle in rapid fire mode, an enormous amount of heat is generated" by the barrel.[60] Thus, by holding the forward grip, rather than the hot

---

[56] 720 Ill. Comp. Stat. 5/24-1.9(a)(1)(A)(i).

[57] Cameron McWhirter & Zusha Elinson, *American Gun: The True Story of the AR-15*, 41 (2023).

[58] 720 Ill. Comp. Stat. 5/24-1.9(a)(1)(A)(ii).

[59] *See Key Points About Assault Weapons*, 1, 8 Violence Policy Center ("VPC") (2017) https://tinyurl.com/4h4naw8z.

[60] *Keeping hot barrels accurate*, AP (Aug. 10, 2018), https://tinyurl.com/3e9td6m5.

barrel, the shooter can sustain rapid fire for longer continuous periods. A barrel shroud[61] offers similar protection in prolonged firing.

Detachable magazines[62] equip firearms with significantly higher ammunition capacity because the number of rounds a detachable magazine can hold is not limited by the size of the gun.[63] They can hold as many as 100 rounds before having to reload and allow shooters to replace an empty magazine with a pre-loaded, full magazine in a few seconds.[64] They are especially lethal when used in combination with "features that allow [for] enhanced control while firing multiple rounds."[65]

\* \* \*

As the Second Circuit observed in *New York State Rifle & Pistol Ass'n v. Cuomo*, which *Bruen* has done nothing to upset, "[the] net effect of these military combat features is a capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general," such that citizens would not require such weapons for ordinary self-defense. 804 F.3d 242, 262 (2d Cir. 2015). The features regulated by the Challenged Laws increase a weapon's lethality by enabling shooters to sustain rapid fire longer with better control. *See Bevis*, 85 F.4th at 1194. Prolonged rapid firing of an assault weapon has only one purpose: to inflict carnage.

---

[61] 720 Ill. Comp. Stat. 5/24-1.9(a)(1)(A)(vi).

[62] *Id.* 5/24-1.9(a)(1)(A).

[63] *See* VPC, *supra* note 59.

[64] *See id.*

[65] *Id.*

20

**E.     The Regulation of LCMs Likewise Does Not Burden the Individual Right to Self-Defense.**

The LCM provision of the Challenged Laws regulates how frequently a shooter must reload their weapon. *See Bevis*, 85 F.4th at 1197 (explaining that LCM regulations do not place restrictions on ammunition because "[a]nyone who wants greater firepower is free under these laws to purchase several magazines of the permitted size."). Such regulation is necessary because LCMs are designed to perpetrate large-scale devastation. They enhance an already dangerous firearm by allowing it to fire more than ten rounds in rapid succession *without the need to reload*. "In the 30 seconds it takes a person to reload and shoot a 10-round magazine three times, someone with a 100-round magazine can shoot 100 bullets without reloading."[66] LCMs thus eliminate the critical pause during which a gunman would have to reload and the gunman's targets could escape or attempt to disarm him[67]—and during which a gunman can reassess the threat posed, as is necessary for lawful self-defense in many states. *See, e.g., Rupp*, 723 F. Supp. 3d at 855. Unsurprisingly, "firearms equipped with LCMs are involved in a disproportionate share of mass shootings."[68] States that restrict access to LCMs—usually with a ten-round limit—experience 63% fewer mass shootings than states that do not.[69]

Numerous courts have found no evidence that firing more than ten bullets without the need to reload is necessary or even beneficial for self-defense. *See, e.g., Duncan v. Bonta*, 133 F.4th

---

[66] Berman & Frankel, *supra* note 33.

[67] During the 2018 shooting in Parkland, Florida, the shooter's 13-second pause to load a new magazine enabled a teacher and ten students to flee. *Marjory Stoneman Douglas High School Public Safety Commission Report*, Fla. Dep't of Law Enforcement, at 32 (2019), tinyurl.com/mvs34fky.

[68] Louis Klarevas et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings*, 1990-2017, 109 AJPH 1754, 1755 (2019).

[69] Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN (Oct. 5, 2017), https://tinyurl.com/bddjjm27.

852 (9th Cir. 2025) ("A large-capacity magazine has little function in armed self-defense."); *Worman v. Healey*, 922 F.3d 26, 37 (1st Cir. 2019) ("[N]ot one of the plaintiffs or their six experts could identify even a single example of . . . a self-defense episode in which ten or more shots were fired.")

Empirical research further demonstrates that the ability to fire more than ten rounds without reloading does not aid in self-defense. The National Rifle Association's Armed Citizen database shows that, in more than 700 self-defense incidents, *less than one half of one percent* (0.5%) involved more than ten rounds of ammunition. *See DSSA*, 108 F.4th at 216 (Roth, J., concurring) ("The record shows it is 'extremely rare' for a person to fire even ten rounds . . . in self-defense.") (citing NRA database data). Other sources confirm that civilians engaged in self-defense generally fire only about two shots.[70] And FBI statistics likewise show that "the average gunfight includes 3 rounds fired."[71] The Challenged Laws thus do not impose a burden on the right to possess a firearm for lawful self-defense because LCMs are neither used nor useful in self-defense.

Nothing illustrates the needlessness and destructive capability of LCMs more poignantly than the words of Mark Kelly, United States Senator and husband of Giffords Law Center founder and mass shooting survivor Gabby Giffords. Testifying before Congress about the shooting that nearly took his wife's life, Senator Kelly said: "The first bullet went into Gabby's head. Bullet number 13 went into a nine-year-old girl named Christina-Taylor Green . . . . When [the shooter] tried to reload one 33-round magazine with another 33-round magazine, he dropped it [and was

---

[70] *See* Claude Werner, *The Armed Citizen - A Five Year Analysis*, Guns Save Lives (Mar. 12, 2012), tinyurl.com/bdemd7ya (average of 2.2 defensive shots fired per incident from 1997–2001).

[71] Kevin Michalowski, *The Statistically Perfect Gunfight*, USCCA (Feb. 25, 2019), https://tinyurl.com/3upbexr9.

subdued]. I contend if [the shooter] . . . did not have access to a high-capacity magazine . . . Christina-Taylor Green would be alive today."[72]

* * *

Assault rifles and weapons outfitted with the regulated features are uniquely dangerous and unusual weapons. They are not the "quintessential self-defense weapons" that the Supreme Court has held the Second Amendment protects. These "rifles were designed to achieve a simple goal: fire a lot of bullets fast to kill or maim as many enemy soldiers as possible."[73] And until the public availability of these destructive weapons is curtailed, as is the constitutionally permissible purpose of the Challenged Laws, they will continue to be used as horrific offensive weapons to commit mass killings of innocent civilians, just as they were in Parkland, Orlando, Uvalde, Highland Park, Buffalo, Las Vegas, and many other domestic massacres.

## IV.     CONCLUSION

For the reasons set forth above and in the Defendants' Brief, this Court should reverse the District Court's judgment and vacate the permanent injunction.

Dated: May 14, 2025                      Respectfully submitted,

                                         /s/ *Jennifer B. Loeb*
                                         Jennifer B. Loeb
                                           *Counsel of Record*
                                         FRESHFIELDS US LLP
                                         700 13th Street NW, 10th Floor
                                         Washington, DC 20005
                                         (202) 777-4500
                                         jennifer.loeb@freshfields.com

---

[72] 159 Cong. Rec. S2743 (daily ed. Apr. 17, 2013) (statement of Sen. Leahy) (quoting Judiciary Committee testimony of Captain Mark Kelly).

[73] McWhirter & Elinson, *supra* note 57.

Aaron R. Marcu
Brandt Henslee
Daniel Hodgkinson
Taylor Jachman
FRESHFIELDS US LLP
3 World Trade Center
175 Greenwich Street, 51st Floor
New York, NY 10007
(212) 277-4000
aaron.marcu@freshfields.com
brandt.henselee@freshfields.com
daniel.hodgkinson@freshfields.com
taylor.jachman@freshfields.com

*Counsel for Amici Curiae*
Giffords Law Center to Prevent Gun Violence and
Brady Center to Prevent Gun Violence

Esther Sanchez-Gomez
Leigh Rome
William T. Clark
GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE
268 Bush Street #555
San Francisco, CA 94104
(415) 433-2062
esanchezgomez@giffords.org
lrome@giffords.org
wclark@giffords.org

Douglas N. Letter
Shira Lauren Feldman
Tess Fardon
BRADY CENTER TO PREVENT GUN VIOLENCE
840 First Street, NE Suite 400
Washington, DC 20002
(202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org
tfardon@bradyunited.org

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Seventh Circuit Rule 29 because this brief contains 6997 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Seventh Circuit Rule 32(b) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Times New Roman font.


Dated: May 14, 2025                     */s/Jennifer B. Loeb*_____
                                         Jennifer B. Loeb
                                         *Counsel for Amici Curiae*
                                         Giffords Law Center to Prevent Gun Violence, and
                                         Brady Center to Prevent Gun Violence