No. 24-3060, 24-3061, 24-3062, 24-3063

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

———————

CALEB BARNETT, et al.,

*Plaintiffs-Appellees*,

v.

KWAME RAOUL, Attorney General of Illinois,
and BRENDAN F. KELLY, Director of the Illinois State Police,

*Defendants-Appellants*.

———————

On Appeal from the United States District Court for the
Southern District of Illinois,
No. 23-cv-00209

———————

## APPELLEES' RESPONSE BRIEF

———————

PAUL D. CLEMENT
ERIN E. MURPHY
MATTHEW D. ROWEN
NICHOLAS A. AQUART
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Appellees*

June 6, 2025

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Plaintiffs-Appellees furnishes the following statement in compliance with Circuit Rule 26.1:

(1)     The full name of every party that the attorney represents in the case:

> Caleb Barnett
> Brian Norman
> Hood's Guns & More
> Pro Gun & Indoor Range
> National Shooting Sports Foundation, Inc.

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

> Swanson, Martin & Bell, LLP
> Clement & Murphy, PLLC

(3)     If the party or amicus is a corporation:

i)     Identify all its parent corporations, if any:

> Hood's Guns & More, Pro Gun & Indoor Range, and National Shooting Sports Foundation, Inc., have no parent corporations.

ii)    List any publicly held company that owns 10% or more of the party's or amicus' stock:

> No company owns 10% or more of Hood's Guns & More, Pro Gun & Indoor Range, or National Shooting Sports Foundation, Inc.'s stock.

> s/Erin E. Murphy
> Erin E. Murphy

June 6, 2025

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES ..................................................................................... iv

INTRODUCTION .................................................................................................... 1

JURISDICTIONAL STATEMENT ........................................................................ 3

STATEMENT OF THE ISSUE ................................................................................ 3

STATEMENT OF THE CASE ................................................................................. 3

    A.    PICA ..................................................................................................... 3

    B.    *Bevis* ................................................................................................... 6

    C.    Proceedings Below ............................................................................ 9

SUMMARY OF ARGUMENT ............................................................................... 12

STANDARD OF REVIEW .................................................................................... 15

ARGUMENT .......................................................................................................... 16

I.    The State Identifies No Reason To Disturb The District Court's Evidence-Backed Conclusion That The Firearms PICA Bans Are "Arms" ................................................................................................... 16

    A.    The District Court Did Not Clearly Err in Finding that Ordinary People Would—and Actually Do—Keep for Self-Defense and Other Lawful Purposes the Firearms PICA Bans ............................................................................................... 17

        1.    The state does not contest any of the evidence showing that the firearms PICA bans are firearms that ordinary people would find useful for self-defense ............................... 17

        2.    The state does not contest any of the evidence showing that ordinary people do, in fact, keep for self-defense the firearms PICA outlaws ...................................................... 21

3.     The state's contrary arguments ignore the law, the facts, and what makes a firearm unlawful under PICA ..................... 23

B.     The District Court Did Not Clearly Err in Finding That the Firearms PICA Bans Are Neither Exclusively Nor Predominantly Useful in Military Service .......................... 29

II.     The State Identifies No Reason To Disturb The District Court's Evidence-Backed Conclusion That The Magazines PICA Bans Are "Arms" ................................................................................................. 37

III.    The District Court Correctly Concluded That The State Failed To Identify Any Tradition Of Banning Ubiquitous, Non-Militaristic Arms ............................................................................................................. 42

A.     The Arms PICA Bans Are Not "Dangerous And Unusual" .............. 43

B.     There is No Historical Tradition of Banning Common, Non-Militaristic Arms that Millions of Law-Abiding Citizens Own for Lawful Purposes ......................................................................... 46

C.     Illinois Cannot Save PICA's Sweeping Ban on Common, Non-Militaristic Arms by Pointing to Some Dramatic Technological Change or Novel Societal Problem ............................ 52

IV.     The District Court Did Not Abuse Its Discretion In Enjoining PICA ............................................................................................................. 55

CONCLUSION ....................................................................................................... 57

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*3M v. Pribyl,*
  259 F.3d 587 (7th Cir. 2001)...........................................................................15

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.,*
  910 F.3d 106 (3d Cir. 2018) ...........................................................................42

*Best v. Taylor Mach. Works,*
  179 Ill.2d 367 (1997) .......................................................................................55

*Bevis v. City of Naperville,*
  85 F.4th 1175 (7th Cir. 2023).................................................................. *passim*

*Buechel v. United States,*
  746 F.3d 753 (7th Cir. 2014)..................................................................... 17, 30

*Caetano v. Massachusetts,*
  577 U.S. 411 (2016).........................................................................................43

*District of Columbia v. Heller,*
  554 U.S. 570 (2008).................................................................................. *passim*

*Dixon v. Williams,*
  93 F.4th 394 (7th Cir. 2024).............................................................................55

*Duncan v. Bonta,*
  133 F.4th 852 (9th Cir. 2025)...........................................................................42

*Garland v. Cargill,*
  602 U.S. 406 (2024).........................................................................................32

*Hanson v. District of Columbia,*
  120 F.4th 223 (D.C. Cir. 2024)................................................................... 42, 51

*Harrel v. Raoul,*
  144 S.Ct. 2491 (2024).......................................................................................9

*Healix Infusion Therapy, Inc. v. Heartland Home Infusions, Inc.,*
  733 F.3d 700 (7th Cir. 2013) ...........................................................................16

iv

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022) ...................................................................... *passim*

*Nunn v. State*,
  1 Ga. 243 (1846) ................................................................................50

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
  No. 23-1141 (U.S. June 5, 2025) ........................................ 4, 37, 44

*Snope v. Brown*,
  2025 WL 1550126 (U.S. June 2, 2025) ............................. 22, 42, 44

*United States v. Malik*,
  680 F.2d 1162 (7th Cir. 1982) ........................................................17

*United States v. Nichols*,
  847 F.3d 851 (7th Cir. 2017) ..........................................................28

*United States v. Rahimi*,
  602 U.S. 680 (2024)..................................................... 47, 48, 49, 52

*Viramontes v. Cook Cnty.*,
  2025 WL 1553896 (7th Cir. June 2, 2025) ............................... 26, 43

**Constitutional Provision and Statutes**

U.S. Const. amend. II ....................................................... 16, 29

28 U.S.C. §1291 .....................................................................3

28 U.S.C. §1331 .....................................................................3

28 U.S.C. §1343 .....................................................................3

1837 Ala. Acts 7 ...................................................................49

1853 Comp. L. Cal. §127 ...................................................49

1859 Ind. Acts 129 ..............................................................49

720 ILCS 5/24-1(a) ...............................................................3

720 ILCS 5/24-1(b) ...............................................................3

720 ILCS 5/24-1.9(a) ........................................................................... *passim*

720 ILCS 5/24-1.9(b) ........................................................................3

720 ILCS 5/24-1.9(c) ........................................................................3

720 ILCS 5/24-1.9(d) ....................................................................4, 11

720 ILCS 5/24-1.9(e) ........................................................................3

720 ILCS 5/24-1.10(a) ......................................................................6

720 ILCS 5/24-1.10(d) ...................................................................6, 11

720 ILCS 5/24-1.10(g) ......................................................................6

## Other Authorities

Br. of Appellees, *Barnett v. Raoul*,
 No. 23-1825 (7th Cir. June 20, 2023), Dkt.56 ...................................16

Br. of State of Illinois as Amicus Curiae, *Viramontes v. Cook Cnty.*,
 No. 24-1437 (7th Cir. 2024), Dkt.27 ................................................26

David Kopel, *Bowie Knife Statutes 1837-1899*, Reason.com
 (Nov. 20, 2022), bit.ly/3RNRpQD ...................................................50

State Defs.' Br. in Opp'n, *Harrel v. Raoul*,
 No. 23-877 (U.S. Apr. 15, 2024) .......................................................9

## INTRODUCTION

When this case was last before this Court, the panel majority held that the Second Amendment protects weapons that "ordinary people would keep at home for purposes of self-defense," but not those "that are not possessed for lawful purposes" and/or "are exclusively or predominantly useful in military service." *Bevis v. City of Naperville*, 85 F.4th 1175, 1194 (7th Cir. 2023). While the Court concluded that the firearms and feeding devices the Protect Illinois Communities Act ("PICA") bans likely fall in the unprotected category, it "stress[ed]" that it had taken "just a preliminary look at the subject" given the relatively scant record before it. *Id.* at 1197. Indeed, *Bevis* not only declined to "rule out the possibility that the plaintiffs will find other evidence" that demonstrates that the Court's preliminary views were mistaken, but expressly acknowledged that more substantial evidence, including "[b]etter data on firing rates" in particular, "might" draw a "sharper distinction" between those firearms and feeding devices and weapons reserved for military service and thereby "change the analysis" altogether. *Id.*

That is precisely what happened. Taking to heart this Court's view that "Second Amendment challenges to gun regulations often require more evidence than is presented in the early phases of litigation," *id.*, the parties developed the most comprehensive record in any Second Amendment case to date. And after reviewing that record and hearing four days of live testimony and argument, the district court

found as a matter of fact that the firearms and magazines PICA bans "are Arms that ordinary people would keep at home for purposes of self-defense," not "weapons that are not possessed for lawful purposes" or are "exclusively or predominantly useful in military service." SA100-59. In fact, the court found (and the state does not dispute) that while millions of ordinary people *do* keep those arms for self-defense, no military in the world issues for combat *any* of the firearms PICA bans, because (among other things) those semiautomatic firearms lack the critical automatic functionality that militaries require. SA107-08.

The state now tries to wish away those facts. Despite having successfully resisted Supreme Court review by repeatedly emphasizing the preliminary nature of *Bevis* and the need for further fact-finding, the state largely ignores all of Plaintiffs' evidence and proceeds as if this Court must discount the district court's extensive factfinding and instead defer to anything and everything the state or its witnesses said. Making matters worse, the state largely ignores the legal test *Bevis* articulated, and instead proceeds as if it may just change the governing law whenever it leads to a result the state does not like. But this Court remanded so the parties could develop a comprehensive record on the facts that matter under *Bevis*. The state had its chance to prove its case under *Bevis*, and it failed; indeed, it barely tried. The district court thus reached a different conclusion in the final analysis because that is what the facts and the law required. This Court should affirm.

## JURISDICTIONAL STATEMENT

The state's jurisdictional statement is accurate but incomplete. The district court had jurisdiction under 28 U.S.C. §1331 and §1343; this Court has jurisdiction under §1291.

## STATEMENT OF THE ISSUE

Whether the district court correctly held, after a trial on the merits and extensive fact-finding, that PICA restricts the keeping and bearing of "Arms" within the meaning of the Second Amendment and is inconsistent with historical tradition.

## STATEMENT OF THE CASE

### A.    PICA

1. In 2023, Illinois made it a crime to "manufacture, deliver, sell, … purchase," or even just "possess" many of the most popular self-defense weapons in America. 720 ILCS 5/24-1.9(b), (c); *see* 720 ILCS 5/24-1(a)(15), (b). The prohibition applies to "any person within this State," except police, active-duty members of the military, and certain private security contractors. 720 ILCS 5/24-1.9(b), (e)(1)-(7). While pre-PICA owners may retain their now-outlawed firearms if registered, they are severely restricted in how and where they may keep and bear them. Grandfathered owners "shall possess such items only" "on private property owned or immediately controlled by the person;" "on private property that is not open to the public with the express permission of the person who owns or immediately controls such property"; "while on the premises of a licensed firearms

dealer or gunsmith for the purpose of lawful repair"; "at a properly licensed firing range or sport shooting competition venue"; or "while traveling to or from these locations," provided that the firearm is unloaded and placed in a container. 720 ILCS 5/24-1.9(d). They may not publicly carry their grandfathered arms anywhere.

A full rundown of the 1,000-plus firearms PICA prohibits citizens from keeping and bearing, which spans multiple pages, can be found at Addendum 1-8.[1] The following is a brief overview.

**Rifles.** Any "semiautomatic rifle" that has both "the capacity to accept a detachable magazine" and "a pistol grip" is banned. 720 ILCS 5/24-1.9(a)(1)(A)(i). That alone captures virtually all rifles on the AR platform, like the AR-15, which a unanimous Supreme Court recently described as the "most popular rifle in the country." Slip op.14, *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, No. 23-1141 (U.S. June 5, 2025); SA88-90, 101. PICA also prohibits any "semiautomatic rifle" that has both "the capacity to accept a detachable magazine" and "one or more of" a "thumbhole stock," "folding, telescoping, thumbhole, or detachable stock," "flash suppressor," or "shroud attached to the barrel or that

---

[1] Even the full rundown in the Addendum is not truly comprehensive. "Any firearm that has been modified to be operable as an assault weapon as defined in this Section," as well as any part that can convert any firearm into the above, is banned. 720 ILCS 5/24-1.9(a)(1)(H)-(I). And the State Police can add to (but not subtract from) the universe of banned firearms each year. *See* 720 ILCS 5/24-1.9(d)(3).

partially or completely encircles the barrel." 720 ILCS 5/24-1.9(a)(1)(A). That in turn captures nearly all modern semiautomatic rifles, which typically come standard with a feature capable of functioning as a protruding grip and/or a barrel shroud. D.Ct.Dkt.253 ¶74; SA87-88. All in all, PICA bans nearly 1,000 rifle models, including all of the most popular ones (both by make and model, and via a catchall). *See also* 720 ILCS 5/24-1.9(a)(1)(H)-(J).

*Pistols.* PICA also bans all semiautomatic pistols with "the capacity to accept a detachable magazine" that have "one or more of" "a threaded barrel," "a second pistol grip," "another feature capable of functioning as a protruding grip that can be held by the non-trigger hand," a shroud that "allow[s] the bearer to hold the firearm with the non-trigger hand," "a flash suppressor," "the capacity to accept a detachable magazine at some location outside of the pistol grip," or "a buffer tube, arm brace, or other part that protrudes horizontally behind the pistol grip and is designed or redesigned to allow or facilitate a firearm to be fired from the shoulder." 720 ILCS 5/24-1.9(a)(1)(C). PICA further bans any "semiautomatic pistol that has a fixed magazine with the capacity to accept more than 15 rounds." 720 ILCS 5/24-1.9(a)(1)(D). And, as with its prohibitions on rifles, after banning these pistols once via their features, PICA bans them twice more (once by a list of make and model, once via a catchall). *See* 720 ILCS 5/24-1.9(a)(1)(H)-(I), (K).

***Shotguns.*** All semiautomatic shotguns that (i) hold more than five rounds, (ii) have a pistol grip, or (iii) can accept a detachable magazine (regardless of capacity) are prohibited. 720 ILCS 5/24-1.9(a)(1)(F), (L) (listing, as with rifles and pistols, particular shotgun makes and models). That includes numerous common models that Americans keep and carry for, *inter alia*, home defense, hunting, and shooting competitions. D.Ct.Dkt.253 ¶¶122-29.

2. PICA also bans any magazine with "a capacity of … more than 10 rounds of ammunition for long guns and more than 15 rounds of ammunition for handguns," 720 ILCS 5/24-1.10(a)(1), which are what comes standard with most semiautomatic rifles and handguns, respectively, *see* D.Ct.Dkt.253 ¶¶141-44. Sale, manufacture, and purchase are outlawed. 720 ILCS 5/24-1.10(g). Possession is outlawed too, save for grandfathered magazines, which owners may continue to possess, but only subject to the same restrictions on their use and disposal placed on the firearms PICA bans. 720 ILCS 5/24-1.10(d).

**B.    *Bevis***

1. Four groups of individuals, industry members, and organizations consolidated before Judge McGlynn in the Southern District of Illinois moved for preliminary injunctions against PICA shortly after its enactment. The court granted the motions, concluding that Plaintiffs were likely to succeed in showing that the firearms and magazines PICA outlaws are "Arms" as the Supreme Court has defined

that term, *see District of Columbia v. Heller*, 554 U.S. 570, 581 (2008); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 28 (2022), and that PICA's sweeping ban on arms in common use is inconsistent with historical tradition. D.Ct.Dkt.101.

2. The state appealed, and the consolidated *Barnett* cases were joined with two cases that had come out the other way. This Court affirmed those two decisions and vacated Judge McGlynn's order, holding—based on the preliminary-injunction record—that Plaintiffs' Second Amendment challenge was not likely to succeed.

First, the Court held that Plaintiffs must show that the firearms and magazines PICA bans are "Arms that ordinary people would keep at home for purposes of self-defense," as opposed to "weapons that are not possessed for lawful purposes" and/or "exclusively or predominantly useful in military service." *Bevis*, 85 F.4th at 1194. But the Court recognized that "many weapons are 'dual use,'" and that "private parties have a constitutionally protected right to 'keep and bear'" such weapons even if "the military provides them to its forces." *Id.* at 1195 n.8.

Applying that framework to the preliminary facts, the Court concluded that "the weapons and feeding devices" PICA bans appeared to be "much more like machineguns and military-grade weaponry than" other lawfully owned firearms and so likely "can lawfully be reserved for military use." *Id.* at 1195-97. "Based on the record before" it, the Court further concluded that the AR-15 semiautomatic rifle is "indistinguishable from [the M16] machinegun," and that both the AR-15 and the

other firearms and feeding devices that PICA covers likely may be banned without implicating the Second Amendment. *Id.* at 1197.

In reaching that conclusion, however, the Court "stress[ed]" that it had taken "just a preliminary look at the subject." *Id.* Because it believed that "Second Amendment challenges to gun regulations often require more evidence than is presented in the early phases of litigation," the Court did "not rule out the possibility that the plaintiffs will find other evidence" proving those preliminary views mistaken. *Id.* It noted in particular that further evidence regarding the construction, function, application, and modification of firearms, as well as "[b]etter data on firing rates," might draw a "sharper distinction" between the firearms PICA bans and firearms reserved for military service, and indeed "might change the analysis" altogether. *Id.*

As to historical tradition, the Court held that Plaintiffs did not show "the necessary likelihood of success on the merits" "at the preliminary injunction stage." *Id.* at 1198. But the tradition the Court concluded PICA likely falls within is one of restricting "weapons and accessories designed for military or law-enforcement use" rather than "for personal use," *id.* at 1201-02, so the Court's historical-traditional analysis likewise was dependent on its preliminary view that the firearms and magazines PICA bans likely fall into the former category.

3. Plaintiffs petitioned for certiorari, which the Supreme Court denied after the state filed an opposition emphasizing the preliminary nature of this Court's decision and the need for further fact-finding. *See* State Defs.' Br. in Opp'n 16-18, *Harrel v. Raoul*, No. 23-877 (U.S. Apr. 15, 2024). Justice Thomas picked up on those points in a statement respecting the denial, where he noted that "if the Seventh Circuit ultimately allows Illinois to ban America's most common civilian rifle," then the Supreme Court "can—and should—review that decision once the cases reach a final judgment," but that the issue was not then ripe because this Court said its "merits analysis was merely 'a preliminary look at the subject.'" *Harrel v. Raoul*, 144 S.Ct. 2491, 2493 (2024) (Thomas, J.) (quoting *Bevis*, 85 F.4th at 1197).

### C. Proceedings Below

On remand, the parties proceeded to develop the most comprehensive record in any Second Amendment case to date. Plaintiffs produced live and written testimony from civilians, firearm design and self-defense experts, firearm instructors, weapons experts, and a firearm retailer showing not only that the arms PICA bans are useful for civilian self-defense, but that many people in fact keep them at home for that and other lawful purposes. D.Ct.Dkt.253 ¶¶20-92, 100-52. Plaintiffs also put on evidence from experts specializing in military tactics and weaponry, who explained that the arms PICA bans are not exclusively or

predominantly useful for military service—precisely because they differ in critical respects from M16s and other arms that militaries use. *Id.* ¶¶153-249.

While the state did not offer any evidence from a self-defense expert, it provided lengthy reporting from consultants and academics in the fields of law and forensics, linguistics, crisis and conflict management, medicine, economics, history, and political science. D.Ct.Dkt.185-1 to -10. In addition, the state put on evidence from its own military experts who, though they contradicted each other in important respects, D.Ct.Dkt.253 ¶¶186-87, 191, and agreed that while millions of civilians possess the firearms PICA bans for lawful purposes, *id.* ¶¶98-100, no military has ever used them as its general service infantry weapon, *id.* ¶¶163, 170, 181-83.

The case culminated in four days of live testimony and argument, D.Ct.Dkts.233-243, after which the parties filed over 400 pages of fact-intensive, post-trial briefing, D.Ct.Dkts.247-255. In the end, the district court held that PICA violates the Second Amendment. After "considering *all* of the evidence," the court concluded that the firearms and magazines PICA bans are "Arms" presumptively protected by the Second Amendment because they are: (1) weapons that "an ordinary person would keep at home for self-defense," SA100-07; (2) not "exclusively or predominantly useful in military service," or at the very least, are subject to "dual use" by citizens and the military, SA107-13; and (3) not predominantly "possessed

for unlawful purposes," SA114-18.[2]  As the fact-finder, the court trudged through the record, SA86-100, and credited Plaintiffs' "testimony from various firearms instructors and self-defense experts … military experts" and "the owner of Piasa Armory," an Illinois-based firearms retailer.  SA100.  The court also found that some of the state's evidence supported its fact-finding.  SA101.

With respect to historical tradition, the court conducted "an exhaustive review of the statutes and arguments provided by the Government," based on the record the parties developed.  SA151.  The court held that "the nation's history and tradition of firearm regulation does *not* support a statute as far-reaching as PICA," SA151, which prohibits law-abiding citizens from possessing common arms that are not exclusively or predominantly useful in military service, *see* SA120-57.

Finally, with respect to PICA's registration requirement, 720 ILCS 5/24-1.9(d), 1.10(d), the court held that because PICA's "prohibition of firearms is unconstitutional, so is the registration scheme."  SA168.

Turning to the scope of relief, the court enjoined PICA in its entirety, noting that the state had not argued for "severability."  SA163-64.

---

[2] The lone exceptions the court found are .50-caliber firearms, "belt-fed weapons," and "grenade launchers."  SA104-05.

The state appealed and sought a stay pending appeal, which this Court granted—but, in doing so, the Court reiterated that its "decision at the preliminary-injunction stage is not dispositive." CA7.Dkt.22 at 2.

## SUMMARY OF ARGUMENT

When this case was last before this Court, the panel majority concluded that Plaintiffs were not likely to succeed on their Second Amendment challenge, but went out of its way to "stress[]" repeatedly that its conclusions were only "preliminary," and that a more developed record with "[b]etter data" on things like the "firing rates" and other technical aspects of the firearms and magazines PICA bans might "change the analysis" entirely. *Bevis*, 85 F.4th at 1197. The Court thus remanded so the parties could develop, and the district court could apply the test *Bevis* announced to, a complete record about the multitude of arms PICA bans. The parties proceeded to do just that, and after considering reams of evidence and holding a four-day trial, the district court found—as this Court expressly recognized it well might—that the firearms and magazines PICA bans satisfy the fact-intensive test *Bevis* identified for determining what weapons qualify as "Arms," and that the state failed to prove that it can ban those arms consistent with our Nation's historical tradition.

Instead of grappling with the district court's findings or the wealth of evidence supporting them, the state largely proceeds as if none of that exists. It barely mentions any of the extensive evidence Plaintiffs put on, and even goes so far as to

claim that the district court made no findings at all—a claim that strains credulity once one reads the court's exceedingly thorough 168-page opinion. In reality, the district court did exactly what this Court instructed: It carefully examined all the evidence to determine whether what PICA bans are weapons that ordinary people would (and do) keep and bear for self-defense, as opposed to weapons that are exclusively or predominantly useful in military service, and concluded that they fall into the former camp. The court then painstakingly examined the history to determine whether PICA might fall within any other historical tradition of firearm regulation and concluded that it does not.

The state insists that those conclusions must be wrong because they did not carry the day at the preliminary stage. But that argument defies this Court's decision, which emphasized—repeatedly—that more factual development not only was necessary, but could well change the bottom line. It defies the state's arguments to the Supreme Court, where Illinois successfully resisted certiorari by insisting that this Court's decision was only preliminary, and that the Supreme Court should stay its hand until a full factual record could be developed. And, most importantly, it defies the comprehensive record the district court had before it.

Every self-defense expert below testified that the firearms and magazines PICA bans are extraordinarily useful for self-defense, and the state does not even dispute the wealth of evidence confirming that millions of Americans possess them

for that very purpose. Firearms that are *in fact* kept and "typically possessed" for self-defense by multitudes of ordinary Americans necessarily qualify as "Arms that ordinary people *would* keep at home for purposes of self-defense." *Id.* at 1194 (emphasis added). Conversely, numerous military, ballistic, and firearm-design experts testified—undisputedly—that *none* of the PICA-banned firearms is used in combat as a service weapon by any branch of the U.S. military or any other military *in the world*. They further testified that no military issues those weapons because they lack the universally required functionality for standard combat arms (automatic-fire capability), have a much lower effective rate of fire than this Court posited in *Bevis*, and differ from military-style combat arms in numerous other respects as well. It is hard to fathom how firearms that no military issues to its servicemembers precisely because they lack functionality essential to combat could credibly be deemed "exclusively or predominantly useful in military service." *Id.* The district court's findings and conclusions thus are not only supported by the record, but eminently correct.

Because what PICA bans are plainly "Arms," the state bore the burden of proving that PICA fits within this Nation's tradition of firearm regulation. It failed. PICA does not fall within the tradition *Bevis* identified of restricting "militaristic" arms because the arms it bans do not satisfy *Bevis*'s "militaristic" test. It does not fall within the tradition of restricting "dangerous *and* unusual" arms because the

arms it bans are exceedingly common, not unusual. And the hodge-podge of historical laws the state invokes do not establish any other tradition that would come anywhere close to justifying a near-total ban on common, non-militaristic (or at least "dual use") arms. PICA thus would not pass constitutional muster even assuming it targeted some "unprecedented societal concern" or "dramatic technologic change," which even the state's experts effectively admitted it does not.

The state is thus left complaining about the scope of relief. But the state never raised below the severability argument it now presses, so that argument is forfeited. Regardless, the decision to enjoin PICA in its entirety is appropriate. The state thus identifies no reason to disturb any aspect of the decision below.

## STANDARD OF REVIEW

This Court reviews the grant of a permanent injunction for abuse of discretion. *3M v. Pribyl*, 259 F.3d 587, 597 (7th Cir. 2001). "Factual determinations are reviewed for clear error and legal conclusions are [reviewed] *de novo*." *Id.*

The state argues that "[t]he *de novo* standard applies" across the board because "the district court entered no findings of fact pursuant to Rule 52(a)(1)." State.Br.20. But the district court made explicit "Findings of Fact" all throughout its decision, *e.g.*, SA2; SA86-99 (the parties' proof); SA100-07 (common use); SA107-13 (non-exclusive military use); SA114-18 (lawful possession), and applied the "law to those findings of fact," which the state admits calls for "clear error" review. State.Br.20.

15

The court's "elaborate," 168-page opinion is more than "sufficient to indicate the factual basis for the ultimate conclusion." *Healix Infusion Therapy, Inc. v. Heartland Home Infusions, Inc.*, 733 F.3d 700, 704 (7th Cir. 2013). And even if there were some deficiency in how the court laid out its findings, nothing remotely supports the state's remarkable suggestion that the Court order "a new trial before a new judge." State.Br.20.

## ARGUMENT

### I. The State Identifies No Reason To Disturb The District Court's Evidence-Backed Conclusion That The Firearms PICA Bans Are "Arms."

The threshold question in a Second Amendment case is "whether 'the Second Amendment's plain text covers an individual's conduct.'" *Bevis*, 85 F.4th at 1191 (quoting *Bruen*, 597 U.S. at 24); *see* U.S. Const. amend. II (securing "the right of the people to keep and bear Arms"). The state does not dispute, nor could it, that PICA applies to "the people" the Second Amendment protects. *See Heller*, 554 U.S. at 579-81. Nor does it deny that PICA restricts the people's ability to "keep" and "bear" firearms. It disputes only whether the many firearms PICA covers are "Arms" within the meaning of the Second Amendment.[3]

---

[3] The state does not dispute that they are "Arms" under the definition *Heller* and *Bruen* supplied. That is wise. *See* Br. of Appellees 27-28, *Barnett v. Raoul*, No. 23-1825 (7th Cir. June 20, 2023), Dkt.56. Plaintiffs, of course, disagree with *Bevis* that any more is required, and they reserve the right to seek review of *Bevis* in an appropriate forum.

To answer that question, *Bevis* assigned Plaintiffs the burden to establish as a matter of fact "that the weapons [PICA covers] are Arms that ordinary people would keep at home for purposes of self-defense, not weapons that are exclusively or predominantly useful in military service, or weapons that are not possessed for lawful purposes." 85 F.4th at 1194. After reviewing reams of evidence and hearing multiple days of live testimony, the district court found that Plaintiffs satisfied that burden. The court's factual findings contain no clear error: They are more than "plausible in light of the record viewed in its entirety," *Buechel v. United States*, 746 F.3d 753, 756 (7th Cir. 2014), and there is "substantial evidence in the record to support the[m]," *United States v. Malik*, 680 F.2d 1162, 1165 (7th Cir. 1982). Indeed, those findings contain no error at all. And under *Bevis*, the court's ultimate conclusion that the firearms PICA bans are "Arms" under the Second Amendment follows ineluctably from them.

**A.  The District Court Did Not Clearly Err in Finding that Ordinary People Would—and Actually Do—Keep for Self-Defense and Other Lawful Purposes the Firearms PICA Bans.**

**1.  The state does not contest any of the evidence showing that the firearms PICA bans are firearms that ordinary people would find useful for self-defense.**

PICA bans an extraordinarily wide array of semiautomatic firearms. *See* 720 ILCS 5/24-1.9(a)(1)(A), (B), (J) (rifles), (a)(1)(C), (D), (K) (pistols), (a)(1)(F), (L) (shotguns). The record, however, showed that "semiautomatic firearms that accept

detachable magazines are so well suited for defense of self or others as to render all other types of firearms obsolete for that purpose." SA87. That is true for law-abiding civilians of all stripes, shapes, and sizes. With semiautomatic firing, there is no need to "hand-operate major portions of the firearm," like with a "bolt" or pump action; the simplicity of the semiautomatic mechanism allows the user to fire multiple shots accurately without needing to reload or undertake a cumbersome physical process. D.Ct.Dkt.253 ¶39. And "[b]ecause the use of recoil energy or diversion of gases in the semi-automatic action significantly reduces felt recoil, semi-automatics can be easier to use by persons who do not have great upper-body strength" compared to lever-action, bolt-action, breach-loading, or pump-action firearms that require human intervention to load a new round into the chamber. *Id.* ¶38. "The reduced recoil and greater accuracy for second or subsequent shots also have obvious self-defense utility." *Id.* ¶42.

The district court further found that "a semiautomatic rifle does not suffer from the lack of control [that] is inherent to machineguns and sawed-off shotguns." SA102. As the court explained, "[a] machine gun is … extremely difficult, if not impossible," for the ordinary person "to control … or to fix … on a discrete target." SA65. Conversely, as the experts explained at trial, and as the state concedes on appeal, "semiautomatic fire" from the arms PICA bans "is more accurate, less likely to result in weapon damage or jamming, and more logistically sustainable than

automatic fire." State.Br.25. That is one of the many reasons why semiautomatic firearms—including the ones PICA bans—are often the "primary" self-defense tool instructors recommend to ordinary people to meet their self-defense needs. D.Ct.Dkt.234 at 189:2-8; *e.g.*, D.Ct.Dkt.253 ¶¶103-10, 240-41.

The various "features" that transform a semiautomatic rifle, pistol, or shotgun into an "assault weapon" under PICA do not change that conclusion. Just the opposite: The evidence overwhelmingly showed that the features PICA singles out—"pistol grips, forward-protruding grips, thumbhole stocks, adjustable stocks, flash suppressors, barrel shrouds, buffer tubes/braces, and threaded barrels," SA86—are uniformly useful for self-defense, as they "improve ergonomics … accuracy[,] maneuverab[ility]," and "control[]." D.Ct.Dkt.253 ¶110; *see also id.* ¶¶46-51, 79-80, 118 (pistol grips); *id.* ¶¶49, 52-55, 74, 79-80, 115 (forward grips); *id.* ¶¶ 56-58, 79-80 (thumbhole stocks); *id.* ¶¶56-58, 79-80 (adjustable stocks); *id.* ¶¶66-70, 117 (flash suppressors); *id.* ¶¶71-74, 116 (barrel shrouds); *id.* ¶¶49, 75-76, 119 (braces); *id.* ¶¶77-78 (threaded barrels). That is likely why so many common firearms come standard with one or more of those features. *Id.* ¶¶35-80; 111-29. And, as the district court found, those firearms—with their reduced recoil, and equipped with their adjustable stocks, forward grips, buffer braces, and detachable magazines, for example—are "especially relevant to" and suitable for "an individual

who is infirm, small-statured, or has limited firearms training" to "defend themselves and their families" in a safe and effective manner.  SA105; *see also* SA86-87.

The state does not dispute a single piece of evidence Plaintiffs put forward establishing that those features aid in civilian self-defense.  It does not dispute, for instance, that:

- **pistol grips** can be "essential to safe [firearm] handling," as they not only allow users to more "easily access the manual safety," but reduce the potential of "bystander" endangerment, D.Ct.Dkt.253 ¶48; *see also* SA87-88; D.Ct.Dkt.253 ¶¶46-51;

- a "**forward grip** 'on a defensive carbine, shotgun, or pistol can aid self-defense in multiple ways that enhance safe handling and effective use of the firearm, particularly under the stress of a self-defense situation,'" SA88 (quoting D.Ct.Dkt.253 ¶53); *see also* D.Ct.Dkt.253 ¶¶52-55;

- **thumbhole stocks** "create a more comfortable and stable grip, which provides for greater accuracy and decreases the risk of dropping the firearm or firing stray shots in self-defense … scenarios," D.Ct.Dkt.253 ¶58; *see also id.* ¶¶56-57;

- **adjustable stocks** increase one's "ability to control [a] firearm," D.Ct.Dkt.253 ¶60; *see also id.* ¶¶59-60;

- **flash suppressors** help "prevent[] the user from being blinded in low lighting conditions, … and can help reduce recoil and muzzle movement, increasing accuracy" of a rifle or pistol, D.Ct.Dkt.253 ¶67; *see also id.* ¶¶66-70;

- **barrel shrouds** "are critical for self-defense," as they prevent users from burning themselves while firing a pistol, which would also put bystanders at risk, D.Ct.Dkt.253 ¶73; *see also id.* ¶¶71-74.

- **braces** "facilitate self-defense by stabilizing the weapon and allowing it to be fired effectively by the population groups … most in need of a firearm for self-defense," D.Ct.Dkt.253 ¶76; *see also id.* ¶¶75-76;

- ***threaded barrels*** are useful for civilian self-defense because they allow users to attach to a pistol "devices, such as a muzzle brake or compensator," that help "redirect propellant gases to counter recoil and its resultant poor accuracy," D.Ct.Dkt.253 ¶¶77-78.

In sum:  The state has provided no basis to disturb the district court's finding that ordinary, law-abiding people would find firearms equipped with the features PICA singles out useful for civilian self-defense.

> **2.  The state does not contest any of the evidence showing that ordinary people do, in fact, keep for self-defense the firearms PICA outlaws.**

The record also showed that the firearms PICA bans are *in fact* "possessed for lawful purposes" by millions of ordinary people. *See Bevis*, 85 F.4th at 1194.  Nearly every expert testified that firearms equipped with the features that, under PICA, transform an otherwise-lawful rifle, pistol, or shotgun into an unlawful "assault weapon" are "possessed" by every-day Americans "for lawful purposes," like self-defense, hunting, competition shooting, and recreational sports.  D.Ct.Dkt.253 ¶¶79-86, 88-92, 108-51.  PICA's registration scheme reinforces that conclusion.  In just the four months after PICA was enacted, nearly 70,000 firearms—now banned from purchase or sale—were registered with the state pursuant to PICA's scheme.  *Id.* ¶102.  Nearly 12,000 more were added in January 2024 alone.  *Id.*  So either tens of thousands of Illinoisans are criminals who were nevertheless willing to register their firearms with the state (unlikely), or tens of thousands of Illinoisans possess PICA-banned firearms for lawful purposes.

The state does not challenge the record of lawful possession on the "extremely popular" pistols and shotguns PICA bans.  *See id.* ¶¶111-29.  To the extent the state addresses lawful possession at all, it focuses only on AR-15-style rifles.  State.Br.28-29, 31-32.  But the district court did not err—let alone clearly err—in crediting the evidence-backed testimony that these "popular" rifles, known in the industry as "modern sporting rifles," are widely "used for lawful purposes such as self-defense, hunting, and target practice," D.Ct.Dkt.253 ¶¶81-86, 88.  *See* SA100-03.  A "conservative" estimate of such rifle sales based on government data puts lawful possession in the multi-millions.  D.Ct.Dkt.253 ¶¶91-92; *see Snope v. Brown*, 2025 WL 1550126, at *1 (U.S. June 2, 2025) (Kavanaugh, J., respecting denial of certiorari) ("Americans today possess an estimated 20 to 30 million AR-15s.").  Even one of the state's "own expert[s] … estimat[ed] 'the number of Americans who" lawfully possess "'AR-15-platform firearms' at '14.1 million' to 18.2 million adults.'" SA101; D.Ct.Dkt.253 ¶98.  And another of the state's witnesses admitted that he himself keeps for lawful recreational use a "SIG Sauer AR-15" with semiautomatic capability, multiple 30-round magazines, a pistol grip, adjustable stock, flash suppressor, and barrel shroud—which would be illegal for him to do if he lived in Illinois.  D.Ct.Dkt.253 ¶100.  Finally, retailer data, supported by live testimony from the owner of an Illinois retailer, confirmed that law-abiding citizens regularly buy AR-style rifles for lawful purposes.  *Id.* ¶101.

Unable to deny what the record overwhelmingly shows, the state faults the district court for focusing on which firearms "Americans 'choose' … for self-defense," instead of asking how often people fire those firearms in self-defense situations. State.Br.31-33. But the test *Bevis* articulated for determining whether something qualifies as an "Arm" asks whether it is a bearable instrument "that ordinary people would *keep* at home for purposes of self-defense," as opposed to something "not *possessed* for lawful purposes." 85 F.4th at 1194 (emphasis added). The state cannot fault the district court for applying the test this Court embraced. And the state offers no explanation for how the district court was supposed to apply that test without considering what ordinary people actually keep for self-defense— let alone for how the court could possibly have erred in concluding that ordinary people *would* keep arms that millions of ordinary people undisputedly *do* keep.

### 3. The state's contrary arguments ignore the law, the facts, and what makes a firearm unlawful under PICA.

Instead of focusing on whether ordinary people *would* keep the firearms PICA bans at home for self-defense, the state tries to shift the inquiry to whether people *should* keep them for self-defense. In the state's view, the millions of Americans who keep for self-defense the rifles, pistols, and shotguns PICA bans have made "poor choices," because those firearms have a greater "range" and "rate of fire" than civilians really need and "carry a serious risk of 'over-penetrat[ing]' walls and injuring innocent bystanders." State.Br.28-29. But *Bevis* does not ask whether

23

ordinary people *should* keep a particular arm for self-defense. It asks whether they *would*. The state cannot apply a test more to its liking just because ordinary people do not share its views about the utility of the firearms it has banned.

At any rate, the record does not remotely support the state's effort to second-guess the wisdom of the millions of law-abiding citizens who have concluded that the banned firearms suit their self-defense needs. The state does not dispute, for instance, that semiautomatic modern sporting rifles like the AR-15 "are lighter in weight, shorter in length, and have less recoil than [other non-banned] rifles, making them easier to handle and shoot." D.Ct.Dkt.253 ¶105. Nor does it dispute that they offer "improve[d] ergonomics" and thus "improve[d] accuracy," or that they are "very maneuverable" in tight spaces in the home. *Id.* ¶107. To the contrary, the state admits that AR-15s are "more accurate" and "less likely to result in weapon damage or jamming," State.Br.25—features with obvious utility for home self-defense. All of that is precisely why the only self-defense experts whose opinions are in the record opined that they "are extremely well suited for self-defense." D.Ct.Dkt.253 ¶110; *see also, e.g.*, D.Ct.Dkt.240 at 468:6-24; D.Ct.Dkt.253 ¶¶103-29.[4]

---

[4] The evidence the state cites in no way undermines those conclusions. The state miscites one of Plaintiffs' witnesses, who is also a self-defense instructor and notably testified that "an AR-type rifle … would be [his] primary recommendation" for "self-defense." D.Ct.Dkt.234 189:2-8. The only other evidence the state cites comes not from a self-defense (or military) expert—much less one who testified at trial—

Instead of focusing on the features ordinary people care about when selecting a firearm for self-defense—e.g., accuracy, ease of use—the state fixates on a firearm's "range," "penetrat[ion]," and "rate of fire." State.Br.28. But the record thoroughly refutes any suggestion that the features that make a firearm an "assault weapon" under PICA—grips, stocks, stabilizing braces, flash suppressors, and hand guards—affect a firearm's effective range, firing rate, or energy output. *See* D.Ct.Dkt.253 ¶¶231-37. Nor, the record confirms, does the capacity to fire semiautomatically or to accept a detachable magazine affect the power of the projectile discharged by a firearm or how far it will travel. *Id.* ¶¶229-30. What "influences" a firearm's effective "[r]ange and penetration" and "the kinetic (or muzzle) energy of a bullet" are "barrel-length" and the type of "bullet chambered." *Id.* ¶¶211-14. Yet PICA does not ban firearms based on either of those things. It instead bans a wide range of rifles, pistols, and shotguns that vary considerably across those metrics, simply because they have features that do not impact them at all.

For instance, the record shows that *none* of the pistols and shotguns PICA bans can fire rounds anywhere near as rapidly as an automatic rifle like the M16 or M27, or with anywhere near the velocities and penetration an automatic—or even a

---

but from a report of a former program manager for ATF's forensic services. *See* State.Br.28 (citing D.Ct.Dkt.185-1).

semiautomatic—rifle can reach. *See* D.Ct.Dkt.253 ¶¶221-25; *see also* Br. of State of Illinois as Amicus Curiae 7, *Viramontes v. Cook Cnty.*, No. 24-1437 (7th Cir. 2024), Dkt.27 (conceding that a semiautomatic pistol has far lower effective penetration than a "military rifle").[5] To take just one example, the evidence showed that the 11.5-inch barreled AR-platform pistol, which some experts deemed "[t]he best designed home defense weapon" in America, has lower range and penetration than *any* rifle, semiautomatic or otherwise. *See* D.Ct.Dkt.253 ¶¶209-12. The state's metrics thus do not even explain why PICA bans what it does, let alone provide a workable test for determining which firearms are "suitable" for self-defense.

It is little surprise, then, that the state does not want to talk about the many pistols and shotguns PICA bans. It instead focuses almost exclusively on rifles, and the AR-15 (and its many cousins) in particular. But the state does not cite a single *self-defense* expert who supported its view that AR-style rifles are not suitable for self-defense. *See* State.Br.28-29; *cf.* D.Ct.Dkt.253 ¶242. That is because there is none. The district court read and heard substantial evidence from self-defense experts and instructors, like David Lombardo, Matthew Little, and Randy Watt, *see*

---

[5] This Court recently rejected Viramontes' appeal, but only because it concluded that he—unlike Plaintiffs here—"fail[ed] to build an adequate record" to support "his challenge." *Viramontes v. Cook Cnty.*, 2025 WL 1553896, at *2 (7th Cir. June 2, 2025).

SA100, and they all reported that efficiencies such as reduced "recoil[,] … lighter weight, shorter barrel, and ergonomic stock and grip" make "AR platform rifles" well-suited for self-defense, which is why they are commonly used in popular "defensive carbine course[s]." D.Ct.Dkt.253 ¶¶103-10, 238, 241. Buford Boone, Former FBI Supervisory Special Agent and head of the FBI's Ballistic Research Facility for its Firearm Training Unit, likewise confirmed that AR-15s are a common "weapon of choice" for civilian "self-defense" precisely because those kinds of features make them well-suited for that purpose. D.Ct.Dkt.253 ¶86.

As Boone further explained, many of the state's claims about the purportedly dangerous range or penetration of AR-style rifles are fundamentally "incomplete" and "erroneous" because they are "attributed only to a style of firearm," without taking account of what ammunition is chambered. D.Ct.Dkt.232-18 ¶¶45-55. Government reporting in the record, based on Boone's ballistics weapons testing, studied AR-15-style rifles' "usefulness inside structures and their threat level to innocent bystanders" and "explained that certain .223 rounds discharged from [an AR-15] rifle were *less* likely to over-penetrate barriers commonly found in structures than certain common rounds fired from handguns."[6] D.Ct.Dkt.232-18 ¶¶38-44 (emphasis added); *see also* D.Ct.Dkt.253 ¶¶211-14. "In other words," according to

---

[6] AR-platform rifles can also fire smaller rimfire cartridges (among others) that have even lower range and penetration rates. D.Ct.Dkt.253 ¶212.

the experts, "such rifles are extremely well suited for self-defense, including within confined areas like a home," D.Ct.Dkt.232-18 ¶41, because with the right ammunition they are *less* likely than handguns to "'over-penetrat[e]' walls and injur[e] innocent bystanders," State.Br.28-29. Once again, the state's contrary claims simply ignore the record Plaintiffs compiled below.

In short, the district court had substantial evidence before it confirming that ordinary people both would and do keep AR-style rifles (and the other firearms PICA bans) because they are effective self-defense firearms. This Court is in no position to "disturb" a determination that is "supported by the record." *E.g.*, *United States v. Nichols*, 847 F.3d 851, 857, 861 (7th Cir. 2017).

*     *     *

The record makes clear beyond reasonable debate that firearms equipped with the features that transform an otherwise-lawful rifle, pistol, or shotgun into an unlawful "assault weapon" under PICA are arms that ordinary people not only would, but do, keep for purposes of self-defense. They are therefore protected without regard to whether or how the military may use them, as *Bevis* recognized that "private parties have a constitutionally protected right to 'keep and bear'" arms that "are used for individual self-defense" even if "the military provides them to its forces." *Bevis*, 85 F.4th at 1195 & n.8. To be sure, some language in *Bevis* might be read to suggest that weapons must be *either* civilian *or* militaristic. But the Court

elsewhere made clear that it was actually recognizing a Venn diagram, not a strict dividing line, as arms that serve "dual use" functions are entitled to protection. *Id.* It could hardly be otherwise, as the prefatory clause of the Second Amendment explicitly contemplates that the Arms the people may keep and bear can and should be useful for militia service. *See* U.S. Const. amend II.

The state suggests that *Bevis* did not create "a separate rule for 'dual use' weapons." State.Br.35. It is not entirely clear what the state means by that, as it promptly admits (as it must) that *Bevis* did recognize that "dual use" weapons are protected. State.Br.35. And the state offers no metric for assessing "dual use" other than the common-sense metric of whether an arm is useful and used by ordinary people for self-defense. The threshold inquiry thus should begin and end with the district court's finding that the arms PICA bans would be and indeed *are* kept by millions of ordinary people for self-defense in the home, as that presumptively entitles them to protection as, at the very least, "dual use" arms. SA112.

**B. The District Court Did Not Clearly Err in Finding That the Firearms PICA Bans Are Neither Exclusively Nor Predominantly Useful in Military Service.**

At any rate, the district court did not clearly err by finding that the arms PICA bans are not "exclusively or predominantly useful in military service." *See Bevis*, 85 F.4th at 1194. To be sure, *Bevis* posited that at least AR-15s may fit that bill. But *Bevis* took pains to "stress" that its determination was "preliminary," and "[b]etter

data on firing rates" and other technical aspects might "change the analysis." *Id.* at 1196-97. That is exactly what happened. The parties and the district court spent thousands of hours working through reports, depositions, and live testimony from numerous experts like Jeffrey Eby and Michael Musselman—two former Marine Corps Infantry Weapons Officers and certified self-defense instructors who even the state's most senior military expert (Colonel Craig Tucker) agreed have "more technical knowledge" because they are *the experts* when it comes to "tactics and weapons employment." D.Ct.Dkt.240 at 536:17-24, 546:25-547:9. Based on that highly "technical" expert testimony, the district court found that Plaintiffs proved their case under *Bevis*. SA107-11. That finding is (more than) "plausible in light of the record viewed in its entirety." *Buechel*, 746 F.3d at 756.

1. At the outset, there should be no serious dispute about the district court's conclusion regarding the semiautomatic pistols and shotguns PICA bans. The state makes no argument about any of those firearms in its brief, and it put on no evidence trying to show that any of them is exclusively, predominantly, or even at all useful in military combat.[7] The state did not have its military experts form or render *any* opinions on those firearms; Colonel Tucker "was not [even] aware" that PICA bans any shotguns, D.Ct.Dkt.253 ¶242. The only expert military opinion on those

---

[7] The state likewise provides no argument regarding the semiautomatic AK-type rifles PICA bans. *See* State.Br.27; D.Ct.Dkt.253 ¶¶221-46.

firearms came from Marine Corps Gunners Eby and Musselman, who testified that "no general-purpose force in the U.S. Army or Marine Corps has a tactical task against an enemy that requires a pistol as a solution," and that the pistols PICA bans are not and have not ever been issued by the military. D.Ct.Dkt.253 ¶¶169, 227.[8] They further testified that shotguns of *any* type are "rarely" if ever "used in theater" because they are most useful in close-range situations, which are far more likely to occur in a civilian self-defense setting than in combat, *id.* ¶¶171-72, 221-28. The district court plainly cannot be faulted for crediting unrebutted testimony about banned firearms that the state and its amici even now continue to ignore.

2. The district court's conclusion that the rifles PICA bans are "not exclusively or predominantly useful in military service" is likewise amply supported. To start, the evidence is uncontested that neither the semiautomatic-only AR-15 nor any other semiautomatic-only rifle of the sort PICA bans (whether via features or by name) "has []*ever* been used by any military force on the planet" as a standard service rifle. SA107; D.Ct.Dkt.253 ¶¶159-68, 195. Militaries instead use rifles with automatic firing capability (other than in certain specialized settings, such as sniper rifles). D.Ct.Dkt.253 ¶¶159-68. This Court did not make any mention of that fact (which

---

[8] While some PICA-banned pistols are sometimes "used by military personnel," they "do not serve any combat purpose"; they are "issued to Staff Non-Commissioned Officers … and Officers" who "have the primary task of leadership and management of forces, not directly engaging [the] enemy." D.Ct.Dkt.253 ¶170.

had not yet been proven through record evidence) in *Bevis*, *contra* State.Br.33-34, and it should be well-nigh dispositive. After all, a firearm that no military issues for military combat cannot coherently be deemed "exclusively or predominantly useful in military service."

Unable to refute that AR-15s and other semiautomatic rifles are not and have not ever been used as standard in military service, the state argues that they are sufficiently similar to weapons that *are* commonly used in military service that they should be treated as "militaristic" by association. That argument is difficult to square with the fact that more than a century's worth of federal and state law—not to mention Supreme Court precedent—has treated the difference between automatic and semiautomatic firearms as not only meaningful, but legally dipositive in numerous contexts. *See, e.g.*, D.Ct.Dkt.253 p.79; *Garland v. Cargill*, 602 U.S. 406, 416-21 (2024). It is also difficult to square with the reality that no military in the world agrees that automatic and semiautomatic rifles are functionally interchangeable. D.Ct.Dkt.253 ¶¶159-74. And while the state continues to hang its hat on *Bevis*'s hypothesis that the AR-15 "is almost the same gun as the M16," 85 F.4th at 1196, *Bevis* expressly acknowledged that a more complete record might "show[]" a "sharper distinction" between the two, *id.* at 1197—which is precisely what the district court found happened on remand.

For instance, although *Bevis* was not persuaded "based on the record before it" that the fact "that AR-15s fire only semiautomatically" sufficed to distinguish them from M16s, State.Br.17, 33, the Court's data on firing rates—an issue it singled out as especially important, 85 F.3d at 1197—was incorrect.  While *Bevis* posited that an AR-15 rifle has a firing rate of 300 rounds per minute, 85 F.3d at 1196, the state's expert agreed on remand that its practical rate of fire is *at most* 45 to 65 rounds per minute—nowhere near what M16s can fire, and much closer to the rate of fire of a feature-less semiautomatic *pistol*, which even the state does not (at least yet) claim can be banned.  D.Ct.Dkt.253 ¶¶203-06.  The state thus has no choice but to admit that an M16's "maximum effective firing rate" is more than 400% higher in "automatic mode" and 200% higher in "burst" mode than an AR-15's.  State.Br.26.

The state tries to downplay the M16's select-fire capability, arguing that the M16 should be evaluated *only* in its semiautomatic mode because automatic fire is purportedly useless and never used in military combat.  State.Br.26.  But multiple experts confirmed that automatic-firing capability is the primary reason the miliary chooses firearms like the M16, instead of the AR-15, for its infantry.  SA108-11; D.Ct.Dkt.253 ¶¶159-68, 175-92.  Military experts confirmed at trial that automatic fire is critical in combat, SA65-66, 76-77; D.Ct.Dkt.253 ¶¶175-80, that they witnessed its use in combat, D.Ct.Dkt.253 ¶181, and that they trained using automatic fire, *id.* ¶¶183-85.  Even one of the state's experts testified that he "would

not want to take the [automatic] option away" from any "squad." *Id.* ¶¶187-91. The state's claim that *semiautomatic* fire is "the most important fire technique," State.Br.25, by contrast, comes from an outdated handbook on controlled-setting *marksmanship*, which military experts at trial explained does not translate to combat tactics. D.Ct.Dkt.253 ¶166; D.Ct.Dkt.234 at 154:13-160:14. And its other support comes from an expert who admittedly never fired a single round from *any* firearm in military combat. *See* D.Ct.Dkt.241 at 643:9-11. A weapon that is not generally used in the military precisely because it lacks functionality of critical importance to the military simply cannot be deemed "exclusively or predominantly useful in military service."

*Bevis* also overlooked other important technical differences between automatic rifles designed for the military and semiautomatic rifles designed for civilians. As Plaintiffs' firearm design expert explained, automatic firearms work differently than semiautomatic rifles, and the "select-fire" capability requires a "[t]otally different build" that cannot be so easily replicated. D.Ct.Dkt.253 ¶¶158, 193-200. Military-issue weapons are also "subject to exact standards of military specificity and rigorous quality-insurance inspections" that semiautomatic-only firearms like the AR-15 do not have to (and generally do not) satisfy. SA110; *see also* D.Ct.Dkt.253 ¶¶196-220 (explaining differences in "machining," "materials," "finishes," and "treatment," among others). And while the state continues to claim

that the AR-15 and M16 are "chambered with identical bullets," State.Br.23, the evidence showed that AR-15s can chamber multiple different calibers, each of which accommodates multiple different bullets, whereas the M16 is designed to chamber only 5.56 NATO, and the military is constrained to only a handful of bullet types. *See* D.Ct.Dkt.253 ¶209.[9]

   That error compounds the state's disregard for the fact that range, penetration, kinetic (muzzle) velocity and energy are all dictated by the combination of the cartridge chambered and the barrel-length, not the features that render a firearm an "assault weapon" under PICA. *Id.* ¶¶211-20, 247. As a result, the state overlooks that some AR-platform firearms have significantly lower effective ranges and penetration ability than the M16, owing to shorter barrels and smaller projectiles fired from smaller cartridges. *Id.* Conversely, the state ignores that there are many *non*-banned rifles with the same barrel dimensions and chambering as the M16 that "produce substantial[ly] identical velocity" and energy—or even greater. *Id.* Once again, then, the state's argument not only fails to explain the lines PICA draws, but does not begin to provide a meaningful metric for determining which arms are

---

[9] The U.S. military recently moved to an even larger caliber, "6.8mm ammunition." D.Ct.Dkt.253 ¶209 n.10. And while the M16 is technically "capable" of firing the smaller .223 caliber ammunition, it was not designed for and is not used with that ammunition. *Id.* ¶209.

"useful in military service." The far more sensible way to answer that question is by considering what arms militaries actually use and why.

The state's refusal to focus on the critical issue of ammunition chamberings also undermines its contentions about the wounding capabilities of AR-15s and M16s. *See* State.Br.26-27. In any event, the ballistics study the state's *medical* expert ran was debunked by an actual *ballistics* expert (Dr. Boone). D.Ct.Dkt.253 ¶¶215-20. The state's field reporting, moreover, was based on "anecdotal statements" about the Vietnam War that "are so ridiculous that they … cast doubt on the credibility of the report and those that present it as factual." *Id.* ¶¶218-20. And while the state continues to invoke its own expert testimony on various other purported distinctions between semiautomatic and automatic firearms, *see* State.Br.22-23, 27-28, the district court acted well within its broad discretion as the fact-finder to find that evidence wanting—especially since most of it came from someone who admittedly is *not* a military expert, was never in the military, did not testify at trial regarding military use, *see* D.Ct.Dkt.185-1 ¶1, and is contradicted by the testimony of military experts who did.

At bottom, the district court considered all the state's evidence, including through a live trial, and was not persuaded. The court instead found as a matter of fact, consistent with a century of law and precedent—including the Supreme Court's

most recent word[10]—and a wealth of evidence, that military arms like the M16 are really *not* the same gun as semiautomatic rifles like the AR-15, let alone as the multitude of other firearms PICA bans. This Court should reject the state's invitation to second-guess that amply supported finding. The state is not entitled to reversal simply because its ill-informed contentions about the multitude of firearms PICA bans did not pan out once put to the crucible of adversarial testing.

## II. The State Identifies No Reason To Disturb The District Court's Evidence-Backed Conclusion That The Magazines PICA Bans Are "Arms."

1. Everything just said about the firearms PICA bans applies to the magazines PICA bans *a fortiori*. The record showed that those magazines are useful for self-defense, and that ordinary people would, should, and do keep them at home for that purpose. One of the state's own firearms experts confirmed that restricting citizens to smaller-capacity magazines could prove dire in self-defense situations. *See* D.Ct.Dkt.253 ¶149. And rightly so, as detachable magazines with larger capacities can be critically important during stressful self-defense situations that make it difficult to reload quickly, *id.* ¶¶138, and where "every second matters," SA105; *see also* D.Ct.Dkt.240 at 444:2-9; D.Ct.Dkt.253 ¶¶43-45, 79-80; D.Ct.Dkt.232-21 ¶17

---

[10] In *Smith & Wesson*, the Court unanimously rejected Mexico's attempt to hold U.S. firearm manufactures and sellers liable for the harm to public safety caused by third-party criminals—and in the process explained that "AR-15" and "AK-47 rifles" "are both widely legal and bought by many ordinary consumers," and that they "appeal" to "millions of law-abiding … Americans." Slip op.14.

(detailing various "defensive" benefits of "a detachable magazine"). That explains why many (if not most) modern semiautomatic handguns on the market today come standard with detachable magazines capable of holding more than 15 rounds of ammunition, and most semiautomatic rifles come standard with a detachable 20-to-30-round magazine: Manufacturers sell what people want. D.Ct.Dkt.253 ¶¶142-43. Simply put, the evidence that millions of Americans would (and in fact do) keep the magazines PICA bans for self-defense is undeniable. *See, e.g.*, *id.* ¶¶147-51.

The state does not meaningfully argue otherwise. Instead, it returns to arguing about what it thinks people *should* keep instead of what they *would* keep, insisting that 10 rounds "exceed[s] what is useful for self-defense" because "[t]he only evidence regarding the number of bullets an ordinary citizen uses for self-defense" shows that, "on average, civilians fire 2.2 shots in self-defense." State.Br.29. The state has both the law and the facts wrong. Again, *Bevis* did not ask how frequently people fire a particular arm (or fire all the rounds in a firearm) in self-defense situations; it asked whether a weapon is one "that ordinary people *would keep* at home for purposes of self-defense." 85 F.4th at 1194 (emphasis added). And the record shows that tens of millions of ordinary, law-abiding people *do* in fact keep the magazines PICA bans for precisely that purpose. While the state belittles that choice, Plaintiffs' experts explained why it is eminently sensible, as "[l]imiting a rifle to a ten-round capacity, a handgun to a 15-round capacity, and a shotgun to a

five-round capacity handicaps the user in a self-defense situation." D.Ct.Dkt.253 ¶¶147-49. Indeed, the state ignores the evidence Plaintiffs provided of numerous unfortunate real-life examples where ordinary people were forced to fire more than 15 rounds in self-defense. *Id.* ¶150. As that underscores, having more rounds at the ready could "be the difference between life and death for a person defending him or herself in the home." SA113; *see also* D.Ct.Dkt.253 ¶¶44-45, 138, 147-50.

The state also once again has no meaningful response to the district court's "dual-use" finding. SA113. All it says is that the magazines PICA bans "allow servicemen to fire more rounds without reloading." State.Br.27. But that is true of any ammunition feeding device, detachable or otherwise—so if that were enough to render an arm "militaristic," then the Second Amendment would not protect even the semiautomatic handguns *Heller* declared the "quintessential self-defense weapon." 554 U.S. at 629. Yet the state offers no explanation beyond that truism for why the magazines PICA bans should be considered militaristic; it does not even cite a military expert in support of its claim that they should. In any event, PICA's limits are far lower than what the military actually uses, D.Ct.Dkt.253 ¶173; and the record refutes any argument that PICA-banned magazines serve exclusively or predominantly military needs, *id.* ¶¶147-50. The district court did not clearly err in concluding that they are "Arms" under *Bevis*.

2. Perhaps recognizing that the record overwhelmingly supports that conclusion, the state rehashes its arguments that the magazines PICA bans are not Arms for the distinct reasons that (a) "ammunition storage containers … were referred to as 'accessories' or 'accoutrements'" in some historical sources, and (b) magazines of more than 10 (or 15) rounds "are not necessary for the functioning of any weapon." State.Br.30. Both arguments fail.

The magazines PICA bans are no mere "accoutrements" or "ammunition storage containers." State.Br.30. They are an integral part of a semiautomatic firearm, as they actively *feed* ammunition into the firing chamber. When a user pulls the trigger, the round in the chamber fires, and the semiautomatic action combines with the magazine to feed a new round into the chamber. *See* D.Ct.Dkt.236 at 228:7-229:18, 246:15-248:1; D.Ct.Dkt.253 ¶38. That is what enables modern firearms (handguns, shotguns, and rifles alike) to work as intended; without a magazine, one cannot load more than one round of ammunition into a semiautomatic firearm, which defeats the point of having a semiautomatic action. *See, e.g.*, D.Ct.Dkt.240 at 443:18-25, 444:2-9. Founding-era storage cases, by contrast, were wooden boxes that stored ammunition; they were not attached to the firearm, and they played no functional role in its firing. D.Ct.Dkt.185-10 ¶35. Saying that a wooden box is analogous to a magazine because both "hold" ammunition is thus like saying that a gas can is analogous to a carburetor because both "hold" fuel.

The state's argument makes particularly little sense given that PICA also bans magazines that are "permanently attached to a firearm." 720 ILCS 5/24-1.9(a)(8); *see also* 720 ILCS 5/24-1.9(a)(1)(B), (D), (F)(v). Those fixed magazines cannot be removed from a firearm without rendering the firearm inoperable. They are no more "accoutrements" to a firearm than a steering wheel or engine is to a car. And nothing in law or logic supports the notion that a component integral to the functioning of a mechanical object ceases to be integral when engineers make it detachable.

The state's second argument—that the magazines PICA bans are not "Arms" because they "are not necessary for the functioning of any weapon," State.Br.30— fares no better. *Bruen*'s threshold inquiry does not ask what is "necessary" for self-defense; it asks whether a bearable instrument "facilitate[s] armed self-defense." 597 U.S. at 28. Devices that play an integral role in the proper functioning of semiautomatic firearms plainly fit that bill. It therefore makes no difference that the "magazines regulated by [PICA] are just a subset of those available on the civilian market." State.Br.30. The same could be said of virtually any firearm or feeding device the state tried to ban. *See Heller*, 554 U.S. at 629 ("It is no answer to say … that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed."). Nor does it make any difference whether a magazine exceeds the state's arbitrary limits, as a magazine facilitates self-defense whether it holds 9 rounds or 10. *Contra* State.Br.31.

While *Duncan v. Bonta*, 133 F.4th 852 (9th Cir. 2025) (en banc), held otherwise, that split decision stands on shaky ground, *see, e.g.*, *Snope*, 2025 WL 1550126 at *1 (Kavanaugh, J., respecting denial of certiorari); *see also id.* at *2-3 (Thomas, J., dissenting from denial of certiorari), has not yet been subject to Supreme Court review, and conflicts with numerous other better-reasoned decisions, *see, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 116 (3d Cir. 2018) ("magazines are 'arms' within the meaning of the Second Amendment"). As the D.C. Circuit recently held, magazines are "'Arms' within the meaning of the Second Amendment" no matter how many rounds they hold, for the incontestable reason that they are "necessary to make meaningful an individual's right to carry a handgun for self-defense." *Hanson v. District of Columbia*, 120 F.4th 223, 232 (D.C. Cir. 2024). "To hold otherwise would allow the government to sidestep the Second Amendment with a regulation prohibiting possession at the component level." *Id.* And to hold that whether a magazine is an "Arm" turns on how many rounds of ammunition it holds would make nonsense of *Bruen*'s instruction that the threshold inquiry is supposed to focus on the plain text.

III. **The District Court Correctly Concluded That The State Failed To Identify Any Tradition Of Banning Ubiquitous, Non-Militaristic Arms.**

Because the firearms and magazines PICA bans are "Arms," the state must prove that they can be banned "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. The state has not met that burden. For

the most part, its historical-tradition argument rests on the premise that PICA fits within the tradition *Bevis* preliminarily identified of restricting access to arms that are "used exclusively by the military" or "essentially reserved to the military," 85 F.4th at 1195 n.8, 1202. While Plaintiffs continue to dispute whether any such tradition exists, that is beside the point now, as the district court correctly found that the arms PICA bans do not fit that bill.[11] The only remaining question, then, is whether the state proved that PICA fits within some other tradition. It did not.

### A. The Arms PICA Bans Are Not "Dangerous And Unusual."

To the extent the state even evokes the "dangerous and unusual" tradition, *but see* State.Br.32, PICA does not fall within it. To be sure, the arms PICA bans are dangerous in the same sense that all firearms are dangerous. But the "dangerous and unusual" test is "conjunctive": "A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano v. Massachusetts*, 577 U.S. 411, 418 (2016) (Alito, J., concurring in the judgment); *accord Bruen*, 597 U.S. at 21, 47; *Snope*,

---

[11] For the same reason, PICA does not fit within any tradition of "except[ing] law enforcement and the military from regulations restricting access to especially dangerous weapons." State.Br.50. And while *Bevis* suggested that there may be a tradition of letting "people who presently own the listed firearms or ammunition … keep them" subject to a "registration requirement," 85 F.4th at 1199, it did not cite any evidence that blanket bans with registration-backed grandfather clauses have a historical pedigree, and the state has not advanced any such argument. *Cf. Viramontes*, 2025 WL 1553896, at *2 (not revisiting *Bevis*'s historical-tradition analysis because the plaintiff there, unlike Plaintiffs here, "fail[ed] to build an adequate record" to support "his challenge").

2025 WL 1550126 at *2, 4 (Thomas, J., dissenting from denial of certiorari); *id.* at *1 (Kavanaugh, J., respecting denial of certiorari). A state thus cannot invoke that tradition to ban a common arm just because it is dangerous. An arm must instead be both uncommon and dangerous in a way that *distinguishes* it from common arms, which a common arm plainly is not. And it makes no difference under that tradition whether there were "comparable arms in common use" when the Second or Fourteenth Amendment was ratified, State.Br.47; what matters is whether arms are common *today*. *Bruen*, 597 U.S. at 47.

The district court correctly concluded that the arms PICA bans are anything but unusual.[12] Millions of Americans collectively own for self-defense and other lawful purposes tens of millions of the semiautomatic rifles that PICA bans. *See* pp.21-23, *supra*. Indeed, the state's own expert "estimate[ed] 'the number of Americans who" lawfully possess "'AR-15-platform firearms' at '14.1 million' to '18.2 million adults.'" SA101; D.Ct.Dkt.253 ¶98; *see also* slip op.14, *Smith & Wesson*, *supra*. The semiautomatic pistols and shotguns PICA bans are only slightly less common. *See* D.Ct.Dkt.253 ¶¶111-29. And the magazines PICA bans are far more common than even AR-15s are. *See id.* ¶¶130-52. Arms owned by tens of

---

[12] Although the district court mistakenly treated common use as a step-one rather than step-two inquiry, who bears the burden on that question does not matter here, as the record conclusively shows that the arms PICA ban "are unquestionably in common use today." *Bruen*, 597 U.S. at 47.

millions of law-abiding citizens for lawful purposes cannot by any stretch of the imagination be deemed "unusual." *Bruen*, 597 U.S. at 47.

The state makes no effort to prove otherwise. It instead just argues that an arm should not be considered "in common use" for lawful purposes unless it is commonly fired in self-defense situations. But the tradition the Supreme Court has identified asks whether arms are "typically *possessed* by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625 (emphasis added), not how frequently law-abiding citizens fire them at would-be attackers. And rightly so, as it would make little sense to ignore the uses the Second Amendment expressly protects—i.e., keeping and bearing Arms—when deciding which Arms the people commonly "use" for purposes of the Second Amendment. How frequently citizens keep or carry versus fire is therefore legally irrelevant, as an individual lawfully "uses" her firearm every time she does *any* of those things. That presumably explains why neither *Heller* nor *Bruen* mentioned how often people fire handguns (or how many bullets they fire) when determining whether they have a right to keep or carry them. It sufficed in *Bruen*, just as in *Heller*, that "handguns are the most popular weapon chosen by Americans for self-defense." *Heller*, 554 U.S. at 629; *see also Bruen*, 597 U.S. at 47. The unrefuted evidence that tens of millions of Americans own for lawful purposes the arms PICA bans thus forecloses any argument PICA fits within the "dangerous and unusual" tradition.

**B.    There is No Historical Tradition of Banning Common, Non-Militaristic Arms that Millions of Law-Abiding Citizens Own for Lawful Purposes.**

To the extent *Heller*, *Bruen,* and *Bevis* leave room for the possibility of some historical tradition that supports banning common, non-militaristic arms, the state did not meet its burden of identifying one.

To establish a historical tradition, the state must identify historical laws that are "relevantly similar" to PICA in both "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 28-29.  It is thus not enough to "simply posit that the regulation promotes an important interest," like public safety.  *Id.* at 17.  *But see* State.Br.51.  The state must demonstrate that both how and why a law operates is consistent with historical tradition.  *Bruen*, 597 U.S. at 17.  And, under *Bevis*, the only justifications that matter are those found in the statutory text.  85 F.4th at 1200-01.  "[E]xtratextual considerations," such as the prevalence of "mass-shooting[s]," are irrelevant.  *Id.*  Relevantly similar historical analogues must also be "well-established and representative."  *Bruen*, 597 U.S. at 30.  Moreover, "when it comes to interpreting the Constitution, not all history is created equal."  *Id.* at 34-35.  Few and late-breaking laws from the nineteenth-

century do not an enduring tradition make. *See id.* at 36-38. Neither does historical evidence from "ancient" days. *Id.* at 34-35.[13]

Applying those principles, the district court conducted an "exhaustive review of the statutes and arguments provided by the Government," and found that "the nation's history and tradition of firearms regulation does *not* support a statute as far-reaching as PICA." SA131-57. That conclusion was eminently correct, as the state's proffered analogues bear no meaningful resemblance to PICA.

The state's first example—a 1686 East New Jersey law restricting concealed carry of knives and "other unusual or unlawful weapons," State.Br.37—flunks the "relevantly similar" requirement twice over. First, it regulated only *unusual* weapons, which the arms PICA bans are not. Second, it restricted only *concealed carrying* of arms, whereas PICA bans *all* carrying *and* possession. A law that

---

[13] *Bevis* posited that "a broader restriction burdens the Second Amendment right more, and thus requires a closer analogical fit between the modern regulation and traditional ones," whereas "a narrower restriction with less impact on the constitutional right might survive with a looser fit." 85 F.4th at 1199. But *United States v. Rahimi*, 602 U.S. 680 (2024), casts serious doubt on that proposition, as it emphasized that the inquiry turns on the *mechanics* of how a law burdens the right, not the degree to which it does so. When analyzing 18 U.S.C. §922(g)(8), the Court did not start by situating the law in a substantial, meaningful, or minimal burden category. It examined how the law works—i.e., by authorizing state actors to disarm someone only after a "judicial determination[]" that the person "likely would threaten or had threatened another with a weapon," and even then, only for a "limited duration"—and compared that to how the government's proffered historical analogues worked. *Rahimi*, 602 U.S. at 699.

restricts only one type of carrying and leaves the right to keep arms in the home untouched obviously burdens the right to armed self-defense in a way different in kind from a law that bans keeping and carrying entirely. Indeed, *Bruen* concluded that a concealed-carry ban was not even analogous to a complete carry ban, 597 U.S. at 53-54; *a fortiori* it is not analogous to a carry *and possession* ban.

The same goes for the state's reference to a 1795 "affray" (or going-armed) law, which was even narrower: It restricted only certain kinds of carry (those that breached the "peace" or caused "terror"), *id.* at 49-50, and thus, "provided a mechanism for punishing those who had menaced others with firearms," while also "offer[ing] the accused significant procedural protections," *Rahimi*, 602 U.S. at 696-97. To be sure, *Rahimi* concluded "that 'surety' and 'going armed' laws were relevantly similar to a federal law that temporarily disarms individuals who present a 'credible threat to the physical safety' of another." State.Br.52-53 (quoting *Rahimi*, 602 U.S. at 698-99). But PICA does not temporarily disarm individuals who have been found to be dangerous. It prohibits nearly everyone in Illinois from keeping or carrying the arms it bans, without regard to whether they pose a credible threat to anyone. *Rahimi* does not require a "'historical twin.'" State.Br.52-53 (quoting *Rahimi*, 602 U.S. at 700-01). But it does require the government to respect the critical distinction our Nation's historical tradition draws between laws that impose special restrictions on "individuals found to threaten the physical safety of another"

and laws that just "broadly restrict arms use by the public generally." *Rahimi*, 602 U.S. at 699.

The rest of the state's early historical narrative, like Boston's 1746 law—which "outlawed" only "the discharge" of certain firearms "within city limits," State.Br.38—cannot begin to justify PICA's arms bans. If historical laws prohibiting the indiscriminate firing of guns on city streets sufficed to justify a modern law banning an entire class of arms, then *Heller* should have come out the other way. *See Heller*, 554 U.S. at 632 (concluding that same Boston ordinance "provide[s] no support for" restricting citizens' ability to possess *any* types of arms).

The state also invokes nineteenth-century regulations of Bowie knives and "percussion-cap pistols." State.Br.38-39. But, again, nearly all nineteenth-century Bowie-knife and percussion-cap pistol laws were limited to restricting concealed carry. *See, e.g.*, D.Ct.Dkt.185-5 ¶¶66-69, 72-73; D.Ct.Dkt.185-6 ¶26; *accord* State.Br.40 (highlighting late-breaking "concealed" "carry prohibitions" on "revolvers"). And most of the laws the state's experts cite merely escalated punishments for crimes committed with those "dangerous and unusual" weapons, D.Ct.Dkt.185-5 ¶70; 1837 Ala. Acts 7; 1853 Comp. L. Cal. §127, or targeted concealed carry or open carry *with intent to do harm*, *see* 1859 Ind. Acts 129, while leaving intact citizens' right to keep and openly bear such weapons, *see* D.Ct.Dkt.253 p.75 n.11. Moreover, the most sweeping laws were short-lived: By

1900, "no state prohibited possession of Bowie knives," for example. David Kopel, *Bowie Knife Statutes 1837-1899*, Reason.com (Nov. 20, 2022), bit.ly/3RNRpQD. And the most onerous laws—one of which the state cites—were contemporaneously deemed *unconstitutional* unless they were construed more narrowly. *See, e.g.*, *Nunn v. State*, 1 Ga. 243 (1846); *see also Bruen*, 597 U.S. at 54; D.Ct.Dkt.185-5 ¶69.

The state is thus forced to resort to twentieth-century laws "restricting possession of" "automatic weapons." State.Br.42-43. But *Bevis* found that those laws reflect a tradition of banning arms "used exclusively by the military," 85 F.4th at 1199, which the district court found that the arms banned by PICA are not. If anything, *Bevis*'s assessment of those laws undermines the state's effort to demonstrate a tradition of banning *semi*automatic firearms. While many laws restricting *automatic* firearms took hold during Prohibition, the few state laws that restricted semiautomatic firearms did not categorically prohibit their sale or possession. One was confined to firearms "altered or modified to increase the magazine capacity from the original design as manufactured by the manufacturers," another simply required a license, without ever prohibiting sale or possession, and still others restricted their mere use in "crime[s] of violence." D.Ct.Dkt.253 pp.79-80 (citing D.Ct.Dkt.185-5 ¶30 n.42 and various state laws). And even those laws were repealed or replaced with laws regulating only fully automatic machineguns. *Id.* pp.80-81, 85.

The lack of a historical tradition supporting PICA's magazine ban is even more palpable. As the state's historian admitted, no state prohibited acquiring ammunition feeding devices of *any* capacity until 1989. D.Ct.Dkt.253 pp.81-83. That is so even though feeding devices capable of holding more than 10 or 15 rounds had by then been marketed to civilians for the better part of a century. *Contra* State.Br.42. And while the state suggests that gunpowder-storage laws provide an early historical analogue, State.Br.37-38, the Supreme Court has already found that those laws are not "relevantly similar" to arms bans "because they were purely fire prevention measures that affected firearm capacity only incidentally." *Hanson*, 120 F.4th at 235 (quoting *Heller*, 554 U.S. at 632). "The suggestion that they limited the Second Amendment right to keep and bear arms is silly." *Id.*

Finally, the state cannot save PICA by claiming some historical tradition of regulating firearms in service of public safety. State.Br.51. If states had carte blanche to enact any restrictions grounded in such generalized concerns, then the historical-tradition test (or at least its "why" component) would be meaningless, as it is hard to imagine a firearms restriction that could not be tied to public safety in some way. Indeed, if that were all it took to withstand Second Amendment scrutiny, then *Heller* and *Bruen* would have come out the other way, as D.C. and New York certainly maintained that they were legislating in the name of public safety. *See Heller*, 554 U.S. at 634-36; *Bruen*, 597 U.S. at 132 (Breyer, J., dissenting). As the

Supreme Court has since reiterated, their laws flunked Second Amendment scrutiny not because the Court doubted the sincerity of those intentions, but because our Nation's historical tradition frowns up on laws that "broadly restrict arms use by the public generally"—even when they do so in the name of public safety. *Rahimi*, 602 U.S. at 700-01.

C.      **Illinois Cannot Save PICA's Sweeping Ban on Common, Non-Militaristic Arms by Pointing to Some Dramatic Technological Change or Novel Societal Problem.**

The lack of well-established historical analogues for PICA is not owing to "unprecedented societal concerns or dramatic technological changes." *Bruen*, 597 U.S. at 27. The state claims that gun violence and mass shootings are "unprecedented societal concerns." State.Br.46. But as the district court recognized, and the state's own historical expert admits, "[m]ass murder has been a fact of life in the United States since the mid-nineteenth century." D.Ct.Dkt.185-6 ¶¶41-43. Gun violence likewise was "common" even in the "mid-seventeenth century." *Id.* ¶18; *see also* D.Ct.Dkt.253 p.86. The state tries to paint this Nation's history as one in which gun violence and mass shootings were rare until the advent of the arms it bans, but it discounts atrocities committed against disfavored groups like enslaved populations and Native Americans as "spontaneous and loosely organized" (as if today's atrocities are not), State.Br.49, and ignores mass killings in the context of political unrest in early America, *see* D.Ct.Dkt.253 p.87. Although it is inconvenient

for the state to acknowledge those tragedies, they are "part of our history too." D.Ct.Dkt.241 at 677:14; *see id.* at 672:23-673:8. That remains true whether they were perpetrated by groups or individuals. *Contra* State.Br.49.

In any event, assuming the state identified some "unprecedented societal concerns," it fails to connect those concerns to the arms PICA bans. The state claims that mass shootings involving those arms "are increasing in frequency," State.Br.47, but the evidence below proves that they are *not* "intrinsic" to that problem. *See* D.Ct.Dkt.185-8 ¶¶42-43 (80% of mass shootings reviewed *did not* involve an "[a]ssault weapon"; 60% *did not* involve "large-capacity magazines"). Government data shows the numbers are even lower for homicides in general, and significantly lower than the numbers for the modern handguns at issue in *Heller* and *Bruen*. D.Ct.Dkt.253 p.89. If the problem of "mass shootings" (though undoubtedly serious) was not constitutionally relevant there, it is hard to see how it could be here.

Finally, the semiautomatic firearms PICA bans are not "dramatic modern" innovations, and neither are magazines that hold 10 or 15 rounds. The state concedes that "multi-shot guns existed at the Founding" but argues that gun violence was low, "due to their" "experimental" status and the "technological limitations" that plagued other arms. State.Br.45. The state (again) ignores the violence perpetrated against enslaved populations and racial minorities during this time period. More important, it elides that, like so many things in America, the capabilities and ubiquity of multi-

53

shot and featured firearms grew *gradually* as America grew.  *See* D.Ct.Dkt.253 pp.91-98*.  That is especially true with respect to "rate[s] of fire, ease of reloading, power, range, and accuracy."  State.Br.46; D.Ct.Dkt.253 pp.95-98.  Like every modern firearm, the arms PICA bans can fire more rounds more accurately and more quickly than their Founding-era predecessors.  But that does not make them any less linear descendants of early multi-shot arms.  *See* D.Ct.Dkt.253 pp.91-98.

Nor could it.  After all, it would be perverse to confine the people to arms that are less accurate, efficient, and reliable—which likely explains why there is no historical tradition of doing so.  Advancements in firearm accuracy and capacity have instead long been welcomed by law-abiding citizens.  *Id*.  They are therefore simply not the sort of "dramatic technological changes" with which *Bruen* was concerned—as evidenced by the Court's focus on whether arms are "in common use *today*," 597 U.S. at 47 (emphasis added), and its recognition that the Second Amendment protects "*modern* instruments that facilitate armed self-defense," *id.* at 28 (emphasis added).

In all events, even if the state had identified some "unprecedented societal concerns or dramatic technological changes," that would just give it more analogical leeway, not eliminate its burden altogether.  *See id.* at 27.  So PICA would still fail for the same ultimate reason:  The state simply has not identified any tradition that supports banning common, non-militaristic arms.

**IV.    The District Court Did Not Abuse Its Discretion In Enjoining PICA.**

Finally, the state's breezy complaints about the scope of the injunction are wrong and largely unpreserved.  State.Br.54-57.  The state chides the district court for declining to slice and dice PICA's many provisions via severability.  State.Br.55.  But the state cannot begrudge the court for not crediting a severability argument *the state never made*.  *See* D.Ct.Dkt.248 pp.60-61 (arguing for an injunction "limited in scope," without addressing severability).  "An argument not raised in the district court is forfeited on appeal."  *Dixon v. Williams*, 93 F.4th 394, 407-08 (7th Cir. 2024).

In any event, the court was right to enjoin PICA in its entirety.  SA164-65.  While there is a "rebuttable presumption" of severability when statutes contain a severability provision, State.Br.56, "because of the very frequency with which it is used, the severability clause is regarded as little more than a mere formality" under Illinois law.  *Best v. Taylor Mach. Works*, 179 Ill.2d 367, 461 (1997).  And that presumption is "overcome" when "the legislative purpose or object in passing the act is significantly undercut … by the elimination of the invalid provisions."  *Id.* at 461-62.

The state's alleged purpose "in passing the act"—i.e., restricting access to firearms it fears may be used to commit mass shootings or other crimes—is obviously "significantly undercut[]" by the elimination of PICA's sweeping arms bans.  *Id.*  Indeed, while the state now argues that the provisions dealing with .50-

caliber rifles and cartridges should have been severed, State.Br.56, it does not even attempt to argue that .50-caliber rifles and cartridges are commonly used for those nefarious ends with which PICA purports to be concerned. And even if the registration requirement were constitutional, it would make little sense to leave it in place without PICA's arms bans given the state's admission that it was designed to "effectuate[] the General Assembly's" desire to distinguish between arms purchased before PICA's "passage" (which are not banned) and those purchased after (which are). State.Br.55. There is obviously no use for that distinction once PICA's arms bans have been held unconstitutional.[14]

---

[14] To the extent this Court disagrees, it should (*contra* State.Br.57) affirm and remand on severability alone so the district court can address the question in the first instance. And while the state chides the district court for enjoining the "State of Illinois," State.Br.55, this Court can address any concern on that front by affirming while clarifying that the *Attorney General* is prohibited from enforcing PICA.

## CONCLUSION

For the foregoing reasons, this Court should affirm.

Respectfully submitted,

s/ERIN E. MURPHY
PAUL D. CLEMENT
ERIN E. MURPHY
MATTHEW D. ROWEN
NICHOLAS A. AQUART
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Appellees*

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION**

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32(c) because, according to the "word count" function of Microsoft Word 2016, it contains 13,589 words, excluding the parts Federal Rule of Appellate Procedure 32(f) exempts from the count.

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

June 6, 2025

                                        s/Erin E. Murphy
                                        Erin E. Murphy

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)

Pursuant to Circuit Rule 30(d), counsel certifies that all materials required by

Circuit Rule 30(a) and (b) are included in the appendix.


June 6, 2025

s/Erin E. Murphy
Erin E. Murphy

**CERTIFICATE OF SERVICE**

I hereby certify that on June 6, 2025, I electronically filed the foregoing with

the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit

by using the CM/ECF system. I certify that all participants in this case are registered

CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Erin E. Murphy</u>
Erin E. Murphy

# ADDENDUM

# Semiautomatic Rifles Capable of Accepting Detachable Magazines Enumerated by PICA Based on Proscribed Feature

**Pistol Grip:**

All AK types, including the AK, AK47, AK47S, AK–74, AKM, AKS, ARM, MAK90, MISR, NHM90, NHM91, SA85, SA93, Vector Arms AK–47, VEPR, WASR–10, WUM, IZHMASH Saiga AK, MAADI AK47 and ARM, Norinco 56S, 56S2, 84S, and 86S, and Poly Technologies AK47 and AKS; all AR types, including the AR–10, AR–15, Alexander Arms Overmatch Plus 16, Armalite M15 22LR Carbine, Armalite M15–T, Barrett REC7, Beretta AR–70, Black Rain Ordnance Recon Scout, Bushmaster ACR, Bushmaster Carbon 15, Bushmaster MOE series, Bushmaster XM15, Chiappa Firearms MFour rifles, Colt Match Target rifles, CORE Rifle Systems CORE15 rifles, Daniel Defense M4A1 rifles, Devil Dog Arms 15 Series rifles, Diamondback DB15 rifles, DoubleStar AR rifles, DPMS Tactical rifles, DSA Inc. ZM–4 Carbine, Heckler & Koch MR556, High Standard HSA–15 rifles, Jesse James Nomad AR–15 rifle, Knight's Armament SR–15, Lancer L15 rifles, MGI Hydra Series rifles, Mossberg MMR Tactical rifles, Noreen Firearms BN 36 rifle, Olympic Arms, POF USA P415, Precision Firearms AR rifles, Remington R–15 rifles, Rhino Arms AR rifles, Rock River Arms LAR–15 or Rock River Arms LAR–47, Sig Sauer SIG516 rifles and MCX rifles, Smith & Wesson M&P15 rifles, Stag Arms AR rifles, Sturm, Ruger & Co. SR556 and AR–556 rifles, Uselton Arms Air-Lite M–4 rifles, Windham Weaponry AR rifles, WMD Guns Big Beast, and Yankee Hill Machine Company, Inc. YHM–15 rifles; Barrett M107A1; Barrett M82A1; Beretta CX4 Storm; Calico Liberty Series; CETME Sporter; Daewoo K–1, K–2, Max 1, Max 2, AR 100, and AR 110C; Fabrique Nationale/FN Herstal FAL, LAR, 22 FNC, 308 Match, L1A1 Sporter, PS90, SCAR, and FS2000; Feather Industries AT–9; Galil Model AR and Model ARM; Hi-Point Carbine; HK–91, HK–93, HK–94, HK–PSG–1, and HK USC; IWI TAVOR, Galil ACE rifle; Kel-Tec Sub-2000, SU–16, and RFB; SIG AMT, SIG PE–57, Sig Sauer SG 550, Sig Sauer SG 551, and SIG MCX; Springfield Armory SAR–48; Steyr AUG; Sturm, Ruger & Co. Mini-14 Tactical Rifle M–14/20CF; all Thompson rifles, including the Thompson M1SB, Thompson T1100D, Thompson T150D, Thompson T1B, Thompson T1B100D, Thompson T1B50D, Thompson T1BSB, Thompson T1–C, Thompson T1D, Thompson T1SB, Thompson T5, Thompson T5100D, Thompson TM1, and Thompson TM1C; UMAREX UZI rifle; Valmet M62S, M71S, and M78; Weaver Arms Nighthawk; and Wilkinson Arms Linda Carbine.

**Protruding Grip:**

All AK types, including the AK, AK47, AK47S, AK–74, AKM, AKS, ARM, MAK90, MISR, NHM90, NHM91, SA85, SA93, Vector Arms AK–47, VEPR, WASR–10, WUM, IZHMASH Saiga AK, MAADI AK47 and ARM, Norinco 56S, 56S2, 84S, and 86S, and Poly Technologies AK47 and AKS; all AR types, including the AR–10, AR–15, Alexander Arms Overmatch Plus 16, Armalite M15 22LR Carbine, Armalite M15–T, Barrett REC7, Beretta AR–70, Black Rain Ordnance Recon Scout, Bushmaster ACR, Bushmaster Carbon 15, Bushmaster MOE series, Bushmaster XM15, Chiappa Firearms MFour rifles, Colt Match Target rifles, CORE Rifle Systems CORE15 rifles, Daniel Defense M4A1 rifles, Devil Dog Arms 15 Series rifles, Diamondback DB15 rifles, DoubleStar AR rifles, DPMS Tactical rifles, DSA Inc. ZM–4 Carbine, Heckler & Koch MR556, High Standard HSA–15 rifles, Jesse James Nomad AR–15 rifle, Knight's Armament SR–15, Lancer L15 rifles, MGI Hydra Series rifles, Mossberg MMR Tactical rifles, Noreen Firearms BN 36 rifle, Olympic Arms, POF USA P415, Precision Firearms AR rifles, Remington R–15 rifles, Rhino Arms AR rifles, Rock River Arms LAR–15 or Rock River Arms LAR–47, Sig Sauer SIG516 rifles and MCX rifles, Smith & Wesson M&P15 rifles, Stag Arms AR rifles, Sturm, Ruger & Co. SR556 and AR–556 rifles, Uselton Arms Air-Lite M–4 rifles, Windham Weaponry AR rifles, WMD Guns Big Beast, and Yankee Hill Machine Company, Inc. YHM–15 rifles; Barrett M107A1; Barrett M82A1; Calico Liberty Series; CETME Sporter; Daewoo K–1, K–2, Max 1, Max 2, AR 100, and AR 110C; Fabrique Nationale/FN Herstal FAL, LAR, 22 FNC, 308 Match, L1A1 Sporter, PS90, SCAR, and FS2000; Feather Industries AT–9; Galil Model AR and Model ARM; Hi-Point Carbine; HK–91, HK–93, HK–94, HK–PSG–1, and HK USC; IWI TAVOR, Galil ACE rifle; SIG AMT, SIG PE–57, Sig Sauer SG 550, Sig Sauer SG 551, and SIG MCX; Springfield Armory SAR–48; Steyr AUG; Sturm, Ruger & Co. SR556 and AR–556 rifles (some models); all Thompson rifles, including the Thompson M1SB, Thompson T1100D, Thompson T150D, Thompson T1B, Thompson T1B100D, Thompson T1B50D, Thompson T1BSB, Thompson T1–C, Thompson T1D, Thompson T1SB, Thompson T5, Thompson T5100D, Thompson TM1, and Thompson TM1C; UZI Mini Carbine, UZI Model A Carbine, and UZI Model B Carbine; Valmet M62S, M71S, and M78; Weaver Arms Nighthawk; and Wilkinson Arms Linda Carbine.

**Thumbhole Stock:**

MAK90, NHM91, SA85, SA93, and WUM; Beretta CX4 Storm; Fabrique Nationale/FN Herstal PS90 and FS2000; HK USC; and Steyr AUG.

**Folding or Telescoping Stock:**

AKS; Berretta AR70, High Standard HSA-15 rifles, and Sig Sauer MCX rifles; Daewoo K–1, K–2, Max 1, Max 2, AR 100, and AR 110C; Fabrique Nationale/FN Herstal FAL, LAR, 22 FNC, 308 Match, L1A1 Sporter, PS90, SCAR, and FS2000; Feather Industries AT–9; Galil Model AR and Model ARM; IWI TAVOR, Galil ACE rifle; Kel-Tec Sub-2000 and SU–16; SIG AMT, SIG PE–57, Sig Sauer SG 550, Sig Sauer SG 551, and SIG MCX; Springfield Armory SAR–48; Sturm, Ruger & Co. SR556 and AR–556 rifles (some models); UMAREX UZI rifle; UZI Mini Carbine, UZI Model A Carbine, and UZI Model B Carbine; Valmet M62S and M71S; and Weaver Arms Nighthawk.

**Flash Suppressor:**

All AR types, including the AR–10, AR–15, Alexander Arms Overmatch Plus 16, Armalite M15 22LR Carbine, Armalite M15–T, Barrett REC7, Beretta AR–70, Black Rain Ordnance Recon Scout, Bushmaster ACR, Bushmaster Carbon 15, Bushmaster MOE series, Bushmaster XM15, Chiappa Firearms MFour rifles, Colt Match Target rifles, CORE Rifle Systems CORE15 rifles, Daniel Defense M4A1 rifles, Devil Dog Arms 15 Series rifles, Diamondback DB15 rifles, DoubleStar AR rifles, DPMS Tactical rifles, DSA Inc. ZM–4 Carbine, Heckler & Koch MR556, High Standard HSA–15 rifles, Jesse James Nomad AR–15 rifle, Knight's Armament SR–15, Lancer L15 rifles, MGI Hydra Series rifles, Mossberg MMR Tactical rifles, Noreen Firearms BN 36 rifle, Olympic Arms, POF USA P415, Precision Firearms AR rifles, Remington R–15 rifles, Rhino Arms AR rifles, Rock River Arms LAR–15 or Rock River Arms LAR–47, Sig Sauer SIG516 rifles and MCX rifles, Smith & Wesson M&P15 rifles, Stag Arms AR rifles, Sturm, Ruger & Co. SR556 and AR–556 rifles, Uselton Arms Air-Lite M–4 rifles, Windham Weaponry AR rifles, WMD Guns Big Beast, and Yankee Hill Machine Company, Inc. YHM–15 rifles; Fabrique Nationale/FN Herstal FAL, LAR, 22 FNC, 308 Match, L1A1 Sporter, PS90, SCAR, and FS2000; Galil Model AR and Model ARM; HK–91, HK–93, HK–94, and HK USC; IWI TAVOR, Galil ACE rifle; Kel-Tec RFB; SIG AMT, SIG PE–57, Sig Sauer SG 550, Sig Sauer SG 551, and SIG MCX; Springfield Armory SAR–48; Steyr AUG; Sturm, Ruger & Co. Mini-14 Tactical Rifle M–14/20CF; all Thompson rifles, including the Thompson M1SB, Thompson T1100D, Thompson T150D, Thompson T1B, Thompson T1B100D, Thompson T1B50D, Thompson T1BSB, Thompson T1–C, Thompson T1D, Thompson T1SB, Thompson T5, Thompson T5100D, Thompson TM1, and Thompson TM1C; Valmet M62S, M71S, and M78; and Weaver Arms Nighthawk.

**Barrel Shroud:**

All AR types, including the AR–10, AR–15, Alexander Arms Overmatch Plus 16, Armalite M15 22LR Carbine, Armalite M15–T, Barrett REC7, Beretta AR–70, Black Rain Ordnance Recon Scout, Bushmaster ACR, Bushmaster Carbon 15, Bushmaster MOE series, Bushmaster XM15, Chiappa Firearms MFour rifles, Colt Match Target rifles, CORE Rifle Systems CORE15 rifles, Daniel Defense M4A1 rifles, Devil Dog Arms 15 Series rifles, Diamondback DB15 rifles, DoubleStar AR rifles, DPMS Tactical rifles, DSA Inc. ZM–4 Carbine, Heckler & Koch MR556, High Standard HSA–15 rifles, Jesse James Nomad AR–15 rifle, Knight's Armament SR–15, Lancer L15 rifles, MGI Hydra Series rifles, Mossberg MMR Tactical rifles, Noreen Firearms BN 36 rifle, Olympic Arms, POF USA P415, Precision Firearms AR rifles, Remington R–15 rifles, Rhino Arms AR rifles, Rock River Arms LAR–15 or Rock River Arms LAR–47, Sig Sauer SIG516 rifles and MCX rifles, Smith & Wesson M&P15 rifles, Stag Arms AR rifles, Sturm, Ruger & Co. SR556 and AR–556 rifles, Uselton Arms Air-Lite M–4 rifles, Windham Weaponry AR rifles, WMD Guns Big Beast, and Yankee Hill Machine Company, Inc. YHM–15 rifles; Barrett M107A1; Barrett M82A1; CETME Sporter; Daewoo K–1, K–2, Max 1, Max 2, AR 100, and AR 110C; Fabrique Nationale/FN Herstal FAL, LAR, 22 FNC, 308 Match, L1A1 Sporter, PS90, SCAR, and FS2000; Galil Model AR and Model ARM; Hi-Point Carbine; HK–91, HK–93, HK–94, HK–PSG–1, and HK USC; Kel-Tec Sub-2000, SU–16, and RFB; SIG AMT, SIG PE–57, Sig Sauer SG 550, Sig Sauer SG 551, and SIG MCX; Springfield Armory SAR–48; and Wilkinson Arms Linda Carbine.

## Semiautomatic Pistols Capable of Accepting Detachable Magazines Enumerated by PICA Based on Proscribed Feature

**Threaded Barrel:**

All AK types, including the Centurion 39 AK pistol, CZ Scorpion pistol, Draco AK–47 pistol, HCR AK–47 pistol, IO Inc. Hellpup AK–47 pistol, Krinkov pistol, Mini Draco AK–47 pistol, PAP M92 pistol, and Yugo Krebs Krink pistol; all AR types, including the American Spirit AR–15 pistol, Bushmaster Carbon 15 pistol, Chiappa Firearms M4 Pistol GEN II, CORE Rifle Systems CORE15 Roscoe pistol, Daniel Defense MK18 pistol, DoubleStar Corporation AR pistol, DPMS AR–15 pistol, Jesse James Nomad AR–15 pistol, Olympic Arms AR–15 pistol, Osprey Armament MK–18 pistol, POF USA AR pistols, Rock River Arms LAR 15 pistol, and Uselton Arms Air-Lite M–4 pistol; Intratec TEC–22 Scorpion, TEC–9, and TEC–DC9; IWI UZI PRO pistol; Kel-Tec PLR 16 pistol; all MAC types, including the MAC–10, MAC–11, Masterpiece Arms MPA A930 Mini Pistol, MPA460 Pistol, MPA Tactical Pistol, MPA Mini Tactical Pistol, Military Armament Corp. Ingram M–11, and Velocity Arms VMAC; Sig Sauer P556 pistol; and Sites Spectre.

**Second Pistol Grip:**

All AK types, including the Centurion 39 AK pistol, CZ Scorpion pistol, Draco AK–47 pistol, HCR AK–47 pistol, IO Inc. Hellpup AK–47 pistol, Krinkov pistol, Mini Draco AK–47 pistol, PAP M92 pistol, and Yugo Krebs Krink pistol; all AR types, including the American Spirit AR–15 pistol, Bushmaster Carbon 15 pistol, Chiappa Firearms M4 Pistol GEN II, CORE Rifle Systems CORE15 Roscoe pistol, Daniel Defense MK18 pistol, DoubleStar Corporation AR pistol, DPMS AR–15 pistol, Jesse James Nomad AR–15 pistol, Olympic Arms AR–15 pistol, Osprey Armament MK–18 pistol, POF USA AR pistols, Rock River Arms LAR 15 pistol, and Uselton Arms Air-Lite M–4 pistol; DSA SA58 PKP FAL pistol; Encom MP–9 and MP–45; Heckler & Koch model SP–89 pistol; Intratec AB–10, TEC–22 Scorpion, TEC–9, and TEC–DC9; IWI Galil Ace pistol; Kel-Tec PLR 16 pistol; Sig Sauer P556 pistol; Sites Spectre; all Thompson types, including the Thompson TA510D and Thompson TA5; and all UZI types, including the Micro-UZI.

**Protruding Grip:**

All AK types, including the Centurion 39 AK pistol, CZ Scorpion pistol, Draco AK–47 pistol, HCR AK–47 pistol, IO Inc. Hellpup AK–47 pistol, Krinkov pistol, Mini Draco AK–47 pistol, PAP M92 pistol, and Yugo Krebs Krink pistol; all AR types, including the American Spirit AR–15 pistol, Bushmaster Carbon 15 pistol, Chiappa Firearms M4 Pistol GEN II, CORE Rifle Systems CORE15 Roscoe pistol, Daniel Defense MK18 pistol, DoubleStar Corporation AR pistol, DPMS AR–15 pistol, Jesse James Nomad AR–15 pistol, Olympic Arms AR–15 pistol, Osprey Armament MK–18 pistol, POF USA AR pistols, Rock River Arms LAR 15 pistol, and Uselton Arms Air-Lite M–4 pistol; DSA SA58 PKP FAL pistol; Encom MP–9 and MP–45; Heckler & Koch model SP–89 pistol; Intratec AB–10, TEC–22 Scorpion, TEC–9, and TEC–DC9; IWI Galil Ace pistol; Kel-Tec PLR 16 pistol; Sig Sauer P556 pistol; Sites Spectre; all Thompson types, including the Thompson TA510D and Thompson TA5; and all UZI types, including the Micro-UZI.

**Barrel Shroud:**

All AR types, including the American Spirit AR–15 pistol, Bushmaster Carbon 15 pistol, Chiappa Firearms M4 Pistol GEN II, CORE Rifle Systems CORE15 Roscoe pistol, Daniel Defense MK18 pistol, DoubleStar Corporation AR pistol, DPMS AR–15 pistol, Jesse James Nomad AR–15 pistol, Olympic Arms AR–15 pistol, Osprey Armament MK–18 pistol, POF USA AR pistols, Rock River Arms LAR 15 pistol, and Uselton Arms Air-Lite M–4 pistol; Encom MP–9 and MP–45; Intratec TEC–9 and TEC–DC9; Kel-Tec PLR 16 pistol; Sig Sauer P556 pistol; and Sites Spectre.

**Flash Suppressor:**

All AK types, including the Centurion 39 AK pistol, CZ Scorpion pistol, Draco AK–47 pistol, HCR AK–47 pistol, IO Inc. Hellpup AK–47 pistol, Krinkov pistol, Mini Draco AK–47 pistol, PAP M92 pistol, and Yugo Krebs Krink pistol; all AR types, including the American Spirit AR–15 pistol, Bushmaster Carbon 15 pistol, Chiappa Firearms M4 Pistol GEN II, CORE Rifle Systems CORE15 Roscoe pistol, Daniel Defense MK18 pistol, DoubleStar Corporation AR pistol, DPMS AR–15 pistol, Jesse James Nomad AR–15 pistol, Olympic Arms AR–15 pistol, Osprey Armament MK–18 pistol, POF USA AR pistols, Rock River Arms LAR 15 pistol, and Uselton Arms Air-Lite M–4 pistol; Calico pistols; DSA SA58 PKP FAL pistol; Encom MP–9 and MP–45; Kel-Tec PLR 16 pistol; and Sig Sauer P556 pistol.

**Capability to Accept Detachable Magazine Outside of Pistol Grip:**

All AK types, including the Centurion 39 AK pistol, CZ Scorpion pistol, Draco AK–47 pistol, HCR AK–47 pistol, IO Inc. Hellpup AK–47 pistol, Krinkov pistol, Mini Draco AK–47 pistol, PAP M92 pistol, and Yugo Krebs Krink pistol; all AR types, including the American Spirit AR–15 pistol, Bushmaster Carbon 15 pistol, Chiappa Firearms M4 Pistol GEN II, CORE Rifle Systems CORE15 Roscoe pistol, Daniel Defense MK18 pistol, DoubleStar Corporation AR pistol, DPMS AR–15 pistol, Jesse James Nomad AR–15 pistol, Olympic Arms AR–15 pistol, Osprey Armament MK–18 pistol, POF USA AR pistols, Rock River Arms LAR 15 pistol, and Uselton Arms Air-Lite M–4 pistol; Calico pistols; DSA SA58 PKP FAL pistol; Encom MP–9 and MP–45; Heckler & Koch model SP–89 pistol; Intratec AB–10, TEC–22 Scorpion, TEC–9, and TEC–DC9; IWI Galil Ace pistol; Kel-Tec PLR 16 pistol; Sig Sauer P556 pistol; Sites Spectre; and all Thompson types, including the Thompson TA510D and Thompson TA5.

**Buffer Tube, Arm Brace, or Other Part that Protrudes Horizontally Behind the Pistol Grip:**

All AR types, including the American Spirit AR–15 pistol, Bushmaster Carbon 15 pistol, Chiappa Firearms M4 Pistol GEN II, CORE Rifle Systems CORE15 Roscoe pistol, Daniel Defense MK18 pistol, DoubleStar Corporation AR pistol, DPMS AR–15 pistol, Jesse James Nomad AR–15 pistol, Olympic Arms AR–15 pistol, Osprey Armament MK–18 pistol, POF USA AR pistols, Rock River Arms LAR 15 pistol, and Uselton Arms Air-Lite M–4 pistol; Calico pistols; DSA SA58 PKP FAL pistol; all MAC types, including the MAC–10, MAC–11, Masterpiece Arms MPA A930 Mini Pistol, MPA460 Pistol, MPA Tactical Pistol, MPA Mini Tactical Pistol, Military Armament Corp. Ingram M–11, and Velocity Arms VMAC; all Thompson types, including the Thompson TA510D and Thompson TA5; and all UZI types, including the Micro-UZI.

# Semiautomatic Shotguns Enumerated by PICA Based on Proscribed Feature

**Five or More Rounds:**

Doruk Lethal shotguns; Franchi LAW–12 and SPAS 12; all IZHMASH Saiga 12 types, including the IZHMASH Saiga 12, IZHMASH Saiga 12S, IZHMASH Saiga 12S EXP–01, IZHMASH Saiga 12K, IZHMASH Saiga 12K–030, and IZHMASH Saiga 12K–040 Taktika; Streetsweeper; and Striker 12.

**Pistol Grip:**

DERYA Anakon MC–1980, Anakon SD12; Doruk Lethal shotguns; Franchi LAW–12 and SPAS 12; all IZHMASH Saiga 12 types, including the IZHMASH Saiga 12, IZHMASH Saiga 12S, IZHMASH Saiga 12S EXP–01, IZHMASH Saiga 12K, IZHMASH Saiga 12K–030, and IZHMASH Saiga 12K–040 Taktika; Streetsweeper; and Striker 12.

**Protruding Grip:**

DERYA Anakon MC–1980, Anakon SD12; Doruk Lethal shotguns; all IZHMASH Saiga 12 types, including the IZHMASH Saiga 12, IZHMASH Saiga 12S, IZHMASH Saiga 12S EXP–01, IZHMASH Saiga 12K, IZHMASH Saiga 12K–030, and IZHMASH Saiga 12K–040 Taktika; Streetsweeper; and Striker 12.

**Folding Stock:**

All IZHMASH Saiga 12 types, including the IZHMASH Saiga 12, IZHMASH Saiga 12S, IZHMASH Saiga 12S EXP–01, IZHMASH Saiga 12K, IZHMASH Saiga 12K–030, and IZHMASH Saiga 12K–040 Taktika.