# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

DANE HARREL, et al.,

*Plaintiffs-Appellees,*

v.

KWAME RAOUL, Attorney General of the State of Illinois, and
BRENDAN F. KELLY, Director of the Illinois State Police,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS (No. 3:23-cv-00209)
HONORABLE STEPHEN P. MCGLYNN

## BRIEF OF *HARREL* PLAINTIFFS-APPELLEES

David G. Sigale
(Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
Tel: (630) 452-4547
Fax: (630) 596-4445
dsigale@sigalelaw.com

David H. Thompson
  *Counsel of Record*
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Avenue,
N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellees*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-3061

Short Caption: Dane Harrel, et al. v. Kwame Raoul, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

DANE HARREL, C4 GUN STORE, LLC, MARENGO GUNS, INC., ILLINOIS STATE RIFLE ASSOCIATON,

FIREARMS POLICY COALITION, INC. and SECOND AMENDMENT FOUNDATION

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Cooper & Kirk, PLLC; Law Firm of David G. Sigale, P.C.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

          C4 Gun Store, LLC - None; Marengo Guns, Inc. - None; ISRA - None; FPC - None; SAF - None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

          C4 Gun Store, LLC - None; Marengo Guns, Inc. - None; ISRA - None; FPC - None; SAF - None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ David H. Thompson      Date: June 6, 2025

Attorney's Printed Name: David H. Thompson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [✓]   **No** [ ]

Address: Cooper & Kirk, PLLC, 1523 New Hampshire Ave., N.W., Washington, DC 20036

Phone Number: (202) 220-9600      Fax Number: (202) 220-9601

E-Mail Address: dhthompson@cooperkirk.com

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-3061

Short Caption: Dane Harrel, et al. v. Kwame Raoul, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
   DANE HARREL, C4 GUN STORE, LLC, MARENGO GUNS, INC., ILLINOIS STATE RIFLE ASSOCIATON,

   FIREARMS POLICY COALITION, INC. and SECOND AMENDMENT FOUNDATION

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
   Cooper & Kirk, PLLC; Law Firm of David G. Sigale, P.C.

(3)   If the party, amicus or intervenor is a corporation:

   i)   Identify all its parent corporations, if any; and

      C4 Gun Store, LLC - None; Marengo Guns, Inc. - None; ISRA - None; FPC - None; SAF - None

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      C4 Gun Store, LLC - None; Marengo Guns, Inc. - None; ISRA - None; FPC - None; SAF - None

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature: /s/ Peter A. Patterson          Date: June 6, 2025

Attorney's Printed Name: Peter A. Patterson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address: Cooper & Kirk, PLLC, 1523 New Hampshire Ave., N.W., Washington, DC 20036

Phone Number: (202) 220-9600          Fax Number: (202) 220-9601

E-Mail Address: ppatterson@cooperkirk.com

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-3061

Short Caption: Dane Harrel, et al. v. Kwame Raoul, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

DANE HARREL, C4 GUN STORE, LLC, MARENGO GUNS, INC., ILLINOIS STATE RIFLE ASSOCIATON,

FIREARMS POLICY COALITION, INC. and SECOND AMENDMENT FOUNDATION

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Cooper &  Kirk, PLLC; Law Firm of David G. Sigale, P.C.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

C4 Gun Store, LLC - None; Marengo Guns, Inc. - None; ISRA - None; FPC - None; SAF - None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

C4 Gun Store, LLC - None; Marengo Guns, Inc. - None; ISRA - None; FPC - None; SAF - None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ William V. Bergstrom    Date: June 6, 2025

Attorney's Printed Name:  William V. Bergstrom

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ✓

Address:  Cooper & Kirk, PLLC, 1523 New Hampshire Ave., N.W., Washington, DC 20036

Phone Number: (202) 220-9600    Fax Number:  (202) 220-9601

E-Mail Address: wbergstrom@cooperkirk.com

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-3061

Short Caption: Dane Harrel, et al. v. Kwame Raoul, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    DANE HARREL, C4 GUN STORE, LLC, MARENGO GUNS, INC., ILLINOIS STATE RIFLE ASSOCIATON,

    FIREARMS POLICY COALITION, INC. and SECOND AMENDMENT FOUNDATION

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Law Firm of David G. Sigale, P.C.

    Cooper & Kirk, PLLC

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        C4 Gun Store, LLC - None; Marengo Guns, Inc. - None; ISRA - None; FPC - None; SAF - None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        C4 Gun Store, LLC - None; Marengo Guns, Inc. - None; ISRA - None; FPC - None; SAF - None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ David G. Sigale    Date:  June 6, 2025

Attorney's Printed Name:  David G. Sigale

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address:  LAW FIRM OF DAVID G. SIGALE, P.C.

    55 West 22nd Street, Suite 230,  Lombard, IL 60148

Phone Number: (630) 452-4547    Fax Number:  (630) 596-4445

E-Mail Address: dsigale@sigalelaw.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................iii

INTRODUCTION .......................................................................... 1

JURISDICTIONAL STATEMENT ............................................... 5

ISSUE PRESENTED FOR REVIEW ....................................... 7

STATEMENT OF THE CASE .................................................... 7

SUMMARY OF ARGUMENT ................................................... 10

ARGUMENT ............................................................................... 12

  I.   This Court Should Affirm Based on *Heller, Bruen*, and *Rahimi*. . 12

      A. *Bevis* is Fundamentally Incompatible with Supreme Court Precedent................................................................... 14

        1. The Term "Arms" Covers All Handheld Weapons, Not Exclusively Civilian Weapons. ............................... 14

        2. No Historical Evidence or Analogue Supports Banning Commonly Used Rifles or Their Standard Magazines.........24

          a. Dangerous and Unusual Arms....................................27

          b. Arms in "Common Use" ................................................35

          c. *Bevis* Misunderstands These Categories. ....................42

          d. Rejecting *Bevis* Accords with Seventh Circuit Practice. ...........................................................52

B. This Case Is Straightforward Under *Heller* and *Bruen*............56

CONCLUSION ...............................................59

# TABLE OF AUTHORITIES

**Cases**                                                             **Page(s)**

*Agostini v. Felton,*
521 U.S. 203 (1997) ...................................................................... 52

*Aymette v. State,*
21 Tenn. (2 Hum.) 154 (1840) ................................................. 33, 40

*Bevis v. City of Naperville,*
85 F.4th 1175 (7th Cir. 2023) ........... 3, 4, 7, 9, 10, 14, 15, 18, 21, 22,
23, 24, 25, 26, 28, 29, 31, 32, 33,
42, 43, 44, 45, 46, 47, 48, 49, 50,
51, 54, 55

*Bianchi v. Brown,*
111 F.4th 438 (4th Cir. 2024) ...................................................... 23

*Bliss v. Commonwealth,*
12 Ky. (2 Litt.) 90 (1822) ............................................................. 44

*Caetano v. Massachusetts,*
577 U.S. 411 (2016) .................................................... 25, 27, 28, 30

*Dabbs v. State,*
39 Ark. 353 (1882) ........................................................................ 48

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ............. 1, 10, 14, 15, 16, 17, 18, 19, 20, 25, 26,
27, 29, 30, 34, 35, 38, 40, 41, 43, 44,
45, 51, 57, 58, 59

*Duncan v. Bonta,*
133 F.4th 852 (9th Cir. 2025) ...................................................... 18

*English v. State,*
35 Tex. 473 (1871) ........................................................................ 33

*Espinoza v. Montana Department of Revenue,*
591 U.S. 464 (2020) ................................................................ 50, 51

*Fyock v. Sunnyvale,*
779 F.3d 991 (9th Cir. 2015) .................................................. 29, 30

*Garland v. Cargill,*
    602 U.S. 406 (2024) ........................................................ 2, 3

*Glaser v. Wound Care Consultants, Inc.,*
    570 F.3d 907 (7th Cir. 2009) ......................................... 52

*Hanson v. District of Columbia,*
    120 F.4th 223 (D.C. Cir. 2024) .................... 13, 28, 43, 58

*Harrel v. Raoul,*
    144 S. Ct. 2491 (2024) (Mem.) ................................. 13, 54

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) ...................................... 2

*New York State Rifle & Pistol Association v. Bruen,*
    597 U.S. 1 (2022) ............................... 1 ,2, 13, 17, 18, 20, 21, 22, 23,
                             24, 28, 29, 30, 31, 32, 33, 34,
                                  35, 45, 50, 51

*Nunn v. State,*
    1 Ga. 243 (1846) ................................................. 38, 39, 44

*Protect Our Parks, Inc. v. Buttigieg,*
    97 F.4th 1077 (7th Cir. 2024) .................................. 54, 55

*Santos v. United States,*
    461 F.3d 886 (7th Cir. 2006) ................................... 52, 55

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos,*
    No. 23-1141 (U.S. June 5, 2025) ............................... 2 ,3

*Simpson v. State,*
    13 Tenn. (5 Yer.) 356 (1833) ......................................... 44

*Snope v. Brown,*
    605 U.S. __, 2025 WL 1550126 (2025) .... 2, 13, 22, 23, 24, 26, 41, 56

*State v. Chandler,*
    5 La. Ann. 489 (1850) .................................................... 44

*State v. Duke,*
    42 Tex. 455 (1875) ......................................................... 44

*State v. Reid,*
    1 Ala. 612 (1840) ........................................................... 44

*State v. Smith,*
   11 La. Ann. 633 (1856) ...................................................... 39

*State v. Workman,*
   14 S.E. 9 (W.V. 1891)................................................... 33, 34

*Teter v. Lopez,*
   76 F.4th 938 (9th Cir. 2023)............................................. 49

*Teter v. Lopez,*
   93 F.4th 1150 (9th Cir. 2024)............................................ 49

*Tully v. Okeson,*
   78 F.4th 377 (7th Cir. 2023).............................. 4, 10, 52, 53, 54, 56

*United States v. Miller,*
   307 U.S. 174 (1939) .................................. 19, 20, 25, 34, 35, 36, 37

*United States v. Rahimi,*
   602 U.S. 680 (2024) ................................... 2, 45, 46, 49, 50

*United States v. Stevens,*
   559 U.S. 460 (2010) ...................................................... 23

*Univ. of Tex. v. Camenisch,*
   451 U.S. 390 (1981) ...................................................... 14

*Viramontes v. Cook County,*
   No. 24-1437, 2025 WL 1553896 (7th Cir. June 2, 2025)................ 56

*Wilson v. State,*
   33 Ark. 557 (1878) ....................................................... 39

## Constitutional Provisions, Rules, Regulations, and Statutes

U.S. Const. amend. II.................................................... 40, 57

U.S. Bur. of Alcohol, Tobacco, Firearms & Explosives, *Definition of "Frame or Receiver" and Identification of Firearms,*
   87 Fed. Reg. 24652 (2022) .............................................. 3

7th Cir. R. 40(e) ......................................................... 13, 14

720 ILCS
   5/24-1.9(a)(1)(A) ........................................................ 8
   5/24-1.9(a)(1)(J)(i)(I) & (ii)(II) ...................................... 7, 8
   5/24-1.9(b) .............................................................. 7

v

5/24-1.10.................................................................58

5/24-1.10(a)(1) .......................................................8

1837 Ga. Acts 90, § 1, https://perma.cc/3D9F-ZEFV...............................49

*An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns* § 10, *reprinted in* LAWS OF THE STATE OF NEW JERSEY, REVISED AND PUBLISHED UNDER THE AUTHORITY OF THE LEGISLATURE (Wm. Patterson, ed. 1800), https://perma.cc/LR6T-6KHB ..........................................32

1 Stat. 271 (1792), https://perma.cc/9GHH-P4BY............................37, 38

1786 N.Y. Laws 220, An act to regulate the militia, ch. 25, https://perma.cc/U2U2-6AMT ........................................37

## Other Authorities

Joel Alicea, Bruen *Was Right*, 174 U. PA. L. REV. __ (forthcoming 2025) .......................................22

Ch. 53—Carrying Weapons, §§ 1907–09, *in* A DIGEST OF THE STATUTES OF ARKANSAS 490 (W.W. Mansfield ed., 1884), https://perma.cc/JHW3-LMLG..........................................47, 48, 55

1 SAMUEL JOHNSON, DICTIONARY OF THE ENGLISH LANGUAGE (6th ed. 1785), *available at* https://perma.cc/6J2U-MUAG ......................................16

Hon. Michael S. Kanne*, The "Non-*Banc En Banc*": Seventh Circuit Rule 40(e) and the Law of the Circuit",* 32 S. ILL. UNIV. L.J. 611 (2008)........................................14

Nelson Lund, *The Past and Future of the Individual's Right to Arms,* 31 GA. L. REV. 1 (1996) ..................................................43

JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS (1994) ..........................43

Simon Marsh, *Of Muskets and Bastard Muskets: Use of Lighter Muskets in Civil War England*, 2 BATTALIA: THE JOURNAL OF THE BATTLEFIELDS TRUST 12 (2024) ..........................................36, 37

Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment,* 62 TENN. L. REV. 461 (1995).....................................43, 44

Antonin Scalia & Bryan A. Garner, READING LAW:
THE INTERPRETATION OF JUDICIAL TEXTS (2012)...................... 17, 18

Mark W. Smith, *"Not all History Is Created Equal": In the Post-Bruen
World, the Critical Period for Historical Analogues Is when the
Second Amendment was Ratified in 1791, and not 1868*,
HARV. J.L. & PUB. POL'Y PER CURIAM (Oct. 1, 2022),
https://perma.cc/W796-8ABP ......................................................... 50

Mark W. Smith, *What Part of "In Common Use" Don't You Understand?:
How Courts Have Defied* Heller *In Arms-Ban Cases—Again*,
HARV. J. L. & PUB POL'Y PER CURIAM (Sept. 27, 2023),
https://perma.cc/QNA2-NZ8T ......................................................... 25

2 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED
STATES (1833), *available at* https://perma.cc/B7LJ-AXDG............ 17

1 JOHN TRUSLER, THE DISTINCTION BETWEEN WORDS
ESTEEMED SYNONYMOUS IN THE ENGLISH LANGUAGE (3d ed. 1794),
*available at* https://perma.cc/39EN-AHMP.................................... 16

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for
Self Defense: An Analytical Framework and a Research Agenda*,
56 UCLA L. REV. 1443 (2009) .................................................. 29, 51

NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE
(1828), https://perma.cc/89UG-Y9WB ...................................... 16, 57

18B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND
PROCEDURE (3d ed. 2019) ........................................................ 52, 53

## INTRODUCTION

The question presented by this case is whether the Second Amendment allows Illinois to ban the best-selling rifle in America and its standard magazine. The answer is no. In *District of Columbia v. Heller*, the Supreme Court held that "[t]he 18th-century meaning" of the word "arms" is "no different from the meaning today"—namely, "weapons of offence, or armour of defence." 554 U.S. 570, 581 (2008) (cleaned up). And because the plain text of the Second Amendment does not distinguish between types of arms, the Amendment's protection "extends, prima facie, to *all* instruments that constitute bearable arms." *Id*. at 582 (emphasis added). Limitations on the right must come from our nation's history. And *Heller* held that "historical tradition" surrounding the ratification of the Second Amendment demonstrates that only "dangerous and unusual weapons" are unprotected. *Id*. at 627 (quotation marks omitted). Firearms "in common use" by law-abiding citizens, by contrast, are protected, because common arms, by definition, cannot be dangerous and unusual weapons. *Id*.

The Supreme Court clarified three years ago in *New York State Rifle & Pistol Association v. Bruen*, and reaffirmed very recently in

*United States v. Rahimi*, that *Heller*'s mode of analysis—a review of the plain text of the Second Amendment followed by analogizing modern restrictions to historically grounded ones—governs all Second Amendment challenges. *Bruen*, 597 U.S. 1 (2022); *Rahimi*, 602 U.S. 680 (2024). The Supreme Court has repeatedly reaffirmed *Heller*, provided a fuller elaboration on its "methodology," *Bruen*, 597 U.S. at 22, and reiterated its central holding that arms in common use are absolutely protected, *see id.* at 22, 32, 47. In doing so, the Court has vindicated then-Judge Kavanaugh's dissent in the D.C. Circuit concluding that bans on common semiautomatic firearms like Illinois's are unconstitutional. *See Heller v. District of Columbia*, 670 F.3d 1244, 1285–91 (D.C. Cir. 2011) ("*Heller II*") (Kavanaugh, J., dissenting); *see also Snope v. Brown*, 605 U.S. __, 2025 WL 1550126, at *1 (2025) (statement of Kavanaugh, J., respecting the denial of certiorari).

The principles established by *Heller* and confirmed by *Bruen* should make this a straightforward case. The paradigmatic semiautomatic rifle banned by Illinois is the modern AR-15 platform rifle, "the most popular rifle in the country" which, like other rifles the State bans including AK-47 style rifles and .50 caliber rifles, is "both widely legal and bought by

many ordinary consumers." *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, No. 23-1141, slip op. at 14 (U.S. June 5, 2025); *see also Garland v. Cargill*, 602 U.S. 406, 429–30 (2024) (Sotomayor, J., dissenting). Indeed, even if ones' view is not restricted to rifles but considers all firearms, the AR-15 is indisputably common. According to the agency charged with administering the Nation's firearms laws it is "one of the most popular firearms in the United States," U.S. Bur. of Alcohol, Tobacco, Firearms & Explosives, *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24652 (2022). Illinois has offered nothing to materially distinguish the AR-15 from the other types of semiautomatic rifles it bans. Under *Heller* and *Bruen*, therefore, the ban is unconstitutional with respect to the semiautomatic rifles and magazines in the Act.

Of course, this Court's decision in *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023), complicates matters. *Bevis* purported to apply *Heller* and *Bruen* to the Illinois ban in a preliminary-injunction posture. But respectfully, *Bevis*'s reasoning was contradictory to both decisions. It was also explicitly preliminary, and this case now provides this Court an

opportunity to reassess its reasoning and take a different tack, which is more faithful to *Heller* and *Bruen*.

This Court should decline to follow *Bevis*, *Tully v. Okeson*, 78 F.4th 377, 380–81 (7th Cir. 2023), or utilize the procedures of Seventh Circuit Rule 40(e) to affirmatively overrule it. *Heller* and *Bruen* do not call for courts and legislatures to make a "distinction between military and civilian weaponry," with the former being unprotected. *Bevis*, 85 F.4th at 1201. Rather, *Heller* and *Bruen* establish that all firearms are protected unless the government can prove they are dangerous and unusual weapons.

Even if this panel chooses to apply *Bevis*, the judgment below should be affirmed. To that extent, Appellees Dane Harrel, C4 Gun Store, LLC, Marengo Guns, Inc., Illinois State Rifle Association, Firearms Policy Coalition, Inc., and the Second Amendment Foundation concur in the arguments made in the brief filed by the *Barnett* appellees today. *Bevis* was a self-declared preliminary look at the merits, and the district court properly granted judgment to Plaintiffs after the record was fully developed, whether analyzed directly under *Heller* and *Bruen* or under *Bevis*'s own mode of analysis.

## JURISDICTIONAL STATEMENT

The jurisdictional statement in Appellants' brief is not complete and correct because it does not note that the district court had jurisdiction under 28 U.S.C. § 1343 and this Court has jurisdiction under 28 U.S.C. § 1291.

The district court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343 because the case presents a challenge to the "Protect Illinois Communities Act" under the Second and Fourteenth Amendments to the United States Constitution. *Harrel v. Raoul*, No. 3:23-cv-00141, Doc. 1 at 25–28 (S.D. Ill. Jan. 7, 2023).

On November 8, 2024, following a four-day bench trial in which this case was consolidated with three others, the district court entered judgment against Defendants on Plaintiffs' Second Amendment claims and enjoined them from enforcing the challenged law. SA1–168; *Harrel,* Doc. 54 (Nov. 8, 2024). Judgment was entered in this case pursuant to Fed. R. Civ. P. 58. SA172–74. No motion to alter or amend the judgment was filed.

The State defendants filed a notice of appeal on November 8, 2024. *Harrel* Doc. 56. The notices were timely under 28 U.S.C. § 2107(a) and

Fed. R. App. P. 4(a)(1)(A) because they were filed within 30 days of the entry of judgment. This Court has jurisdiction over the appeals under 28 U.S.C. § 1291 because the district court's decision and order disposed of all claims against all parties.

On November 14, 2024, this Court noted that the judgment was deficient and ordered the parties to file memoranda stating why the appeal should not be remanded to the district court to enter proper judgments. 7th Cir. Doc. 3 (Nov. 14, 2024). The parties argued that this Court had jurisdiction, notwithstanding the district court's incomplete compliance with Rules 58 and 65. *See* 7th Cir. Docs. 19, 20 (Dec. 2, 2024). This Court agreed, retaining jurisdiction over the appeal but suggesting that the district court "enter appropriate orders promptly without the need for a formal command by this court." 7th Cir. Doc. 22 at 2 (Dec. 5, 2024). On December 9, 2024, the district court entered a new permanent injunction order and separate judgment. *Harrel,* Doc. 61; SA185–88.

## ISSUE PRESENTED FOR REVIEW

Whether the Court should affirm the district court's judgment holding that Illinois's attempt to ban the most popular rifles[1] in America and their standard magazines violates the Second and Fourteenth Amendments.

## STATEMENT OF THE CASE

Illinois has made it "unlawful for any person within th[e] State to knowingly manufacture, deliver, sell, import, or purchase or cause to be manufactured, delivered, sold, imported, or purchased by another, an assault weapon" or "assault weapon attachment." 720 ILCS 5/24-1.9(b). This law, dubbed the Protecting Illinois Communities Act (PICA), identifies many popular semiautomatic rifles as so-called "assault weapons" both by feature and by name.

The extensive list of banned rifles—as well as copies or duplicates thereof—includes the modern AR-15 and AK-47 rifle platforms. 720 ILCS

---

[1] The *Harrel* Plaintiffs focus on the AR-15 rifle in this brief because that was the firearm that *Bevis* discussed as "paradigmatic" and on which the State focuses in its brief. *See Bevis*, 85 F.4th at 1183. For the reasons laid out below that rifles are protected arms, the common handguns and shotguns (which are discussed fully in the *Barnett* appellees' brief) are equally protected and cannot be banned.

5/24-1.9(a)(1)(J)(i)(I) & (ii)(II). And the features-based ban covers those same rifles in their standard configurations, banning any semiautomatic rifle with the ability to accept a detachable magazine if it has one or more of the following features:

(i)    a pistol grip or thumbhole stock;
(ii)   any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;
(iii)  a folding, telescoping, thumbhole, or detachable stock, or a stock that is otherwise foldable or adjustable in a manner that operates to reduce the length, size, or any other dimension, or otherwise enhances the concealability of, the weapon;
(iv)   a flash suppressor;
(v)    a grenade launcher;
(vi)   a shroud attached to the barrel or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel.

720 ILCS 5/24-1.9(a)(1)(A). PICA also makes it a criminal offense to possess a magazine that can hold "more than 10 rounds of ammunition for long guns and more than 15 rounds of ammunition for handguns[.]" 720 ILCS 5/24-1.10(a)(1).

Almost immediately after Illinois enacted PICA, multiple sets of plaintiffs sued to enjoin its enforcement. After one district court granted a preliminary injunction and others denied the same, the resulting

interlocutory appeals were consolidated. This Court sided with the district courts that denied injunctive relief because it concluded no plaintiff had shown a likelihood of success on the merits, and thus vacated the injunction entered in these cases in the Southern District of Illinois. *Bevis*, 85 F.4th at 1182. Judge Brennan dissented, explaining that the majority misinterpreted Supreme Court precedent and the original public meaning of the Second Amendment. *Id.* at 1206–07 (Brennan, J., dissenting).

Although this Court dissolved the injunction, the consolidated cases relevant to this appeal continued to progress in the district court. It held a trial to determine how common the weapons banned by the PICA are and better understand their function. After the trial, the district court issued an opinion finding that PICA was unconstitutional, including as applied to so-called "assault rifles" and "large-capacity magazines." SA 112–13, SA 117, SA 167. It further found that these provisions were inseverable from the rest of PICA and thus held the entire act unenforceable. SA 164–65. As for a remedy, it enjoined Defendants from enforcing PICA against any person. This appeal follows.

## SUMMARY OF ARGUMENT

1. This Court can and should resolve this case by applying the Supreme Court's Second Amendment precedents directly. A straightforward application of those cases requires affirming the decision below.

A. Doing so would entail rejecting *Bevis*, which this Court has authority to do because it does not constitute "law of the case," *Tully*, 78 F.4th at 380–81, and even if it did, the procedures of Circuit Rule 40(e) allow for a panel to overrule a prior decision. *Bevis* is both inconsistent with the text of the Second Amendment and the Supreme Court precedents interpreting it. *Bevis*'s reading of "arms" to mean certain non-military firearms, 85 F.4th at 1192–93—as determined by judges—is impossible to square with *Heller*'s definitive interpretation of the term "arms" applying Founding-era dictionaries. 554 U.S. at 581–82. *Bevis*'s reasons that justify its atextual conclusion are based on a misinterpretation of *Heller*. The statement *Bevis* relied on (1) was concerned with *history* not the Amendment's plain text and (2) does not establish that arms can be banned if they are "exclusively or predominantly useful in military service," *Bevis*, 85 F.4th at 1194 , but

rather seeks to explain how certain arms can be banned *despite* their use by the military if they are both "dangerous" and "unusual" when compared to commonly used civilian arms.

Similarly, *Bevis*'s rejection of "common use" as dispositive of the historical analysis called for in *Bruen* cannot be squared with either *Bruen* or *Heller*. In *Heller*, which itself dealt with an arms ban (there, handguns), the Court surveyed the relevant history and concluded that the only historical tradition that could support banning a type of firearm was the historical prohibition on restricting "dangerous and unusual weapons." But while acknowledging that tradition, the Court noted that it had a positive corollary: arms in common use are *per se* protected and cannot be banned. *Bruen* did nothing to call this conclusion into question—indeed *Bruen* itself used the tradition of restricting "dangerous and unusual weapons" as an example of the sort of rules that can be appropriately derived from history when explaining its analytical framework.

Finally, *Bevis*'s analysis of historical analogues fails on its own terms. As *Bruen* explained, to support a modern law that implicates the plain text of the Second Amendment, historical restrictions must be part

of a broader "tradition" of regulation that impacted the right to keep and bear arms in similar ways and for similar reasons. The handful of laws collected by the *Bevis* panel fail this test: they are either inapposite or affirmatively disprove *Bevis*'s conclusion that exclusive or predominant military usefulness excludes a weapon from the protection of the Second Amendment.

B. If *Bevis* is overruled as inconsistent with *Heller* and *Bruen*, as it should be, resolution of this case is straightforward. *Heller* held that *all* weapons are "arms" within the scope of the Second Amendment, and it also held that an arm "in common use" cannot be banned consistent with history. Other cases applying *Bruen* will involve original historical work and analysis of the foundations of a modern restriction, but here, because there can be no doubt that the banned arms are "in common use," Illinois's ban is an historical outlier repugnant to the Second Amendment and should be held unconstitutional.

## ARGUMENT

### I. This Court Should Affirm Based on *Heller, Bruen*, and *Rahimi.*

To resolve a Second Amendment challenge, the reviewing court must determine whether the challenged regulation is consistent with the

historical tradition of firearm regulations in our country. First, the court asks whether the plain text of the Amendment is implicated. *Bruen*, 597 U.S. at 24–25. If so, the government then must justify its prima facie encroachment on the right to keep and bear arms by pointing to a historical tradition that demonstrates the right does not actually protect the plaintiff's conduct. *See id.*

*Bevis* misapplied this test at both steps. Its reasoning has been described by the author of *Bruen* as "contort[ed]," "tautological[]," "contrived," and "unmoored from both [the] text and history" of the Second Amendment, *Harrel v. Raoul*, 144 S. Ct. 2491, 2492 (2024) (Mem.) (Thomas, J., statement respecting the denial of certiorari), and by another circuit court as "the pinnacle of abstraction," *Hanson v. District of Columbia*, 120 F.4th 223, 234 (D.C. Cir. 2024) (per curiam); *see also Snope*, 605 U.S. (slip op. at 2) (statement of Kavanaugh, J.) ("Given that millions of Americans own AR-15s and that a significant majority of the States allow possession of those rifles, petitioners have a strong argument that AR-15s are in 'common use' by law-abiding citizens and therefore are protected by the Second Amendment under *Heller*."). This Court now has the opportunity to reassess its reasoning in *Bevis*, and

that reasoning can and should be overruled by this panel. *See* 7th Cir. R. 40(e) (providing a mechanism for a panel of this Court to overrule prior panel decisions); *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (explaining that preliminary-injunction rulings are "not binding" later on); *see also* Hon. Michael S. Kanne*, The "Non-*Banc En Banc*": Seventh Circuit Rule 40(e) and the Law of the Circuit"*, 32 S. ILL. UNIV. L.J. 611, 613 (2008) ("[A]n average of just under eight Circuit Rule 40(e) circulations [occur] per year.").

## A. *Bevis* is Fundamentally Incompatible with Supreme Court Precedent.

*Bevis* purported to apply the analytical framework enunciated in *Heller*, which was clarified in *Bruen* and *Rahimi*. But both its textual and historical analysis deviated significantly from the framework the Supreme Court has established. As such, *Bevis* should be overruled.

### 1. The Term "Arms" Covers All Handheld Weapons, Not Exclusively Civilian Weapons.

*Bevis* concluded that the word "arms" means "some arms." 85 F.4th at 1194–95. More specifically, it held that the *textual* meaning of "arms" in the Second Amendment does not include "weapons that are exclusively or predominantly useful in military service[.]" *Id.* at 1194. But as *Heller*

14

held, "arms" in the Second Amendment's text contains no such carveout. And traditional tools of legal interpretation confirm this holding.

Begin with *Heller* itself. Interpreting the term "arms" in accordance with its plain meaning, the Supreme Court in *Heller* concluded that the term covers "*all* instruments that constitute bearable arms." 554 U.S. at 582 (emphasis added); *see also Bevis*, 85 F.4th at 1225 (Brennan, J., dissenting). That is, "arms" in the Second Amendment are "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 554 U.S. at 582 (quoting 1 A New and Complete Law Dictionary). At no point in its *textual* analysis did *Heller* even ask whether exclusive or predominant military usefulness makes a handheld weapon not an "arm" within the meaning of the Second Amendment.

*Heller* did address the argument that "arms" meant *only* military weapons and not those kept for purposes of self-defense. Rebutting the dissent's contention that the Second Amendment only applies to persons enrolled in a militia, *Heller* explained that "[t]he term [arms] was applied, then as now, to weapons that were not specifically designed for military use and were not employed in a military capacity." 554 U.S. at

581. But the fact that "arms" included nonmilitary weapons does not mean that it *excluded* military weapons. Such an inference, as *Bevis* made, is both logically incorrect and wholly implausible given that one citation *Heller* used in that same paragraph defined arms with an explicit reference to "instruments of offence *generally* made use of in war." *See id.* at 581–82 (citing 1 John Trusler, The Distinction Between Words Esteemed Synonymous in the English Language 37 (3d ed. 1794), *available at* https://perma.cc/39EN-AHMP).

If there existed any doubt about *Heller*'s interpretation of "arms," ordinary tools of interpretation demonstrate that *Heller* was correct to conclude that all bearable weapons are arms. Founding-era dictionaries universally define "arms" as "weapons of offence," or "armour of defence" or something substantially similar. *To Arm*, 1 Samuel Johnson, Dictionary of the English Language (6th ed. 1785), *available at* https://perma.cc/6J2U-MUAG; *Arms*, Noah Webster, American Dictionary of the English Language (1828), https://perma.cc/89UG-Y9WB ("Weapons of offense, or armor for defense and protection of the body."); *Arms, Weapons*, 1 Trusler, *supra*, at 37 (defining arms as "instruments of offence *generally* made use of in war" (emphasis added)).

Not a single known dictionary from the Founding era defines "arms" exclusively in civilian terms. Indeed, the debate between Justices Scalia and Stevens in *Heller* was between dictionaries that used a military-specific definition and those that used a broader one. *See* 554 U.S. at 581–89; *id.* at 646–48 (Stevens, J., dissenting). Neither thought that "arms" had a civilian-specific meaning.

There is no reason to read "arms" in the Second Amendment narrower than every contemporary dictionary did. It is a black-letter law of interpretation that "[g]eneral words (like all words, general or not) are to be accorded their full and fair scope." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF JUDICIAL TEXTS 101 (2012). A court should not "arbitrarily limit[]" the breadth of a term, like "arms," unless there exist clear textual indicia demanding so. *Id.* This rule of interpretation has existed uncontroversially since the early days of the Republic. *See*, *e.g.*, 2 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 506, § 1057 (1833), *available at* https://perma.cc/B7LJ-AXDG ("The words being general, the sense must be general also, and embrace all subjects comprehended under them."). With nothing in the Second Amendment's "unqualified" text signifying a

limit on the definition of "arms," *Bruen*, 597 U.S. at 17 (cleaned up), it should be given its "full and fair scope," SCALIA & GARNER, *supra*, at 101. In other words, just as "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms," *Bruen*, 597 U.S. at 32, nothing in that text draws a distinction between any type of bearable arm, and it is not for the courts to read distinctions into the plain text that are not present there. *See Duncan v. Bonta*, 133 F.4th 852, 899–900 (9th Cir. 2025) (en banc) (Bumatay, J., dissenting).

*Bevis* took a different approach. Despite the evidence, *Bevis* read *Heller* to hold that "arms" was textually limited to exclude "weapons that are exclusively or predominantly useful in military service." 85 F.4th at 1194. *Bevis*'s primary evidence was the Supreme Court's dictum in *Heller* that "machineguns … can be dedicated exclusively to military use." *Id.* (citing *Heller*, 554 U.S. at 624). *Bevis* took from this proposition that the bearable arms covered by the plain text of the Second Amendment cannot include all weapons that are " 'transportable' or 'capable of being held,' " *id.* (citing *Heller*, 554 U.S. at 627), but the conclusion does not follow from the premise. Machineguns plainly are bearable arms under the

definitions relied on by *Heller*, and nothing in the Court's opinion suggests a contrary conclusion. But under *Heller*, plain-text coverage results only in *presumptive* protection, with the burden then shifting to the government to prove that any restrictions on conduct covered by the plain text are consistent with history. And it is as part of this *historical* analysis that *Heller* suggested machineguns could be banned if they are "highly unusual in society at large," 554 U.S. at 627—not because they somehow are not bearable arms to begin with.

Many pages after *Heller* defined the term "arms," it looked to prior Supreme Court cases to "ask whether any of our precedents forecloses the conclusions we have reached about the meaning of the Second Amendment." *Id.* at 619. In answering "no," the Court analyzed the discussion of short-barreled shotguns in *United States v. Miller*, 307 U.S. 174 (1939). In that 1939 case, the Supreme Court indicated that weapons which were "part of the ordinary military equipment" would be protected under the Second Amendment. *Miller*, 307 U.S. at 179. Dispelling the notion that this statement would necessarily include machineguns, *Heller* pointed to qualifying language in *Miller* which explained that only "military equipment" of a "kind in common use at the time" was

encompassed by that statement. *Heller*, 554 U.S. at 624–25 (quoting *Miller*, 307 U.S. at 179). The entire discussions in both *Heller* and *Miller* were about history, not text. Indeed, *Miller* was deriving these rules by tracing the right to keep and bear arms through "the history and legislation of Colonies and States," not dictionaries and grammar guides. 307 U.S. at 179.

If anything, *Heller* explained that the "*historical tradition* of prohibiting the carrying of 'dangerous and unusual weapons,'" permitted certain arms to be banned. 554 U.S. at 627 (emphasis added). But, the Court made clear, arms "in common use" are "protected" and therefore cannot be banned. *Id.* This was a rule developed from "*the historical understanding* of the scope of the right," *id.* at 625 (emphasis added), and it was consistent with another historical tradition: as the prefatory clause of the Second Amendment notes, the explicit purpose for which the right to keep and bear arms was included in the Constitution was to ensure the preservation of the militia, which "was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." *Id.* at 624.

To the extent there could be any dispute over *Heller*'s holding on what an "arm" was, *Bruen* confirms that semiautomatic rifles are "arms." The methodology of *Bruen* requires the Court to first look at the plain text of the Second Amendment to see if the relevant conduct—such as possessing an AR-15—falls within its "unqualified command." 597 U.S. at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 n.10 (1961)). If so, the Court determines whether the government can demonstrate that a modern restriction is consistent with the Nation's historical tradition of firearm regulation. *Id.* The test makes clear how courts must analyze these challenges: plain text first, then historical justifications. But *Bevis* transgresses *Bruen*'s command and imports an *atextual* historical test into the first part of the analysis. *Bevis*, 85 F.4th at 1189.

To be sure, before diving into the textual analysis of the Second Amendment, *Bruen* stipulated that the petitioners in that case were both law-abiding citizens and that "handguns are weapons in common use today for self-defense." 597 U.S. at 31–32 (cleaned up). But these statements were not part of *Bruen*'s textual inquiry. It was only after *Bruen* made clear that these issues were undisputed did it "turn to

whether the plain text of the Second Amendment protects [petitioners'] proposed course of conduct." *Id.* at 32. As explained by Professor Joel Alicea, *Bruen* first addressed the fact that petitioners were part of the people and their firearms were in common use because these were points not in dispute and thus could be summarily disposed of definitively, as a matter of both text and history, before the Court tackled the contested issues. Joel Alicea, Bruen *Was Right*, 174 U. PA. L. REV. __, 12–14 (forthcoming 2025). *Bruen* did not *sub silentio* import these considerations into the textual analysis and therefore contradict the test it had just laid out. *See Snope*, 605 U.S. (slip op. at 2) (Thomas, J., dissenting from the denial of certiorari) ("AR-15s are clearly 'Arms' under the Second Amendment's plain text.").

*Bevis* not only is inconsistent with binding Supreme Court precedent but also is internally inconsistent. After incorrectly declaring that "Supreme Court decisions and historical sources indicate that the Arms the Second Amendment" covers as a matter of plain text are "weapons in common use for self-defense," 85 F.4th at 1192, *Bevis* later purported to "assume (without deciding the question)" that the common-use test "is a step two inquiry, where the state bears the burden of proof,"

*id.* at 1198. These two statements are contradictory. The first sentence purports to establish that the "common-use" test is part of the textual inquiry at step one of *Bruen*, and the second sentence expresses agnosticism about which step the "common-use" test belongs.

Two more issues with *Bevis*'s textual analysis bear mentioning. First, *Bevis*'s statement that it was treating the Second Amendment's text like the text of other amendments is puzzling. *Id.* at 1194. In the First Amendment context, unprotected expressive activities, such as those which are obscene, defamatory, or fighting words, are still "speech." *United States v. Stevens*, 559 U.S. 460, 470 (2010). They are just "unprotected speech." *Id.* "[S]uch speech is unprotected because history and tradition tell us so, not because it falls outside the plain meaning of 'speech.'" *Bianchi v. Brown*, 111 F.4th 438, 522 n.65 (4th Cir. 2024) (en banc) (Richardson, J., dissenting). Second, *Bevis*'s reliance on the absurdity of private citizens owning handheld nuclear arms is inapposite. *See* 85 F.4th at 1182. Such weapons are obviously not in common use and would fall into the much-discussed category of "dangerous and unusual weapons," so the fact that they are not excluded at step one is

meaningless. *See Snope*, 605 U.S. (slip op. at 6) (Thomas, J., dissenting from the denial of certiorari).

*Bevis*'s misreading of the Second Amendment's text and binding Supreme Court precedent is anything but harmless. *Heller* and *Bruen* laid out a clear burden-shifting analysis in which the State bears the burden to identify a justifying historical tradition for its regulation, but *Bevis* collapsed the inquiry and shifted the burden. If historical restrictions are considered as part of the definition of "arms," then the plaintiff bears the burden of demonstrating them, not the defendant. *Contra Bruen*, 597 U.S. at 24–25.

### 2. No Historical Evidence or Analogue Supports Banning Commonly Used Rifles or Their Standard Magazines.

Although the *Bevis* court was "satisfied that these appeals can be resolved at the first step of the *Bruen* framework," it nonetheless examined whether PICA was "consistent with the history and tradition of firearms regulation" in our country. 85 F.4th at 1197–98. Given its previous conclusion that the text of the Second Amendment only covers civilian weapons, it is unsurprising that *Bevis* discovered an ostensible

historical tradition of banning militaristic arms. *Id.* at 1198. But that holding contradicts what the Supreme Court has said on the matter.

When it comes to firearm bans, the Supreme Court has held that two related traditions—one establishing an unprotected class of arms and one evincing a protected class—are relevant. The unprotected category is "dangerous and unusual arms," which *Heller* found "fairly supported" in Founding-era practice. 554 U.S. at 627; *see also* Mark W. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied* Heller *In Arms-Ban Cases—Again*, Harv. J. L. & Pub. Pol'y Per Curiam (Sept. 27, 2023), https://perma.cc/QNA2-NZ8T. The protected category is arms "in common use" for "lawful purposes"— which, by definition, cannot be dangerous and unusual. *Heller*, 554 U.S. at 625, 627; *see also Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring in the judgment) ("As the [Supreme Court] opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual."). This protected class of arms also dovetails with historical tradition—the tradition that members of the militia would bring common arms when pressed into service. *See Heller*, 554 U.S. at 627; *see also Miller*, 307 U.S. at 179–82.

While appearing to acknowledge *Heller*'s holding that commonly used firearms cannot be banned, *Bevis* nonetheless concluded that the common-use test does not turn on the prevalence of a weapon in civil society but whether it is "militaristic." 85 F.4th at 1199. *Bevis* was mistaken. *Heller* held that all weapons in "common use" for lawful purposes are protected under the Second Amendment: full stop. 554 U.S. at 624–25; *see also Snope*, 605 U.S. (slip op. at 1) (statement of Kavanaugh, J.). *Heller* never inquired into whether a weapon predominantly useful for military purposes because common use was sufficient for the handguns in that case to be protected. 554 U.S. at 624–25; *Snope*, 605 U.S. (slip op. at 1) (statement of Kavanaugh, J.); *see also Hanson*, 120 F.4th at 268 (Walker, J., dissenting) ("[T]he government cannot ban an arm in common use for lawful purposes. That alone decides this case."). And if anything, the historical evidence amassed by *Heller* and *Bruen* demonstrates that military usefulness is a factor *in favor* of protected status and not a sign that the arm is "dangerous and unusual." *Bevis*'s holding otherwise misinterpreted binding Supreme Court precedent that established these categories of arms and the history that went into that determination.

### a. Dangerous and Unusual Arms

*Heller* held that the American history of firearms regulation established that only arms which are "dangerous and unusual" fall outside of the Second Amendment's protection. 554 U.S. at 627. As the word "and" requires, the government must establish both criteria to succeed. *See Caetano*, 577 U.S. at 417 (Alito, J., concurring in the judgment).

This conjunctive nature of the dangerous and unusual test follows directly from *Heller*. In that case, the Supreme Court determined that handguns are in common use and then noted that protection for commonly used weapons was "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Heller*, 554 U.S. at 627 (citing several historical sources). In addition to using the word "and," the Court did not undertake a separate analysis of whether modern handguns were "dangerous" under the "historical tradition" described. *Id.* And, to be sure, the alleged "danger" of handguns was extensively briefed and highlighted by one dissenting opinion, which argued that they were "particularly dangerous." *See id.* at 711 (Breyer, J., dissenting). But despite the fact that the Court was told handguns

were used in an "extraordinary percentage of this country's well-publicized shootings, including the large majority of mass shootings," *Heller* still stopped the analysis upon concluding they were in common use. *Hanson*, 120 F.4th at 272 (Walker, J., dissenting) (quoting an amicus brief). *Bruen* also acknowledged the government's argument "that handguns" may have been "considered 'dangerous and unusual' during the colonial period" and concluded that, even if true, the point was now irrelevant because "they . . . are unquestionably in common use today." 597 U.S. at 47; *see also Caetano*, 577 U.S. at 418 (Alito, J., concurring in the judgment) ("[T]he relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes."). The direct contrast between dangerousness and common use demonstrates that alleged dangerousness standing alone cannot be a basis for restricting a common type of arm.

In any event, even if dangerousness were an independent basis for restricting arms, that would not materially change the test. That is because the question would be dangerous *compared to what*. Even *Bevis* acknowledged that requirement to prove an arm is "dangerous" requires more than the fact that it can inflict grievous wounds or death. 85 F.4th

at 1201 n.12 ("We realize that all guns are dangerous when used as intended: a gunshot wound may be fatal or life-threatening."). All weapons, including firearms, are "dangerous" in the abstract. They expel projectiles at extremely fast speeds with the purpose of causing harm to the target.

The definition that is more consistent with Supreme Court precedent is a comparative one. *Heller* and *Bruen* contrasted "dangerous and unusual weapons" with weapons in "common use." *Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 47–48. The natural inference one draws from *Heller* and *Bruen* juxtaposing these categories is that "dangerous" means "dangerous when compared to commonly used weapons" (as it must be when talking about weapons). *See Bevis*, 85 F.4th at 1201 n.12. An arm therefore is sufficiently "dangerous" to be restricted only if it is dangerous in some distinct way that a commonly used arm is not. *See id.* at 1215 n.10 (Brennan, J., dissenting); *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1481–82 (2009). Or, as the Ninth Circuit has formulated, whether it has "uniquely dangerous

propensities" that distinguish it from common arms. *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015), *abrogated on other grounds by Bruen*.

The "unusual" requirement of the Supreme Court's dangerous-and-unusual test has been more explicitly fleshed out. As *Bruen* confirmed, the question courts must ask is whether ownership of the arm is "highly unusual in society at large." 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627); *see also Heller*, 554 U.S. at 627 (assuming that "sophisticated arms that are highly unusual in society at large" would not be protected). The "society" the Court is referring to is our modern one, as the Supreme Court has rejected the idea that the inquiry is pegged to "the time of the Second Amendment's enactment." *Caetano*, 577 U.S. at 412 (per curiam) (quotation marks omitted). What matters is whether the arm is "highly unusual in society" today, not whether it was in 1791 or 1868. This accords with how other rights work. *See Heller*, 554 U.S. at 582 (citing *Reno v. ACLU,* 521 U.S. 844, 849 (1997), and *Kyllo v. United States,* 533 U.S. 27, 35–36 (2001)). The principle behind the right still applies to new technologies, whether it be the internet or thermal cameras.

In short, the Supreme Court has held that only arms which are uniquely dangerous and uncommon in society at large may be banned

consistent with the Second Amendment. And even if the Court had not held so, our Nation's history would independently compel that conclusion.

The origins of the "dangerous and unusual" arms exception make clear that it only covers arms "highly unusual in society" that are uniquely dangerous compared to commonly used weapons of the time. *Bruen*, 597 U.S. at 47. For instance, the ancient Statute of Northampton allowed for the carrying of daggers, which nearly every person carried for protection, but it disallowed the carrying of offensive weapons like the "launcegay," which was a "10- to 12-foot-long lightweight lance." *Id.* at 41. It is notable that the permitted daggers were both carried by "[a]lmost everyone" for self defense *and* "used by knights in warfare." *Id.* (quoting H. PETERSON, DAGGERS AND FIGHTING KNIVES OF THE WESTERN WORLD 12 (2001)). And on the topic of English firearm regulations, it is worth noting that while the Statute of Northampton was active, pistols were occasionally banned. *See Bruen*, 597 U.S. at 42 (citing 6 Hen. 8 c. 13, § 1 (1514); 25 Hen. 8 c. 17, § 1 (1533); 33 Hen. 8 c. 6 (1541); Prohibiting Use of Handguns and Crossbows (Jan. 1537), *in* 1 TUDOR ROYAL PROCLAMATIONS 249 (P. Hughes & J. Larkin eds., 1964)). But this was

not because they were too lethal but because they were inefficient and interfered with Englishmen's training with the longbow, a proper military arm at the time. *See id.*

American statutes and judicial opinions held the same line, and it had nothing to do with the "militaristic" qualities of the arm. Take the Bowie knife as an example. With its ability to be concealed and known popularity in fatal duels, the Bowie knife was, at least in the estimation of some, both more dangerous than the commonly owned weapons of the time (including firearms) and not commonly owned for lawful purposes. *See Bevis*, 85 F.4th at 1217 (Brennan, J., dissenting). The same was true for so-called "trap guns," which were firearms rigged to shoot when someone tripped a wire. *See An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns* § 10, *reprinted in* LAWS OF THE STATE OF NEW JERSEY, REVISED AND PUBLISHED UNDER THE AUTHORITY OF THE LEGISLATURE 19–20 (Wm. Patterson, ed. 1800), https://perma.cc/S86D-BR4Z (1771 law banning trap guns). Because they lacked an individual operator to determine whether the gun was firing at the proper target, they "fire[d] indiscriminately" and thus had an

unusually high chance of causing collateral damage to innocent persons. *Bevis*, 85 F.4th at 1218 (Brennan, J., dissenting).

Not a single English, federal, or state judicial opinion that we are aware of relied on the militaristic nature of a weapon to conclude that it was dangerous or unusual. Indeed, to the extent courts upheld restrictions on weapons such as Bowie knives, they did so because they concluded such weapons *were not* useful for military purposes. *See, e.g.*, *Aymette v. State*, 21 Tenn. (2 Hum.) 154, 159 (1840) (affirming conviction for the concealed carry of a Bowie knife and reasoning that the government has "a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defence"); *English v. State*, 35 Tex. 473, 477 (1871) ("The terms dirks, daggers, slungshots, sword-canes, brass-knuckles and bowie knives, belong to no military vocabulary."); *State v. Workman*, 14 S.E. 9, 11 (W.V. 1891) ("[I]n regard to the kind of arms referred to in the amendment, it must be held to refer to the weapons of warfare to be used by the militia, such as swords, guns, rifles, and muskets, … and not to pistols, bowie-knife, brass knuckles, billies, and such other weapons as are … only habitually

carried by bullies, blackguards, and desperadoes…."). To be sure, *Heller* and *Bruen* have criticized these decisions for being too *narrow* in their conception of the right to keep and bear arms, *see Heller*, 554 U.S. at 613; *Bruen*, 597 U.S. at 65, but they were too narrow for being too focused on the militia purpose of the right to keep and bear arms to the *detriment* of other purposes advanced by the right, such as individual self-defense. *Heller* and *Bruen*'s criticisms are thus incompatible with the notion that militaristic nature is a valid basis to ban arms. And such a result would have been nonsensical because it was precisely military weapons that men were expected to bring with them when the militia was called forth. *See Heller*, 554 U.S. at 624–25. Although the fact that a weapon is useful in military contexts is a mark in favor of protection, that does not mean that no weapon used by the military can fall into the "dangerous and unusual" camp. As explained in *Miller*, "ordinarily when called for service [militia] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." 307 U.S. at 179. *Heller* thus concluded that "sophisticated arms that are highly unusual in society at large" may be banned despite—not because of—any military utility they may have. 554 U.S. at 627.

### b. Arms in "Common Use"

As *Heller* and *Bruen* held, the necessary implication that only "dangerous and unusual" weapons can be banned means that arms in "common use" cannot be banned. *Bruen*, 597 U.S. at 21; *Heller*, 554 U.S. at 624–25, 627; *Miller*, 307 U.S. at 179. If an arm is "common" it, by definition, cannot be "highly unusual in society at large." *Bruen*, 597 U.S. at 47. Nothing about *Heller* and *Bruen*'s logic on this point changes if the "common" arm is a so-called "militaristic" one. Indeed, as *Heller* explained, "the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty." *Heller*, 554 U.S. at 627. Thus, *Heller* explicitly contemplated weapons that are used in militia combat being part of the *per se* protected class of "commonly used" arms.

The sources that *Heller* and *Bruen* relied upon confirm their holdings that arms in common use are *per se* protected, even if (or, more accurately, especially if) these commonly used arms are useful for militia or military service. Start with the early state militia laws and state-court decisions they rely on to provide evidence of the Second Amendment's

35

original meaning. *See Heller*, 554 U.S. at 592–93, 599. These sources of law expounded upon the same underlying, "pre-existing" right that the Second Amendment codified, *id.* at 603, and demonstrate that usefulness in a military setting *favored* Second Amendment protection. That is, common arms which bore "reasonable relationship to the preservation or efficiency of a well regulated militia" were the epitome of the arms entitled to protection. *Miller*, 307 U.S. at 178.

Indeed, in the 17th and 18th centuries able-bodied men were not only allowed to keep and bear military arms but were legally required to do so as part of their militia duties. As the Supreme Court explained in *Miller*, some colonies required possession of a " 'good fixed musket,' not under bastard musket bore, not less than three feet, nine inches, nor more than four feet three inches in length, a priming wire, scourer, and mould, a sword, rest, bandoleers, one pound of powder, twenty bullets, and two fathoms of match." *Id.* at 180 (quoting 1 Osgood, The American Colonies In The Seventeenth Century ch. XIII (1904)). The weapon described was a *military* musket. It had to be sufficient length to ensure accuracy at long range and could not have "under bastard musket bore," which meant that it had to have a sufficiently large musket ball for

military purposes. *See* Simon Marsh, *Of Muskets and Bastard Muskets: Use of Lighter Muskets in Civil War England*, 2 BATTALIA: THE JOURNAL OF THE BATTLEFIELDS TRUST 12–14 (2024) (describing the usage of "bastard" and "full bore" muskets). In the same period, New York also required able-bodied men to keep a "good Musket or Firelock, a sufficient Bayonet and Belt, a Pouch with a Box therein to contain not less than Twenty-four Cartridges." 1786 N.Y. Laws 220, An act to regulate the militia, ch. 25, https://perma.cc/U2U2-6AMT. As evidenced by the requirement to possess a bayonet, this was military gear. It was precisely these laws (and others), requiring possession of military-quality firearms that the Supreme Court in *Miller* relied upon to inform the scope of the Second Amendment. 307 U.S. at 179–82.

Post-ratification militia laws were substantially identical to these pre-ratification laws: Military-age men had a statutory duty to possess the arms commonly used in the military. The Militia Act of 1792, for example, made clear that the arms in common use were military-style arms. That statute required able-bodied men over the age of 18 to possess a "good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than

twenty-four cartridges, suited to the bore of his musket or firelock[.]" 1 Stat. 271, 271 (1792), https://perma.cc/9GHH-P4BY. These were the standard military armaments at the time. Given that the purpose of the Second Amendment was to preserve the militia by guaranteeing *individuals* the right to keep and bear arms, *Heller*, 554 U.S. at 594, these militia statutes are strong evidence of what kind of firearm the Constitution protects.

States began restricting the carrying—and occasionally possession—of certain weapons in the early 19th century. When defendants that were accused of violating these laws were brought into court, they often argued that their right to keep and bear was being infringed. And state courts held that even military arms in common use were protected, while especially dangerous and uncommon weapons were not. In that sense, these opinions perfectly match the militia laws described above.

One prime example is *Nunn v. State,* 1 Ga. 243, 251 (1846), where the Georgia Supreme Court confronted a ban on the open carry of pistols. While expounding upon both the Georgia and federal right to keep and bear arms, the Court explained that the "right to keep and bear arms"

included the bearing of pistols because it encompassed weapons "not *such* merely as are used by the *militia*." *Id.* (emphasis in original). *Nunn* took as a given that militia-style weapons were protected, and the question was whether pistols were as well regardless of their military utility at the time. *Nunn*, like *Heller*, concluded "yes."

Every single court of this era of which we are aware to confront the issue of which arms were eligible to be carried—much less owned in the privacy of one's own home—held that military use was a mark in favor of protection. For example, the Arkansas Supreme Court explained that "to prohibit the citizen from wearing or carrying a war arm" was an "unwarranted restriction upon his constitutional right to keep and bear arms" and thus reversed a conviction entered against a man who was carrying an "army size pistol." *Wilson v. State*, 33 Ark. 557, 559–60 (1878). The Louisiana Supreme Court, interpreting the Second Amendment, stated that "[t]he arms there spoken of are such as are borne by a people in war" and not "weapons . . . used most frequently by evil-disposed men." *State v. Smith*, 11 La. Ann. 633, 633 (1856). And as explained above, even 19th-century decisions that *Heller* and *Bruen* criticized as outliers for too narrowly interpreting the right to keep and

bear arms concluded that militia-style weapons were protected. In *Aymette*, for example, the Tennessee Supreme Court concluded that both the Tennessee Constitution and the "2d section of the amendments to the constitution of the United States" gave individuals the right to possess "the arms . . . such as are usually employed in civilized warfare, and that constitute the ordinary military equipment." 21 Tenn. (2 Hum.) at 157–58.

The history thus perfectly matches the holdings of *Heller* and *Bruen*, in addition to the Second Amendment's text. As the prefatory clause makes clear, the purpose of the Second Amendment was to guarantee that the militia would be able to protect "the security of a free State." U.S. CONST. amend. II; *Heller*, 554 U.S. at 599 ("[T]he Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia."). The way that militias had been nullified in England by the Stuart Kings was through seizing their arms. *Heller*, 554 U.S. at 592–93. And the attempt to seize American arms at Lexington and Concord was the spark that started the Revolutionary War. To ensure that the militia did not suffer the same fate as the English ones of old, the Second Amendment guaranteed an

*individual* right to keep and bear arms that would be useful in militia or military service, as well as for self-defense and other lawful purposes. *Id.* at 624–25. To say that firearms can be banned because they serve a military or militia purpose would be to "completely detach[] . . . the prefatory clause" from the rest of the Second Amendment. *Id.* at 627.

In short, the history leading up to the ratification of the Second Amendment and the case law immediately following that period demonstrate that arms that are in common use by civilians for lawful purposes cannot be banned because of any military utility they may have. The dichotomy between arms in common use and dangerous and unusual arms explains why an individual cannot own a M1 Abrams Tank, M388 Davy Crockett system nuclear bomb, or surface-to-air FIM-92 Stinger Missile System. Each of these weapons are "highly unusual in society at large." *Id.* at 627; *Snope*, 605 U.S. (slip op. at 6) (Thomas, J., dissenting from the denial of certiorari). And each of them is obviously more dangerous than any weapon in common use, such as a semiautomatic handgun or rifle. None, in short, are "the sorts of lawful weapons" that are "possessed at home" that at the Founding would have been brought "to militia duty." *Heller*, 554 U.S. at 627.

### c. *Bevis* Misunderstands These Categories.

*Bevis* misunderstood *Heller*, *Bruen*, and their holdings about the relationship between commonly used arms and dangerous and unusual arms. It correctly noted that "the idea of 'common use' cannot be severed from the historical scope of the common-law right that the Second Amendment was designed to protect against encroachment," but then made the mistaken conclusion that this logic would exclude "militaristic" weapons. *Bevis*, 85 F.4th at 1199. *Bevis* conceded that the Framers of the Second Amendment were "well aware by 1791 that the King of England had an impressive standing army, and that [militaristic] weapons existed." *Id.* It nonetheless failed to understand that the existence of impressive weapons wielded by professional militaries was a reason *in favor* of guaranteeing the men that would make up our militia the right to keep and bear arms useful for defense of their community. The Framers of the Second Amendment knew of the militaristic weapons wielded by their adversaries and wanted to ensure that the people of their new nation would go toe-to-toe with foreign and domestic threats if necessary. This is why the militia statutes discussed above required able-bodied men to possess military-quality weapons.

One apparent reason that *Bevis* ended up in the position of claiming that the most useful weapons are unprotected is that it artificially limited the "lawful purposes" for which one could own a firearm. *Heller*, 554 U.S. at 625. Although *Bevis* acknowledged that firearms are lawfully possessed for reasons other than individual self-defense, it discounted them as outside the core of the Second Amendment and only asked whether the relevant weapons were helpful to "the individual right to self-defense." 85 F.4th at 1192. But "individual" self-defense, while certainly an important part of the Second Amendment, is not the only virtue protected by it. *Heller*, 554 U.S. at 599. For that reason, the D.C. Circuit has rejected the argument that some arms "are outside the scope of the Second Amendment because they are most useful in military service." *Hanson*, 120 F.4th at 233.

The Second Amendment was not *just* about protecting oneself from criminals; it was also about protection of the community from foreign and domestic threats. *See* Nelson Lund, *The Past and Future of the Individual's Right to Arms*, 31 GA. L. REV. 1, 59 (1996); JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS 162–63 (1994); Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 TENN. L. REV.

461, 475 (1995). The militia, which the right to keep and bear arms was designed to protect, served as an alternative to a standing army. *Heller*, 554 U.S. at 598–99. The latter, although an effective way to protect a country, risked devolving into tyrannical rule if the leader of the army wished to suppress the country's liberties. *Id.* Given the common-defense purpose of the militia, the right to keep and bear arms necessarily had to protect the weapons used by the militia. Otherwise, it could not serve its goal of maintaining the militia as a bulwark against tyranny.

Ignoring this background, *Bevis* took far too narrow a view of what the Second Amendment was designed to accomplish. In concluding that self-defense was the *only* purpose to consider, it rejected the mainstream view of the state courts that the right to keep and bear arms included both individual and collective self-defense. *See Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822); *State v. Reid*, 1 Ala. 612, 616, 619 (1840); *Nunn*, 1 Ga. 243; *Simpson v. State*, 13 Tenn. (5 Yer.) 356 (1833); *State v. Chandler*, 5 La. Ann. 489 (1850); *State v. Duke*, 42 Tex. 455, 459 (1875). *Bevis*'s conclusion that a militaristic nature was a strike against protected status is thus no surprise, as it failed to properly assess the American legal tradition surrounding the Second Amendment's adopting.

*Bevis* also erred in stating that "the Supreme Court severed" the "connection" between the prefatory clause and the operative clause of the Second Amendment in *Heller*. 85 F.4th at 1188. It did not. The Court explained that "the Second Amendment's prefatory clause announces the purpose for which the right was codified" in the operative clause. *Heller*, 554 U.S. at 599. The two "fit[] perfectly," once one knows the history that the Founding generation knew, that is, the history of English monarchs seizing firearms from private individuals to squash the militia. *Id.* at 598. If anything, it was *Bevis* that severed the connection by reducing the Second Amendment to purely individual defense.

The historical analogues presented by *Bevis* demonstrate why the holding of that case is incorrect. For an analogue to support a modern regulation, restriction, or ban, it must both be relevantly similar in "why" and "how" it restricts firearm access. *Rahimi*, 602 U.S. at 700–01.

To support the proposed distinction between "militaristic" weapons and civilian weapons, *Bevis* provided seven examples of historical laws. None of them establish a single valid analogue, much less a "historical tradition." *Bruen*, 597 U.S. at 58. Indeed, none of the laws burden the

ability to keep and bear arms in like manner or for the similar reasons as PICA does. *See Rahimi*, 602 U.S. at 700.

*Bevis*'s first law is irrelevant. It is a Boston law from 1746 that prohibited the "discharging of any cannon, gun, or pistol within city limits" of Boston but permitted soldiers to fire them "on their training days." 85 F.4th at 1201 (quoting Chapter 11—An Act to Prevent the Firing of Guns Charged with Shot[t] or Ball in the Town of Boston, §§ 1–3, *in* 3 THE ACTS AND RESOLVES OF THE PROVINCE OF THE MASSACHUSETTS BAY 1742-1756, at 309 (1878)). But a restriction on the discharge of firearms within city limits that contains an exception for soldiers engaging in target practice (presumably at a military installation) says nothing about the kinds of arms protected by the right to keep and bear arms. Indeed, the need for the restriction assumes that the arms in question were owned by the general populace. Other "similar" laws, such as an apparently identical Cleveland ordinance, are inapposite for the same reason. Neither the "how" nor "why" of these ordinances resemble PICA. *Rahimi*, 602 U.S. at 700. They restrict the *firing* of all arms within city limits, not the carrying or possession of any type of firearm. And the apparent purpose for such statutes, either avoiding unnecessary noise or

the potential for injuries caused by stray musket balls in an urban environment, does not resemble Illinois's reasons for enacting PICA.

The next set of allegedly analogous laws are the mid-19th century regulations on the carrying of Bowie knives and other concealable weapons. *Bevis*, 85 F.4th at 1201 (citing Ch. 53—Carrying Weapons, §§ 1907–09, *in* A DIGEST OF THE STATUTES OF ARKANSAS 490 (W.W. Mansfield ed., 1884)). But these laws served the exact opposite purpose of PICA and imposed a completely different type of burden in any case.

These regulations on the carrying of Bowie knives and other concealable weapons excluded weapons that were in common use for self-defense purposes, *especially if they were militaristic*. Take the Arkansas statute that "outlawed the sale of all dirks, Bowie knives, cane-swords, metal knuckles, and pistols, except such as are used in the army or navy of the United States[.]" *See* Chapter 53—Carrying Weapons, §§ 1907–1909, *in* A DIGEST OF THE STATUTES OF ARKANSAS 490 (W.W. Mansfield ed., 1884), https://perma.cc/JHW3-LMLG. *Bevis* contended that this statute drew a distinction between military and nonmilitary arms, with the former falling on the unprotected side. 85 F.4th at 1201. But *Bevis*'s conclusion rests on the fact that it altered the statute's language when

discussing it. *Bevis* characterized the statute as banning sales of the listed items "except as *for use in* the army or navy of the United States." 85 F.4th at 1201 (emphasis added). But in fact, the statute's sales ban applied to those items "except *such as are used* in the army or navy." Chapter 53—Carrying Weapons, §§ 1907–1909, *in* A DIGEST OF THE STATUTES OF ARKANSAS 490 (W.W. Mansfield ed., 1884), https://perma.cc/JHW3-LMLG (emphasis added). That small change in wording dramatically changes the meaning, as the actual text of the Arkansas statute *protects* civilians' right to acquire arms that are used by the military, and *Bevis*'s alteration makes it appear to reserve such arms exclusively for the military. The proper reading of the statute thus perfectly aligns with the unanimous 19th century court decisions that held that commonly possessed military-style arms were protected.

If there were any doubts about the meaning of the Arkansas statute, they are dispelled by the Arkansas Supreme Court's subsequent interpretation of the right to keep and bear arms. It held that the law was constitutional because "*it in no wise restrains the use or sale of such arms as are useful in warfare.*" *Dabbs v. State*, 39 Ark. 353, 357 (1882) (emphasis added).

Although not cited by *Bevis* as an analogue, it is worth noting that Georgia had a materially identical early 19th-century statute that prohibited carrying "Bowie . . . knives . . . pistols, dirks, sword canes, spears" but explicitly excluded "horseman's pistols," 1837 Ga. Acts 90, § 1, https://perma.cc/3D9F-ZEFV, which were large pistols usually employed in military contexts. Perhaps because of its misinterpretation of Arkansas law, *Bevis* failed to grapple with the fact that the distinction it drew between "military" and "civilian" arms was affirmatively contradicted by the law in the 18th and 19th centuries.

In addition to these laws protecting the right to use common firearms that were useful in combat, it is worth noting that they almost exclusively concerned the *carrying* of arms, not the ownership of them. And "the vast majority" of states restricting carry prohibited only "*concealed carry*" of weapons like "bowie knives, Arkansas Toothpicks, dirks, daggers, or other 'deadly weapons.' " *Teter v. Lopez*, 76 F.4th 938, 952 (9th Cir. 2023), *vacated upon grant of rehearing en banc*, 93 F.4th 1150 (9th Cir. 2024). But a restriction on carrying an arm, typically simply a restriction on carrying a concealed arm, is not the same burden as a restriction on merely possessing the arm. Thus, neither the "why"

nor the "how" of these statutes is comparable to PICA. *Rahimi*, 602 U.S. at 700–01.

The final three laws *Bevis* relies on are all federal restrictions on machine guns, bombs, missiles, and grenades, dating to 1934, 1968 and 1986, respectively. 85 F.4th at 1202. Of course, these laws may be *consistent with* the historical tradition of restricting dangerous and unusual weapons, but they come too late to *establish* any separate, standalone tradition of restricting militaristic arms. The critical period for historical restrictions that shed light on the scope of the Second Amendment is the period immediately preceding and following its ratification in 1791. *See generally* Mark W. Smith, *"Not all History Is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second Amendment was Ratified in 1791, and not 1868*, HARV. J.L. & PUB. POL'Y PER CURIAM (Oct. 1, 2022), https://perma.cc/W796-8ABP. But even if one takes into account pre-bellum and post-Fourteenth Amendment laws, these 20th century statutes come far too late to inform the relevant historical tradition. *Bruen* itself struck down New York's Sullivan Law, which was passed in 1911. 597 U.S. at 11. And it made explicit that any laws passed after 1900

were useless to understand the Second Amendment. *Id.* at 66 n.28; *see also Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 482 (2020). *Bevis*'s reliance on these laws was contradictory to the instruction of *Bruen. See Bevis*, 85 F.4th at 1227 (Brennan, J., dissenting).

*Bevis*'s misunderstanding of the Second Amendment's purpose and erroneous analogies were not its only faults. For instance, *Bevis* asserts that the proper test to determine whether an arm is in "common use" cannot be whether it is a popular firearm in the civilian sector because firearm restrictions often influence which weapons are popular. *Id.* at 1190, 1198–99. But as Judge Brennan explained in his dissent, that conclusion does not follow. *Id.* at 1211 (Brennan, J., dissenting). The fact that a firearm is in "common use" means that it is *per se* protected, *Heller*, 554 U.S. at 627, but the reverse is not true. The fact that an arm is not in common use does not mean that it is *per se* unprotected. So if a new firearm comes on the market, the mere fact that it is not yet commonly owned is not dispositive to its unprotected status. *Bevis*, 85 F.4th at 1211 (Brennan, J., dissenting). If that arm is comparable to firearms in common use, it would be protected because it is not more "dangerous" than a commonly used arm. *Cf.* Eugene Volokh, *supra*, 1481–82 (2009).

## d. Rejecting *Bevis* Accords with Seventh Circuit Practice.

Although panels in the Seventh Circuit often "give considerable weight to . . . prior decisions," they are "not bound by" the decisions "absolutely." *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 915 (7th Cir. 2009). In accordance with those principles, panels sometimes require "a compelling reason" to overturn a precedent. *Santos v. United States*, 461 F.3d 886, 891 (7th Cir. 2006) (quoting *McClain v. Retail Food Emps. Joint Pension Plan*, 413 F.3d 582, 586 (7th Cir. 2005)). How compelling the reason must be depends on the nature of the issue in the case. The Supreme Court, for example, has explained that *stare decisis* "is at its weakest when we interpret the Constitution[,]" thus indicating that a less-compelling reason is required in such cases. *Agostini v. Felton*, 521 U.S. 203, 235 (1997).

The unique posture of this appeal means that *Bevis* is entitled to no deference and thus requires no compelling reason to be overturned. "The Supreme Court has held that legal and factual rulings made as part of a preliminary-injunction analysis are not binding upon panels when they later consider the matter on the merits." *Tully*, 78 F.4th at 380–81 (citing *Camenisch*, 451 U.S. at 395); *see also* 18B CHARLES ALAN WRIGHT

ET AL., FEDERAL PRACTICE AND PROCEDURE § 4478.5 (3d ed. 2019) (same).

When a post-final-judgment appeal arises after a preliminary-injunction appeal, Seventh Circuit panels have been willing to examine the legal issues anew, without conducting a stare-decisis or compelling-interest analysis. *See Tully*, 78 F.4th at 380.

*Tully* is an example of this phenomenon. In that case, which involved interpreting the 26th Amendment, the preliminary-injunction opinion held that "the right to vote does not include Plaintiffs' claimed right to receive absentee ballots." *Id.* at 379 (cleaned up). But once the appeal came back to this Court on final judgment, the panel reconsidered this prior holding. Instead of following the previous ruling, it held that the right to vote includes the right to "effectively" vote and then concluded that the laws in question did not hamper that right. *Id.* at 384, 387–88. The panel changed its rationale without conducting a compelling-reason analysis or complying with the procedures of Circuit Rule 40(e) for overruling Circuit precedent. All that mattered was that the law-of-the-case doctrine did not apply and that the panel determined that the previous ruling was legally incorrect. The same logic applies here.

To be sure, "a fully considered appellate ruling on an issue of law made on a preliminary injunction appeal" may constitute law of the case, *see Protect Our Parks, Inc. v. Buttigieg*, 97 F.4th 1077, 1091 (7th Cir. 2024) (quoting *Tully*, 78 F.4th at 381), but this is not one of the "rare[ ]" circumstances in which this exception to the normal rule applies. *See id.* To the contrary, *Bevis* is replete with tentative language about its conclusions. *See* 85 F.4th at 1187 ("we are not here today to rule definitively on the constitutionality of the Act"); *id.* at 1197 ("stressing" that Court's conclusion on likelihood of success with respect to plain text was "just a preliminary look at the subject"); *id.* at 1198 (at historical step, stating that "[h]ere, too, *at the preliminary injunction stage*, we conclude that plaintiffs have not shown the necessary likelihood of success on the merits") (emphasis added). And in a statement respecting the denial of certiorari, Justice Thomas emphasized the tentative nature of the decision. *See Harrel*, 144 S. Ct. at 2493 (statement of Thomas, J.) ("the Seventh Circuit stressed that its merits analysis was merely 'a preliminary look at the subject' ") (quoting *Bevis*, 85 F.4th at 1197).

Even if a compelling reason were necessary to overrule *Bevis*, many such reasons exist here. To begin with, *Bevis* made the kind of "manifest

error" that panels often find sufficiently compelling to override finality concerns. *Protect Our Parks*, 97 F.4th at 1092. *Bevis* objectively misread one of the analogue statutes it relied upon to craft its military-arms rule. Recall that *Bevis* read mid-19th-century Arkansas law to prohibit possession of certain weapons "except *as for use in* the army or navy," 85 F.4th at 1201 (emphasis added), when the actual text of the statute prohibited certain weapons except "such *as are used* in the army or navy[.]" Chapter 53—Carrying Weapons, §§ 1907–1909, *in* A DIGEST OF THE STATUTES OF ARKANSAS, *supra*, at 490 (emphasis added). This small change in wording, certainly an inadvertent error, changed the meaning of the statute from one that *protects* weapons used in the military to one that *reserves* certain weapons for military uses. If completely inverting the meaning of a key statute is not the kind of "manifest error," *Protect Our Parks*, 97 F.4th at 1092, or "compelling reason" to take a fresh look at the case, it is difficult so see what would be, *Santos*, 461 F.3d at 891.

Overruling *Bevis* would also not upset any reliance interests, which are at the core of stare decisis. The opinion was explicitly cast as a "preliminary assessment" that was subject to change. *Bevis*, 85 F.4th at 1202. And nothing in the past two years has made correcting *Bevis*'s

errors unduly burdensome. If anything, recent events demonstrate that *Bevis* is ripe for reconsideration. Although the Supreme Court declined to take up a Fourth Circuit case posing an identical issue, three Justices indicated that they would have granted certiorari, and Justice Kavanaugh penned a statement asserting that the Court would take up a semiautomatic rifle ban in the "next Term or two." *Snope*, 605 U.S. (slip op. at 3) (statement of Kavanaugh, J.). It is hard to imagine any reliance interests forming when the actions of four Justices have indicated that review of this issue is imminent.

One panel of this Court recently declined to overrule *Bevis* based on a perceived lack of special factors counseling overruling it. *See Viramontes v. Cook County*, No. 24-1437 (7th Cir. June 2, 2025) (listing non-exhaustive reasons to overrule a panel opinion). Such grounds are not required here because this appeal is part of the same case as *Bevis*, *Tully*, 78 F.4th at 380, and in any event, Appellants provide ample reasons for why *Bevis* is not only wrong but suitable to be overruled.

### B. This Case Is Straightforward Under *Heller* and *Bruen*.

If this Court overrules *Bevis*, then this case is easily resolved in Plaintiffs' favor. The first question under *Bruen* is whether the "plain

text" of the Second Amendment protects owning semiautomatic rifles that Illinois has inaccurately labeled "assault weapons." The plain text of the Second Amendment states that it protects the right "keep and bear [a]rms." U.S. CONST. amend. II. The question here, then, is what was understood by the term "arms" at the Founding. *Heller* offers a simple answer to that question: "The 18th-century meaning is no different from the meaning today." 554 U.S. at 581. "The 1773 edition of Samuel Johnson's dictionary defined 'arms' as '[w]eapons of offence, or armour of defence.'" *Id*. And "Timothy Cunningham's important 1771 legal dictionary defined 'arms' as 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Id*. The Court also cited without quoting Webster's 1828 American Dictionary of the English Language, which gave as its first definition of arms "[w]eapons of offense, or armor for defense and protection of the body," and said that "in law, *arms* are any thing which a man takes in his hand in anger, to strike or assault another." *Arms*, WEBSTER, *supra*. Firearms plainly are encompassed within "arms." Indeed, while the Court noted one anomalous Founding-era source that "limited 'arms' (as opposed to 'weapons') to 'instruments of offence *generally* made use of in

war,'" it emphasized that "even that source stated that all firearms constituted 'arms.'" *Heller*, 554 U.S. at 581 (citation omitted). In sum, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms[.]" *Id.* at 581–582. Because PICA bans certain types of firearms, the plain text is necessarily implicated, and the burden is on the State to justify its law by reference to history.

The same goes for the ban on magazines that hold over 10 rounds for rifles or 15 rounds for handguns. 720 ILCS 5/24-1.10. It is the magazine that a man "useth in wrath to cast" bullets, regardless of how many bullets it can "cast." *Heller*, 554 U.S. at 581. There is no other use for a magazine aside from holding and reloading rounds of ammunition. As the D.C. Circuit concluded, "[a] magazine is necessary to make meaningful an individual's right to . . . self-defense. To hold otherwise would allow the government to sidestep the Second Amendment with a regulation prohibiting possession at the component level, such as a firing pin." *Hanson*, 120 F.4th at 232 (cleaned up). If an 11-round rifle magazine is not an "arm," then there is no reason that a ten-round magazine would be either. Or a three-round rifle magazine for that matter. As the D.C. Circuit held, stripping a component part of a firearm of Second

Amendment protection would operate no differently than banning the firearm altogether. *Id.* Thus, to justify a ban on magazine capacity, the State must also resort to historic firearm regulations.

It cannot do so because, as already discussed in great detail, the historical work here has been done by *Heller*, and it yielded the rule that only "dangerous and unusual" arms can be banned, while arms "in common use" are protected. 554 U.S. at 627. After all, an arm that is in common use cannot be dangerous and unusual. The State bears the burden of showing the arms it bans are both "dangerous and unusual" (and hence, proving they are *not* in common use). And for the reasons described above it fails to do so. AR-15s, their standard magazines, and the materially identical weapons that Illinois bans are some of the most popular arms in the country. As the district court found, "the rifles and other weapons banned by PICA are in common use" and thus cannot be banned. SA102.

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment of the district court.

Dated: June 6, 2025

Respectfully submitted,

/s/ David H. Thompson

David G. Sigale
(Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
Tel: (630) 452-4547
Fax: (630) 596-4445
dsigale@sigalelaw.com

David H. Thompson
   *Counsel of Record*
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellees*

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION</u>

This brief complies with the type-volume limitation of Circuit Rule 32(c) because it contains 12,190 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook font.

Dated: June 6, 2025        <u>/s/ David H. Thompson</u>
                                        David H. Thompson

                                        *Attorney for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ David H. Thompson
David H. Thompson

*Attorney for Plaintiffs-Appellees*