Nos. 24-3060, 24-3061, 24-3062, 24-3063 (consol.)

## UNITED STATES COURT OF APPEALS

## FOR THE SEVENTH CIRCUIT

JEREMY W. LANGLEY, et al,

Plaintiffs-Appellees,

v.

BRENDAN KELLY, in his official
capacity as Director of the Illinois
State Police,

Defendant-Appellant

———————————————

On Appeal from the United States District Court for the
Southern District of Illinois
No. 23-CV-192-SPM

———————————————

## APPELLEES' RESPONSE BRIEF
———————————————

Thomas G. Maag
Peter J. Maag
*Counsel of Record*
Maag Law Firm, LLC
22 West Lorena Avenue
Wood River, IL 62095

(618)-216-5291

tmaag@maaglaw.com

Counsel for Langley *Appellees*

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Plaintiff-Appellants furnishes the following statement in compliance with Circuit Rule 26.1.

**(1) The full name of every party that the attorney represents in the case:**

Jeremy W. Langley

Timothy B Jones

Matthew Wilson

**(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:**

Maag Law Firm, LLC

**(3) If the party or amicus is a corporation:**

**i)      Identify all its parent corporations, if any:**

N/A

**ii)      List any publicly held company that owns 10% or more of the party's or amicus' stock:**

N/A

s/*Thomas G. Maag*

Counsel for Langley Appellees

# TABLE OF CONTENTS

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT** ................................. i

**TABLE OF AUTHORITIES** ........................................................... ii

**INTRODUCTION** ........................................................................ 1

**JURISDICTIONAL STATEMENT** ................................................ 2

**STATEMENT OF THE ISSUES** ................................................... 3

**STATEMENT OF THE CASE** ...................................................... 4

**SUMMARY OF THE ARGUMENT** .............................................. 7

**STANDARD OF REVIEW** ......................................................... 11

**ARGUMENT** ............................................................................ 11

**INTRODUCTION**

This case asks whether ordinary citizens, entrusted to vote, entrusted to serve on juries, relied on by this Country to pay its taxes and, if necessary, defend it in time of war, and who are convicted of no crime, suffer of no mental illness, are addicted to no narcotic or illegal drugs, and who are simply loyal ordinary Americans, can be deprived of access to America's most commonly owned civilian rifle, firearms like it, and their most common parts. "Some have referred to these [items] as "military style" assault weapons, among which it includes AR–15 rifles, AK–47 rifles, and .50 caliber sniper rifles." … "But those products are both widely legal and bought by many ordinary consumers. []The AR–15 is the most popular rifle in the country." *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U. S. ____ (2025) * 13, 14.

As noted by the Supreme Court previously, in *Staples v. United States,* 511 U. S. 600, 612 (1994) (AR–15s "traditionally have been widely accepted as lawful possessions").

This is, or course, not the first time this case has been on appeal in this Court. In a split decision, on an interlocutory appeal concerning a preliminary injunction, a panel of this Court, in *Bevis v. City of Naperville*, Illinois, 85 F. 4th 1175 (7th Circuit 2023), for a variety of reasons, concluded that the Plaintiffs in the consolidated cases were not likely to prevail. That decision has not aged well, and

the trial court has, in fact, ruled in Plaintiffs' favor.  Since this Court's prior decision,
the trial court that the facts and related law were, in fact, what this Court thought
was unlikely to be proven.  In the order of the Supreme Court denying Certiorari in
that case, Justice Thomas commented:

> "By contorting what little guidance our precedents provide, the Seventh
> Circuit concluded that the Second Amendment does not protect
> "militaristic" weapons. See 85 F.4th at 1199. It then tautologically defined
> "militaristic" weapons as those "that may be reserved for military use." Id.,
> at 1194. The Seventh Circuit's contrived "non-militaristic" limitation on
> the Arms protected by the Second Amendment seems unmoored from both
> text and history. … And, even on its own terms, the Seventh Circuit's
> application of its definition is nonsensical. See 85 F.4th at 1222
> (BRENNAN, J., dissenting) ("The AR-15 is a civilian, not military,
> weapon. No army in the world uses a service rifle that is only
> semiautomatic"). In my view, Illinois' ban is "highly suspect because it
> broadly prohibits common semiautomatic firearms used for lawful
> purposes." Friedman, 577 U.S. at 1042, 136 S.Ct. 447 (opinion of
> THOMAS, J.). It is difficult to see how the Seventh Circuit could have
> concluded that the most widely owned semiautomatic rifles are not
> "Arms" protected by the Second Amendment."

*Harrel v. Raoul,* 144 S. Ct. 2491 - Supreme Court 2024 (Statement of Justice

2

Thomas).

Given that millions of Americans own AR–15s and that a significant majority of the States allow possession of those rifles, petitioners have a strong argument that AR–15s are in "common use" by law-abiding citizens and therefore are protected by the Second Amendment under *Heller*. *Snope v. Brown*, 605 U. S. ____ (2025) *2 (Kavanaugh statement).

Justice Thomas thereafter makes his own dissent on denial of rehearing, and, in sum, agrees, if only more strongly.  Id, (Thomas Dissent).

`              Not long ago, the Supreme Court issued its opinion in *New York Rifle and Pistol Ass'n v. Bruen*, 142 S.Ct. 2111, 2128 (2022), and held that "the Second Amendment protects the possession and use of weapons that are in common use." The record in this case shows common use in the literal tens of millions.  Litigation positions aside, there appears to be no honest dispute that the number of AR15 class firearms possessed in the United States today is measured in the tens of millions. Their magazines, even more.

In January, 2023, the State of Illinois enacted, with great fanfare, Illinois Public Act 102-1116, which, by any other name, is simply a firearm and magazine ban for firearms largely of mid to late 20th Century design and/or manufacture, the prototypical example, the AR15 tyle, and its standard 30 round magazines. Penalties for violation range from minor misdemeanors to major felonies, depending on the particulars.  Of course, a felony conviction, per 18

3

U.S.C. § 922(g)(1), and several other statutes, bars possession of firearms and ammunition, meaning a violation of the statute has the potential to deprive Plaintiffs of all of their Second Amendment rights.

After signature by the Governor, and the statute being in effect for several days, Plaintiffs, all residents of Crawford County, Illinois, filed suit in the Circuit Court of Crawford County, Illinois, challenging the ban. Defendants promptly removed the case to the Southern District of Illinois, which in turn consolidated it with three other similar cases there pending. Ultimately a bench trial took place.

The firearms and ammunition feeding devices in question are largely not new inventions, with many of the exact items being designed literally five or six decades ago, and all of them based on century or older technology. In fact, many of the actual ammunition feeding devices banned are themselves, literally of 50 to 60 year old actual manufacture, with, for instance, 15 round 1940s manufacture M1 carbine magazines well outnumbering reproduction magazines on the commercial market.

In any events, there are literally tens of millions of such firearms, and likely hundreds of millions of such magazines owned in the United States today, making those firearms and ammunition feeding devices some of the most common consumer products owned in the United States today.

In this case, the trial court, in the Southern District of Illinois, Judge McGlynn, found that the ban violated the Second and 14th Amendments, along

4

with related findings, following full briefing and argument, an entered a final judgment to this effect.  In sum, it is the position of Plaintiffs that the challenged ban prohibits ordinary Americans from possessing not only common and popular bearable arms, but the most popular and common bearable arms, in common use at this time, and that there is no relevant historical precedent to allow same under the Second Amendments.  Thus, it is unconstitutional under the Second Amendment and Fourteenth Amendment to the U.S. Constitution to ban said firearms and ammunition feeding devices.

This Court should affirm Judge McGlynn's judgment in this case.

## JURISDICTIONAL STATEMENT

The "State Defendants" comprised of Defendants-Appellants Attorney General Kwame Raoul, State Police Director Brendan Kelly, and Governor JB has filed a jurisdiction statement which is complete and correct.  Plaintiff-Appellee does not dispute this Court's subject matter jurisdiction.

## STATEMENT OF THE ISSUE

1. The first issue presented is, whether the Second and Fourteenth Amendments to the U.S. Constitution, *prima facia* protects the right of ordinary Americans, like Plaintiffs, to keep and bear modern firearms and modern ammunition feeding devices, such as those banned by the Act,

and that no relevant historical analogue from near or prior to the time of

the Revolution provides any justification for any such restriction or ban.

## STATEMENT OF THE CASE

On January 10, 2023, Illinois enacted the Act, which imposes restrictions on

the sale, purchase, manufacture, delivery, importation, and possession of the

firearms and necessary components of said firearms most commonly used for self

defense, and other lawful purposes, in the United States today. 720 ILCS 5/24-1.9,

1.10. These firearms are not some new invention, or some radically advanced

departure from what came before them, or from what has been on the market for

over 100 years. In fact, at least some of the prohibited firearms literally predate the

Spanish-American War of 1898. The Mauser pistol carried by Winston Churchill,

as a war correspondent during the Boer War, is generally prohibited in Illinois

under PICA. These are not man portable air defense missiles, like the Stinger.

The PICA statute has no effect on machineguns, hand grenades or rocket

launchers, and thus, any comment on them would be seeking an advisory opinion.

The firearms and parts here are, quite simply, modern incarnations of the lineal

descendants of Brown Bess and Charleville muskets of the Revolutionary War era,

that, in colonists hands, instigated a rebellion, fought a revolution, and forged a

nation. A right to cherished by the founders of this nation, they enshrined it in

their founding document.

These early firearms evolved into the Henry/Winchester rifles and Spencer carbines of the late Civil War / Reconstruction / Old West Era were common, complete with magazine capacities prohibited under this legislation. These, in turn evolved into the Mauser / Springfield type bolt action rifles of the late 19th and early 20th Centuries, with their turnbolt actions and quick loading "clips" of which were used to maintain high rates of fire, to grisly effect in two world wars, and countless small wars, and which provided the basis of design for the bolt action rifles commonly used for deer hunting today, which this Act exempts, and by the early 1940s was certainly feeling their age.

The Act broadly includes semiautomatic rifles with the capacity to accept "detachable magazine[s]" including the ability to be converted to accept detachable magazines, and at least one of the following features: a pistol grip or thumbhole stock, a protruding grip held by the non-trigger hand, a flash suppressor, a flare launcher, a barrel shroud, or a folding telescoping, or detachable stock. 720 ILCS 5/24-1.9(a)(1)(A). Similar prohibitions apply to pistols. Most semi-automatic shotguns on the market are prohibited under the Act.

In their Brief, Defendants acknowledge that pistol grips are useful for stabilizing firearms for accurate shooting, as though accurate aimed fire is only useful in military situations, and self defense is sufficient with inaccurate fire.

Defendants also acknowledge that "flash suppressors" help reduce "night blindness", as through being able to see in a self defense situation and thus better defend oneself is somehow a purely military feature. Barrel shrouds are attacked, as lights and aiming devices can be attached to them, again, as through being able to see and hit the target is somehow a purely military feature, as though this was somehow undesirable.

Defendants, relying on their "expert" goes to great pains to justify how one firearm or item or another is not "needed" for self defense.

Much of the history of firearms use and the passage of the Act itself is contained in the brief of co-appellee, and thus will not be restated here, in an effort to avoid unnecessary briefing.

The exceptions are irrelevant as well, as there is no exception for ordinary Americans, no matter how well or highly trained they may be. Likewise, it is not as through Plaintiffs in this case can simply take a class, or a course, or even years of training, and lawfully possess these arms under the Act.  Likewise, that existing items are "grandfathered" with all the historical baggage that term carries, is likewise irrelevant.

## SUMMARY OF ARGUMENT

With absolute certainty, it can be said that *New York State Rifle &*
*Pistol Ass'n, Inc. v. Bruen,* 142 S. Ct. 2111 (2022) largely overruled every
Second Amendment case that this Court has considered in which it upheld a
statute or restriction, simply by virtue of the fact that this Court, like many
others, was applying a standard that *Bruen* rejects.

Applying *Bruen*, correctly, as stated by the Supreme Court itself,

"We reiterate that the standard for applying the Second Amendment is
as follows:

When the Second Amendment's plain text covers an individual's
conduct, the Constitution presumptively protects that conduct.

The government must then justify its regulation by demonstrating that
it is consistent with the Nation's historical tradition of firearm
regulation.

Only then may a court conclude that the individual's conduct falls
outside the Second Amendment's "unqualified command."

Just as the First Amendment protects modern forms of communications,
and the Fourth Amendment applies to modern forms of search, the
Second Amendment extends, prima facie, to all instruments that

constitute bearable arms, even those that were not in exist  ence at the time of the founding."

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court undertook its first-ever "in-depth examination" of the Second Amendment's meaning Id. at 635. After a lengthy historical discussion, the Court ultimately concluded that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation" (id. at 592); that "central to" this right is "the inherent right of self-defense"(id. at 628); that "the home" is "where the need for defense of self, family, and property is most acute" (id. at 628); and that, "above all other interests," the second amendment elevates "the right of law-abiding, responsible citizens to use arms in defense of hearth and home" (id. at 635). *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) reaffirmed that modern devices and arms not common at the time of the Revolution are indeed protected by the Second Amendment.  As literally noted by a unanimous Supreme Court, just hours before the filing of this brief:

> "Some have referred to these [items] as "military style" assault weapons, among which it includes AR–15 rifles, AK–47 rifles, and .50 caliber sniper rifles." … "But those products are both widely

legal and bought by many ordinary consumers. []The AR–15 is the most popular rifle in the country."

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U. S. \_\_\_\_ (2025) * 13, 14.

Applying *Bruen,* the plain text of the Second Amendment covers this issue. The firearms in question are bearable arms, there is not one firearm in the list of what is prohibited filed by the State than cannot be carried and used by one person. As a class and type, they are among the most common arms in either Illinois, or the United States.  They are, in fact, the lineal descendants of the Brown Bess and Charleville muskets common during the Revolution, perhaps of shorter length, longer range, made of aluminums and polymer instead of manut or steel,, and firing metallic cartridges, but fulfilling the exact same function as those firearms of the Revolutionary Era.

The firearms are not only "commonly" owned, they are, perhaps, the most commonly owned firearms in the United States today, bar none.  Their numbers are measured in the multiple tens of millions.  To say that the semi-automatic firearms based only on the AR15 model, made in numbers exceeding multiple tens of millions, is more ubiquitous than all of the small arms of this nation during World War II combined, is a fair statement.  The other banned models, while not as common, are, as a whole, tens of millions more of the same general type of firearms.  To say that the AR15, or the

class of firearms banned by the Act are anything other than common as dirt, is simply wishful thinking on the part of those who wish to ban them.

Likewise, the banned magazines, or for that matter any of the banned ammunition feeding devices are, as a group, even more common than the firearms. Defendants play word games, claiming that magazines are not "arms", rather they are "accouterments" but, under the Second Amendment, this is a distinction without a difference.  The Amendment certainly protect a Charleville Musket, but not the ramrod used to load the firearm.

Also, while actual use in self defense of these arms is not the as t do so would have the anomalous result of giving *criminals* say in what kinds of arms are used against them, or worse, a nation with literally no crime might have no right to bear arms.  In actuality, the, per *Heller*, the right extends to all arms held "for traditionally lawful purposes, such as self-defense within the home.".  The record is replete with these firearms being used for "traditionally lawful purposes."

The time has come for the Defendants to justify their regulation on historical grounds, not judicially weighted public policy grounds. Unfortunately, Defendant actually offers no comparable *relevant* historical analogy, likely because there is no relevant historical analogy to banning the most popular and commonly owned arms in the United States.  The fact that some jurisdictions have, in fairly recent history, purported to enact bans, in  not

a relevant analogue.

Instead, Defendants make reference to some vague to "unprecedented societal concerns" that emerged as a result of "dramatic technological changes" in weapons technology." But the arms in question are not the result of "dramatic technological changes", the semi automatic AR15 rifle has been on the market since 1964. Others, like a Mauser C96 pistol, are literal pre-1899 "antiques."

Folding stock M1 carbines have been made since 1944. Semi-automatic shotguns have been on the market since at least 1905. Semi automatic pistols with detachable magazines have been available commercially since the late 1800s. The same is true of ammunition feeding devices of over 10 or 15 rounds, which were known during the Civil War, some of these, like with the Spencer, detachable for replacement and quick reloading.

Nor do Defendants offer some kind of "nuanced" approach. Nuance is not a broad and outright ban.

## STANDARD OF REVIEW

The standard of review of this appeal is that of a hybrid. A district court's decision to enter a permanent injunction is reviewed "for abuse of discretion, and its legal conclusions *de novo*." *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 724 F.3d 854, 863 (7th Cir. 2013).

Similarly, in an appeal from a bench trial, this court reviews "a

district court's conclusions of law *de novo*," and "its findings of fact, as well as applications of law to those findings of fact, for clear error." *Trustees of Chi. Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Tr. Funds v. Royal Int'l Drywall & Decorating, Inc.,* 493 F.3d 782, 785 (7th Cir. 2007).

Accordingly, review of *facts*, are reviewed for clear error. The application of those facts to the law for abuse of discretion, and only matters of pure law are reviewed *de novo.*

## ARGUMENT

These Appellees have endeavored to avoid repeating that addressed in other briefs. To the extent not inconsistent with the arguments presented herein, these Plaintiffs these Plaintiffs adopt the arguments made by other Plaintiffs in their respective briefs.

As noted by the trial court, tike many of the major issues in dispute today, there are strong feelings among many, including many in the court system itself, as to what the law *ought* to be. The trial court's duck and rabbit illustration  (Doc. 258, page 3) does accurately demonstrate how sometimes people see what they want. The trial Court's discussion of the infamous E. St Louis race riot (Doc. 258, Page 80), if anything, was sanitized; with the authors of this brief being told, as children, by persons who actually witnessed it, how brutal it was, and how the rioters and arsonists came to visit the home of the

14

Great-Grandfather of the author of this brief, threatening to burn down his home, with his family inside, unless certain black families, hiding in the basement, were turned over.  (254, Page 3). A revolver in each hand, and an obsolete Swiss army rifle, with its 12 shot magazine, pointing out a window at the mob, the mob went elsewhere.  Id.  Others, obviously, were not so lucky.

Our Supreme Court has, since 2008, effectively overruled most of this Court's Second Amendment jurisprudence in due course, starting with *District of Columbia v. Heller*, 554 U.S. 570 (2008), which recognized a private right to keep and bear arms, unconnected to any militia service, for historically lawful activities, such as self defense in the home.

*Heller* also made crystal clear that one cannot ban one kind of protected arm as long as some other kind is available.  *District of Columbia v. Heller*, 554 US 570, 575 (Supreme Court 2008)("It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed.").

Shortly thereafter, the Supreme Court in *McDonald v. City of Chicago*, 561 U.S. 742 (2010) overruled this Court in finding that the Second Amendment is not incorporated against the states.

Despite the forgoing, this Court, in *Friedman v. City of Highland Park*, No. 784 f.3D 406 (7th Cir. 2015), upheld, over a very well reasoned dissent, a semi-automatic firearm ban, finding that, the features banned were not common at the

15

time of the Revolution, a point rebuked in *Caetano v. Massachusetts*, 577 U.S. ___

(2016), and by applying a very weak balancing test.  Thereafter, in this cases

prior appeal, this Court applied yet another test.

On this test, Justice Thomas commented:

> "By contorting what little guidance our precedents provide, the
>
> Seventh Circuit concluded that the Second Amendment does not
>
> protect "militaristic" weapons. See 85 F.4th at 1199. It then
>
> tautologically defined "militaristic" weapons as those "that may be
>
> reserved for military use." Id., at 1194. The Seventh Circuit's
>
> contrived "non-militaristic" limitation on the Arms protected by the
>
> Second Amendment seems unmoored from both text and history. …
>
> And, even on its own terms, the Seventh Circuit's application of its
>
> definition is nonsensical. See 85 F.4th at 1222 (BRENNAN, J.,
>
> dissenting) ("The AR-15 is a civilian, not military, weapon. No
>
> army in the world uses a service rifle that is only semiautomatic").
>
> In my view, Illinois' ban is "highly suspect because it broadly
>
> prohibits common semiautomatic firearms used for lawful

purposes." Friedman, 577 U.S. at 1042, 136 S.Ct. 447 (opinion of

THOMAS, J.). It is difficult to see how the Seventh Circuit could

have concluded that the most widely owned semiautomatic rifles are

not "Arms" protected by the Second Amendment."

*Harrel v. Raoul,* 144 S. Ct. 2491 - Supreme Court 2024 (Statement of

Justice Thomas).

　　In the last week before filing this brief, the Supreme Court,

*unanimously* stated:

> "Some have referred to these [items] as "military style" assault
>
> weapons, among which it includes AR–15 rifles, AK–47 rifles,
>
> and .50 caliber sniper rifles."  … "But those products are both
>
> widely legal and bought by many ordinary consumers. []The AR–
>
> 15 is the most popular rifle in the country."

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U. S.

____ (2025) * 13, 14.

　　As also noted by the Supreme Court previously, in  *Staples v.*

*United States,* 511 U. S. 600, 612 (1994) (AR–15s "traditionally have

been widely accepted as lawful possessions").

　　In *District of Columbia v. Heller*, the Supreme Court ruled that the

Second Amendment must be interpreted in light of constitutional text,

history, and tradition. 554 U. S. 570, 576–628 (2008). The Court further

17

determined that the Second Amendment protects those weapons that are in "common use" by law-abiding citizens. Id., at 624, 627. The Court's later Second Amendment decisions in *Bruen* and *Rahimi* did not disturb the historically based "common use" test with respect to the possession of particular weapons. See *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U. S. 1, 47 (2022); see also *United States v. Rahimi*, 602 U. S. 680, 735–736 (2024) (KAVANAUGH, J., concurring); post, at 1–6 (THOMAS, J.,).

What is crystal clear is that whatever the AR15 and its kind are, they are in "common use" (Doc. 258, Page 101, 102) and as such, the State of Illinois has no power to ban them any more than D.C. had the power to ban handguns in *Heller*, for the exact same reason.  Certain Judges of this Court may think the reasoning providing that arms in common use are protected is circular, and perhaps it is, but it is not up to this Court to overrule the Supreme Court on that point.  The record in this case is that AR15 and similar arms, are the most popular arms today, and are in common use.

Similarly, based on their commonality, they cannot be, by definition, "dangerous and unusual", as common things are not unusual.

Based on recent writings from the Supreme Court, it would appear that the Supreme Court has had enough.  "Additional petitions for

18

certiorari will likely be before this Court shortly and, in my view, this Court should and presumably will address the AR–15 issue soon, in the next Term or two."

*Snopes v Brown,* 605 U. S. ____ *3 (2025) (Comment of Justice Kavanaugh).

Today we have *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 142 S. Ct. 2111 (2022), and applying *Bruen*, correctly, as stated by the Supreme Court itself:

> "We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.
>
> The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

## Presumptively Protected Conduct

When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The Second Amendment's plain text presumptively protects the rights to "keep" and

"bear" "arms".

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court undertook its first-ever "in-depth examination" of the Second Amendment's meaning Id. at 635. After a lengthy historical discussion, the Court ultimately concluded that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation" (id. at 592); that "central to" this right is "the inherent right of self-defense"(id. at 628); that "the home" is "where the need for defense of self, family, and property is most acute" (id. at 628); and that, "above all other interests," the second amendment elevates "the right of law-abiding, responsible citizens to use arms in defense of hearth and home" (id. at 635).

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) reaffirmed that modern devices and arms not common at the time of the Revolution are indeed protected by the Second Amendment.

At the risk of stating the obvious, the firearms and ammunition feeding devices at issue are weapons and weapon components, and common ones at that, with several tens of millions of just AR15 model rifles owned, and perhaps 100 million such magazines owned today.  As such, it is not appropriate to ban them.

Applying *Bruen*, the plain text of the Second Amendment covers this issue. The firearms in question are bearable arms, there is not one firearm in the list

of what is prohibited filed by the State than cannot be carried and used by one person in self defense. They are, in fact, the lineal descendants of the Brown Bess and Charleville muskets common during the Revolution, perhaps of shorter length, longer range, made of different materials, and firing metallic cartridges, but fulfilling the exact same function as those firearms of the Revolutionary Era.

These firearms are not only "commonly" owned, they are, perhaps, the most commonly owned firearms in the United States today, bar none. Their numbers are measured in the multiple tens of millions. The other banned models, while not as common, are, as a whole, tens of millions more of the same general type of firearms. To say that the AR15, or the class of firearms banned by the Act are anything other than common as dirt, is simply wishful thinking on the part of those who wish to ban them. As they are in such common use, they are not open to being banned.

Likewise, the banned magazines, or for that matter any of the banned ammunition feeding devices are, as a group, even more common than the firearms. Defendants play word games, claiming that magazines are not "arms", rather they are "accouterments" but, under the Second Amendment, this is a distinction without a difference. The argument is the equivalent of stating that the Second Amendment might protect the right to a knife, but the stone to sharpen that knife into a useful tool with is not protected, such that

only dull and ineffective "knives" as allowed.

**Common Use For Lawful Purposes**

Defendants miss the entire target range, not just the bullseye, when they

claim that Plaintiffs presented to evidence of actual use in self defense of these

arms.  Actual use in self defense of these arms is not the test.  If it were, then a nation with literally no violent crime might have no right to bear arms, which is somewhat circuitous, as perhaps it is the presence of the arms that deters the violent crime..  In actuality, per *Heller*, the right extends to all arms held not just used for actual self defense, but "for traditionally lawful purposes, such as self-defense within the home.".  The record is replete with these firearms being used for "traditionally lawful purposes."

**Historical Analogies**

The time has come for the Defendants to justify their regulation on historical grounds, not judicially weighed public policy grounds.  Unfortunately, Defendant actually offers no comparable historical analogy, likely because there is none.  Twentieth century analogs, like a purported ban on the Thompson submachineguns in the early 20th Century simply do not wash, Overlooking the fact that "machineguns"  were not, in fact, "banned" in the early Twentieth Century, taxed, perhaps, but not banned, and, in fact, many remain lawfully owned in the United States today, the relevant time period for an analogy is not the Twentieth Century.

The arms in question are not the result of "dramatic technological changes", the semi automatic AR15 rifle has been on the market since 1964. (Doc. 258, Page 94).  Folding stock M1 carbines have been made since 1944. Semi-automatic shotguns have been on the market since at least 1905.  Semi

automatic pistols with detachable magazines have been available commercially for well over 100 years.  The same is true of ammunition feeding devices of over 10 or 15 rounds.  Nor do Defendants offer some kind of "nuanced" approach. They bring a sledge hammer and ban away with it.  A "nuanced" approach might be to impose a background check or to require registration of the actual most dangerous firearms. Nuance is not a broad and outright ban.  That *might* justify some sort of registration requirement, assuming the registration requirement did not violate other constitutional rights (See *Haynes v. United States,* 390 U.S. 85 (1968), or if it  might actually accomplish some legitimate law enforcement function.  But this ban goes well beyond mere registration, what it required to be registered is essentially what is grandfathered, with no new purchases allowed.  In other words it is a  means to enforce the otherwise total ban.

## CONCLUSION

For the foregoing reasons, as well as those reasons articulated by the    other challengers to the ban, that are not inconsistent with the arguments made of record, this Court should affirm the trial court's findings that the Protect Illinois Communities Act, is unconstitutional, as described by the trial Court, and remand for enforcement of the appliable stay and other related matters.

6-6-25                                    Respectfully Submitted,

                                          Thomas G. Maag
                                          Peter J. Maag
                                          *Counsel of Record*
                                          Maag Law Firm, LLC
                                          22 West Lorena Avenue
                                          Wood River, IL  62095

                                          (618)-216-5291

                                          tmaag@maaglaw.com

                        Counsel for Langley *Appellees*

## CERTIFICATE OF COMPLIANCE

## WITH TYPE-VOLUME LIMITATION

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because, according to the "word count" function of Microsoft Word 2306, the Brief contains 5,644 words, excluding the parts of the brief exempted from the word count by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because the Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

June 6, 2025

s/Thomas G. Maag

Thomas G. Maag

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)**

Pursuant to Circuit Rule 30(d), counsel certifies that all materials

required by Circuit Rule 30(a) and (b) are included in the appendix.

June 6, 2025

s/Thomas G. Maag

Thomas G. Maag