# United States Court of Appeals

### *for the*

# Seventh Circuit

Case Nos. 24-3060,
24-3061, 24-3062,
24-3063
(consolidated)

CALEB BARNETT, *et al.*,

*Plaintiffs-Appellees,*

– v. –

KWAME RAOUL and BRENDAN F. KELLY,

*Defendants-Appellants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS,
NO. 3:23-CV-00209-SPM
THE HONORABLE STEPHEN P. MCGLYNN, JUDGE PRESIDING

## BRIEF OF NATIONAL ASSOCIATION FOR GUN RIGHTS AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

BARRY K. ARRINGTON
 *Counsel of Record*
ARRINGTON LAW FIRM
4195 South Wadsworth Boulevard
Wheat Ridge, Colorado 80033
(303) 205-7870

*Counsel for Amicus Curiae
National Association for Gun Rights*

Save As          Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-3060 (consol.)

Short Caption: Barnett et al v. Raoul

 To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

 The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 National Association for Gun Rights

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Arrington Law Firm

(3)   If the party, amicus or intervenor is a corporation:

 i)   Identify all its parent corporations, if any; and
 None

 ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
 None

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
 N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
 N/A

Attorney's Signature: /s/ Barry K. Arrington          Date: June 13, 2025

Attorney's Printed Name:  Barry K. Arrington

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☑   No ☐

Address:  4195 Wadsworth Boulevard, Wheat Ridge, CO 80033

Phone Number:  (303) 205-7870          Fax Number:  n/a

E-Mail Address: barry@arringtonpc.com

rev. 12/19 AK

## TABLE OF CONTENTS

**Page**

RULE 26.1 DISCLOSURE ................................................................... i

TABLE OF AUTHORITIES ............................................................... iii

INTEREST OF AMICUS.................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................... 2

ARGUMENT ..................................................................................... 4

    I.    The Court Should Reject the Government's Cramped
        Conception of the Right to Self-Defense ................................... 4

    II.   A Proper Understanding of the Second Amendment Reveals
        that AR-15s Have Greater Protection Than Handguns ...................... 11

        A.    The Founders Were More Concerned with Tyranny
               Than with Defense Against Criminals ...................... 11

        B.    Arms Useful for Resistance Are at the Top of the
               Hierarchy of Protected Weapons ............................... 13

    III.  Smith & Wesson Brands is Dispositive on AR-15s and AK-47s........... 17

CONCLUSION.............................................................................. 19

# TABLE OF AUTHORITIES

<strong>Page(s)</strong>

**Cases:**

*Alden v. Maine,*
    527 U.S. 706 (1999).................................................................................. 4

*Aymette v. State,*
    21 Tenn. 154 (1840) ........................................................................... 5, 7

*Bevis v. City of Naperville, Illinois,*
    85 F.4th 1175 (7th Cir. 2023) ............................................................ 19

*Bianchi v. Brown,*
    111 F.4th 438 (4th Cir. 2024) ............................................................. 5

*D.C. v. Heller,*
    554 U.S. 570 (2008)................................................................... *passim*

*Garland v. Cargill,*
    602 U.S. 406 (2024)............................................................................ 18

*Silveira v. Lockyer,*
    312 F.3d 1052 (9th Cir. 2002) ........................................................... 15

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos,*
    --- S.Ct. ---, 2025 WL 1583281 (U.S. June 5, 2025) .................... 3, 17, 18

*Stenberg v. Carhart,*
    530 U.S. 914 (2000)............................................................................ 14

*United States v. Rahimi,*
    602 U.S. 680 (2024)................................................................... *passim*


**Statutes & Other Authorities:**

U.S. Const., Amend. II...............................................................*passim*

1 Blackstone 136 (1765)........................................................................ 4

1 St. George Tucker, *Blackstone's Commentaries: With Notes of Reference,*
    *to the Constitution and Laws, of the Federal Government of the United States;*
    *and of the Commonwealth of Virginia,* pt. 1 (1803) ............................. 13

2 J. de Lolme, *The Rise and Progress of the English Constitution* 886–887 (1784)
    (A. Stephens ed. 1838)................................................................. *passim*

Alexander Hamilton, *The Federalist No. 29*.............................................. 12

Antonin Scalia, *On Faith: Lessons from an American Believer,*
  Christopher J. Scalia and Edward Whelan, eds.
  (Penguin Random House 2019), Kindle ................................................. 16

C.D. Michel and Konstadinos Moros, *Restrictions "Our Ancestors
  Would Never Have Accepted": The Historical Case Against Assault
  Weapon Bans*, 24 Wyo. L. Rev. 89 (2024) ....................................... 11, 14

Cong. Globe, 40th Cong., 2d Sess., 1967 (1868) (statement of Rep. Stevens) ............. 9

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine:
  Locational Limits on the Right to Bear Arms,*
  13 Charleston L. Rev. 205 (2018) ................................................. 8

G. Sharp, Tracts, *Concerning the Ancient and Only True Legal Means
  of National Defence, by a Free Militia* (3d ed. 1782) ........................... 4, 6

James Madison, *The Federalist No. 46* ............................................. 12

Joyce Lee Malcolm, *The Right of the People to Keep and Bear Arms:
  The Common Law Tradition*, 10 Hastings Const. L. Q. 285 (1983) ................... 6

Noah Webster, *An Examination into the Leading Principles of the Federal
  Constitution Proposed by the Late Convention Held at Philadelphia* (1787)
  reprinted in *Pamphlets on the Constitution of the United States* 56
  (Paul Ford ed. 1888) ............................................................ 12-13

Robert J. Cottrol and Brannon P. Denning,
  *To Trust the People with Arms, The Supreme Court
  and the Second Amendment* (University of Kansas Press 2023) ....................... 17

T. Gross, How the AR-15 Became the Bestselling Rifle in the U.S., NPR
  (Apr. 20, 2023) ................................................................. 18

Tench Coxe in '*Remarks on the First Part of the Amendments
  to the Federal Constitution*' under the Pseudonym 'A Pennsylvanian'
  in the Philadelphia Federal Gazette, June 18, 1789,) ............................ 12

*Tench Coxe*, James Madison Rsch. Libr. & Info. Ctr. ............................... 12

W. Blizard, *Desultory Reflections on Police* (1785) .............................. 4, 8

## INTEREST OF AMICUS

The right to keep and bear arms is a fundamental right that existed prior to the Constitution. The right is not in any sense granted by the Constitution. Nor does it depend on the Constitution for its existence. Rather, the Second Amendment declares that the pre-existing "right of the people to keep and bear Arms shall not be infringed." The National Association for Gun Rights ("NAGR")[1] is a nonprofit membership and donor-supported organization with hundreds of thousands of members nationwide. The sole reason for NAGR's existence is to defend American citizens' right to keep and bear arms. In pursuit of this goal, NAGR has filed numerous lawsuits seeking to uphold Americans' Second Amendment rights. NAGR has a strong interest in this case because the guidance the Court will provide in its resolution of this matter will have a major impact on NAGR's ongoing litigation efforts in support of Americans' fundamental right to keep and bear arms.

---

[1] No party's counsel authored this brief in whole or in part and other than NAGR no person contributed money to fund its preparation or submission. All parties consent to the submission of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In *D.C. v. Heller*, 554 U.S. 570 (2008), the Court held that the Second Amendment protects an individual right to defend against both public and private violence. The right to defend against "public violence" includes the right to resist government tyranny and the predations of armed mobs. The right to defend against private violence includes the right to self-defense against criminal activity.

In this case, the Government has demonstrated a fundamental misunderstanding of *Heller*. Despite *Heller's* clear statement to the contrary, the Government seems to believe that the Second Amendment codifies only the right to defend against private violence (i.e., private criminal conduct). The Court should reject the Government's cramped conception of the right to keep and bear arms. As the authorities cited in *Heller* explain in great detail, the right to defend against public violence (i.e., tyranny and mobs) was always understood to be part of (indeed, the most important part of) the right that was codified in the Second Amendment. As recently as last term, in *United States v. Rahimi*, 602 U.S. 680 (2024), the Court once again pointed out that the Second Amendment protects both aspects of the right.

The Government's conception of the right to keep and bear arms codified in the Second Amendment is not merely wrong. It stands the original understanding of the right on its head. When the Second Amendment was ratified, the Founders had recently fought a war to throw off a tyrannical government. Yes, the right to keep and bear arms includes the right to bear arms for self-preservation. But can there be any doubt that protecting the right of resistance against tyranny was foremost in the

Founders' minds when they ratified the Second Amendment? Numerous Founding-era sources confirm this commonsense conclusion.

This has important implications for the weapons at issue in this case. As *Heller* explained, the right to keep and bear arms was originally understood to protect the right to keep and bear the type of arms commonly possessed by members of the militia to be used in their service in the militia. When militia members showed up for service, they brought commonly possessed long guns. Indeed, the militia laws generally required them to bring long guns as opposed to handguns. The AR-15s banned by the Government are the modern analogue to the muskets brought by the Minutemen for service in the militia in the Founding era. Thus, if anything, AR-15s are entitled to more, not less, protection than handguns.

The idea that defense against tyranny is no longer a consideration when deciding the types of weapons protected by the Second Amendment is not only wrong as a matter of law, but it is also misguided a matter of history. As the violence visited upon African Americans and their supporters during the civil rights movement of 1950s and 60s demonstrates, the need to defend against public violence is, sadly, not a relic of the distant past.

Finally, in *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, --- S.Ct. ---, 2025 WL 1583281 (U.S. June 5, 2025), the Court held that AR-15 rifles and AK-47 rifles are in common use by ordinary citizens. This is absolutely dispositive on whether these firearms are protected by the Second Amendment. They are.

**ARGUMENT**

## I.   The Court Should Reject the Government's Cramped Conception of the Right to Self-Defense

The Government argues that AR-15s are not suitable for personal protection against criminals and are therefore not protected by the Second Amendment. Specifically, the Government states:

> [T]he items regulated by the Act far exceed what is needed for personal protection outside of a warzone. Especially when compared to handguns, the "quintessential" civilian self-defense weapon, *Heller*, 556 U.S. at 629, the regulated items are poor choices for self-defense.

Op.Br. 28.

This cramped conception of the scope of the right to self-defense is inconsistent with the right to keep and bear arms protected by the Second Amendment. The right to self-defense codified in that amendment is not restricted to personal defense against criminal attacks. In *D.C. v. Heller*, 554 U.S. 570 (2008), the Court summarized the right as follows:

> By the time of the founding, the right to have arms had become fundamental for English subjects. See Malcolm 122–134. Blackstone, whose works, we have said, "constituted the preeminent authority on English law for the founding generation," *Alden v. Maine* . . . cited the arms provision of the Bill of Rights as one of the fundamental rights of Englishmen. See 1 Blackstone 136, 139–140 (1765) . . . It was, he said, "the natural right of *resistance and self-preservation*," *id.*, at 139, and "the right of having and using arms for *self-preservation and defence*," *id.*, at 140; see also 3 *id.*, at 2–4 (1768). Other contemporary authorities concurred. See G. Sharp, Tracts, *Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia* 17–18, 27 (3d ed. 1782); 2 J. de Lolme, *The Rise and Progress of the English Constitution* 886–887 (1784) (A. Stephens ed. 1838); W. Blizard, *Desultory Reflections on Police* 59–60 (1785). Thus, the right secured in 1689 as a result of the Stuarts' abuses was by the time of the founding understood to be an individual right protecting against *both public and private violence*.

*Id.*, 554 U.S. at 593–94 (emphasis added).

One immediately notices that the common law right to self-defense was always described using doublets that encompassed two different components of the right, i.e., "resistance and self-preservation" or "self-preservation and defence."[2] In the passages cited by *Heller*, the right of "self-preservation" meant the right to defend against private violence, i.e. self-defense against criminal attack. And the right to "resistance" and "defence" meant the right to defend against public violence (i.e. governmental tyranny and mob violence). In this context, "resistance" and "defence" mean the same thing—defense against public violence. See 2 J. de Lolme, *The Rise and Progress of the English Constitution* 885 (1784) (A. Stephens ed. 1838).

Importantly for the resolution of this case, as *Heller* noted, the right to defend against public violence has always been part of the right. In an early case, the Tennessee Supreme Court explained that English citizens had the right to bear arms because "being armed, they may as a body rise up to defend their just rights, and compel their rulers to respect the laws." *Aymette v. State*, 21 Tenn. 154, 157 (1840). But in its effort to cabin *Heller* as much as possible, the Government has elided completely this aspect of the right. Yes, the right to keep and bear arms encompasses the right to defend against a criminal attack (private violence). But it also encompasses the right to defend against government tyranny, as at Lexington and Concord, and the unchecked predations of lawless mobs (public violence).

---

[2] Blackstone explained that the right of having arms declared by the English Bill of Rights and derived from the natural right of resistance and self-preservation was an "auxiliary right" that served principally as a barrier to protect and maintain inviolate the three great and primary rights of personal security, personal liberty, and private property. *Bianchi v. Brown*, 111 F.4th 438, 486–87 (4th Cir. 2024) (Richardson, J., dissenting) (cleaned up).

That the Second Amendment right encompasses the right to defend against government tyranny and mob violence is made crystal clear from the other three commentators which were cited in this passage from *Heller*. The first citation is to a tract written by Granville Sharp in 1782, in which he stated:

> If it be alleged that there can be no occasion, in these modern times, to arm and train the inhabitants of England, because there is an ample military force, or standing army, to preserve the peace; yet let it be remembered, that the greater and more powerful the standing army is, *so much more necessary is it that there should be a proper balance to that power, to prevent any ill effects from it . . . No Englishman, therefore, can be truly loyal, who opposes these essential principles of the English law, whereby the people are required, to have* "arms of defence and peace," *for mutual as well as private defence . . .*

G. Sharp, Tracts, *Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia* 26-27 (3d ed. 1782) (emphasis added). The thrust of this passage is that Englishmen have the right to arm themselves against potential depredations of a national army acting outside of its constitutional authority.

The second citation was to 2 J. de Lolme, *The Rise and Progress of the English Constitution* (1784) (A. Stephens ed. 1838).[3] The cited passage is to a chapter entitled "Right of Resistance," in which Lolme wrote:

> But all those privileges of the people, considered in themselves, are but feeble defences against the real strength of those who govern. All those provisions, all those reciprocal rights, necessarily suppose that things remain in their legal and settled course: what would then be the resource of the people, if ever the prince, suddenly freeing himself from all restraint, and throwing himself, as it were, out of the constitution, should no longer respect either the person or the property of the subject, and either should make no account of his conventions with the parliament, or attempt to force it implicitly to submit to his will?—**It would be resistance**. . . . [T]he question has been decided in favour of this

---

[3] Lolme was an eighteen-century author much read at the time of the American Revolution. Joyce Lee Malcolm, *The Right of the People to Keep and Bear Arms: The Common Law Tradition*, 10 Hastings Const. L. Q. 285 (1983).

doctrine by the laws of England, and that *resistance is looked upon by them as the ultimate and lawful resource against the violences of power*. It was resistance that gave birth to the Great Charter, that lasting foundation of English liberty, and the excesses of a power established by force were also restrained by force. It has been by the same means that, at different times, the people have procured the confirmation of that same charter. . . .

And, lest those principles, to which the [Glorious] Revolution thus gave a sanction, should, in process of time, become mere *arcana* [i.e., secrets] of state, exclusively appropriated, and only known to a certain class of subjects; the same act, we have just mentioned, expressly ensured to individuals the right of publicly preferring complaints against the abuses of government, and, moreover, of being provided with arms for their own defence. Judge Blackstone expresses himself in the following terms, in his Commentaries on the Laws of England.

> "To vindicate these rights, when actually violated or attacked, the subjects of England are entitled, in the first place, to the regular administration and free course of justice in the courts of law; next, to the right of petitioning the king and parliament for redress of grievances; and, lastly, to the right of having and using arms for self-preservation and defence." . . .

The power of the people is not when they strike, but when they keep in awe: it is when they can overthrow every thing, that they never need to move; and Manlius included all in four words, when he said to the people  of Rome,— *Ostendite bellum, pacem habebitis* ["Show war, and you will have peace"].

*Id*. at 885-87; 891. It was understood at the time the Second Amendment was ratified that the right to self-defense encompasses the right of citizens to hold sufficient arms to keep the government "in awe" of their power, lest that government be tempted to slip its constitutional bonds. In *Aymette*, the Tennessee Supreme Court used the same terms when it held that the purpose of citizens having arms is "to *keep in awe* those who are in power, and to maintain the supremacy of the laws and the constitution." 21 Tenn. at 158 (emphasis added).

Finally, as mentioned, the right to defend against public violence extends to collective action against mobs. *Heller's* last citation in this passage was to W. Blizard, *Desultory Reflections on Police* (1785). That passage concerned armed citizen patrols that had assisted the civil authorities in suppressing the terrible London riots of 1780. David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 294 n.25 (2018). After peace was restored, there was a debate in Parliament in which an official who wanted to disarm the neighborhood patrols was sharply criticized. *Id*. The Recorder of London (the city attorney) issued an opinion affirming the legality of the armed citizen patrols. *Id*. Specifically, in the passage cited in *Heller*, the Recorder stated:

> *The right of his majesty's Protestant subjects, to have arms for their own defence [against such mobs], and to use them for lawful purposes, is most clear and undeniable*. It seems, indeed, to be considered, by the ancient laws of this kingdom, not only as a right, but as a duty; for all the subjects of the realm, who are able to bear arms, are bound to be ready, at all times, to assist the sheriff, and other civil magistrates, in the execution of the laws and the preservation of the public peace. And that right, which every Protestant most unquestionably possesses, individually, may, and in many cases must, be exercised collectively, is likewise a point which I conceive to be most clearly established by the authority of judicial decisions and ancient acts of parliament, as well as by reason and common sense.

*Desultory Reflections on Police* at 59–60 (emphasis added).

The Government's error in this case is especially startling in light of the Supreme Court's recent guidance in *Rahimi*. There, the Court stated:

> We have held that the right to keep and bear arms is among the fundamental rights necessary to our system of ordered liberty. Derived from English practice and codified in the Second Amendment, the right secures for Americans a means of self-defense. The spark that ignited the American Revolution was struck at Lexington and Concord, when the British governor dispatched soldiers to seize the local farmers' arms and powder stores. In the

aftermath of the Civil War, Congress's desire to enable the newly freed slaves to defend themselves against former Confederates helped inspire the passage of the Fourteenth Amendment, which secured the right to bear arms against interference by the States. As a leading and early proponent of emancipation observed, "*Disarm a community and you rob them of the means of defending life. Take away their weapons of defense and you take away the inalienable right of defending liberty.*" Cong. Globe, 40th Cong., 2d Sess., 1967 (1868) (statement of Rep. Stevens).

*Id*., 602 U.S. at 690 (selected citations and quotation marks omitted; emphasis added).

*Rahimi* brought defense against both kinds of violence described by *Heller* into focus when it quoted Representative Stevens' statement: "'Disarm a community and you rob them of the means of defending life. Take away their weapons of defense and you take away the inalienable right of defending liberty.' Cong. Globe, 40th Cong., 2d Sess., 1967 (1868) (statement of Rep. Stevens).'" *Id*. In the first sentence, Representative Stevens referred to taking away the means of defending life – i.e. depriving citizens of their right of self-preservation. This is evil because (using *Heller's* terms) it deprives citizens of the means to defend against private violence.

Representative Stevens's second sentence is the one that is important for this case. There, he referred to taking away citizens' "inalienable right of defending liberty." Stevens was obviously alluding to the Declaration of Independence, which states that men are "endowed by their Creator with certain unalienable Rights." The very purpose of the Declaration was to justify separation from England because the "present King" had sought "establishment of an absolute Tyranny over these States." The Declaration stated that men have a natural right to resist such tyranny. Thus, by invoking the Declaration, Representative Stevens was referring to the inalienable

natural right of "resistance" described by Lolme in *The Rise and Progress of the English Constitution*, *supra*. In *Heller's* terms, he was referring to the right to defend against public violence. *Rahimi* quoted both of Representative Stevens's sentences because the Court intended to re-emphasize that the Second Amendment right covers both kinds of self-defense. The first aspect of the right (defense against public violence) needs to be brought to the fore in this case because the Government is trying to shove that part of *Heller* down the memory hole.

In summary, *Heller* held that the right to keep and bear arms protects citizens' right to self-defense. The right to self-defense includes the right to have arms for the purpose of "resistance" and "defence" (defense against public violence) and "self-preservation" (defense against private violence). The particular law at issue in *Heller* (D.C.'s prohibition on the possession of handguns even for self-defense in the home) burdened citizens' ability to defend against private violence. Therefore, *Heller* naturally focused on that aspect of the right. But the Court never stated that the right to defend against criminal assault is the only right protected by the Second Amendment. Indeed, as set forth above, it stated the opposite. Unfortunately, the Government has incorrectly concluded from *Heller's* focus on defense against private violence that that is the only part of the right to keep and bear arms that is codified in the Second Amendment. This Court should not make the same error.

## II.   A Proper Understanding of the Second Amendment Reveals that AR-15s Have Greater Protection Than Handguns

### A.   The Founders Were More Concerned with Tyranny Than with Defense Against Criminals

The Government's laser-focus on the Second Amendment's protection of the right to self-defense against private criminal conduct to the exclusion of the amendment's protection of the right to defend against public violence is ironic because it turns the original primary purpose of the Second Amendment on its head. When the Second Amendment was ratified, the Founders had recently fought a war to throw off a tyrannical government. Yes, the right to keep and bear arms includes the right to bear arms for self-preservation. But can there be any doubt that protecting the right of resistance was foremost in the Founders' minds?

This issue was recently addressed in C.D. Michel and Konstadinos Moros, *Restrictions "Our Ancestors Would Never Have Accepted": The Historical Case Against Assault Weapon Bans*, 24 Wyo. L. Rev. 89 (2024). The authors note that the Second Amendment was ratified by people who had just violently overthrown their former government, and the provision was included in the Bill of Rights because they were afraid the new government they were forming would itself become tyrannical. *Id.* at 97. The authors included a collection of quotations from the Founding period that make this point. For example, James Madison wrote:

> Let a regular army, fully equal to the resources of the country, be formed; and let it be entirely at the devotion of the federal government . . . To these would be opposed a militia amounting to near half a million of citizens with arms in their hands, officered by men chosen from among themselves, fighting for their common liberties, and united and conducted by governments possessing their affections and confidence. It may well be doubted, whether a militia thus

circumstanced could ever be conquered by such a proportion of regular troops. Those who are best acquainted with the last successful resistance of this country against the British arms, will be most inclined to deny the possibility of it. Besides the advantage of being armed, which the Americans possess over the people of almost every other nation, the existence of subordinate governments, to which the people are attached, and by which the militia officers are appointed, forms a barrier against the enterprises of ambition, more insurmountable than any which a simple government of any form can admit of.

*The Federalist No. 46* (James Madison).

Alexander Hamilton wrote that should a large army ever be raised, "that army can never be formidable to the liberties of the people while there is a large body of citizens, little, if at all, inferior to them in discipline and the use of arms, who stand ready to defend their own rights and those of their fellow-citizens." *The Federalist No. 29* (Alexander Hamilton). Tench Coxe, a delegate to the Constitutional Convention, in discussing the Second Amendment, wrote "civil rulers . . . may attempt to tyrannize," and they might use the power of the military to injure fellow citizens. Thus, "the people are confirmed by the article in their right to keep and bear their private arms." *Tench Coxe*, James Madison Rsch. Libr. & Info. Ctr., https://www.madisonbrigade.com/t_coxe.htm (last accessed June 5, 2025) (quoting Tench Coxe in '*Remarks on the First Part of the Amendments to the Federal Constitution*' under the Pseudonym 'A Pennsylvanian' in the Philadelphia Federal Gazette, June 18, 1789, at 2 col. 1).

Noah Webster wrote, "[b]efore a standing army can rule, the people must be disarmed; as they are in almost every kingdom of Europe." Noah Webster, *An Examination into the Leading Principles of the Federal Constitution Proposed by the*

*Late Convention Held at Philadelphia* (1787) reprinted in *Pamphlets on the Constitution of the United States* 56 (Paul Ford ed. 1888). He added that unlike in Europe, the United States is less susceptible to tyrants enforcing unjust laws "because the whole body of the people are armed, and constitute a force superior to any band of regular troops that can be, on any pretense, raised in the United States." *Id*.

Finally, the authors note that St. George Tucker, perhaps the preeminent authority on the Constitution for the Founding generation, wrote that the Second Amendment

> may be considered as the true palladium[4] of liberty . . . in most governments it has been the study of rulers to confine this right within the narrowest limits possible. Whenever standing armies are kept up, and the right of the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction.

1 St. George Tucker, *Blackstone's Commentaries: With Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia*, pt. 1, at 300 (1803).

## B.    Arms Useful for Resistance Are at the Top of the Hierarchy of Protected Weapons

The Second Amendment codified the right to keep and bear arms to quell the fears of the anti-federalists that the federal government would attempt to eliminate the effectiveness of the militia by disarming the people. This reason for codifying the right is why the prefatory clause speaks of a militia. *Heller*, 554 U.S. at 599. The

---

[4] "Palladium" is a word not much used nowadays. It is derived from the Greek "Palládion," which meant a thing that provides protection. Thus, "palladium of liberty" means "protector of liberty."

Founders' preoccupation with preserving the right to keep and bear arms for the purpose of collective action against a tyrannical government has implications for the hierarchy of weapons protected by the Second Amendment. Surely those arms most useful for collective resistance would be at the top of that hierarchy. Michel and Moros write:

> [P]eople do not typically resist a tyrant with small pistols or slow-firing hunting rifles, which even governments have acknowledged when faced with invasion and distributing weapons to civilians. Resistors do it with the prevailing common long guns of the day – AR-15s and other similar so-called "assault weapons" that are owned by millions of regular citizens across the country. These are "the sorts of lawful weapons that they possessed at home" that would be brought to bear in the horrible circumstance of a tyrant upsetting our constitutional order or a foreign invader occupying our country.

*Restrictions "Our Ancestors Would Never Have Accepted"*, 24 Wyo. L. Rev. at 96.

The Government's preoccupation with banning so-called "assault weapons"[5] is thus deeply ironic. *Heller* noted that at the time of the Founding, "ordinarily when called for militia service able-bodied men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time."[6] Those men did not show up for militia service with handguns. They showed up with muskets, the Founding-era analog to the AR-15.

Commonly possessed rifles like the AR-15, not handguns, are the most useful weapons for exercising the right of resistance to tyranny. Former Ninth Circuit Judge Kozinski was in a better position than most to understand this. Judge Kozinski was born to a Jewish family in Romania shortly after World War II. Both of his parents

---

[5] "Assault weapon" is a propaganda term developed by the anti-gun lobby. *Stenberg v. Carhart*, 530 U.S. 914, 1001 n. 16 (2000) (Thomas, J., dissenting) (citation omitted).
[6] *Id.*, 554 U.S. at 624 (cleaned up; internal citation and quotation marks omitted).

were Holocaust survivors. In the pre-*Heller* case of *Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002), the court erroneously held there is no individual right to keep and bear arms and upheld California's "assault weapon" ban. NAGR begs the Court's indulgence while it quotes Judge Kozinski's justly famous dissent at length:

> The majority falls prey to the delusion – popular in some circles – that ordinary people are too careless and stupid to own guns, and we would be far better off leaving all weapons in the hands of professionals on the government payroll. But the simple truth – born of experience – is that tyranny thrives best where government need not fear the wrath of an armed people. Our own sorry history bears this out: Disarmament was the tool of choice for subjugating both slaves and free blacks in the South. . . .

> All too many of the other great tragedies of history – Stalin's atrocities, the killing fields of Cambodia, the Holocaust, to name but a few – were perpetrated by armed troops against unarmed populations. Many could well have been avoided or mitigated, had the perpetrators known their intended victims were equipped with a rifle and twenty bullets apiece, as the Militia Act required . . . If a few hundred Jewish fighters in the Warsaw Ghetto could hold off the Wehrmacht for almost a month with only a handful of weapons, six million Jews armed with rifles could not so easily have been herded into cattle cars.

> My excellent colleagues have forgotten these bitter lessons of history. The prospect of tyranny may not grab the headlines the way vivid stories of gun crime routinely do. But few saw the Third Reich coming until it was too late. The Second Amendment is a doomsday provision, one designed for those exceptionally rare circumstances where all other rights have failed – where the government refuses to stand for reelection and silences those who protest; where courts have lost the courage to oppose, or can find no one to enforce their decrees. However improbable these contingencies may seem today, facing them unprepared is a mistake a free people get to make only once.

*Id.*, 312 F.3d at 569-70 (Kozinski, J., dissenting).

Some might say that defense against tyranny is no longer necessary and therefore protecting the weapons most useful for resistance is not a priority. But surely Judge Kozinski was correct. No society, even an advanced liberal democracy, is immune to human nature. Justice Scalia emphasized this point in a speech he gave

15

in 1987 on Holocaust Remembrance Day. Anyone who believes "it can't happen here" because America is such a sophisticated liberal democracy would do well to heed his warning about Germany's descent into madness.

> The one message I want to convey today is that you will have missed the most frightening aspect of it all, if you do not appreciate that it happened in one of the most educated, most progressive, most cultured countries in the world.
>
> The Germany of the late 1920s and early 1930s was a world leader in most fields of art, science, and intellect. Berlin was a center of theater; with the assistance of the famous producer Max Reinhardt, playwrights and composers of the caliber of Bertolt Brecht and Kurt Weill flourished. Berlin had three opera houses, and Germany as a whole no less than eighty. Every middle-sized city had its own orchestra. German poets and writers included Hermann Hesse, Stefan George, Leonhard Frank, Franz Kafka, and Thomas Mann, who won the Nobel Prize for Literature in 1929. In architecture, Germany was the cutting edge, with Gropius and the Bauhaus school. It boasted painters like Paul Klee and Oskar Schlemmer. Musical composers like Anton Webern, Alban Berg, Arnold Schoenberg, and Paul Hindemith. Conductors like Otto Klemperer, Bruno Walter, Erich Kleiber, and Wilhelm Furtwängler. And in science, of course, the Germans were preeminent.

Antonin Scalia, *On Faith: Lessons from an American Believer,* Christopher J. Scalia and Edward Whelan, eds. (Penguin Random House 2019), Kindle, 149-150.

Moreover, while the United States has so far escaped a dictator's coup, as *Rahimi* reminded us, it has not escaped the plague of violence against hated minorities. Cottrol and Denning recently reminded us of this unpleasant aspect of our history:

> If the nation as a whole [has] escaped the problem of a macro-tyranny imposed by a dictator's usurpation or a military coup, it [has] not escaped the problem of micro-tyranny, ruthless suppression of disfavored minorities brought about by the systemic failure of federal and state governments to protect citizens against racial violence.

Robert J. Cottrol and Brannon P. Denning, *To Trust the People with Arms, The Supreme Court and the Second Amendment* (University of Kanas Press 2023), 122.

Sadly, such public violence is not a relic of the nation's distant post-Reconstruction past. It is within the living memory of some, including the leaders of the civil rights movement. Cottrol and Denning continue:

> Individuals like Robert Williams and members of groups like the Deacons for Defense and Justice helped transform the South and the nation. Student Nonviolent Coordinating Committee veteran Charles Cobb was probably not exaggerating when he said that the willingness of groups like the Deacons to provide armed defense against racial violence made the civil rights movement possible. Many veterans of the movement experienced occasions when local police officers were often sympathetic to the Klan, and federal officials provided little protection for the lives of Southern Negros and the civil rights workers who worked with them. For those who lived through that history the right to be armed proved critical. *And the idea that governmental tyranny could take the form of indifference and inaction as well as active oppression became a strongly held belief.*

*Id*. at 125 (emphasis added).

One hopes that the demon of systemic violence against hated minorities has been banished never to return. But even a casual perusal of the latest headlines suggests that one counts on it at one's peril. And that is why the Government's determination to strip its citizens of the arms most useful for exercising the right of resistance is not only erroneous as a matter of law, it is also tragically misguided as a matter of history.

## III.   Smith & Wesson Brands is Dispositive on AR-15s and AK-47s

On June 5, 2025, the United States Supreme Court entered its decision in *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, --- S.Ct. ---, 2025 WL 1583281 (U.S. June 5, 2025), in which the Court dismissed Mexico's case against

seven gun manufacturers for failure to state a claim. *Id.*, at \*9. Critically for purposes of this case, Mexico argued that its claim was supported by the fact that the manufacturers sold "military style" assault weapons including AR–15 rifles and AK–47 rifles. The Court rejected this argument, holding:

> Finally, Mexico's allegations about the manufacturers' "design and marketing decisions" add nothing of consequence. As noted above, Mexico here focuses on the manufacturers' production of "military style" assault weapons, among which it includes AR–15 rifles [and] AK–47 rifles. *But those products are both widely legal and bought by many ordinary consumers.* (*The AR–15 is the most popular rifle in the country.* See T. Gross, How the AR–15 Became the Bestselling Rifle in the U. S., NPR (Apr. 20, 2023).)) The manufacturers cannot be charged with assisting in criminal acts just because Mexican cartel members like those guns too.

*Id.*, at \*8 (cleaned up; emphasis added).

In *D.C. v. Heller*, 554 U.S. 570 (2008), the Court held that the government may not ban firearms that are in common use by law-abiding citizens. *Id.*, at 625, 627. In *Smith & Wesson Brands,* the Court held that AR–15 rifles and AK–47 rifles are in common use by ordinary citizens. Moreover, the Court held that the mere fact that criminals also use those firearms has no bearing on the analysis. See also *Garland v. Cargill*, 602 U.S. 406, 429 (2024) (Sotomayor, J., dissenting) (semiautomatic rifles like those used in Las Vegas shooting, which included AR-15s, are "commonly available, semiautomatic rifles").

*Smith & Wesson Brands, Inc.* is absolutely dispositive on the issue of whether AR–15 rifles and AK–47 rifles are protected by the Second Amendment. Because they are in common use by ordinary citizens, they are protected.

Moreover, the Court held that labeling AR-15s and AK-47s as "'military style' assault weapons" has no bearing on the analysis. This holding completely undermines this Court's holding in *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1199 (7th Cir. 2023), that a weapon is not protected by the Second Amendment merely because it can be described as "militaristic."

## CONCLUSION

NAGR respectfully requests the Court to affirm the district court's ruling. Respectfully submitted,

*/s/ Barry K. Arrington*

_____

BARRY K. ARRINGTON
ARRINGTON LAW FIRM
4195 WADSWORTH BOULEVARD
WHEAT RIDGE, COLORADO 80033
(303) 205-7870
E-mail: barry@arringtonpc.com
*Attorney for Amicus Curiae*

June 10, 2025

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing Amicus Brief of National Association for Gun Rights complies with Fed. R. App. P. 29(c) and the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5,810 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

The undersigned further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word Version 2010 in 12 point Century Schoolbook font.

Dated: June 10, 2025

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Attorney for Amicus Curiae
National Association for Gun Rights

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2025, the Brief of Amicus Curiae National Association for Gun Rights was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Attorney for Amicus Curiae
National Association for Gun Rights