Nos. 24-3060, 24-3061, 24-3062, 24-3063 (consol.)

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

CALEB BARNETT, et al.,

*Plaintiffs-Appellees*,

v.

KWAME RAOUL AND BRENDAN F. KELLY,

*Defendants-Appellants.*

Appeal from the United States District Court for the Southern District of Illinois
Case Nos. 3:23-cv-00209-SPM, 3:23-cv-00141-SPM,
3:23-cv-00192-SPM, 3:23-cv-00215-SPM
The Honorable STEPHEN P. MCGLYNN, Judge Presiding

**BRIEF OF *AMICI CURIAE***
**ILLINOIS STATE'S ATTORNEYS OF MADISON BROWN, CALHOUN, CARROLL,**
**CHRISTIAN, CLARK, CLAY, CLINTON, CUMBERLAND, EDWARDS, EFFINGHAM,**
**GALLATIN, HANCOCK, HENRY, IROQUOIS, JASPER, JEFFERSON, JERSEY, JO**
**DAVIESS, JOHNSON, LIVINGSTON, MARION, MERCER, MONROE, OGLE, PERRY,**
**PULASKI, SCHUYLER, SCOTT, UNION, VERMILION, WARREN, WASHINGTON,**
**WHITE, AND WOODFORD COUNTIES, IN SUPPORT OF PLAINTIFFS-APPELLEES**

Thomas A. Haine
Madison County
State's Attorney
157 N. Main Street, Suite 402
Edwardsville, IL 62025
618-692-6280
tahaine@madisoncountyil.gov
Lead Attorney for *Amici Curiae*

(*Additional Counsel on Next Page*)

**Michael Hill**
State's Attorney of
Brown County

**Aaron Kaney**
State's Attorney of
Carroll County

**Kyle Hutson**
State's Attorney of
Clark County

**J.D. Brandmeyer**
State's Attorney of
Clinton County

**Eric A. St. Ledger**
State's Attorney of
Edwards County

**Douglas E. Dyhrkopp**
State's Attorney of
Gallatin County

**Catherine Runty**
State's Attorney of
Henry County

**James S. Treccia**
State's Attorney of
Jasper County

**Benjamin L. Goetten**
State's Attorney of
Jersey County

**J. Jeremy Lloyd**
State's Attorney of
Johnson County

**Lucas Fanning**
State's Attorney of
Calhoun County

**John H. McWard**
State's Attorney of
Christian County

**Phillip M. Givens**
State's Attorney of
Clay County

**Bryan D. Robbins**
State's Attorney of
Cumberland County

**Aaron Jones**
State's Attorney of
Effingham County

**Bobi Gail James**
State's Attorney of
Hancock County

**Michael J. Quinlan**
State's Attorney of
Iroquois County

**Sean Featherstun**
State's Attorney of
Jefferson County

**Christopher Allendorf**
State's Attorney of
Jo Daviess County

**Michael Regnier**
State's Attorney of
Livingston County

**Timothy J. Hudspeth**
State's Attorney of
Marion County

**Ryan G. Webb**
State's Attorney of
Monroe County

**David Searby**
State's Attorney of
Perry County

**Charles Laegeler**
State's Attorney of
Schuyler County

**Tyler Tripp**
State's Attorney of
Union County

**Thomas Siegel**
State's Attorney of
Warren County

**Chris Neal**
State's Attorney of
White County

**Grace Simpson**
State's Attorney of
Mercer County

**Mike Rock**
State's Attorney of
Ogle County

**Lisa C. Casper**
State's Attorney of
Pulaski County

**Richard K. Crews**
State's Attorney of
Scott County

**Jacqueline M. Lacy**
State's Attorney of
Vermilion County

**Crystal May**
State's Attorney of
Washington County

**Erik R. Gibson**
State's Attorney of
Woodford County

**<u>TABLE OF CONTENTS</u>**

**INTEREST OF** *AMICI CURIAE*…………………………...……………………………...1

**SUMMARY OF ARGUMENT**………………………………………………………………2

**ARGUMENT**……………………………………………………………………………..4

    I.   **THE ACT AS A BAN ON A CLASS OF ARMS "IN COMMON USE" FOR SELF-DEFENSE TODAY, IS CATEGORICALLY UNCONSTITUTIONAL UNDER** *HELLER*………..……………………………………………………..………4

        A.  <u>Statistically, the weapons and magazines banned by the Act are in "Common Use."</u>………………………………………………………………5

        B.  <u>Neither semiautomatic weapons nor 10+ capacity magazines are "dangerous and unusual."</u>…………………………………………………8

        C.  <u>The most common uses of weapons banned by the Act are lawful.</u>………...9

    II.  **THE ACT IS INCONSISTENT WITH THE HISTORICAL TRADITION OF FIREARMS REGULATION AND IS THEREFORE UNCONSTITUTIONAL UNDER** *BRUEN*…………………………………………………………..12

        A.  <u>There is no "historical tradition" of banning semiautomatic rifles or handguns.</u>………………………………..……………………………14

        B.  <u>There is no "historical tradition" of banning 10+ capacity magazines.</u>……..17

**CONCLUSION**…………………………………………………………………18

**CERTIFICATE OF COMPLIANCE**…………………………………………………21

**CERTIFICATE OF SERVICE**................………………………………………21

## TABLE OF AUTHORITY

**Cases**

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Atty. Gen. of N.J.*, 974 F.3d 237 (3d Cir. 2020)…………………………………………………………….………...…….…...18

*Barnett v. Raoul*, 756 F.Supp. 3d 564 (S.D. Ill. 2024) (*Barnett I*)………...……………..4, *passim*

*Caetano v. Massachusetts*, 577 U.S. 411 (2016)…………………………………………………4, 9

*District of Columbia v. Heller*, 554 U.S. 570 (2008)……………………………….…..2, *passim*

*Duncan v. Becerra,* 970 F.3d 1133 (9th Cir. 2020)……………......…………………..8, 14, 17, 18

*Duncan v. Bonta,* 19 F.4th 1087 (9th Cir. 2021)……………………….………………..….…8, 14

*Friedman v. City of Highland Park,* 784 F.3d 406 (7th Cir. 2015).................................................9

*Fyock v. City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2015)……………………………..…6, 9

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)……….………………………14

*Hollis v. Lynch,* 827 F.3d 436 (5th Cir. 2016)……………………………………………….5, 9

*Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014)………...……………8

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)……………………………………………2

*Miller v. Bonta,* 542 F. Supp. 3d 1009 (S.D. Cal. 2021)……………………………...7, 11, 12, 15

*Moore v. Madigan,* 702 F.3d 933 (7th Cir. 2012)……………………………..……………………..14

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022)……..……………………3, *passim*

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2nd Cir. 2015)…………………..6

*Staples v. United States*, 511 U.S. 600 (1994)……………………………………………….......16

*United States v. Miller,* 307 U.S. 174 (1939)………………………………………………..7

**Constitutional Provisions and Statutes**

U.S. Const., amend II……………………….…………….....……………………….……....2

U.S. Const., amend XIV………………………..………...…………………………....2

55 ILCS 5/3-9001………………………………..………………..……………...……....1

55 ILCS 5/3-9005(a)………………………………..………………..……………………..1

Ill. Pub. Act. 102-116 (720 ILL. COMP. STAT. 5/24-1.9-1.10) …………………………...1, *passim*

D.C. Code §7-2501.01(3A)(A)……………………………………..…..……………….…15

D.C. Code § 7-2502.02(a)(6)……………………………………..………………………15

56 D.C. Reg. 3438 (May 1, 2009)……………………………………..…………....……..15

**Rules**

Illinois Rule of Professional Conduct 3.8……………………………….………………...2

**Other Authority**

Christopher Koper, et al., *Updated Assessment of the Federal Assault Weapons Ban Impacts on Gun Markets and Gun Violence, 1994-2003* (2004) U.S. DEP'T OF JUST…...........................................................................................................10, 17

David B. Kopel, *The History of Firearm Magazines* and Magazine Prohibitions, 78 Alb. L. Rev. 849 (2015)……………………………………………………..……….…18

Expanded Homicide Table 8, Crime in the United States, U.S. DEP'T OF JUST. (FBI 2019)…..……………………………………………………………….…..10

Gary Kleck, Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. OF CRIM. L. & CRIMINOLOGY 150, 164 (1995)……………………………………………………………...……….11

Giffords Law Center, *Large Capacity Magazines, Summary of State Law* (2020)………………………………………………………………….…..…..18

January 10, 2023 Press Release, Office of the Governor of the State of Illinois, "Illinois Becomes Ninth State to Institute Assault Weapons Ban"………………………………………..…7

NAT'L SHOOTING SPORTS FOUND., INC., *Modern Sporting Rifle: Comprehensive Consumer Report* 18 (July 14, 2022)……………………………………………………11

Shannon Catalano, *Victimization During Household Burglary, Bureau of Justice Statistics Special Report,* NCJ227379, (2010)…………………….............................................11

William English, PhD, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 2 (May 13, 2022)……………………………………………...…………..7

## INTEREST OF *AMICI CURIAE*

This brief is filed on behalf of the State's Attorneys of the following counties in Illinois:

**Madison**, **Brown, Calhoun, Carroll, Christian, Clark, Clay, Clinton, Cumberland, Edwards, Effingham, Gallatin, Hancock, Henry, Iroquois, Jasper, Jefferson, Jersey, Jo Daviess, Johnson, Livingston, Marion, Mercer, Monroe, Ogle, Perry, Pulaski, Schuyler, Scott, Union, Vermilion, Warren, Washington, White, and Woodford** ("*Amici*")[1].

State's Attorneys like those joining as *Amici* are enjoined by their sworn duty to protect and defend the rights of the citizens residing in their respective counties. *See* Powers and Duties of State's Attorney, 55 ILCS 5/3-9005(a). They each swear the following oath:

> I do solemnly swear … that I will support the constitution of the United States and the constitution of the state of Illinois, and that I will faithfully discharge the duties of the office of state's attorney according to the best of my ability.

55 ILCS 5/3-9001. Therefore, each of the thirty-five State's Attorneys *Amici* has an inherent interest in the constitutionality of criminal statutes like Ill. Pub. Act 102-1116 (codified as 720 Ill. Comp. Stat. 5/24-1.9-1.10) (the so-called "Assault Weapons Ban," and hereinafter, "the Act"). After all, the Act creates various criminal penalties and enforcement rules, for which the duty rests on the offices of *Amici* to pursue and enforce in their respective counties.

However, on its face, the Act violates the Second Amendment to the United States Constitution, which protects an individual's right to bear arms, and is therefore unconstitutional.[2]

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no person or entity, other than *Amici* and their counsel, has contributed money that was intended to fund preparing or submitting this brief.

[2] The State's Attorney is conscious of their dual responsibilities both to support the Constitution of the United States and to prosecute offenses committed in violation of the laws of the State of Illinois. Until the courts clarify that such restrictions are unconstitutional, the duty to enforce the law remains, while each State's Attorney makes prosecutorial decisions based on their understanding of the appropriate legal principles at play and the facts and circumstances of each case.

1

The Act places *Amici* in a difficult ethical and legal quandary. Illinois Rule of Professional Conduct 3.8 provides that "[t]he duty of a public prosecutor is to seek justice, not merely to convict." Committee Comment 1 states "[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice[.]" To avoid this dilemma, and in the interest of clarity for all, *Amici* encourage this honorable Court to affirm the District Court's well-reasoned conclusion and strike down the Act as an unconstitutional infringement of the Second Amendment rights of the residents of Illinois. *Amici* have a substantial interest in this litigation and the constitutionality of laws *Amici* will be responsible for enforcing.

## SUMMARY OF ARGUMENT

The Second Amendment to the United States Constitution provides "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." U.S. Const., amend. II. Through the Fourteenth Amendment (U.S. Const., amend. XIV), this right is "fully applicable to the States." *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).

The Supreme Court of the United States has declared that when it comes to arms in "common use" for "self-defense" today, a sweeping ban on an "entire class" of such arms is categorically unconstitutional – quite apart from any "standards of [constitutional] scrutiny" and regardless of whether "the possession of other firearms … is allowed." *District of Columbia v. Heller*, 554 U.S. 570, 627-629 (2008). Since the Act is a flat ban on a large class of arms – including essential components of firearms – widely used for self-defense today, the Act is unconstitutional under *Heller*. Indeed, the constitutional infirmity is especially clear in the Act's prohibition of the possession of arms widely used for self-defense "extends … to the home, where

2

the need for defense of self, family, and property is most acute." *Id*. at 629.

It is no answer to recast the Act as a mere regulation rather than a categorical ban in the hope of subjecting it to a more flexible constitutional test. In fact, balancing tests were squarely repudiated by the Supreme Court of the United States in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). In *Bruen*, the Supreme Court rejected reliance on "*any* means-end test such as strict or intermediate scrutiny" or "*any* judge-empowering interest-balancing inquiry." *Id*. at 22. (emphasis added). Instead of any such test, *Bruen* requires "a test rooted in the Second Amendment's text, as informed by history." *Id*. at 19. Specifically, under *Bruen*, if a law burdens conduct protected by the Second Amendment's plain text," the law is unconstitutional unless the law has a "proper analogue" in the "Nation's historical tradition of firearm regulation." *Id*. at 17. Crucially, it is the government's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 19. The most telling historical regulations are those dating back to the ratification era or soon thereafter. *Id*. at 27-8. Thus, in *Bruen*, the Court found that "post-Civil War discussions of the right to keep and bear arms," which "took place 75 years after the ratification of the Second Amendment, … do not provide as much insight into its original meaning as earlier sources." *Id*. at 36 (quoting *Heller*, 554 U.S. 570, 614 (2008)). Additionally, in *Bruen*, the Court simply refused to consider "any of the 20th-century historical evidence" brought to bear in defense of the law challenged there. *See id*. at 66, n.28.

The single-step, historical analysis required by *Bruen* is simple, straightforward, and devastating to the constitutionality of the Act's categorical ban on nearly every modern semiautomatic firearm, including the most commonly owned rifles currently possessed for lawful purposes throughout the United States. As discussed below, only a handful of states currently have

3

similar bans, and none of them are older than the internet. The constitutional conclusion, supported by the historical record, is inescapable – the Act violates the Second Amendment and cannot stand.

## ARGUMENT

The District Court correctly concluded the Act "is an unconstitutional affront to the Second Amendment […]. The Government may not deprive law-abiding citizens of their guaranteed right to self-defense as a means of offense." *Barnett v. Raoul*, 756 F.Supp.3d 564, 659 (S.D. Ill. 2024) ("*Barnett I*"). For the reasons set forth herein, *Amici* urges this Court to uphold the sound and jurisprudentially supported judgment of the District Court. The Act is unconstitutional now, and as such, "was unconstitutional when enacted and violates" law-abiding Illinoisians' "Second Amendment rights every day it remains on the books." *Barnett I*, 756 F.Supp.3d at 627 (*citing Ezell v. City of Chicago*, 651 F.3d 684, 697 (7th Cir. 2011).

I.     **THE ACT, AS A BAN ON A CLASS OF ARMS "IN COMMON USE" FOR SELF-DEFENSE TODAY, IS CATEGORICALLY UNCONSTITUTIONAL UNDER *HELLER*.**

Just as the First Amendment protects modern forms of communication, and the Fourth Amendment applies to modern searches, the Second Amendment extends to arms that did not exist at the founding. *Bruen*, 597 U.S. 1, 21 (2022) (quoting *Heller*, 554 U.S. at 627); *see also Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016) (per curium) (invalidating the State of Massachusetts' ban on stun guns). "[A]ll instruments that constitute bearable arms, even those that were not in existence at the time of the founding," come within the ambit of the Second Amendment. *See Heller*, 554 U.S. at 582. And, the Supreme Court has made unmistakably clear that whatever the constitutional status of mere regulations of commonly used firearms, "a complete prohibition of their use is invalid," regardless of whether "the possession of other firearms … is allowed." *Id*. at 629. Simply put, a state shall not "prohibit[] … an entire class of 'arms' that is overwhelmingly

chosen by American society for [the] lawful purpose" of self-defense. *Id*. at 628. So, if a class of firearms is "typically possessed by law-abiding citizens for lawful purposes" today, it cannot be categorically banned. *See id*. at 625.

Nonetheless, on January 10, 2023, the Illinois Legislature passed, and Governor approved, the Act.[3] The Act bans nearly every modern semiautomatic rifle and pistol, as well as all ammunition-feeding devices capable of holding "more than 10 rounds of ammunition for long guns and more than 15 rounds of ammunition for handguns[.]" 720 ILCS 5/24-1.10(a)-(c). The Act makes it "unlawful for any person within this State to knowingly manufacture, deliver, sell, import, or purchase or cause to be manufactured, delivered, sold, imported, or purchased by another, an assault weapon." 720 ILCS 5/24-1.9(b). Under the Act, it is unlawful simply to "*possess* an assault weapon," even within a home for self-defense. See 720 ILCS 5/24-1.9(c) (emphasis added). Yet, this class of weapon includes the most popular type of rifle in the country – the AR-15 styled platform – and many others commonly owned by law-abiding citizens for self-defense and other lawful purposes.

### A. <u>Statistically, the weapons and magazines banned by the Act are in "common use."</u>

Statistical data shows that both the firearms and the magazines banned by the Act are "in common use" today. In fact, as noted by the District Court, "the Government's own expert indicated that, at minimum, *millions* of Americans own AR-15s at this very moment." *Barnett I*, 756 F.Supp.3d at 626. To determine what is in "common use," courts have repeatedly "relied on statistical data of some form, creating a consensus that common use is an objective and largely statistical inquiry." *Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016) (internal quotations

---

[3] *See* Bill Status of HB5471, 102nd Gen. Assembly, https://bit.ly/3ZJCslX (last visited May 30, 2025).

omitted). The Second Circuit found a "common use" where "Americans own millions of the firearms that the challenged legislation prohibits," despite such arms accounting for only two percent of the nation's firearms. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2nd Cir. 2015). The D.C. Circuit found a subset of the very arms at issue here to be "in common use," concluding:

> We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in "common use," as the plaintiffs contend. Approximately 1.6 million AR-15s alone have been manufactured since 1986, and in 2007, this one popular model accounted for 5.5 percent of all firearms and 14.4 percent of all rifles, produced in the U.S. for the domestic market. As for magazines, fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000. There may well be some capacity above which magazines are not in common use but, if so, the record is devoid of evidence as to what that capacity is; in any event, that capacity surely is not ten.

*Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011). The Ninth Circuit, in a case involving 11+ round magazines, upheld a district court's conclusion that "at a minimum, [11+ round magazines] are in common use" based on "sales statistics indicating that millions of magazines, some of which … were magazines fitting Sunnyvale's definition of large-capacity magazines, have been sold over the last two decades in the United States." *Fyock v. City of Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015).

Against the backdrop of these cases, the current statistical data regarding the "common use" of the semiautomatic rifles banned by the Act is even clearer. In fact, it is overwhelming. In 2020 alone, nearly 2.8 million AR-15-style rifles were produced or imported into the United

States.[4] Further, AR-15-style rifles accounted for "almost one-half of all rifles (48%) produced in 2018." *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1022 (S.D. Cal. 2021). A recent survey of gun owners found that a staggering 24.6 million Americans have owned or now own one or more AR-15-style rifles.[5] In fact, the widespread use of these firearms is precisely what led the sponsors of the Act to target these commonly used firearms.[6] The District Court was correct when it noted that "AR-type weapons are both 'commonly available' in the United States and have been called the country's most popular rifle for decades. *Barnett I*, 756 F.Supp.3d at 627 (*citing Garland v. Cargill*, 602 U.S. 406, 430 (2024)).

The Second Amendment protects not only the semiautomatic rifles and pistols, but also the magazines the Act bans. Logically, the right to keep and bear arms necessarily includes the right to keep and bear the components (such as ammunition and magazines) without which the firearms cannot function. *See United States v. Miller*, 307 U.S. 174, 180 (1939) (citing 17th-century commentary recognizing "[t]he possession of arms also impl[ies] the possession of ammunition."). As the Ninth Circuit succinctly put it, "without bullets, the right to bear arms would be

---

[4] *See* National Shooting Sports Foundation, Inc., *Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation* (July 20, 2022), https://bit.ly/45BJtuz (citing data) (last accessed May 30, 2025).

[5] *See* William English, PhD, *2021 National Firearm Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022), https://bit.ly/3FgQ0Al (last accessed May 30, 2025).

[6] See January 10, 2023 Press Release, Office of the Governor of the State of Illinois, " Gov. Pritzker Signs Legislation Banning Assault Weapons and Sale of High-Capacity Magazines, Illinois Becomes Ninth State to Institute Assault Weapons Ban," https://www.illinois.gov/news/press-release.25890.html (last accessed May 30, 2025).

"[F]rom ending the sale of assault rifles to stopping the tidal wave of guns flooding into Illinois from surrounding states, the Protect Illinois Communities Act is one of the strongest gun safety laws in the nation … Delivering on this promise – the promise to remove these weapons of war from … communities throughout Illinois will remain one of my proudest achievements as Speaker of the House." House Speaker Emanuel "Chris" Welch.

meaningless." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014).

The statistics regarding the "common use" of the detachable magazines banned by the Act are equally conclusive: millions of law-abiding Americans own tens of millions – if not hundreds of millions – of such magazines for use of their legally-owned semiautomatic firearms. In fact, "approximately half of all privately owned magazines in the United States" – roughly 115 million in total – are capable of holding "more than 10 rounds of ammunition." *Cf. Duncan v. Bonta*, 19 F.4th 1087, 1097 (9th Cir. 2021). After all, every AR-15-style rifle comes standard with magazines with a capacity of 15 or more rounds, as do many popular semiautomatic pistols. For example, the Beretta Model 92, "[a]nother popular handgun used for self-defense … which entered the market in 1976 and comes standard with a sixteen-round magazine." *Duncan v. Becerra*, 970 F.3d 1133, 1142 (9th Cir. 2020).

While one can dispute the precise threshold for establishing common use, no one can deny that semiautomatic rifles and 10-15 round magazines are commonly – indeed "overwhelmingly" – used by law-abiding citizens for "lawful purpose[s]," including for "defense of self, family, and property" in the home, where Second Amendment interests are "most acute." *Heller*, 554 U.S. at 628. The common use of such firearms and magazines mandates Second Amendment protection, making a ban on these arms unconstitutional per se – that is, quite apart from "any of the standards of [constitutional] scrutiny," and regardless of whether "the possession of other firearms … is allowed." *Id*. at 628-29.

**B. <u>Neither semiautomatic weapons nor 10+ capacity magazines are "dangerous and unusual."</u>**

In Heller, the Supreme Court noted that "dangerous and unusual weapons" are not protected by the Second Amendment, however, that doctrine is no help to the Act at issue here. *Id*. at 627. To be considered a "dangerous and unusual" firearm, it must be *both* dangerous *and*

8

unusual. *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring). The

semiautomatic rifles, handguns, and magazines banned by the Act are not "unusual" precisely

because they are so commonly used. As correctly reasoned by the District Court,

> [I]t is clear that a semiautomatic rifle does not suffer from the lack
> of control as is inherent to machineguns and sawed-off shotguns.
> Additionally, the AR-15 and other semiautomatic rifles do not
> appear to be "unusual" like ricin-pellet launchers or directed-energy
> weapons…they do not operate or utilize technology sufficient to call
> them "unusual" in the sense that they are not widely used in the
> United States … instead, … the rifles and other weapons banned by
> [the Act] are in common use when considering the volume of sales
> over the last 20 years and the fact that both experts … and fact
> witnesses … attest to the fact that law-abiding citizens choose them
> for self-defense.

*Barnett I*, 756 F.Supp.3d at 627.

As the Ninth Circuit explained, "[t]o determine [whether a weapon is dangerous and

unusual], we consider whether the weapon has uniquely dangerous propensities *and* whether the

weapon is commonly possessed by law-abiding citizens for lawful purposes." *Fyock* 779 F.3d at

997 (emphasis added); *see also Hollis*, 827 F.3d at 448-51 (5th Cir. 2016). Therefore, the

"dangerous and unusual weapons" question is not an exception to the protection afforded to arms

in "common use," but rather a reinforcement of that doctrine from another angle: an "unusual"

weapon is simply the opposite of a weapon that is "common." *See Friedman v. City of Highland

Park*, 784 F.3d 406, 409 (7th Cir. 2015) (holding that if "the banned weapons are commonly owned

… they are not unusual."). Since the guns and magazines banned by the Act are in common use

(*see supra* Section I.A.), they are not "dangerous and unusual."

**C.  <u>The most common uses of weapons banned by the Act are lawful.</u>**

While it is dispositive under *Heller* that the Act is unconstitutional in that it prohibits "an

entire class of 'arms' that is overwhelmingly chosen by American society for th[e] lawful purpose"

of self-defense, *Amici's* experience in the thirty-five Illinois counties they represent suggests the Act would fare no better if its validity turned on its costs and benefits. 554 U.S. at 628. In *Amici's* practical experience, the AR-15 style rifles that typify the so-called "assault weapons" banned by the Act are *not* the normal choice for criminals in the commission of gun violence. The use of such "assault" rifles in the violent crimes routinely prosecuted by *Amici* in courtrooms across the state is highly *abnormal*. These rifles are far more often used for lawful purposes – and it is no surprise they are, for they have several features that make them especially suitable for personal and familial self-defense.

*Amici's* experience that gun crimes rarely involve the use of AR-15 style weapons finds ample empirical support. *Amici* reflect the practical experience of thirty-five A study by the United States Department of Justice concluded that such arms "are used in a small fraction of gun crimes."[7] According to statistics compiled by the Federal Bureau of Investigations in 2019, there were only 364 homicides known to be committed with rifles of any type, compared to 6,368 with handguns, 1,476 with knives or other cutting instruments, 600 with personal weapons (hands, feet, *etc*.) and 397 with blunt objects.[8] These statistics comport with the experience of *Amici*, all of whose offices prosecute violent crimes in their respective counties. Simply put, gun crimes very seldom are committed by "assault" rifles. Instead, the crimes we prosecute overwhelmingly involve handguns, which are almost always already illegally owned or possessed.

In addition to being an uncommon choice for those committing violent crime, the rifles banned by the Act are ideal for self-defense, as recognized by those who buy them: "[i]n 2018, …

---

[7] Christopher Koper, et al., *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence*, 1994-2003 (2004), U.S. DEPT. OF JUST., https://bit.ly/3hZiy5v (last accessed May 30, 2025).
[8] *See* U.S. Expanded Homicide Table 8, Crime in the United States, U.S. DEPT. OF JUST. (FBI 2019), https://bit.ly/3HdolNd (last accessed May 30, 2025).

34% of buyers purchased a modern rifle [predominately] for personal protection, while 36% purchased [predominately] for target practice or informal shooting[9], and 29% purchased [predominately] for hunting." *Miller*, 542 F.Supp.3d at 1022. Contrast that with non-semiautomatic rifles, "only 5% of [which] were bought for personal protection." *Id*. Owners of AR-15s and other similar rifles rated self-defense as over 8 out of 10 in importance for owning them, the second-highest rating after recreational target shooting.[10]

These statistics are no surprise. As firearm owners know, the specifics matter: these weapons are simple to fire, maintain, and keep from harming loved ones who may be bystanders to a defensive shooting. First, detachable magazines make it easier to reload firearms, which can be critical in the stressful circumstance of being forced to defend "self, family, or property." *Heller*, 554 U.S. at 628. Second, the AR-15 rifle shoots a relatively inexpensive and common cartridge that is particularly well-suited for defense at home, "where the need . . . is most acute," *id.*, because it has sufficient stopping power in the event of a home intrusion, but quickly loses velocity after passing through a target. This is key, because household members are present for almost a third of all burglaries and become victims of violent crimes in more than a quarter of those cases.[11] Stopping the crime, but not injuring others, is of fundamental interest to those who buy firearms for home defense. None of this is an academic exercise, or mere comfort to people unreasonably fearful for their safety. Studies on the frequency of defensive firearm uses in the United States have determined that there are up to 2.5 million instances each year in which civilians used

---

[9] "During 2018, approximately 18,327,314 people participated nationally in target and sport shooting specifically with [AR-15-style] rifles." *Miller*, 542 F.Supp. 3d at 1022.
[10] *See* NAT'L SHOOTING SPORTS FOUND., INC., *Modern Sporting Rifle: Comprehensive Consumer Report 18* (July 14, 2022), https://bit.ly/3SSrVjM (last accessed May 30, 2025).
[11] *See* Shannon Catalano, *Victimization During Household Burglary*, Bureau of Justice Statistics Special Report, NCJ227379, (2010).

firearms for home defense.[12]

With respect to the large-capacity magazines and various attachments banned by the Act, the District Court astutely held:

> [T]hese devices are also in common use and have legitimate self-defense purposes. For magazines, every round matters in a self-defense scenario – reloading takes away significant time during which the defender can be injured or wounded. Moreover, unlike in military combat where soldiers are equipped with pockets, vests, and belts to carry spare ammunition, a defender will only have what he or she can carry. Thus, in a critical self-defense scenario, more rounds equals a higher chance of survival.
>
> Similarly, the attachments at issue make a weapon safer, easier to aim, and easier to fire, features that are well-suited for self-defense. This is especially relevant to an individual who is infirm, small-statured, or has limited firearms training. In a self-defense scenario, every second matters and this Court will not fault individuals who are not able-bodied for choosing weapons that enable them to more carefully defend themselves and their families.

*Barnett I*, 756 F.Supp.3d at 628.

Additionally, the firearms banned by the Act are also well-suited for hunting and sport; a use that is lawful in every state in America and protected by the Second Amendment. *See Heller*, 554 U.S. at 599. More than half of all gun owners use a firearm for hunting or sport shooting, and recreational target shooting is a top reason for owning semiautomatic rifles like those banned by the Act. *Miller*, 542 F.Supp.3d at 1022.

In short, the Act is targeted at weapons that are particularly well-suited for lawful purposes, and particularly unpopular for the commission of crimes.

## II.  THE ACT IS INCONSISTENT WITH THE HISTORICAL TRADITION OF FIREARMS REGULATION AND IS THEREFORE UNCONSTITUTIONAL UNDER *BRUEN*.

---

[12] Gary Kleck, Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. OF CRIM. L. & CRIMINOLOGY 150, 164 (1995).

It is impossible to salvage the Act by rebranding it as a mere regulation short of an outright ban, in the hopes of getting to invoke some more flexible constitutional test. In 2022, the Supreme Court explicitly repudiated "this two-step approach[,]" for including "one step too many"—the balancing step. *See Bruen*, 597 U.S. at 19.

*Bruen* observed that "reliance on history to interpret a constitutional text—especially text meant to codify a *pre-existing* right—is … more legitimate, and more administrable, than asking judges to 'make difficult empirical judgments' about 'the costs and benefits of firearms restrictions,' especially given their 'lack [of] expertise'" in the field. *Id.* at 24 (quoting *McDonald*, 561 U.S. at 790–91 (plurality opinion)). In the *Bruen* Court's view, "federal courts tasked with making such difficult empirical judgments regarding firearm regulations under the banner of 'intermediate scrutiny' often defer to the determinations of legislatures," *id.* at 8, forgetting that "[t]he Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Id.* at 26 (quoting *Heller*, 554 U. S. at 635)). "It is this balance—struck by the traditions of the American people—that demands our unqualified deference." *Id.*

Instead of invoking balancing tests, the Court in *Bruen* declared that a government hoping to defend a gun regulation "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* Under this historical test, regulation of conduct falling within "the Second Amendment's plain text" is unconstitutional unless it has a "proper analogue" in the "Nation's historical tradition of firearm regulation." *Id.* at 22–23, 27. And the most telling regulatory traditions are early ones. Thus, the *Bruen* Court found that "post-Civil War discussions of the right to keep and bear arms," which "took place 75 years after the ratification of the Second Amendment, . . . do not provide as much

insight into its original meaning as earlier sources," *id.* at 2137 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 614 (2008)), and *Bruen* set aside altogether certain "20th-century historical evidence," *id.* at 37 n.28.

### A. There is no "historical tradition" of banning semiautomatic rifles or handguns.

Even if the Act could be passed off as a mere regulation that did *not* "amount[] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for . . . lawful purpose[s]," *Heller*, 554 U.S. at 628, the Act would fail muster unless it were consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. And "the burden falls on [the state] to show that [its] requirement is consistent with this Nation's historical tradition of firearm regulation"—*i.e.*, that it has a "proper analogue" in some historically prominent regulation. *See id.* at 32, 27. In short, it is not Appellee's burden to show that laws analogous to the Act were long *rejected*. It is the State's burden to show that a ban like the Act was long *accepted*. *See Heller v. District of Columbia,* 670 F.3d 1244, 1253 (D.C. Cir. 2011) (that "a regulation that is 'longstanding' [and thus presumptively lawful under *Heller*] … necessarily means it has long been accepted by the public").

Illinois cannot make that showing. There were no restrictions on firing capacity, reloading mechanisms, or the kinds of attachments the state has singled out, anytime near 1791, "the critical year for determining the [Second Amendment's] historical meaning." *See Moore v. Madigan,* 702 F.3d 933, 935 (7th Cir. 2012). And these types of arms were not new, even then: "[T]he first firearm that could fire more than ten rounds without reloading was invented around 1580," and several such handguns and long guns "pre-date the American Revolution." *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), *and on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert.*

*granted, judgment vacated*, 142 S.Ct. 2895 (2022), *and vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022). Indeed, "[p]rior to the 1990's, there was no national history of banning weapons because they were equipped with furniture like pistol grips, collapsible stocks, flash hiders, flare launchers, or barrel shrouds." *Miller*, 542 F.Supp.3d at 1024.

Most tellingly, the federal government had no nation-wide restrictions on "assault weapons" until 1994—a law that it subsequently let expire. Such bans in the states remain exceedingly rare. When the Act took effect in Illinois, only eight other states[13] singled out so-called "assault weapons" for special restrictions, and all those state restrictions are newer than the internet: California (Jan. 1, 1990); New Jersey (Sept. 1, 1990); Hawaii (July 1, 1992, assault pistols only); Connecticut (Oct. 1, 1993); Maryland (June 1, 1994, assault pistols only, expanded to include long guns effective Oct. 1, 2013); Massachusetts (codification of federal assault weapons ban effective July 23, 1998, with new state licensing requirements effective Oct. 21, 1998); New York (Nov. 1, 2000); and Delaware (June 30, 2022).

To be sure, a District of Columbia ban on "machinegun[s]" also banned those that shot "semiautomatically" and dates to 1932. *See Miller v. Bonta*, 542 F. Supp. 3d 1009, 1025 (S.D. Cal. 2021). This ban has been re-codified by the District various times and in its current version continues to prohibit assault weapons. *See* 56 D.C. Reg. 3438 (May 1, 2009); D.C. Code §§ 7-2502.02(a)(6), 7-2501.01(3A)(A). But D.C.'s 1932 regulation of "semiautomatic" weapons is an obvious historical outlier and still far too new to reflect anything like a tradition of similar firearm regulation relevant for Second Amendment purposes. *See Miller,* 542 F. Supp. at 1025 (stating "this Court finds that the District of Columbia regulation is insufficient to demonstrate a

---

[13] Prior to 1990, only three states had imposed some restrictions on *semi*automatic firearms, all subsequently repealed: Michigan (1927, repealed in 1959); Rhode Island (1927, repealed in 1975); Ohio (1933, repealed in 2014). *See Duncan v. Becerra*, 970 F.3d 1133, 1150 & n.10 (9th Cir. 2020).

longstanding prohibition on semiautomatic modern firearms")

In short, a tradition of state laws dating only to 1990 come far too late in the record to serve as an indicator of a "historical tradition." *Bruen*, 597 U.S. at 17. If a "handful of late 19th-century laws cannot make for a tradition, *id.* at 37, a handful of state laws only in effect for the last 40 surely cannot. Similarly, laws passed centuries before the founding of our nation, such as the Statute of Northampton, are not analogous enough to justify an infringement on the Second Amendment rights of law-abiding citizens. The District Court notably and rightfully observed:

> Seeking ancient laws that may partner well with a present-day infringement on a right proclaimed in the Bill of Rights without reading it in conjunction with the aforementioned history is nonsense. The Statute of Northampton cannot in the least bit be used to vex the rights of Illinois citizens in the 21st century to keep and bear arms. The oft-quoted phrase that "no right is absolute" does not mean that fundamental rights precariously subsist subject to the whims, caprice, or appetite of government officials or judges.

*Barnett I*, 756 F.Supp.3d at 659.

Moreover, Illinois can point to no "dramatic technological change[]" or "unprecedented societal concern[]" regarding such weapons since 1990. *See id.* at 27. As detailed above, semiautomatic firearms have been around for more than a century, while the compelling "societal concern" regarding safeguarding the lives of innocent civilians from violence is as old as any weapon known to man, was undoubtedly shared by those who drafted and ratified the Second Amendment, and has been shared by all upstanding Americans since. Furthermore, the Supreme Court has explicitly recognized that semiautomatic rifles like the AR-15 are "civilian" firearms and are included in the category of those firearms "traditionally … widely accepted as lawful possessions." *Staples v. United States*, 511 U.S. 600, 603, 612 (1994).

In short, there is no "enduring American tradition of state regulation" forbidding the purchase or possession of semiautomatic rifles and pistols by law-abiding citizens for lawful

purposes. *See Bruen*, 597 U.S. 67. To the contrary, the American tradition is one of *protecting* the right of the people to possess firearms that, like semiautomatic rifles and pistols, are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 624-25. Because Illinois cannot "affirmatively prove" that such an extensive regulation "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *Bruen*, 597 U.S. at 19, the Act unconstitutionally infringes upon Second Amendment rights. *See id.* at 24.

### B.  There is no "historical tradition" of banning 10+ capacity magazines.

The same holds true for the Act's ban on magazines that hold 10+ rounds. Such arms are "presumptively protect[ed]" by the Second Amendment, so Illinois would have to "affirmatively prove that its [magazine ban] is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 2127.

Illinois cannot make that showing. As the Ninth Circuit found, "when the Founders ratified the Second Amendment, no laws restricted ammunition capacity despite multi-shot firearms having been in existence for some 200 years." *Duncan v. Becerra*, 970 F.3d 1133, 1150 (9th Cir. 2020). At the earliest, such laws "emerged in 1927." *Id*. at 1150-51.  But laws enacted for the first time in the twentieth century "come too late to provide insight into the meaning of [the Constitution]." *Bruen*, 597 U.S. at 36 (alteration in original) (quoting *Sprint Communs. Co., L.P. v. APCC Services*, 554 U.S. 269, 312 (2008) (Roberts, C.J., dissenting)); see also *Bruen*, 597 U.S. at 37 (rejecting reliance on "late-19th-century [laws]").

Even if the history of magazine restrictions could be dated to earlier than 1927 (which it cannot) such laws would remain highly unusual in America today. The federal government did not restrict magazine capacity until 1994—and Congress likewise allowed that law to expire in 2004

after the DOJ study revealed that it had produced "no discernible reduction" in gun violence.[14] Currently, only 13 other states have laws analogous to Illinois's magazine capacity limit, with four of them only dating to 2022.[15]

The absence of historical laws restricting firing capacity does not mean that recent history has witnessed some "dramatic technological change[]" or "unprecedented societal concern[.]" *Bruen*, 597 U.S.. at 27. Firearms capable of firing more than 10 rounds long predate the Founding. *See Duncan*, 970 F.3d at 1147. They were marketed to and bought by civilians from the start. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Atty. Gen. of N.J.*, 974 F.3d 237, 255 (3d Cir. 2020) (Matey, C.J. dissenting). It cannot be denied that "magazines of more than ten rounds ha[ve] been well established in the mainstream of American gun ownership" for a very long time.[16]

In sum, once again, there is no "enduring American tradition of state regulation" forbidding the purchase or possession of magazines capable of holding more than 10 rounds by law-abiding citizens for lawful purposes. *Bruen*, 597 U.S. at 68. Our American tradition is one of protecting the right of the people to possess arms that, like these ubiquitous magazines, are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 624-25. Because Illinois cannot "affirmatively prove that its … regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *Bruen*, 597 U.S. at 19, the magazine ban unconstitutionally infringes upon Second Amendment rights, *id*. at 24.

## CONCLUSION

---

[14] Koper *et al., supra*, at 96.
[15] *See Large Capacity Magazines, Summary of State Law*, Giffords Law Center, https://tinyurl.com/5n82cbn8 (last accessed May 30, 2025).

[16] David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849 (2015) at 862.

Many Americans of good will continue to debate the merits of our Country's broad-based culture of gun ownership. Some fear broad gun rights facilitate violence by criminals. Others contend that while the law should take aggressive steps to stop criminals, it must also respect responsible citizens' rights to own commonplace firearms as an effective means of self-defense against those very same criminals, making the public more secure, not less. While this debate will undoubtedly endure, at least this much has been settled since 1791: the Second Amendment – "the very product of an interest balancing by the" founding generation which ratified it – "elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense. *Bruen*, 597 U.S. at 25 (citing *Heller*, 544 U.S. at 635). As correctly explained by the District Court, "[t]he Second Amendment is a time-honored civil right that has been enshrined in our Constitution for centuries; it deserves at least the same respect as befitting its status in the Bill of Rights." *Barnett I*, 756 F.Supp.3d at 637. Therefore, no state may "prohibit[] … an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose." *Heller*, 554 U.S. at 628. Yet, the Act bans entire categories of firearms and firearm components and accessories (i.e., magazines) undoubtedly in common use for lawful purposes today. It is therefore unconstitutional under the Second Amendment, as authoritatively held by *Heller* and *Bruen*.

Certain firearms – like the AR-15 – may seem excessive and menacing to those with little experience with firearms, but they are quite normal and valuable to millions of responsible, law-abiding Americans. In fact, it is the experience of the thirty-five *Amici*, as the chief law-enforcement officers of our respective counties that the overwhelmingly common use of such firearms is self-defense and recreation – for which they are well-suited – and not violent crime.

Like all Americans, *Amici* are horrified by the mass shootings and violence our nation has experienced. These are heartbreaking reminders of how much pain and sorrow violent individuals

with evil intentions can cause. As prosecutors, we go to work every day to deter such crimes, command justice for victims, put those who do harm to our communities behind bars, and protect our residents by strengthening the justice system and enforcing the rule of law.

It is in service to that same rule of law that we urge this honorable Court to support and uphold the Constitutionally protected rights enshrined in the Second Amendment - the right of the people to own commonplace firearms so they can defend hearth and home and live freely with the means to secure their own and others' ultimate safety. *Amici* respectfully contend this Court should affirm the District Court's correct conclusion:

> [W]hile mass shootings and firearm related deaths are universally tragic and senseless, the Government has not met its burden to prove that the history and tradition of firearm regulations supports PICA's expansive sweep, covering hundreds of models of weapons, magazines, and attachments used by tens of millions of law-abiding United States citizens.

*Barnett I*, 756 F.Supp.3d at 654.

WHEREFORE, *Amici* pray that this honorable Court affirm the District Court's holding and find the Act unconstitutional under the Second Amendment and thereby secure the constitutionally protected rights of law-abiding, responsible citizens in the counties represented by *Amici*, and throughout Illinois.

Dated: June 13, 2025                    Respectfully submitted,

/s/ *Thomas A. Haine*
Thomas A. Haine,
Madison County State's Attorney
*Lead Counsel for Amici Curiae*
157 N. Main
Street, Suite 402
Edwardsville, IL
62025
(618) 692-6280
tahaine@madisoncountyil.gov

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Seventh Circuit Rule 29 because this brief contains 6,600 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Seventh Circuit Rule 32(b) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Times New Roman font.


Dated: June 13, 2025

/s/ *Thomas A. Haine*
Thomas A. Haine,
Madison County State's Attorney
*Lead Counsel for Amici Curiae*
157 N. Main Street, Suite 402
Edwardsville, IL 62025
(618) 692-6280
tahaine@madisoncountyil.gov

## CERTIFICATE OF SERVICE

I certify that on June 13, 2025, I electronically filed the attached Brief of Amici with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished via the CM/ECF system.


Dated: June 13, 2025

/s/ *Thomas A. Haine*