Nos. 24-3060, 24-3061, 24-3062, 24-3063 (consol.)

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| CALEB BARNETT, BRIAN NORMAN, HOOD'S GUNS & MORE, PRO GUN AND INDOOR RANGE, and NATIONAL SHOOTING SPORTS FOUNDATION, INC., | ) ) ) ) ) | Appeal from the United States District Court for the Southern District of Illinois |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 3:23-cv-00209-SPM |
| KWAME RAOUL, Attorney General of the State of Illinois, and BRENDAN F. KELLY, Director of the Illinois State Police, | ) ) ) ) ) | The Honorable STEPHEN P. McGLYNN, |
| Defendants-Appellants. | ) ) | Judge Presiding.[1] |

**REPLY BRIEF OF STATE DEFENDANTS**

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

**SARAH A. HUNGER**
Deputy Solicitor General
**MEGAN L. BROWN**
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(224) 204-9642 (office)
(312) 415-6318 (cell)
Megan.Brown@ilag.gov

115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3000

Attorneys for State Defendants

**ORAL ARGUMENT REQUESTED**

---

[1] Together with *Harrel v. Raoul*, No. 24-3061; *Langley v. Kelly*, No. 24-3062; and *Federal Firearms Licensees of Illinois v. Pritzker (FFL)*, No. 24-3063.

# TABLE OF CONTENTS

**Page(s)**

ARGUMENT ............................................................................................. 1

I.    The Act's restrictions are consistent with the Second Amendment. ................ 1

    A.    The standard of review is *de novo*. ............................................ 1

    B.    Plaintiffs' proposed conduct is not protected by the Second Amendment. .......................................................................... 3

        1.    The regulated items are not "Arms." ............................................ 3

            a.    The regulated items are militaristic. ................................. 3

            b.    The regulated items are not suitable for self-defense. ...... 8

            c.    The regulated items are not commonly used for self-defense. ................................................................. 12

        2.    The regulated attachments, accessories, and magazines are accoutrements unprotected by the Second Amendment. ........... 15

    C.    The Act is consistent with the Nation's historical tradition of firearms regulation. ............................................................. 16

        1.    The "more nuanced approach" applies. ..................................... 16

        2.    The Act is relevantly similar to historical analogues. .............. 20

    D.    The district court entered overbroad and improper relief. ................... 24

II.    *Bevis* should not be overruled. ........................................................ 25

CONCLUSION ...................................................................................... 28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amcast Indus. Corp. v. Detrex Corp.*,
   2 F.3d 746 (7th Cir. 1993) ................................................................. 25

*Best v. Taylor Mach. Works*,
   179 Ill. 2d 367 (1997) ...................................................................... 25

*Bevis v. City of Naperville*,
   85 F.4th 1175 (7th Cir. 2023) ...................................................*passim*

*Bianchi v. Brown*,
   111 F.4th 438 (4th Cir. 2024) (*en banc*) ......................... 4, 12, 17, 18

*Brooks v. Walls*,
   279 F.3d 518 (7th Cir. 2002) ........................................................ 25-26

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ............................................................................ 9

*Doe v. Prosecutor, Marion Cnty.*,
   705 F.3d 694 (7th Cir. 2013) .............................................................. 2

*Duncan v. Bonta*,
   133 F.4th 852 (9th Cir. 2025) (*en banc*) ................................... 14, 24

*Erdman v. City of Madison*,
   91 F.4th 465 (7th Cir. 2024) ............................................................... 1

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) ........................................................ 15-16

*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir. 2015) ................................................ 4, 12, 20

*Garland v. Cargill*,
   602 U.S. 406 (2024) ............................................................................. 4

*Glaser v. Wound Care Consultants, Inc.*,
   570 F.3d 907 (7th Cir. 2009) ........................................................... 26

*Harrel v. Raoul,*
    144 S. Ct. 2491 (2024) ................................................................. 26

*In re Sw. Airlines Voucher Litig.,*
    799 F.3d 701 (7th Cir. 2015) ...................................................... 25

*Langevin v. Chenango Ct., Inc.,*
    447 F.2d 296 (7th Cir. 1971) ....................................................... 2

*Lombardo v. United States,*
    860 F.3d 547 (7th Cir. 2017) ................................................. 26-27

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    597 U.S. 1 (2022) ........................................................... 15-16, 19

*Rosiles-Camarena v. Holder,*
    735 F.3d 534 (7th Cir. 2013) ....................................................... 2

*State v. Huntly,*
    25 N.C. 418 (1843) ................................................................... 21

*Tully v. Okeson,*
    78 F.4th 377 (7th Cir. 2023) ..................................................... 27

*United States v. Alaniz,*
    69 F.4th 1124 (9th Cir. 2023) ................................................... 18

*United States v. Guinn,*
    89 F.4th 838 (10th Cir. 2023) ................................................... 24

*United States v. Rahimi,*
    602 U.S. 680 (2024) ................................................................. 21

*United States v. Rush,*
    130 F.4th 633 (7th Cir. 2025) ................................................ 1, 26

*Viramontes v. Cook Cnty.,*
    No. 24-1437, 2025 WL 1553896 (7th Cir. June 2, 2025)............ 13, 26

## Statutes and Regulations

1856-1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled 'Revenue,' ch. 34 § 23,
pt.4.............................................................................................. 24

720 ILCS 5/24-1.9(a) ................................................................ 11

720 ILCS 5/24-1.9(a)(1)(A) ....................................................... 8

720 ILCS 5/24-1.10 ................................................................. 11

Act 56. Passed March 2, 1631, http://bit.ly/44Z8iPj ..................... 24

Pub. Act 102-1116, § 97 (2023) ................................................ 25

**Rules**

7th Cir. R. 40(e) .................................................................... 26

**Other Authorities**

*Statistics*, ISP, http://bit.ly/4o9xoUs .......................................... 13

*QuickFacts: Illinois*, U.S. Census Bureau, http://bit.ly/45jJOBu ............................. 13

## ARGUMENT

As explained in defendants' opening brief, the evidence developed on remand demonstrates, as this court preliminarily held in *Bevis v. City of Naperville*, 85 F.4th 1175, 1194 (7th Cir. 2023), that the Protect Illinois Communities Act is constitutional. Plaintiffs' contrary arguments are rooted in their belief that *Bevis* was wrong and that the district court's decision should be afforded deference. But as explained below, this court reviews legal conclusions *de novo*, and the district court made no clear factual findings for this court to review, let alone afford deference. Furthermore, there is no reason to modify or disturb *Bevis*, as would be required to accept plaintiffs' arguments in support of affirmance. *Bevis* faithfully applied Supreme Court precedent, is consistent with the opinions of every other court of appeals to have addressed the constitutionality of statutes like the Act, and aligns with the record evidence. The district court's decision should be reversed.

## I.    The Act's restrictions are consistent with the Second Amendment.

### A.    The standard of review is *de novo*.

In an appeal from a bench trial, this court reviews a district court's conclusions of law *de novo*. *Erdman v. City of Madison*, 91 F.4th 465, 470 (7th Cir. 2024). Here, as defendants explained, the district court's holding that the Act is unconstitutional resolved a legal question and thus is reviewed *de novo*. AT Br.19-20; *United States v. Rush*, 130 F.4th 633, 635-36 (7th Cir. 2025). Plaintiffs offer no direct response. *E.g.*, *Barnett* Br.15-16. Nor could they: in the district court, plaintiffs argued that the Act's constitutionality rests on legislative facts, which

typically arise in cases presenting "'questions of law.'"  Doc.251 at 2 (quoting *Langevin v. Chenango Ct., Inc.*, 447 F.2d 296, 300 (2d Cir. 1971)).

Instead, plaintiffs argue that the decision should be reviewed for clear error because the district court "made explicit 'Findings of Fact' all throughout its decision." *Barnett* Br.15.  This is untrue.  AT Br.20.  The "findings of fact" plaintiffs cite are primarily in the introduction, SA2, and the recitation of the parties' *proposed* findings of facts, SA86-99, with the remainder embedded in the district court's legal conclusions, SA100-18.  The inaccuracy of plaintiffs' position is underscored by their briefing:  they cite almost exclusively to their *proposed* findings of fact, rather than the district court's decision (or to the evidence).  *E.g.*, *Barnett* Br. (Argument includes 91 citations to plaintiffs' proposed findings of fact).

But even if the Act's constitutionality were not a question of law and the district court had made findings of fact, this case would call for a less deferential standard of review than "clear error."  This court has stated that "only adjudicative facts"—*i.e.,* facts that "concern the parties' conduct"—"are entitled to the clearly erroneous standard of review."  *Doe v. Prosecutor, Marion Cnty.*, 705 F.3d 694, 697 n.4 (7th Cir. 2013).  However, "[w]hen a decision depends on characteristics of non-litigants . . . and establishes a rule with a broad scope, the appellate role can be more expansive" than in a case that is "person specific."  *Rosiles-Camarena v. Holder*, 735 F.3d 534, 538 (7th Cir. 2013).  As noted, plaintiffs agreed below that the facts underpinning this case were legislative, not adjudicative.  Doc.251 at 2-5.

**B.     Plaintiffs' proposed conduct is not protected by the Second Amendment.**

*Bevis*'s preliminary determination that the regulated items are not Second Amendment "Arms" was confirmed by the evidence presented at trial in two ways. AT Br.22-31.  First, the evidence showed that the regulated items are militaristic and not commonly used or appropriate for self-defense.  *Id.* at 22-29.  Second, the evidence showed that LCMs and regulated accessories are "accoutrements," not Arms.  *Id.* at 30-31.

**1.     The regulated items are not "Arms."**

The evidence supports *Bevis*'s initial conclusion that assault weapons (in particular, AR-15s) and LCMs are not protected by the Second Amendment because they are more like military-grade weaponry than the many different types of firearms used for individual self-defense.  AT Br.22-28.  Plaintiffs' contrary arguments are not persuasive.

**a.     The regulated items are militaristic.**

First, the evidence confirmed that the regulated items are not "Arms" because their exceptional lethality makes them similar to military-grade weaponry like machineguns.  AT Br.22-28.

Plaintiffs' primary argument to the contrary—that the regulated items "are not exclusively or predominantly useful in military service" because none "has ever been used by any military force on the planet," *Barnett* Br.31 (cleaned up)—was rejected by *Bevis*'s majority and embraced only by the dissent, *see* AT Br.21.  As the majority rightly explained, *Bruen*'s first step asks whether the regulated items are

commonly used for individual self-defense. *Bevis*, 85 F.4th at 1193. Weapons used for other purposes, like those that are "exclusively or predominantly useful in military service," are not protected by the Second Amendment. *Id.* at 1194; *Friedman v. City of Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015) (*Heller* distinguished between weapons "in common use at the time," such as by private citizens in their militia duties, and "military-grade weapons" of the "sort that would be in a militia's armory," like "machine guns" or "weapons especially attractive to criminals"). In other words, this standard does not turn on whether the military issues a specific weapon to its members. Nor should it: under plaintiffs' approach, States could have constitutionally regulated semiautomatic rifles in the 1950s when the U.S. military equipped its soldiers with the semiautomatic M1 Garand, but not in the 1960s once select-fire rifles were introduced. Doc.234 at 121:2-6.

Nor is plaintiffs' proposed standard supported by Supreme Court precedent. According to plaintiffs, the Court "has treated the difference between automatic and semiautomatic firearms as not only meaningful, but legally dispositive in numerous contexts." *Barnett* Br.32. But the only case cited for that proposition—*Garland v. Cargill*, 602 U.S. 406 (2024)—has no bearing on the issues here. *Cargill* "rested on a close reading of statutory text and regulatory deviation from it." *Bianchi v. Brown*, 111 F.4th 438, 456 (4th Cir. 2024) (*en banc*).

Plaintiffs alternatively argue that even under *Bevis*, affirmance is warranted because the evidence showed "a sharper distinction" between automatic and

4

semiautomatic weapons that disproves "*Bevis*'s hypothesis that the AR-15 is almost the same gun as the M16." *Barnett* Br.32 (cleaned up). To make this argument, plaintiffs rely on the difference between semiautomatic and automatic *fire*, which, given the evidence presented below, makes no constitutional difference. AT Br.24-26. And, in any event, this difference is immaterial in practice given that servicemembers use M16s almost exclusively in semiautomatic mode, which, as explained, operates identically to AR-15s. *Id.* at 23-27.

To start, the M16's rate of fire when used in automatic mode does not support plaintiffs' position. *Barnett* Br.33. To be sure, a weapon firing automatically will fire more rounds per minute than a weapon firing semiautomatically. But the difference between these modes of fire is much smaller once real-world limitations are placed on both weapons. AT Br.25-26. Nor is it material that the evidence presented on remand did not mirror *Bevis*'s preliminary assessment. *See Barnett* Br.33. *Bevis* relied on theoretical rates of fire, and the record was subsequently supplemented with evidence about how M16s and AR-15s operate in practice, including their "maximum effective firing rate." The difference is only 135 rounds per minute. Doc.247-37 at 39 (M16 fires approximately 45-65 rounds per minute semiautomatically and 150-200 rounds per minute automatically). In *Bevis*, the court anticipated that a M16 firing automatically would fire 400 more rounds per minute than an AR-15 yet described them as essentially the "same gun," 85 F.4th at 1195-97, likely because their firing rate *combined* with their similar muzzle

velocity, effective range, and wounding capability makes both types of weapons phenomenally lethal, even when firing semiautomatically, AT Br.22-28.

Plaintiffs also note that "automatic firearms work differently than semiautomatic rifles" and need a "totally different build," making them "subject to exact standards of military specificity and rigorous quality-insurance inspections." *Barnett* Br.34 (cleaned up). But these "standards"—which ensure durability and operating requirements for extreme temperatures, Doc.236 at 240:12-241:4—are immaterial because they affect only where a weapon can be used and how long it can remain in circulation, not its lethality on the battlefield or its unsuitability for self-defense. Similarly, plaintiffs are incorrect that to be constitutional, the Act needed to draw distinctions based on barrel length or ammunition. *Barnett* Br.35-37. Barrel length is irrelevant to whether a weapon is militaristic: many servicemembers carry M4s, which have a *shorter* barrel than M16s but are "functionally identical" and "more convenient" for riflemen. Doc.241 at 570:17-571:1; *see also* Doc.222-3 ¶3. And the fact that M16s and AR-15s need not always be chambered with the same ammunition does not change the fact that when chambered with the same ammunition (as is often the case, Doc.185-1 ¶102), they have the same range, muzzle velocity, and energy.

Plaintiffs also argue that defendants "downplay the M16's select-fire capability." *Barnett* Br.33. But defendants' position is not that automatic fire is *never* useful (or used) in combat. Defendants simply make the commonsense point that when determining whether a weapon is militaristic, the focus should be on how

6

the military *typically* uses the weapon. AT Br.24-25. Here*,* every military expert testified that they rarely—if ever—fired their rifle automatically. *Id.* After all, the military did not, contrary to plaintiffs' suggestion, select the M16 solely because of its ability to fire automatically. *Barnett* Br.33. Rather, as defendants' military experts testified, the M16's tactical purpose is to "kill specific enemy targets with well-aimed, effective fire," and this is best achieved using the weapon's semiautomatic setting. Doc.222-3 ¶16; Doc.222-2 ¶10. Plaintiffs' experts did not disagree. *E.g.* Doc.232-17 at 6 (admitting that semiautomatic rifle fire has been standard in combat during last 60 years).

Finally, there is no merit to plaintiffs' arguments about the other regulated items. Plaintiffs suggest that LCMs are not militaristic, *Barnett* Br.38-39, but they ignore that the U.S. military equips its soldiers with 30-round LCMs for its rifles, Doc.240 at 541:14-18. Plaintiffs accuse defendants of providing "no argument regarding the semiautomatic AK-type rifles," *Barnett* Br.30 n.7, but defendants' brief addressed these weapons, AT Br.27, and the record showed that AK-type weapons are militaristic, Doc.185-1 ¶123 ("The semi-automatic versions of the AK-47 have the exact same firepower as their military counterparts, but without select-fire capability.").

Nor are plaintiffs correct that there is "no serious dispute about the district court's conclusion regarding the semiautomatic pistols and shotguns" the Act restricts. *Barnett* Br.30-31. For starters, the district court reached no "conclusion"—factual or otherwise—about those weapons. SA107-13. And the

7

record established that the restricted pistols and shotguns are descended from military weapons.  *E.g.*, Doc.185-1 ¶¶152-62, 167-77; AT Br.27-28.  The military often equips infantrymen with a carbine,[2] and plaintiffs' expert admitted that he would not allow students to bring the restricted pistols to his "defensive pistol" courses because they are "in the carbine category."  Doc.240 at 426:7-23.  Moreover, many of the shotguns the Act regulates have unusual features that make them unlike most shotguns on the market, yet similar to AR-15s.  Doc.185-1 ¶¶170-74 (many regulated shotguns incorporate AR- or AK-style features, and at least one advertises itself as "a shotgun for the battlefield").

> **b.    The regulated items are not suitable for self-defense.**

Plaintiffs advance three arguments to support their view that the regulated items are "Arms" protected by the Second Amendment because they are purportedly well-suited for self-defense.  None is persuasive.

First, plaintiffs assert that "'semiautomatic firearms that accept detachable magazines are so well suited for defense of self or others as to render all other types of firearms obsolete for that purpose.'"  *Barnett* Br.17-18 (quoting SA87).  Even if true, this would be irrelevant because many semiautomatic firearms that accept detachable magazines are not regulated by the Act.  *E.g.*, 720 ILCS 5/24-1.9(a)(1)(A) (restricting semiautomatic rifles with detachable magazines *and* one or more enumerated features).  In fact, that is among the reasons that the Act is

---

[2] A "carbine" is generally defined to be a compact version of a full-size rifle.  Doc.185-1 ¶45 & n.21.

constitutional:  it preserves access to a wide range of firearms that are suitable for self-defense.  AT Br.50.

Second, concerning assault rifles specifically, plaintiffs claim that they are more suitable for self-defense than machineguns and sawed-off shotguns.  *Barnett* Br.18.  But to determine if assault rifles are "Arms" that ordinary people would use in the home for self-defense, it is more appropriate to compare them to the "quintessential" self-defense weapon:  the semiautomatic handgun, *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008).  The difference between assault rifles and handguns is stark.  AR-15s with standard military-caliber ammunition have an effective range that exceeds the range necessary in a typical self-defense scenario by 90 times, Doc.247-37 at 39; Doc.234 178:20-22, and can fire through walls and injure bystanders, Doc.185-1 ¶180.  And the magazines the Act restricts contain far more ammunition than is necessary for the two or three shots typically used in self-defense scenarios.  Doc.185-8 ¶¶ 11-13; AT Br.28-29.  By contrast, the effective range of semiautomatic handguns (approximately 50 yards) is more appropriate for self-defense scenarios.  Doc.185-1 ¶28(e).  Such handguns also carry a lower risk of over-penetration and wounding potential due to their lower muzzle velocity.  Doc.234 at 200:16-21.  They are easily accessed in an emergency, cannot readily be wrestled away by an attacker, are easily handled by those with weak upper-body strength, and can be used one-handed while calling for help.  *Heller*, 554 U.S. at 629.  The Act thus reflects what most Americans already know:  civilian self-defense does not require AR-15s or similar weapons.

9

Third, Plaintiffs argue that "ordinary, law-abiding people *would* find firearms equipped with the features [the Act] singles out useful for civilian self-defense." *Barnett* Br.21 (emphasis added). But this argument confirms what defendants have said all along: plaintiffs have no evidence that civilians *actually* find firearms with these features useful for self-defense, let alone that they commonly use them for that purpose. Instead, plaintiffs theorize that the features that render these weapons useful in combat scenarios, Doc.185-1 ¶90, could also be useful for self-defense, especially as to unidentified individuals who are "'infirm, small-statured, or [have] limited firearms training.'" *Barnett* Br.19-20 (quoting SA105). But plaintiffs offer no evidence that this is true, or that individuals with such preferences exist. In other words, it is plaintiffs (and not defendants) that are supplanting the judgment of Illinoisians and opining on "whether people *should* keep them for self-defense." *Id.* at 23 (emphasis in original).

Moreover, the evidence plaintiffs did offer has flaws. Plaintiffs note that their expert (Boone) described AR-15s as the "weapon of choice" for civilian self-defense. *Barnett* Br.27 (citing Doc.232-18 ¶¶38-44). But Boone's declaration reveals that AR-type rifles are actually the "weapon of choice" for the U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). Doc.232-18 ¶¶38-39. And the presentation Boone cites in his report reveals that ATF made AR-type rifles its weapon of choice because its officers often need to "mak[e] entry into residences" and arrest "suspects using body armor," *id.* at 28—considerations irrelevant to civilian self-defense.

As for plaintiffs' claim that defendants have "not dispute[d] a single piece of evidence Plaintiffs put forward establishing that those features aid in civilian self-defense," *Barnett* Br.19-20, this is untrue. By its terms, the Act singles out features that, individually or in combination, render the regulated items ill-suited for civilian self-defense but uniquely dangerous as offensive, militaristic weapons. *See* 720 ILCS 5/24-1.9(a), 1.10. And defendants presented evidence demonstrating that each regulated feature has a military history, was developed for use in combat, and is unnecessary for civilian self-defense. Doc.185-1 ¶¶90-99.

For example, flash suppressors, which reduce the light emitted when a projectile is fired and thus help to "conceal the shooter's position," are not needed for self-defense. Instead, this feature is useful in combat when "acquir[ing] additional targets in a short[ ] period of time," a circumstance not typical of self-defense scenarios. *Id.* ¶94. Likewise, protruding foregrips are not found on traditional sporting firearms; they became widespread in the civilian market only after the U.S. military accepted a system that allowed foregrips to be easily attached to weapons. *Id.* ¶92. Their purpose is to increase the hit probability of multiple successive shots, *id.*—a goal of semiautomatic fire in combat, Doc.222-3 ¶16. But civilians rarely fire more than five shots in self-defense. Doc.185-8 ¶11. Barrel shrouds also are useful in combat, where rapid semiautomatic fire is the single most important fire technique, Doc.222-3 ¶22, because they allow shooters "to steady and control the rifle during rapid, repeat firing without being burned by a hot barrel," Doc.185-1 ¶96. But there was no evidence that technique is necessary

11

or even advisable for civilian self-defense.  At bottom, plaintiffs did not present

evidence showing the regulated items were suitable for self-defense.

> ### c.      The regulated items are not commonly used for self-defense.

Plaintiffs also contend that regardless of whether the regulated items are

suitable for civilian self-defense, they are "Arms" because civilians commonly

possess them for lawful purposes.  *Barnett* Br.21-23.  As support for this argument,

plaintiffs rely on sales and ownership data.  *Id.*  At the threshold, plaintiffs are

incorrect that such data is relevant to the Act's constitutionality.  Most obviously,

relying on a weapon's supposed popularity runs headlong into *Bevis*, 85 F.4th at

1198, and *Friedman*, 784 F.3d at 409, which declared that argument "circular."

Furthermore, it does not account for the fact that Americans rarely use the

regulated weapons or magazines for self-defense purposes.  AT Br.32-33.  As this

court and others have explained, the "Arms the Second Amendment is talking about

are weapons in common *use*" for individual self-defense.  85 F.4th at 1192 (emphasis

added); *Bianchi*, 111 F.4th at 460 ("choice of the phrase common *use* instead of

common *possession* suggests that only instances of 'active employment' of the

weapon should count, and perhaps only active employment in self-defense"

(emphasis in original)).

There are also evidentiary issues with plaintiffs' argument.  As even the

district court recognized, much of the plaintiffs' evidence on this point was

unreliable, and thus stricken from the record.  Doc.257 at 10-22.  Plaintiffs note

that 82,000 firearms were registered under the Act.  *Barnett* Br.21.  But even if

each registered firearm belonged to a unique individual, that would mean that they were owned by only 0.64% of Illinois's population and 3% of Illinois's firearm licensees.[3] Moreover, these percentages are almost certainly lower: 36,000 individuals submitted registration affidavits for those 82,000 firearms.[4] Relatedly, plaintiffs cite the district court's estimate that between 14.1 and 18.2 million adults own AR-platform rifles. *Barnett* Br.22. Even if these national numbers were more probative than the Illinois-specific data, that would amount to only 5% of Americans. In short, the evidence showed that these firearms are *not* widely possessed.[5]

Plaintiffs also argue that the Act is unconstitutional as to certain categories of regulated items—such as rifles, pistols, and shotguns—by pointing to purported failings of proof and argument by defendants. *Barnett* Br.22. But it is plaintiffs' burden to make these showings, not defendants'. *Bevis*, 85 F.4th at 1194; *Viramontes v. Cook Cnty.*, No. 24-1437, 2025 WL 1553896, *2 (7th Cir. June 2, 2025). And plaintiffs' numerical data does not shed light on any category of regulated item; instead, it provides information about *all* semiautomatic rifles,

---

[3] *See QuickFacts: Illinois*, U.S. Census Bureau, http://bit.ly/45jJOBu; *Statistics*, ISP, http://bit.ly/4o9xoUs (2.4 million firearm licensees in Illinois). All websites last visited August 14, 2025.

[4] *Statistics*, ISP, http://bit.ly/4o9xoUs.

[5] Plaintiffs' related assertion that the district court properly credited their expert's anecdotal testimony that "modern sporting rifles" are widely purchased and used for "lawful purposes such as self-defense, hunting, and target practice," *Barnett* Br.22 (cleaned up), is likewise belied by this data because it shows that only a very small percentage of Americans own these weapons.

pistols, and handguns.  Doc.253 ¶¶91, 111-13.  In fact, plaintiffs' expert admitted that using plaintiffs' data, he was unable to opine on the number of any particular item that was sold in a given year.  Doc.232-12 at 136:12-16.

About LCMs, plaintiffs describe testimony that having more ammunition available makes a person safer, as well as anecdotal incidents in which an individual fired more than 10 bullets in self-defense.  *Barnett* Br.37-39; *Harrel* Br.58-59.  These isolated incidents cannot undermine the data establishing that civilians use between two and three bullets on average when firing in self-defense.  Doc.185-8 ¶¶11-13.  And even in the hypothetical situation in which more than 10 shots from a long gun or more than 15 shots from a handgun might be desired, the Act presents no problem:  it regulates only how many shots can be fired without reloading, not the total amount of ammunition a person can have.  *See Duncan v. Bonta*, 133 F.4th 852, 878 (9th Cir. 2025) (*en banc*).

Finally, plaintiffs contend that the regulated items are "'dual use'" weapons entitled to Second Amendment protection.  *Barnett* Br.28-29 (quoting *Bevis*, 85 F.4th at 1195 n.8 ).  In making this argument, plaintiffs appear to assume any weapon not used exclusively by the military is a "dual use" weapon, *see id.*, but that could not have been this court's meaning because it recognized that AR-15s were not used in the military yet did not consider them "dual use."  Instead, "dual use" simply acknowledges that there are weapons that are in common use for self-defense *and* are deployed by the military.  *E.g.*, Doc.222-3 ¶35 ("[P]istols in the military are primarily used for the same purpose they are in civilian life: self-

defense.").  Because plaintiffs have not shown that the regulated items are commonly used for self-defense, they cannot fall into this category.

### 2.    The regulated attachments, accessories, and magazines are accoutrements unprotected by the Second Amendment.

As explained, AT Br.30-31, LCMs and other accessories are outside of the scope of the Second Amendment for an additional reason:  they are "accoutrements," not "Arms."  Plaintiffs do not directly address this point.  Instead, they point to the fact that, unlike "Founding-era storage cases," a magazine is necessary for semiautomatic fire.  *Barnett* Br.40-41 ("[W]ithout a magazine, one cannot load more than one round of ammunition into a semiautomatic firearm.").  This is irrelevant: the Act restricts LCMs, not all magazines that enable semiautomatic fire.  AT Br.30-31.  And, as plaintiffs appear to recognize, LCMs are not necessary to the operation of semiautomatic weapons.  *Barnett* Br.41 (court need not "ask what is 'necessary' for self-defense; it simply asks whether a bearable instrument 'facilitates armed self-defense'") (cleaned up).  Indeed, any firearm that can accept a detachable LCM can also accept magazines that hold fewer rounds and work just as well.  Doc.185-1 ¶111.

Nor is there any merit to plaintiffs' argument that the Second Amendment applies to accessories that "facilitate" firearms' operation for self-defense.  *Barnett* Br.41-42; *FFL* Br.6-9; U.S. Br.22-26.  The reason that the Second Amendment extends to accessories that are necessary to operate firearms is because restricting such accessories effectively restricts the use of the firearm itself.  *E.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011), *abrogated on other grounds by N.Y.*

*State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 16, 18-19 (2022).  The same is not true for accessories that facilitate, but are not necessary to, firearms' operation.  Here, individuals in Illinois remain able to purchase and possess magazines and ammunition necessary to operate their firearms.

### C.   The Act is consistent with the Nation's historical tradition of firearms regulation.

Even if plaintiffs had shown that the regulated items are Second Amendment "Arms," this court should reverse the district court's decision because the Act is "consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 24.  The two "central considerations" for determining whether the historical inquiry is satisfied are "whether [the] modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified."  *Id.* at 29 (cleaned up).  Where, as here, the modern regulation implicates "unprecedented societal concerns or dramatic technological changes," courts should apply a "more nuanced approach" to the inquiry.  *Id.* at 27.  Because the Act is analogous to the historical tradition of regulating dangerous and unusual weapons with or without the nuanced approach, AT Br.49-54, the district court erred in determining that the Act violates the Second Amendment.

### 1.   The "more nuanced approach" applies.

To begin, *Bruen*'s "more nuanced approach" is warranted because the Act implicates both dramatic technological changes and unprecedented societal concerns.  As to technological changes, the Act regulates items that were not in existence during the Founding or Reconstruction eras and that were made possible

only by advancements in weapons technology in the mid-20th century.  AT Br.44-
48.  And the phenomenal lethality associated with these technological
advancements allows lone shooters armed with assault weapons and LCMs to
murder many people at once.  AT Br.49; *Bianchi*, 111 F.4th at 463-64 (new
technologies compound the problem of mass shootings).  The increasing frequency
and severity of these mass shootings confirms this is an unprecedented societal
concern.  AT Br.46-47.

Plaintiffs make three arguments in response, but none is persuasive.  First,
plaintiffs assert that mass shootings do not constitute an unprecedented societal
concern because "mass murder has been a fact of life in the United States since the
mid-nineteenth century."  *Barnett* Br.52 (cleaned up).  In other words, plaintiffs
seek to define the relevant societal concern at a level of generality that would group
together all forms of mass murder throughout history.  *Id.* at 53.  But the Act is not
responding to the threat of mass murder generally.  Rather, the Act responds to the
modern and unprecedented public-safety threat of lone shooters increasingly using
assault weapons and LCMs to commit multiple murders within minutes or even
seconds.  AT Br.47-49.  The evidence showed that, before the advent of modern
weapons technology, mass murder was "a group activity," not one undertaken by
single individuals.  *Id.* at 49.  And even in the late 19th and early 20th centuries,
with the advent of dynamite and submachine guns, groups were still required to kill
large numbers of people.  *Id.*  Now, however, lone gunmen can use assault weapons
and LCMs "to commit mass murder."  *Id.*  This threat differs in material respects

17

from those in prior eras and constitutes an unprecedented societal concern. *E.g.*, *United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023) (rejecting argument that "felony drug trafficking presents the same 'perceived societal problem,' as did smuggling crimes in the founding era").[6]

Second, plaintiffs assert that although mass shootings are increasing in frequency, the regulated items "are not 'intrinsic' to that problem." *Barnett* Br.53. Plaintiffs are incorrect: the evidence showed that LCMs and firearms like AR-15s *are* driving up the lethality of shootings. *E.g.*, Doc.185-9 ¶¶34-35 (559% increase in the number of LCMs recovered at shootings by Chicago Police Department); Doc.190-1 at 43 (assault weapons used in 75% of all mass shootings resulting in more than 20 deaths); *see also* 7th.Cir.Doc.38 at 11-14 (describing how LCMs and assault weapons have proliferated in Chicago, driving up fatalities). Indeed, although plaintiffs insist that assault weapons and LCMs are not commonly used in mass shootings, between 2019 and 2022, over half of all mass shooting incidents resulting in six or more deaths involved assault weapons, and *all* of these shootings involved magazines greater than 10 rounds. Doc.190-1 at 39-40. The Act is therefore targeting the weapons and magazines that mass shooters prefer. *Id.*

Third, plaintiffs claim that assault weapons and LCMs "are not 'dramatic modern' innovations," but reflect a gradual growth in the "capabilities and ubiquity

---

[6] Plaintiffs also accuse defendants of ignoring historical "atrocities committed against disfavored groups." *Barnett* Br.52-53. This history is shameful. But armed mobs are different in kind from lone shooters capable of extinguishing or permanently altering dozens of lives in seconds without any chance for law enforcement to respond. AT Br.47; *Bianchi*, 111 F.4th at 463-64.

18

of multi-shot and featured firearms." *Barnett* Br.53-54.  By making this argument, plaintiffs do not contest that today's high-powered, rapid-fire semiautomatic weapons are materially distinct from founding-era muskets and fowling pieces.  AT Br.44-46.  Instead, they claim that "[a]dvancements in firearm accuracy and capacity" do not constitute a dramatic technological shift.  *Barnett* Br.54.  But this is incorrect.  The Cold War–era developments—which enabled rifles to fire rounds at a high velocity, high rate of delivery, and high degree of accuracy at long range—represented a material and substantial technological change from the earlier multi-shot weapons, including the semiautomatic firearms that came into existence during the late 19th and early 20th centuries.  AT Br.45-46; Doc.232-17 at 11 (plaintiffs' experts describing AR-platform rifle as "most significant design in weaponry" in the past "60 years").  And these changes, as reflected by the contemporaneous records of the AR-15's initial testers, resulted in "phenomenal lethality."  Doc.185-1 ¶39.

Nor is it true that applying the "more nuanced approach" to such advancements would "confine" people to "arms that are less accurate, efficient, and reliable." *Barnett* Br.54.  Even under the nuanced approach, defendants must show that the regulations are "relevantly similar" in why and how they burden the individual right to self-defense. *Bruen*, 597 U.S. at 28-29.  And as explained, AT Br.50, the Act's restrictions do not prevent Illinoisans from possessing many types of modern weapons, including many popular semiautomatic handguns, *see* Doc.185-1 ¶¶188-90, that are accurate, efficient, and reliable.

## 2.    The Act is relevantly similar to historical analogues.

Regardless of whether the court applies a "more nuanced approach," the Act respects the Second Amendment because it is consistent with our nation's tradition of regulating the possession and use of dangerous and unusual weapons by civilians. AT Br.35-54. The Act works similarly to historical firearms regulations because it explicitly preserves access to less dangerous weapons more suitable for self-defense, and it was enacted for a similar reason: the protection of the public from especially lethal weapons. *Id.*

Plaintiffs challenge this conclusion by first asserting that the regulated items must be *both* dangerous and unusual to fall within this tradition. *Barnett* Br.43. According to plaintiffs, defendants have failed to satisfy the "unusual" prong because assault weapons and LCMs are "common *today*." *Id.* at 44 (emphasis in original). Likewise, plaintiffs claim that the "dangerous" prong is not met because a weapon is dangerous only if it is "dangerous in a way that *distinguishes* it from common arms, which a common arm plainly is not." *Id.* (emphasis in original). In other words, notwithstanding plaintiffs' assertion that the "dangerous and unusual" standard is a "conjunctive" test, *id.* at 43, plaintiffs propose a standard that would collapse the dangerous and unusual tradition into a single inquiry that rests on "commonality." This court has rightly rejected such a standard—which flows from the premise that the government cannot regulate a weapon once it reaches a certain degree of popularity—as circular. *Bevis*, 85 F.4th at 1198; *Friedman*, 784 F.3d at 409.

20

In any event, plaintiffs are also wrong as a factual and historical matter. As discussed, *supra* 12-14, the regulated items are not "common." Furthermore, history establishes that popular weapons can be considered "unusual." *E.g.*, *State v. Huntly*, 25 N.C. 418, 422 (1843) (rejecting argument that a "double-barrelled gun, or any other gun, cannot in this country come under the description of 'unusual weapons'" just because many "in the community . . . own[ed] and occasionally use[d] a gun"); Doc.185-5 ¶¶65-72 (discussing "ubiquity" of concerns over Bowie knives, which were widely used in fights and led to broad legislative response). Indeed, it is the growing popularity of weapons and their increasing danger to the public that tends to trigger regulation in the first place. AT Br.38-42, 51.

Plaintiffs next argue that defendants' historical analogues "bear no meaningful resemblance to [the Act]." *Barnett* Br.47. To start, plaintiffs attempt to discount any historical analogue regulating the carriage of dangerous weapons, claiming that those laws "burden[ed] the right to armed self-defense in a way different in kind from a law that bans keeping and carrying entirely." *Barnett* Br.48. But this argument flouts *Bevis*, 85 F.4th at 1201 (citing concealed carry laws as analogues), and runs counter to *United States v. Rahimi*, 602 U.S. 680 (2024). Indeed, the Supreme Court made clear that its Second Amendment precedents "were not meant to suggest a law trapped in amber." *Rahimi*, 602 U.S. at 691. Instead, the critical inquiry is whether a "challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id.* at 692 (emphasis added). And here, concealed carry regulations, like the Act, impose a limited burden on the

right to self-defense by restricting dangerous and unusual weapons in a manner that is tailored to the nature of the public-safety threat posed by the specific weapon in question.

Plaintiffs next take issue with the specific subset of carriage laws that prohibited carriage that "'breached the peace' or caused 'terror.'" *Barnett* Br.48. Specifically, plaintiffs appear to argue that under *Rahimi*, these laws (and surety laws) can only be analogues for contemporary laws that "temporarily disarm individuals who have been found to be dangerous." *Id.* But *Rahimi* contains no such limitation, and there is no reason to impose one here.

Plaintiffs also claim that the 1746 Boston law outlawing the discharge of certain weapons within city limits cannot suffice "to justify a modern law banning an entire class of arms." *Id.* at 49. Otherwise, plaintiffs claim, "*Heller* should have come out the other way." *Id.* But no one has proffered this law for that purpose or claimed that the entirety of the relevant historical tradition rests on this example. Instead, as *Bevis* explained, 85 F.4th at 1201; *see also* AT Br.38, this law is just one example of how States and municipalities allowed law enforcement and military officials to use weapons in ways that were banned for civilians.

Similarly, plaintiffs attempt to discredit the "twentieth-century laws restricting possession of automatic weapons" by arguing that the existence of these laws undermines the "tradition of banning semiautomatic firearms." *Barnett* Br.50 (cleaned up). According to plaintiffs, "[w]hile many laws restricting *automatic* firearms took hold during Prohibition, the few state laws that restricted

22

*semi*automatic firearms did not categorically prohibit their sale or possession." *Id.*
(emphasis in original).  But the reason that laws restricting automatic weapons
were more prevalent during that time is because they were responding to the
increased use of automatic weapons in violent crime.  Doc.185-5 ¶¶14-31.  Similarly,
laws regulating assault weapons coincided with the increased use of these weapons
in mass shootings following their proliferation into the civilian market upon
expiration of the federal assault weapons ban.  Doc.185-7 at 35.

    In addition to critiquing these specific analogues, plaintiffs make the blanket
assertion that defendants cannot rely on a "historical tradition of regulating
firearms in service of public safety." *Barnett* Br.51.  But that misdescribes
defendants' argument, as well as *Bevis*, which concluded that the public-safety
justifications underlying the Act are consistent with those that prompted historical
legislatures to "regulat[e] weapons to advance similar purposes." 85 F.4th at 1200.
Like their regulatory predecessors, the Act was passed in response to a developing
phenomenon involving especially dangerous weapons:  the emergence of assault
weapons and LCMs as the weapons of choice for mass shooters.  AT Br.51.

    Finally, plaintiffs assert that defendants failed to point to a sufficient
historical analogue for either the LCM regulations or the registration requirement.
*Barnett* Br.43, 51; *FFL* Br.10-12.  As to the former, plaintiffs have provided no basis
to assess LCMs separately for purposes of the historical analysis.  On the contrary,
the tradition articulated by defendants, and described in *Bevis*, 85 F.4th at 1202,
encompasses all regulated items.  And regardless, defendants cited historical laws

specific to ammunition.  AT Br.37-38; *see also Duncan*, 133 F.4th at 877-78.  As to

the latter, as *Bevis* recognized, so long as the rest of the Act complies with the

Second Amendment, the registration requirement "will be valid as long as it can

withstand rational basis review."  *Bevis*, 85 F.4th at 1202; *see id.* at 1219 (Brennan,

J., dissenting).  Moreover, the Act's registration requirement is "no more onerous

than many found in history."  *Id.* at 1199.  Indeed, governments have been counting

arms since the Colonial Era.  *See* Act 56. Passed March 2, 1631, http://bit.ly/44Z8iPj

(Viriginia colony law requiring the annual accounting of "armes and munition" held

by inhabitants); *see also* 1856-1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled

'Revenue,' ch. 34 § 23, pt. 4 (tax on pistols, with exception for mustering); Doc.248 at

58 n.43.

### D.     The district court entered overbroad and improper relief.

Lastly, the district court wrongly enjoined the entirety of the Act—even those

provisions that plaintiffs did not challenge or that the court concluded were

constitutional—upon determining that the Act is not severable.  *See* AT Br.55-57.[7]

Plaintiffs assert at the threshold that defendants have forfeited this argument.

*Barnett* Br.55-56.  This is not true.  An argument made for the first time on appeal

is not forfeited when the district court *sua sponte* raises and explicitly resolves the

issue of law on the merits.  *E.g.*, *United States v. Guinn*, 89 F.4th 838, 846 (10th Cir.

2023).  As to the merits, under Illinois law, the Act is presumptively severable

---

[7]  Plaintiffs do not contest that the court entered an improper judgment against the
State.  *Barnett* Br.56 n.14.

because it contains a severability provision.  *See* Pub. Act 102-1116, § 97 (2023);

*Best v. Taylor Mach. Works*, 179 Ill. 2d 367, 460 (1997) (severability clause creates a

rebuttable presumption that legislature intended statute to be severable).  To

overcome this presumption, plaintiffs were required to show that severing the

unconstitutional portions would significantly undercut the Act's legislative purpose.

*Barnett* Br.55 (citing *Best*, 179 Ill. 2d at 461).  Plaintiffs did not present this

argument below, let alone make such a showing.

Regardless, this court has discretion to address the severability issue.  *In re*

*Sw. Airlines Voucher Litig.*, 799 F.3d 701, 714 (7th Cir. 2015) ("[W]e have discretion

to decide issues of law not argued in the district court[.]").  Use of that discretion is

particularly appropriate here, where the district court was the first to raise

severability, which is a question of law.  *Amcast Indus. Corp v. Detrex Corp.*, 2 F.3d

746, 749-50 (7th Cir. 1993) (particularly appropriate for this court to address new

argument when argument is "fully argued in the brief of the appellant" and rests

"entirely on a pure issue of statutory interpretation").  At minimum, if this court

should determine that portions of the Act are unconstitutional, it should remand

the issue to the district court so that the parties can make arguments as to

severability in the first instance.

## II.   *Bevis* should not be overruled.

Alternatively, plaintiffs argue that this court should overrule *Bevis*.  *Harrel*

Br.12-65; *Barnett* Br.16 n.3; *FFL* Br.1; U.S. Br.2, 15 & 6, 20-21.  This is both

procedurally improper and substantively unwarranted.  To start, "one panel of this

court cannot overrule another implicitly."  *Brooks v. Walls*, 279 F.3d 518, 522 (7th

Cir. 2002).  Instead, it must comply with Circuit Rule 40(e), which would require circulating the opinion to the whole court for a vote on whether "to rehear en banc the issue of whether the position should be adopted."  As this court has recognized, this exercise, as well as traditional *en banc* review, is reserved for limited circumstances, including when there is an intervening Supreme Court decision casting doubt on this court's precedent, a circuit split, or an intracircuit conflict. *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 915-16 (7th Cir. 2009).  None applies here.

As to the first, there are no such Supreme Court cases, intervening or otherwise.  In fact, the Court has not yet "squarely addressed what types of weapons are 'Arms' protected by the Second Amendment," *Harrel v. Raoul*, 144 S. Ct. 2491, 2492 (2024) (Thomas, J., respecting denial of certiorari), let alone whether restricting assault weapons and LCMs is constitutional.  Furthermore, overruling *Bevis* would *create* a circuit split (not resolve one), since every court of appeals to address the constitutionality of restrictions on assault weapons or LCMs has upheld those restrictions.  AT Br.17 (collecting cases).  Finally, there is no conflict among this circuit's decisions.  On the contrary, this court recently declined to overrule *Bevis* in a case where the plaintiffs made the same arguments presented here. *Viramontes*, 2025 WL 1553896, *2; *see also Rush*, 130 F.4th at 639 (applying *Bevis* and rejecting arguments to overrule it).  In short, there is no basis for this court to overturn *Bevis*.  *E.g.*, *Lombardo v. United States*, 860 F.3d 547, 559 (7th Cir. 2017)

(rejecting argument where it "would require us to overturn our own precedent on this topic and create a circuit split").

Nevertheless, plaintiffs wrongly claim that this court can and should overrule *Bevis* because "[t]he unique posture of this appeal means that *Bevis* is entitled to no deference." *Harrel* Br.52.[8]  According to plaintiffs, under *Tully v. Okeson*, 78 F.4th 377 (7th Cir. 2023), "legal and factual rulings made as part of a preliminary-injunction analysis are not binding upon panels when they later consider the matter on the merits." *Id.* (internal quotations omitted).  But *Tully* is inapposite, since the court there decided not to apply the law of the case doctrine to its legal conclusions because those conclusions did not drive its preliminary injunction decision.  78 F.4th at 382.  Instead, the court's decision was determined in large part by the desire not to change voting rules on the eve of the 2020 election, when state resources were taxed by its Covid-19 response.  *Id.*  By the time the case reached the merits stage, however, those concerns were alleviated, and the court decided to review the legal issues anew.  *Id.*  In *Bevis*, however, the court conducted a fulsome merits analysis that weighed heavily in its preliminary decision.  85 F.4th at 1182.  And that merits decision, as explained throughout defendants' opening brief, is entirely consistent with the framework outlined by the Supreme Court in *Heller* and *Bruen*, and reaffirmed in *Rahimi*.

---

[8]  Plaintiffs also assert that there is a "compelling reason" to overrule *Bevis* because the court made a "manifest error" when it "misread one of the analogue statutes it relied upon to craft its military-arms rule."  *Harrel* Br.55.  Even if correct (which it is not), a misreading of a single analogue in the robust historical tradition discussed cannot be a "compelling reason."

## CONCLUSION

Defendants request that this court reverse the district court's judgment and vacate the permanent injunction.

Respectfully submitted,

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3000

Attorneys for the State Defendants

/s/ Megan L. Brown
**SARAH A. HUNGER**
Deputy Solicitor General
**MEGAN L. BROWN**
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(224) 204-9642 (office)
(312) 415-6318 (cell)
Megan.Brown@ilag.gov

August 14, 2025

**CERTIFICATE OF COMPLIANCE WITH PAGE LIMIT, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

I hereby certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word for Microsoft 365, in 12-point Century Schoolbook font, and complies with Seventh Circuit Rule 32(c) in that the brief contains 7,000 words.

/s/ Megan L. Brown
MEGAN L. BROWN
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(224) 204-9642 (office)
(312) 415-6318 (cell)
Megan.Brown@ilag.gov

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on August 14, 2025, I electronically filed the foregoing Reply Brief of State Defendants with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

I certify that the other participants in this appeal, named below, are CM/ECF users and will be served by the CM/ECF system.

Paul D. Clement
paul.clement@clementmurphy.com

Erin Murphy
erin.murphy@clementmurphy.com

Matthew Rowen
matthew.rowen@clementmurphy.com

Nicholas Albert Aquart
nicholas.aquart@clementmurphy.com

Andrew Arthur Lothson
alothson@smbtrials.com

David G. Sigale
dsigale@sigalelaw.com

David Thompson
dthompson@cooperkirk.com

Peter J. Maag
lawmaag@gmail.com

Thomas G. Maag
tmaag@maaglaw.com

Carl D. Michel
cmichel@michellawyers.com

Sean Anthony Brady
seanabrady@startmail.com

Jennifer Craigmile Neubauer
jcneubauer@shawlawltd.com

Mark L. Shaw
mlshaw@shawlawltd.com

Jennifer Loeb
jennifer.loeb@freshfields.com

Barry K. Arrington
barry@arringtonpc.com

Jonathon D. Byrer
jonathon.byrer@cookcountysao.org

Jeremy M. Feigenbaum
jeremy.feigenbaum@njoag.gov

Thomas A. Haine
tahaine@madisoncountyil.gov

Donald Kilmer Jr.
don@dklawoffice.com

Jason Manion
jason.manion2@usdoj.gov

Elizabeth Tisher
elizabeth.tisher@cityofchicago.org

Jordan Wilkow
jwilkow@tdrlawfirm.com

/s/ Megan L. Brown
MEGAN L. BROWN
Assistant Attorney General

115 South LaSalle Street
Chicago, Illinois 60603
(224) 204-9642 (office)
(312) 415-6318 (cell)
Megan.Brown@ilag.gov