In the

# United States Court of Appeals
## For the Seventh Circuit

―――――――――――

Nos. 24-3060, 24-3061, 24-3062 & 24-3063

CALEB BARNETT, *et al.*,

*Plaintiffs-Appellees*,

*v.*

KWAME RAOUL, Attorney General of
the State of Illinois, *et al.*,

*Defendants-Appellants*.

―――――――――――

Appeals from the United States District Court for the
Southern District of Illinois.
Nos. 3:23-cv-209, 3:23-cv-141, 3:23-cv-192 & 3:23-cv-215 —
**Stephen P. McGlynn**, *Judge*.

―――――――――――

ARGUED SEPTEMBER 22, 2025 — DECIDED JULY 9, 2026

―――――――――――

Before BRENNAN, *Chief Judge*, and EASTERBROOK and ST.
EVE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. In 2023, six months after a mass
shooting at a Chicago suburb's Independence Day parade left
seven dead and dozens more wounded, Illinois enacted the
Protect Illinois Communities Act. Among other things, the

Act criminalizes the manufacture, sale, delivery, purchase, and possession of assault weapons and large-capacity magazines. A grandfather clause permits preexisting lawful owners of the regulated items to continue possessing them.

Plaintiffs across Illinois swiftly challenged the Act, suing state and local officials for declaratory and injunctive relief protecting their right to keep and bear arms. One federal court granted a preliminary injunction, two did not, and all three losing parties appealed. We consolidated their appeals and held in *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023), that the plaintiffs were unlikely to succeed on the merits of their challenges.

One of the consolidated cases in *Bevis* was *Barnett v. Raoul*, which itself was the lead case for a set of four similar challenges pending in the Southern District of Illinois. After building out the record following *Bevis*, the *Barnett* parties proceeded to a bench trial. In the end, the district court held that much of the Act violated the Second Amendment and that the offending provisions were not severable. The court therefore enjoined enforcement of the Act in its entirety. The defendants appealed.

For reasons that follow, we focus on the Act's application to AR-15s and thirty-round rifle magazines. The Act's restrictions on these items, we hold, are consistent with the principles that underpin our Nation's tradition of firearm regulation. Whether to adopt them is thus a decision reposed in our elected representatives, and we reverse.

## I. Background

### A. The Protect Illinois Communities Act

The Protect Illinois Communities Act, *see* Pub. Act 102-1116 (2023), 2022 Ill. Laws 8833, covers a broad array of matters, both substantive and administrative, but its restrictions on weapons, parts, accessories, and the like are the subject of the disputes before us.

Beginning with the restrictions on firearms, the Act makes it unlawful to knowingly carry, possess, manufacture, sell, deliver, import, or purchase any assault weapon. 720 ILCS 5/24-1.9(b)–(c); *see* 720 ILCS 5/24-1(a)(15)–(16), (b). Given the range of conduct proscribed, the Act effectively amounts to a ban. That ban, however, does not apply to qualified law enforcement officers, members of the military performing official duties, and other similar groups. 720 ILCS 5/24-1.9(e).

The Act defines four types of weapons as assault weapons. First are semiautomatic rifles that can accept a detachable magazine and have at least one of the following features: a pistol grip or thumbhole stock; a protruding grip that can be held by the non-trigger hand; a folding, telescoping, thumbhole, or detachable stock; a flash suppressor; a grenade launcher; or a barrel shroud. *Id.* 5/24-1.9(a)(1)(A). Second and third, the Act bans semiautomatic pistols and shotguns that can accept detachable magazines and have at least one feature from enumerated lists, the details of which are not relevant here. *Id.* 5/24-1.9(a)(1)(C), (F). Finally, the Act bans certain firearms based on the type of ammunition feeding device they utilize—for example, semiautomatic weapons that can accept a belt ammunition feeding device. *Id.* 5/24-1.9(a)(1)(B), (D)–(E), (G). As with the expired federal assault weapon ban from

which Illinois borrowed, the Act defines assault weapons not only by reference to these features but also through a list of prohibited models, including the AR-15. *Id.* 5/24-1.9(a)(1)(J)–(L). The Act also bans "assault weapon attachments"—that is, "any device capable of being attached to a firearm that is specifically designed for making or converting a firearm into" an assault weapon. *Id.* 5/24-1.9(a)(3), (b)–(c).

The Act next criminalizes the knowing manufacture, delivery, sale, purchase, or possession of "large capacity ammunition feeding devices." *Id.* 5/24-1.10(b)–(c), (g). That term is defined to include "a magazine, belt, drum, feed strip, or similar device that has a capacity of" more than ten rounds for rifles and shotguns, and more than fifteen rounds for handguns. *Id.* 5/24-1.10(a)(1). We will focus, as the parties have, on magazines, the most common type of ammunition feeding device. And we will refer to the restricted ones as "large-capacity magazines."

Finally, the Act bans certain .50 caliber rifles and their cartridges, as well as any device or accessory—like a bump stock—"that is designed to and functions to increase the rate of fire of a semiautomatic firearm above the standard rate of fire for semiautomatic firearms." *Id.* 5/24-1.9(a)(6), 5/24-1(a)(14).

The Act's grandfather clauses provide significant exceptions to these restrictions. As to assault weapons, assault weapon attachments, .50 caliber rifles, or .50 caliber cartridges, preexisting lawful owners could continue possessing them if they provided the Illinois State Police an "endorsement affidavit" containing certain information by January 1, 2024. *Id.* 5/24-1.9(d). The required information consisted of the owner's firearm license number, an affirmation that he pos-

sessed the item before the Act went into effect, and the make, model, caliber, and serial number of the item. *Id.* 5/24-1.9(d)(1)–(3). This registration process, which was free, "create[d] a rebuttable presumption that the person [was] entitled to possess and transport the" restricted item. *Id.* 5/24-1.9(d)(3). As to large capacity ammunition feeding devices, preexisting lawful owners could continue possessing them (subject to locational restrictions) with no registration required. *Id.* 5/24-1.10(d). Those who move to Illinois today and wish to possess the restricted items may avail themselves of the grandfather clauses by applying for an Illinois firearm license and (for everything but the ammunition feeding devices) completing an endorsement affidavit within sixty days of moving. *Id.* 5/24-1.9(d), 5/24-1.10(d).

### B. Procedural History

Four related cases, which the district court consolidated, are now before us. *See Langley v. Kelly*, No. 3:23-cv-192 (S.D. Ill.); *Harrel v. Raoul*, No. 3:23-cv-141 (S.D. Ill.); *Barnett v. Raoul*, 3:23-cv-209 (S.D. Ill.); *Federal Firearms Licensees of Ill. v. Pritzker*, No. 3:23-cv-215 (S.D. Ill.). The plaintiffs consist of individuals, participants in the commercial firearm market, and organizations that advocate for Second Amendment rights. The defendants are a wide range of state and local officials charged with enforcing the Act in one way or another.

Each of the plaintiffs, relying on 42 U.S.C. § 1983, challenged the Act's ban on assault weapons, large-capacity magazines, and assault weapon attachments under the Second Amendment. The *Langley* and *Federal Firearms Licensees* plaintiffs further challenged the Act's ban on .50 caliber rifles and

cartridges. Only the *Langley* plaintiffs attacked the Act's registration requirement.[1]

After each set of plaintiffs moved for a preliminary injunction, the district court consolidated the four actions, designating *Barnett* as the lead case. It then granted the plaintiffs preliminary relief. *See generally Barnett v. Raoul*, 671 F. Supp. 3d 928 (S.D. Ill. 2023). But in functionally identical Second Amendment challenges, two district judges in the Northern District of Illinois came out the other way. *See generally Bevis v. City of Naperville*, 657 F. Supp. 3d 1052 (N.D. Ill. 2023); *Herrera v. Raoul*, 670 F. Supp. 3d 665 (N.D. Ill. 2023). So when all three losing parties appealed, we consolidated the three cases to unify the Act's status across Illinois and to guide the district courts and parties in litigating the cases to final judgment. *See generally Bevis*, 85 F.4th 1175.

When we decided *Bevis*, no circuit court had applied the Supreme Court's seminal decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), to assault weapons and large-capacity magazines. In *Bruen*, the Supreme Court established a new test governing Second Amendment claims: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.

*Bevis* sought to flesh out the *Bruen* inquiry, particularly its first step. Based on an analysis of *District of Columbia v. Heller*,

---

[1] The *Langley* plaintiffs also asserted a due process challenge below, but the district court granted summary judgment to the defendants on that claim. The *Langley* plaintiffs did not cross-appeal that decision.

554 U.S. 570 (2008), *Bevis* concluded that *Bruen*'s first step required "the plaintiffs in each of the cases before us [to show] that the weapons addressed in the pertinent legislation are Arms that ordinary people would keep at home for purposes of self-defense, not weapons that are exclusively or predominantly useful in military service, or weapons that are not possessed for lawful purposes." *Bevis*, 85 F.4th at 1194. If a regulated weapon meets this definition, it is an "Arm" covered by the Second Amendment's plain text, satisfying *Bruen*'s first step; if not, the regulation is constitutional without need to evaluate our historical tradition of firearm regulation.

Applying this test, *Bevis* concluded the plaintiffs were not likely to succeed on the merits of their Second Amendment challenges because AR-15s (which the court used as representative of the banned weapons) and large-capacity magazines "are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense (or so the legislature was entitled to conclude)." *Id.* at 1195. AR-15s, *Bevis* concluded, are not "materially different" from M16s—which *Heller* confirmed may be banned. *Id.* at 1195–97; *see Heller*, 554 U.S. at 627. To be sure, *Bevis* recognized that AR-15s are limited to semiautomatic fire, whereas M16s are capable of both semiautomatic and automatic fire. *See Bevis*, 85 F.4th at 1195–96. And *Bevis* recognized this difference in firing modes translates to a difference in firing rates. *Id.* at 1196. But *Bevis* ultimately concluded that the distinctions between AR-15s and M16s paled in comparison to their similarities, placing AR-15s beyond the Second Amendment's protections.

After assuming that the regulated items were "Arms" under the Second Amendment, *Bevis* went on to hold that the

Act also passed muster under *Bruen*'s second step. Our Nation's history of firearm regulation, *Bevis* concluded, revealed a tradition of reserving especially dangerous weapons for military use while leaving many other weapons available for civilians. *See id.* at 1197–1202. And the Act "respects and relies on" that tradition. *Id.* at 1202. We therefore vacated the preliminary injunctions that the district court had entered in *Barnett*, *Harrel*, *Langley*, and *Federal Firearms Licensees*. *See id.* at 1203.[2]

Following *Bevis*'s direction, the plaintiffs and defendants in *Barnett* and the consolidated cases developed the record. The parties stipulated to presenting much of the evidence on the papers, but the court also held a four-day bench trial. At the conclusion, the district court held in a thorough opinion that the Act's ban on assault weapons, assault weapon attachments, and large-capacity magazines violated the Second Amendment, as did the registration requirement.

Tackling *Bevis*'s "Arms" inquiry, the district court first concluded that ordinary citizens choose assault weapons, large-capacity magazines, and assault weapon attachments for self-defense. With respect to the firearms themselves, the court relied on both statistical evidence of these items' wide circulation and testimony from self-defense experts, firearm instructors, and a gun store owner. As for the large-capacity magazines, the court noted that "every round matters in a self-defense scenario." And the attachments, the district court reasoned, are "well-suited for self-defense," especially for "an individual who is infirm, small-statured, or has limited firearms

---

[2] The plaintiffs filed a petition for certiorari, which the Supreme Court denied. *See Harrel v. Raoul*, 144 S. Ct. 2491 (2024).

training." The district court concluded, by contrast, that law-abiding citizens would not choose .50 caliber rifles, their ammunition, .50 caliber pistols, belt-fed weapons, and grenade launchers for self-defense, so these items failed to qualify for presumptive constitutional protection under *Bevis*.

Moving to whether the regulated items are exclusively or predominantly useful in military service, the district court concluded that AR-15s are materially distinct from the M16 rifles that the U.S. military issues. The court first stressed that no military has ever issued AR-15s to its troops, largely because of their different firing modes: AR-15s can fire only semiautomatically, whereas M16s are capable of semiautomatic, automatic, and burst fire.[3] The court stressed, too, that AR-15s are not "subject to exact standards of military specificity and rigorous quality-insurance [sic] inspections." The court further held that large-capacity magazines and assault weapon attachments are not predominantly useful in military service because the military does not issue them for use in combat. And finally, the court concluded that people do not possess AR-15–style semiautomatic rifles, large-capacity magazines holding up to thirty rounds, and assault weapon attachments (other than grenade launchers) for unlawful purposes because most of the weapons are not used in illegal activity.

---

[3] Though *Bevis* had identified the difference in firing rates between AR-15s and M16s as important, the district court did not expressly make a finding on this matter. It came close, however, in a footnote—located in the court's summary of circuit caselaw—where it cited a U.S. Army manual stating that an M16 in automatic mode has a maximum effective firing rate of 150–200 rounds per minute, whereas in semiautomatic mode it has a maximum effective firing rate of 45–65 rounds per minute.

Having concluded that the items the Act regulates qualify as "Arms" for Second Amendment purposes under *Bevis*, the court proceeded to *Bruen*'s second step, where it held that the defendants failed to establish that the Act is consistent with our Nation's history of firearm regulation. At this stage, the court did not make or rely on factual findings undercutting the applicability of *Bevis*'s historical assessment. Instead, looking at essentially the same record as existed at the preliminary injunction stage, the district court found *Bevis*'s dissenting opinion more persuasive than its majority, holding that the historical analogues on which *Bevis* relied were insufficient to sustain the Act.

Because the district court concluded that the offending provisions of the Act were not severable, it enjoined the Act in its entirety. The court's permanent injunctions (one for each of the four cases), entered under Federal Rule of Civil Procedure 65, enjoined "the State of Illinois" from enforcing the Act against anyone.[4] The defendants appealed, and we granted their request to stay the district court's injunctions pending appeal.

## II. Discussion

### A. Standard of Review

We begin with our standard of review. We review the district court's decision to grant a permanent injunction for abuse of discretion. *See eBay Inc. v. MercExchange, L.L.C.*, 547

---

[4] Enjoining enforcement of the Act against *anyone*—i.e., entering a universal injunction—became problematic after the Supreme Court's decision in *Trump v. CASA, Inc.*, 606 U.S. 831, 837 (2025), but our conclusion in these appeals renders that flaw moot.

Nos. 24-3060 *et al.* 11

U.S. 388, 391 (2006); *Republic Techs. (NA), LLC v. BBK Tobacco & Foods, LLP*, 135 F.4th 572, 587 (7th Cir. 2025). On the merits, however, our standard of review is somewhat murkier. Though it is clear (and undisputed) that we review "the underlying question of constitutional law *de novo*," *Schoenthal v. Raoul*, 150 F.4th 889, 901 (7th Cir. 2025), it is less clear (and is disputed) how much deference, if any, we owe the district court's findings of fact.

As a general matter, Federal Rule of Civil Procedure 52(a) prescribes that on appellate review of a bench trial, "[f]indings of fact … must not be set aside unless clearly erroneous." That standard is satisfied only if we are "left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985). But the Supreme Court has recognized that appellate review may be more searching as to legislative facts than adjudicative facts. *See Lockhart v. McCree*, 476 U.S. 162, 168 n.3 (1986) ("We are far from persuaded … that the 'clearly erroneous' standard of Rule 52(a) applies to the kind of 'legislative' facts at issue here."); *see also Doe v. Prosecutor, Marion Cnty.*, 705 F.3d 694, 697 n.4 (7th Cir. 2013). Though the line between the two can be blurry, roughly speaking, "[l]egislative facts are those general considerations that move a lawmaking or rulemaking body to adopt a rule, as distinct from the facts which determine whether the rule was correctly applied." *Menora v. Ill. High Sch. Ass'n*, 683 F.2d 1030, 1036 (7th Cir. 1982); *see also Frank v. Walker*, 773 F.3d 783, 795 (7th Cir. 2014) (Posner, J., dissenting) ("The concept of a legislative fact comes into its own when there is no reason to believe that certain facts pertinent to a case vary from locality to locality, or from person to person; a typical definition of legislative facts is broad, general facts that are not unique to a particular case and provide

therefore an appropriate basis for legislation of general application."). And even for adjudicative facts, an exception to Rule 52(a) for so-called constitutional facts—ultimate facts in constitutional cases—might create yet another obstacle to clear-error review. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 510–14 (1984) (making an independent determination of "actual malice" for First Amendment purposes); *A Woman's Choice-E. Side Women's Clinic v. Newman*, 305 F.3d 684, 689 (7th Cir. 2002) (explaining that de novo review of constitutional facts "prevent[s] the idiosyncrasies of a single judge or jury from having far-reaching legal effects").

We need not wade into these murky waters, however. Instead, "[b]ecause we do not ultimately base our decision today on the invalidity of the lower court['s] factual findings, we need not decide the standard of review issue." *McCree*, 476 U.S. at 168 n.3 (citation modified). We therefore assume that the district court's factual findings are shielded by clear-error review.[5]

**B. The Plaintiffs' Facial Challenges**

Each of the plaintiffs presses a facial challenge against the Act's operative provisions in 720 ILCS 5/24-1.9(b)–(c) and 5/24-1.10(b)–(c). The former provisions make it unlawful to

---

[5] The defendants separately contend that the district court did not make *any* factual findings under Rule 52(a)(1)—which requires "the court" to "find the facts specially and state its conclusions of law separately"—because its opinion contained only introduction, background, and analysis sections. But substance, not form, determines compliance with Rule 52(a)(1). *See Bartsh v. Nw. Airlines, Inc.*, 831 F.2d 1297, 1304 (7th Cir. 1987); *see also Valsamis v. Gonzalez-Romero*, 748 F.3d 61, 63 (1st Cir. 2014). The district court made factual findings, even if it did not specifically delineate them.

"knowingly manufacture, deliver, sell, import, or purchase …
an assault weapon, assault weapon attachment, .50 caliber ri-
fle, or .50 caliber cartridge," 720 ILCS 5/24-1.9(b), or "to know-
ingly possess" these items, *id.* 5/24-1.9(c). The latter provisions
make it unlawful "to knowingly manufacture, deliver, sell,
[or] purchase … a large capacity ammunition feeding de-
vice," *id.* 5/24-1.10(b), or "to knowingly possess" one, *id.* 5/24-
1.10(c).[6]

The plaintiffs' decisions to pursue facial claims "come[] at
a cost," as the Supreme Court has "made facial challenges
hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024);
*see Wash. State Grange v. Wash. State Republican Party*, 552 U.S.
442, 450–51 (2008) (explaining that facial challenges are "dis-
favored" because they "often rest on speculation," "short cir-
cuit the democratic process," and "run contrary to the funda-
mental principle of judicial restraint"). To prevail on a claim
of facial invalidity, the challenger must "establish that no set
of circumstances exists under which the [challenged provi-
sions] would be valid." *United States v. Rahimi*, 602 U.S. 680,
693 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745
(1987)). In the context of these appeals, that standard requires
us to side with the defendants as to 720 ILCS 5/24-1.9(b) and
(c) if the Act's restriction of *any* "assault weapon, assault
weapon attachment, .50 caliber rifle, or .50 caliber cartridge"
is constitutional. The same goes with respect to 720 ILCS 5/24-
1.10(b) and (c) if the Act's restriction on any "large capacity
ammunition feeding device" is valid. *See, e.g., Bianchi v.*

---

[6] The *Federal Firearms Licensees* plaintiffs also challenge the endorse-
ment affidavit requirement (part of the Act's grandfather clause), which
we address below.

14                                          Nos. 24-3060 *et al.*

*Brown*, 111 F.4th 438, 452–54 (4th Cir. 2024) (en banc) (exemplifying this approach); *Capen v. Campbell*, 134 F.4th 660, 668–69 (1st Cir. 2025) (same).

The plaintiffs cannot satisfy this demanding standard. Indeed, they do not even advance arguments as to some of the items that 720 ILCS 5/24-1.9 and 5/24-1.10 regulate, *all* of which must be constitutionally protected for their facial claims to be viable. The Act, for example, restricts semiautomatic rifles that have grenade launchers attached, 720 ILCS 5/24-1.9(a)(1)(A)(v), yet the district court unsurprisingly held that the Act may ban these weapons because they are not in common use for lawful purposes, and no plaintiff argues otherwise on appeal. Likewise, the plaintiffs focus on magazines holding up to thirty rounds, but 720 ILCS 5/24-1.10's restriction of "large capacity ammunition feeding device[s]" also includes, among other things, belts and ammunition feeding devices holding more than thirty rounds. Notwithstanding their failure to substantiate their attack on every item that the challenged provisions regulate, the plaintiffs ask that we enjoin the Act in its entirety. But because the plaintiffs have not made the showing that Supreme Court precedent requires, "the broad relief their facial challenge seeks is not ours to grant." *Bianchi*, 111 F.4th at 453; *see also, e.g.*, *United States v. Charles*, 159 F.4th 545, 547 (8th Cir. 2025) (rejecting facial challenge to federal machine gun ban because some machine guns, such as the M230 machine gun mounted on military helicopters, are not bearable and thus lie beyond the Second Amendment's scope).

Following the Fourth Circuit's model under similar circumstances, we nonetheless proceed to evaluate the Act's restrictions on assault weapons and large-capacity magazines

based on the circumstances on which the parties have principally focused: an AR-15 (as representative of the banned rifles) and a thirty-round rifle magazine.[7] *See Bianchi*, 111 F.4th at 452–54. As in *Bianchi*, "the parties thoroughly briefed the issue of whether the Second Amendment protects a citizen's ability to purchase and possess" these items, and moreover, the parties developed a record focused primarily on them. *Id.* at 453–54. "Not to address [them] would be to bypass the very heart of the dispute in this proceeding." *Id.* at 454. It would also leave the two other cases *Bevis* consolidated, which remain pending in the Northern District of Illinois, in limbo.

## C. The Second Amendment

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The Supreme Court recognized in *Heller* that these words secure an individual right to keep and bear arms for self-defense, *see* 554 U.S. at 576–600—a right that Justice Story called "the palladium of the liberties of a republic," 2 Joseph Story, *Commentaries on the Constitution of the United States* 620 (4th ed. Boston, Little, Brown & Co. 1873). Two years after *Heller*, the Court confirmed that the states must respect that right by virtue of the Fourteenth Amendment. *See McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010). All Americans, therefore, may enjoy

---

[7] Thus, we do not resolve the constitutionality of the Act's application to the pistols and shotguns that the Act defines as assault weapons. Nor do we address pistol or shotgun magazines that qualify as large-capacity magazines under the Act. These restrictions, and any others not addressed in this opinion, are better left for another day and remain open to challenge on an as-applied basis.

the "means of self-defense" that "the right secures." *Rahimi*, 602 U.S. at 690.

Fundamental as it is, "the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. In this respect, the right to keep and bear arms is just like other constitutional rights. The Free Speech Clause does not enshrine an absolute right to express oneself however one sees fit. The Free Exercise Clause does not protect believers from any and all burdens on their religious practice. And the Second Amendment does not secure "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.*; *see Wolford v. Lopez*, 609 U.S. ----, No. 24-1046, 2026 WL 1825723, at *5 (June 25, 2026) ("[W]hile the founding generation cherished the Second Amendment right, they did not think it was absolute.").

What *does* distinguish the Second Amendment is the nature of the standard governing challenges brought under it. Rejecting means-end scrutiny in favor of history and tradition, the Court in *Bruen* set out a two-step framework for adjudicating challenges to firearm regulations. Courts first ask whether "the Second Amendment's plain text covers an individual's conduct"; if it does, "the Constitution presumptively protects that conduct." 597 U.S. at 17. At that point, the burden shifts to the government to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Only if the government carries that burden "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

In assessing whether a state's proffered historical analogues satisfy its step-two burden, courts should consider "the number of jurisdictions in which they were adopted," "the extent to which they were well-accepted," and whether they are "'relevantly similar' to the modern law." *Wolford*, 2026 WL 1825723, at *6. Ascertaining whether historical analogues are "relevantly similar" to a modern law in turn "requires consideration of 'how' the analogue restricted the keeping or bearing of arms" and "'why' the analogue restricted the keeping or bearing of arms." *Id.*

Especially because "states were not bound by the Second Amendment until the Fourteenth Amendment was ratified in 1868," we may rely on nineteenth-century statutes to shed light on the prevailing understanding of the right to keep and bear arms. *Schoenthal*, 150 F.4th at 913; *see United States v. Hemani*, 608 U.S. ----, No. 24-1234, 2026 WL 1751710, at *6 n.3 (June 18, 2026) (reserving the question "'whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868' or when the Bill of Rights was ratified in 1791" (quoting *Bruen*, 597 U.S. at 37–38)); *Wolford*, 2026 WL 1825723, at *13 (indicating that the adoption of the Fourteenth Amendment may be a relevant time period for purposes of ascertaining the Second Amendment's meaning); *see also Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 235 (2d Cir. 2025); *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1121 (11th Cir. 2025).

### D. AR-15s and Large-Capacity Magazines

We turn now to whether the Act's restrictions on AR-15s and thirty-round rifle magazines pass muster. We will assume for purposes of today's ruling that the regulated items are "Arms" under *Bevis*, such that their possession is presump-

tively entitled to constitutional protection, and move to *Bruen*'s second step. We hold that the Act is consistent with the principles that underpin our regulatory tradition. In short, legislatures have long imposed restrictions on particularly dangerous weapons, and the Act is but another chapter in that story.

As an initial matter, little has changed since we held in *Bevis* that the Act satisfies *Bruen*'s historical inquiry. *See* 85 F.4th at 1197–1202. To be sure, the parties developed the record in the years since *Bevis*. But that development—and the district court's factual findings—went almost exclusively to step one. By contrast, the historical laws in the record, and the parties' arguments about them, remain essentially the same as they stood at the preliminary injunction stage. Indeed, notable intervening developments favor the defendants. First, the Court decided *Rahimi*, which "clarified that the *Bruen* standard should not be misunderstood to mean that modern firearm regulations require close founding-era comparators." *United States v. Reyna*, 165 F.4th 1056, 1062 (7th Cir. 2026). And second, every circuit to have confronted the issue has agreed with our conclusion that legislatures may ban AR-15s and large-capacity magazines.[8] Though we do not rest on this point, we note that creating a conflict under these circum-

---

[8] *See Capen*, 134 F.4th at 668–77 (assault weapons and large-capacity magazines); *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 43–52 (1st Cir. 2024) (large-capacity magazines); *Lamont*, 153 F.4th at 235–47 (assault weapons and large-capacity magazines); *Bianchi*, 111 F.4th at 446–72 (assault weapons); *Duncan v. Bonta*, 133 F.4th 852, 865–84 (9th Cir. 2025) (en banc) (large-capacity magazines); *Hanson v. District of Columbia*, 120 F.4th 223, 234–43 (D.C. Cir. 2024) (large-capacity magazines).

stances would be imprudent. *See United States v. Tuggle*, 4 F.4th 505, 522 (7th Cir. 2021).

In any event, we remain persuaded by the unanimous circuit consensus. Using one or another label—"dangerous and unusual," "unusually dangerous," "especially dangerous," "particularly capable of unprecedented lethality"—these courts have coalesced around a largely overlapping set of historical regulations imposing targeted restrictions on weapons whose danger and lethality stand out. These courts have further concluded that those regulations justify restrictions on AR-15s and large-capacity magazines equivalent to those the Act imposes. *See Ocean State Tactical*, 95 F.4th at 44–52; *Capen*, 134 F.4th at 669–73; *Lamont*, 153 F.4th at 240–47; *Bianchi*, 111 F.4th at 464–72; *Duncan*, 133 F.4th at 874–84; *Hanson*, 120 F.4th at 234–40. Given the ground already covered, we think it unnecessary to reiterate the courts' analyses of each of the statutes comprising this tradition, which spans from the pre-Founding going-armed laws through today's machine gun ban.[9] Although we adopt the courts' well-reasoned analyses of these statutes, we focus here instead on a leading example of this tradition: regulations of the Bowie knife[10]—or, as one Reconstruction-era court called it, the "instrument of almost certain death." *Cockrum v. State*, 24 Tex. 394, 402 (1859).

---

[9] To be clear, we recognize that twentieth century machine gun bans are "insufficient to support a tradition of regulating [arms] in and of themselves." *Hanson*, 120 F.4th at 239. They "fit nicely," however, "into the tradition of regulating weapons particularly capable of unprecedented lethality." *Id.*

[10] The Second Amendment's plain text is not limited to firearms. *See Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016) (per curiam).

Popularized in the 1830s, Bowie knives came in a variety of forms, but "in its purest form" it was "a large knife with a clipped point" making the tip more piercing. Harold L. Peterson, *American Knives: The First History and Collectors' Guide* 26 (1958). These features, combined with the technological shortcomings plaguing the era's prominent firearms—which required the user to carefully reload after every shot, such that one missed shot could leave the user defenseless—made Bowie knives a popular choice for fights and duels.

Contrary to the dissenting opinion's efforts (often without citation) to conclusively link Bowie knives to criminality, however, Bowie knives were both widespread and used for lawful purposes. One expert in the history of arms in America, for example, explained that in the nineteenth century, "European visitors who ventured beyond the Appalachians found [the Bowie knife] such an integral part of the American way of life that they felt compelled to comment on it at length in accounts of their adventures…. In many communities, no man, whether hunter, gambler, tradesman or political leader felt himself fully clothed without one." Peterson, *supra*, at 25. Similarly, the historian who (literally) wrote the book on Bowie knives noted they were "widely carried by Americans of all stripes"; "served everyone equally, upstanding citizens and villains" alike; were "wide[ly] popular[], in the North and South" during the Civil War; and were "common[]"—"a weapon carried by men of all walks of life." Norm Flayderman, *The Bowie Knife: Unsheathing an American Legend* 20, 125, 130 (2004). Other scholars agree. *See* David B. Kopel, Clayton E. Cramer & Joseph Edward Olson, *Knives and the Second Amendment*, 47 U. Mich. J.L. Reform 167, 184 (2013) ("During the nineteenth century, Bowie knives were commonly present in many areas of the United States. Contemporary sources

leave no question that Bowie knives, Arkansas Toothpicks, and similar knives were a common part of American life until well after the Civil War….").

Bowie knives were also "particularly suitable for self-defense" and "typically possessed for self-defense." *Id.* at 180, 185; *see* Peterson, *supra,* at 26 ("[T]he original knife made for James Bowie was a large heavy knife suitable for both self-defense and general utility in the woods."); *Cockrum*, 24 Tex. at 402 (noting that "[t]he gun or pistol may miss its aim, and when discharged, its dangerous character is lost, or diminished at least," whereas the Bowie knife is "difficult to defend against"). Hunting served as another lawful purpose for which people owned Bowie knives. *See* Joseph E. Worcester, Dictionary of the English Language 165 (1860) (defining the term as "[a] large knife or dagger, used as a weapon, and carried by hunters in the South-western part of the United States"); *see also Wolford*, 2026 WL 1825723, at *4 n.4 ("[M]ost Americans in the late 18th century also 'undoubtedly thought' that the codified Second Amendment was 'important for hunting,' which, particularly for those moving west, was an important source of sustenance." (quoting *Heller*, 554 U.S. at 599)). But their "large blades … wreaked particularly bloody and gruesome injuries," *Lamont*, 153 F.4th at 243 (citation modified), and no doubt criminals misused them.

Legislatures responded accordingly, enacting criminal prohibitions that often authorized imprisonment. Some jurisdictions banned the carry of Bowie knives, with narrow exceptions or none at all—a broad proscription. *See* 1871 Tex. Laws 1st Sess. 25; 1881 Ark. Acts 191; 1889 Ariz. Sess. Laws 30. Others prohibited their concealed carry. *See, e.g.,* 1820 Ind. Acts 39; 1838 Va. Acts 76; 1838 Tenn. Pub. Acts 200; 1839 Ala.

Acts 67; 1878 Miss. Laws 175; 1879 N.C. Sess. Laws 231; 1880 S.C. Acts 448. While these restrictions targeted what one did in public, others burdened one's ability to own Bowie knives for use in private too, such as for defense of the home, by banning the sale of Bowie knives or imposing burdensome, and sometimes prohibitive, taxes. *See* 1838 Tenn. Pub. Acts 200 (banning sale); 1881 Ark. Acts 192 (same); 1837 Ala. Laws 7 ($100 tax per sale, which is equivalent to several thousand dollars today); 1838 Fla. Terr. Laws 36 ($200 per year tax on Bowie-knife sellers and $10 per year on Bowie-knife carriers).

The dissenting opinion seeks to undermine our reliance on the Texas, Arkansas, and Arizona carry bans, but it misapprehends these statutes. The dissenting opinion first claims that the Texas and Arizona statutes permitted carry for self-defense, but their exceptions were significantly narrower. The Arizona statute, for example, excepted only "one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack upon legal process." 1889 Ariz. Sess. Laws 30. The Texas statute employed a similar standard. *See* 1871 Tex. Laws 1st Sess. 25. In other words, neither statute permitted carry for self-defense generally; they allowed it only for those with a heightened and urgent need. *Bruen*'s holding—striking down a New York regime under which concealed carry licenses were available to only those with "a special need for self-protection distinguishable from that of the general community," 597 U.S. at 12—underscores that notwithstanding Arizona's and Texas's narrow exceptions, their statutes meaningfully burdened the right to armed self-defense.

The dissenting opinion next claims that the Arkansas statute did not apply to public carry because of its exception for those "carrying any weapon when upon a journey." 1881 Ark. Acts 191. The dissenting opinion ignores the meaning of "journey" in this statute. If "journey" were synonymous with "public carry," the statutory prohibition on "wear[ing] or carry[ing]" Bowie knives "in any manner whatever" would be sapped of all meaning. Instead, as the Supreme Court of Arkansas explained, "journey" meant something far more narrow. *See Carr v. State*, 34 Ark. 448, 449 (1879) ("The exception [for journeys] in [a statute proscribing concealed carry of a pistol] is to enable travelers to protect themselves on the highways, or in transit through populous places—not to allow them the privilege of mixing with the people in ordinary intercourse, about the streets, armed in a manner which, upon a sudden fit of passion, might endanger the lives of others. Travelers do not need weapons, whilst stopping in towns, any more than citizens do. They should lay them aside, unless the delay be slight, and the journey soon resumed."); *Hathcote v. State*, 17 S.W. 721, 722 (Ark. 1891) ("The prohibition was designed to stop the carrying of weapons on the streets, in society, and among one's habitual associates. The exception [for journeys] was designed to permit it when necessary to defend against perils of the highway to which strangers are exposed, and that are not supposed to exist among one's own neighbors.").

Contemporaneous court decisions rejected Second Amendment challenges (or those predicated on state-constitutional analogues) to statutes like these. In *Aymette v. State*, for example, the Supreme Court of Tennessee sustained, over the defendant's constitutional objection, a conviction for concealed carry of a Bowie knife. *See* 21 Tenn. 154, 156–62 (1840).

The Supreme Court of Tennessee later upheld another conviction for concealed carry of a similar knife; though this defendant's challenge was on statutory, not constitutional, grounds, the court's explanation of why the legislature regulated such knives is instructive: "The design of the statute was to prohibit the wearing of bowie-knives, and others of a similar description, which the experience of the country had proven to be extremely dangerous and destructive to human life; the carrying of which by truculent and evil-disposed persons but too often ended in assassination." *Haynes v. State*, 24 Tenn. 120, 122 (1844). The Supreme Court of Texas weighed in too, upholding the application of a penalty enhancement for homicides committed with a Bowie knife. *Cockrum*, 24 Tex. at 402. In doing so, the court stressed the knife's great danger, calling it "an exceeding[ly] destructive weapon," "the instrument of almost certain death," and "the most deadly of all weapons in common use," such that carrying the knife makes one "more dangerous to the rights of others … than if [one] carried a less dangerous weapon." *See id.* at 402–03; *see also Wolford*, 2026 WL 1825723, at *18 (Barrett, J., concurring) (favorably citing *Cockrum* as an example of a state court decision that "upheld [a] gun regulation[] … because the State[] [was] pursuing specific regulatory ends, not because [it was] hostile to gun rights").

Contrary evidence is limited. The plaintiffs highlight the Supreme Court of Georgia's decision in *Nunn v. State*, 1 Ga. 243 (1846), which upheld an ambiguous statute to the extent it prohibited concealed carry but struck it down to the extent it prohibited open carry. *Id.* at 251. Most fundamentally, *Nunn* is only one case; just as in *Bruen* the Court refused to "give disproportionate weight to a single statute and a pair of state-court decisions," we refuse to place on *Nunn* more weight

than it can bear. *Bruen*, 597 U.S. at 65; *cf. Wolford*, 2026 WL 1825723, at *6. Furthermore, it is hard to discern what, if anything, we can draw from *Nunn*, which conceived of the Second Amendment as protecting the right "to keep and bear *arms of every description*," 1 Ga. at 251 (emphasis added)—a view plainly inconsistent with the Court's pronouncements in *Heller* that machine guns and sawed-off shotguns are not protected, *see* 554 U.S. at 625, 627; *see also Bianchi*, 111 F.4th at 513 n.47 (Richardson, J., dissenting) (explaining that, for this reason, *Nunn* is an "outlier of little value in discerning the nature of 'dangerous and unusual' weapons in the Anglo-American legal tradition").[11]

In evaluating whether a modern law coheres with the principles underpinning our regulatory tradition, "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 692. Doing so requires comparing the modern and historical regulations across at least two metrics: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29; *see Hemani*, 2026 WL 1751710, at *5 ("The more closely a contemporary law

---

[11] Seeking to bolster *Nunn*, the dissenting opinion states that *Heller* concluded *Nunn* "'perfectly captured' the meaning of the Second Amendment." More precisely, however, *Heller* said that *Nunn* "perfectly captured *the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause*." 554 U.S. at 612 (emphasis added). *Heller*'s endorsement of *Nunn*'s recognition that the Second Amendment protects more than just a militia-centered right does not imply wholesale endorsement of *Nunn*'s every word—especially when, as relevant here and as explained above, *Nunn*'s conception of the scope of protected arms conflicts with *Heller*'s.

mirrors a well-established historical analogue in purpose and operation, the more likely it is to be upheld."). The "how" component of the *Bruen* inquiry in turn encompasses at least four considerations: how the Act operates mechanically, how much it burdens the right of armed self-defense, the restriction's duration, and the penalty associated with violating it. *See Rahimi*, 602 U.S. at 698–99 (noting that 18 U.S.C. § 922(g)(8), like historical antecedents, disarms individuals only temporarily and only after an individualized judicial determination of dangerousness, and that its penalty is consistent with the regulatory tradition); *Bruen*, 597 U.S. at 29 (asking "whether modern and historical regulations impose a comparable burden on the right of armed self-defense"). The "why" inquiry asks whether the burdens imposed by modern and historical regulations are "comparably justified." *Bruen*, 597 U.S. at 29.

While the Act "is by no means identical to" the historical regimes, "it does not need to be." *Rahimi*, 602 U.S. at 698. In both how and why it burdens the right to keep and bear arms, the Act is "'relevantly similar' to laws that our tradition is understood to permit." *Id.* at 692 (quoting *Bruen*, 597 U.S. at 29).

Start with "how." Like historical regulations, the Act operates by imposing targeted restrictions on particular weapons, leaving untouched a wide variety of other arms—including many handguns, which *Heller* called "the quintessential self-defense weapon." 554 U.S. at 629. It also applies categorically to most of the population while carving out exceptions for special groups like law enforcement, a dividing line that *Bevis* noted our regulatory tradition establishes. *See* 85 F.4th at 1201–02. The Act also "fits within the regulatory tradition," *Rahimi*, 602 U.S. at 699, because it applies indefinitely and au-

thorizes imprisonment for violations, like the Bowie knife statutes.

Moreover, the Act's "burden on the right of armed self-defense," *Bruen*, 597 U.S. at 29, is minimal. To be sure, the district court found that AR-15s offer self-defense utility and that "every round matters in a self-defense scenario"; we accept those findings and therefore accept that the Act imposes *some* burden. We also of course agree, as the dissenting opinion emphasizes, that self-defense has long been a cherished and closely guarded right. But the burden the Act imposes on that right is mitigated by what the record indicates about how frequently individuals *actually use* AR-15s and more than ten rounds in self-defense—a matter on which the district court made no factual findings and on which the only evidence came from the defendants' expert.[12] *See Ocean State Tactical*, 95 F.4th at 50 ("Depriving citizens of a device that is virtually never used in self-defense imposes less of a burden on [the right of armed self-defense] than does banning a weapon that is, in fact, traditionally used in self-defense."). According to her report, using more than ten rounds in self-defense is "extremely rare": She identified only two such incidents in a sample of roughly five thousand instances of armed self-defense. Indeed, those engaged in self-defense fire only 2.2 rounds on average. It is also quite rare for individuals to use rifles in self-defense: The same expert's analysis of an online database containing over one thousand defensive gun uses reveals that

---

[12] The dissenting opinion claims that "many Americans in fact use [AR-15s] for self-defense," but the evidence it relies on—consumer surveys about why Americans buy AR-15s and expert testimony about AR-15s' properties—does not support that assertion.

whereas 90% of defenders employed a handgun, a mere 4% turned to a rifle.[13] These figures remained the same after excluding states with assault weapon bans, meaning they reflect self-defenders' choices when unfettered by regulation.[14]

While in the district court the plaintiffs cited a smattering of online articles reporting on the self-defensive use of items that the Act regulates, the plaintiffs submitted no evidence on the frequency of such occurrences. The articles that the plaintiffs cited, moreover, are entirely consistent with the defendants' evidence; the defense expert did not conclude that the regulated items are *never* used for self-defense—only that such use is exceedingly rare.[15] The Act therefore imposes a limited burden on the right of armed self-defense, one comparable to historical antecedents considering Bowie knives'

---

[13] These are the figures for incidents in which the gun type was known.

[14] Perhaps *Heller*'s reasoning for why handguns are "the quintessential self-defense weapon" explains this phenomenon. *See* 554 U.S. at 629 ("There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police.").

[15] To be clear, we are not, as the dissenting opinion suggests, shifting the burden to the plaintiffs. No doubt, the defendants bear the burden at *Bruen*'s second step, and we are relying on the evidence they submitted—the expert report referenced above—to evaluate whether they carried that burden. We reference the plaintiffs' evidentiary showing only to make clear that we are not improperly resolving a factual dispute about how frequently AR-15s and more than ten rounds are actually used in self-defense.

utility and use for self-defense. That is especially so given that the Act's grandfather clause permitted citizens who already owned AR-15s and large-capacity magazines to continue possessing them.

The plaintiffs object that the Act's "how" differs too greatly from those of historical regulations. Many of the Bowie knife regulations, the plaintiffs stress, imposed less burdensome restrictions than does the Act—mostly because they regulated only carry or only concealed carry, but also because some only imposed penalty enhancements for crimes committed with the knives or severely taxed them. The Act therefore incomparably burdens the right of armed self-defense, the plaintiffs contend.

We accept the premise that the Act lacks a "historical twin," *Rahimi*, 602 U.S. at 701, but that is not the touchstone, so we reject the conclusion that the historical antecedents on which the defendants rely are insufficient. First, the Supreme Court itself took just the leap that the plaintiffs argue is impermissible. In *Heller*, the Court invoked "the historical tradition of prohibiting the *carrying* of 'dangerous and unusual weapons'" in explaining that M16 rifles "may be *banned*." 554 U.S. at 627 (emphasis added). And while *Heller* was not applying *Bruen*'s inquiry per se, *Bruen* made clear that its approach was consistent with—even more, *stemmed from*—*Heller*. *See, e.g.*, 597 U.S. at 26 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding.").

Second, *Rahimi*, which "refine[d]" *Bruen*, "confirmed that a closer match to a historical precursor is not necessary" by rejecting distinctions no smaller than those here. *Reyna*, 165

F.4th at 1064. *Rahimi* considered the constitutionality of 18 U.S.C. § 922(g)(8), which "prohibits an individual subject to a domestic violence restraining order from possessing a firearm if that order includes a finding that he 'represents a credible threat to the physical safety of [an] intimate partner,' or a child of the partner or individual." *Rahimi*, 602 U.S. at 684–85 (alteration in original) (quoting 18 U.S.C. § 922(g)(8)). In rejecting a facial challenge to that provision, the Court relied on two historical regimes: surety laws and going-armed laws. Neither regime, however, imposed anything particularly close to the restriction of § 922(g)(8).

Under the surety laws, a judicial officer could require one proven likely to misuse firearms to post a bond that would forfeit if one ultimately misused them. *See id.* at 695–96. But that was all—it was, "in a nutshell, a fine on certain behavior." *Id.* at 753 (Thomas, J., dissenting). "After providing sureties, a person kept possession of all his firearms; could purchase additional firearms; and could carry firearms in public and private. Even if he breached the peace, the only penalty was that he and his sureties had to pay a sum of money." *Id.* at 764. As for the going-armed laws, those prohibited "carrying certain weapons … in a particular manner … and in particular places." *Id.* at 770. In stark contrast to both these regimes, § 922(g)(8) completely denies an individual the ability to keep and bear arms for the duration of his restraining order; regardless of how much he is willing to put up as bond, he may not possess any firearm in any place or in any manner. No matter: Without denying the existence of the gaps the dissent emphasized, the Court's majority had "no trouble" concluding, with an emphasis on the *principles* underlying the historical regulations, that § 922(g)(8) was facially constitutional. *Id.* at 700 (majority opinion).

The same goes here. True, the Act is "by no means identical" to its antecedents, but neither was § 922(g)(8). *Id.* at 698. If anything, the distinctions between § 922(g)(8) and its antecedents seem of a greater magnitude than those between the Act and its antecedents. But most important is that the *principles* underlying each tradition justify the modern regulation: For § 922(g)(8), disarming those found by a court to pose a credible threat to the physical safety of another, and for the Act, imposing a targeted restriction on particularly dangerous weapons while leaving a host of others available for self-defense.

Finally, and most generally, the Supreme Court recently stressed that the primacy of history and tradition does not create "a law trapped in amber." *Id.* at 691. Just as the Second Amendment protects more than just "muskets and sabers," so too it "permits more than just those regulations identical to ones that could be found in 1791" or 1868. *Id.* at 692. The question confronting courts, then, is not whether there is a "dead ringer" or "historical twin" for the challenged regulation, but instead "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id.* (emphasis added); *see id.* at 740 (Barrett, J., concurring) ("Historical regulations reveal a principle, not a mold."). Among other things, an excessively exacting approach would risk mistaking a historical legislature's decision not to maximally regulate as marking the outer limits of the Second Amendment's original meaning, when legislative restraint or raw political compromise may in fact have motivated the choice. *See id.* at 739–40 (Barrett, J., concurring) (explaining that "imposing a test that demands overly specific analogues" inappropriately "assumes that founding-era legislatures maximally exercised

their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority").

As for the Act's justification—the "why"—the defendants seem to offer both "protect[ing] Illinois communities" and "protect[ing] the public from weapons that pose a special danger to its safety." We cannot accept the former. Because every firearm regulation is at some level about public safety, that justification operates "at such a high level of generality that it waters down the right." *Id.* at 740. But the latter is more specific, appropriately so, and better coheres with the statutory text of the challenged provisions, which focuses not on safety generally but on especially dangerous weapons specifically. And that justification is consistent with the rationales underlying the historical regulations canvassed above, as our sister circuits have concluded. *See, e.g., Hanson*, 120 F.4th at 240; *Lamont*, 153 F.4th at 246.

The record confirms that AR-15s equipped with thirty-round magazines are indeed particularly dangerous—far more like the bannable M16 than "the quintessential self-defense weapon" that we know may not be banned for the entire population, the handgun. *Heller*, 554 U.S. at 629. There is no dispute that when chambered with identical bullets, the AR-15 and the M16 fire rounds at approximately the same velocity—about 3,100 feet, or ten football fields, per second. That is about three times the velocity of a standard handgun bullet. There is also no dispute that AR-15s and M16s firing the same ammunition have the same maximum effective range of about 500 yards, compared to just 50 yards for a 9mm handgun. Likewise, the parties agree that AR-15s and M16s firing the same ammunition will have consistent wounding capabilities, as measured by the kinetic (or muzzle) energy of the rounds

fired. Moreover, the plaintiffs do not dispute the state's evidence that the 5.56 NATO bullets commonly fired by AR-15s and M16s are more likely than slower, heavier handgun bullets to rotate within the body and potentially fragment, which causes additional damage to tissue and organs adjacent to the bullet's entry point. AR-15s, in other words, are dangerous not only in the sense that all firearms are dangerous but also relative to the semiautomatic handguns that *Heller* confirmed are protected. And large-capacity magazines amplify each and every one of the AR-15's dangerous characteristics by allowing a shooter to fire more of these lethal rounds without breaking to reload.

We recite these uncontested facts not to suggest that "the gravity of the harms the legislation was designed to avert and the appropriateness of the mechanism they adopt" justify the Act or to engage in interest balancing. *Bevis*, 85 F.4th at 1200. *Bruen* clearly rejected means-end scrutiny. We recite these facts, instead, to demonstrate that the Act and its antecedents are "comparably justified." *Bruen*, 597 U.S. at 29; *see Schoenthal*, 150 F.4th at 910 (recognizing that "the fact that similar points can be made under different tests is a familiar aspect of the law"). The justification for the Act is akin to that seen in our history and tradition. As the Reconstruction-era judicial decisions cited earlier demonstrate, our ancestors regulated particularly dangerous weapons for sufficiently specific similar reasons as Illinois is regulating AR-15s and large-capacity magazines. *See, e.g., Haynes*, 24 Tenn. at 122 ("The design of the statute was to prohibit the wearing of bowie-knives, and others of a similar description, which the experience of the country had proven to be extremely dangerous and destructive to human life…."); *Cockrum*, 24 Tex. at 402; *see also Wolford*, 2026 WL 1825723, at *17 (Barrett, J., concurring) (criticiz-

ing the challenged regulation because "[r]ather than identifying a specific threat to public peace and safety," the state "is responding to the general danger associated with the presence of firearms").

We must address one final point. The district court, plaintiffs, and dissenting opinion have made much of the fact that AR-15s and large-capacity magazines are popular—i.e., there are many in civilian hands—and therefore (they argue) "in common use" as *Heller* and its progeny have used that term. *See Heller*, 554 U.S. at 627. We do not deny that AR-15s are "both widely legal and bought by many ordinary consumers." *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (2025). As in *Bevis*, however, "we decline to base our assessment of the constitutionality of [the Act] on numbers alone." 85 F.4th at 1198–99. We need not belabor this point, which the Supreme Court's post-*Bevis* precedents do not address and which our precedents in *Bevis* and *Friedman v. City of Highland Park* have forcefully made. *See* 85 F.4th at 1198–99; 784 F.3d 406, 408–09 (7th Cir. 2015). We add only that *Bruen* cuts against the conclusion that a weapon's "common use" leaves it immune from regulation. After confirming that "handguns are weapons in common use today for self-defense," *Bruen*, 597 U.S. at 32 (citation modified), the Court proceeded to undertake an "extended analysis of the Government's proposed historical analogues, hardly an *obiter dictum*," *Hanson*, 120 F.4th at 234.

*        *        *

Before moving on, we must address a methodological divergence between our opinion and the dissenting opinion. The dissenting opinion asserts that we "break fresh ground"

by not applying its understanding of "[t]he only relevant historical tradition the Court has recognized"—"the regulation of 'dangerous and unusual' weapons." But the Court has not set out a comprehensive framework through which to evaluate challenges to restrictions on particular weapons, as its recent grant of certiorari in cases similar to this one indicates. *See Viramontes v. Cook County*, --- S. Ct. ----, 2026 WL 1871322 (mem.) (June 30, 2026); *Grant v. Higgins*, --- S. Ct. ----, 2026 WL 1871312 (mem.) (June 30, 2026). Accordingly, far from breaking fresh ground, we have applied the general methodological principles established in the Court's recent Second Amendment jurisprudence by identifying relevantly similar historical analogues.

**E. A More Nuanced Approach**

*Bruen*'s recognition that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to its historical inquiry fortifies, but is not essential to, our conclusion.[16] 597 U.S. at 27. This consideration—the flipside of the more "straightforward" inquiry applicable where the challenged regulation addresses an age-old problem—reflects that the farther today's regulatory challenges get from "those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," the greater the need to "reason[] by analogy." *Id.* at 28; *see Wolford*, 2026 WL 1825723, at *6–7 (cases involving "distinctively modern" conduct, as when "the modern law addresses a situation that could not have arisen when the Second or

---

[16] In other words, we do not—as the dissenting opinion claims—conclude that the Constitution would protect AR-15s but for dramatic technological changes and unprecedented societal concerns.

Fourteenth Amendment was adopted," "call[] for a more difficult exercise of judgment").

A more nuanced approach reinforces our conclusion here, as our sister circuits have concluded. *See, e.g.*, *Lamont*, 153 F.4th at 236–40; *Hanson*, 120 F.4th at 240–42; *Bianchi*, 111 F.4th at 463–64. Indeed, this case implicates both of the grounds *Bruen* identified in an interdependent way: The dramatic technological change embodied in AR-15s equipped with large-capacity magazines has enabled the unprecedented societal concern of mass killings speedily carried out by lone shooters. *See Bianchi*, 111 F.4th at 464 ("These are not our forebears' arms, and these are not our forebears' calamities.").

From 1791 through the mid-nineteenth century, the ubiquitous firearm was a single-shot, muzzle-loaded firearm. In other words, these guns could not fire consecutive rounds; someone seeking to fire two shots would have needed to reload the gun in between rounds by meticulously loading the projectile and a propellant into the muzzle—a process that could take half a minute. As such, they "did not have the capacity to occasion a societal concern with mass shootings…." *Hanson*, 120 F.4th at 240.

AR-15s equipped with large-capacity magazines are a far cry from these antecedents. With this combination, a shooter can discharge thirty rounds—each of which travels five football fields in half-a-second and releases ten times the energy of a musket ball upon impact—as quickly as he can pull the trigger. And when that magazine is empty, he can replace it in just a few seconds, reloading thirty rounds in a fraction of the time it would have taken to reload one in 1791 or 1868. Taking all of this together, a modern shooter armed with an AR-15 and thirty-round magazines can fire almost sixty ex-

traordinarily lethal rounds—assuming about one pull of the trigger per second, with a few seconds to change out magazines—in the time it took to fire a pair of far less damaging shots at the Founding. In other words, Illinois faces a "regulatory challenge[]" unlike "those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 597 U.S. at 27.[17]

True, as the plaintiffs and dissenting opinion note, repeating arms (i.e., those capable of firing multiple rounds without reloading) existed during this era. But through most of the nineteenth century, these weapons remained technologically flawed curios with limited practical utility. The 1779 Girandoni air rifle, for example, was fragile, complex, and impractical, while the 1821 Jennings flintlock rifle "was beset by technical challenges," *Hanson*, 120 F.4th at 249 (citation modified), such as its use of "superposed loads" (stacking multiple loads in the barrel at once) that "were prone to explode if the sequencing between rounds was off," *Lamont*, 153 F.4th at 237 (citation modified). These firearms, moreover, were exceedingly rare and never penetrated the commercial or military

---

[17] Relying on our identification of these technological advancements, the dissenting opinion incorrectly imputes to us the position that the Second Amendment protects only those arms known to the Founders. That is certainly not our stance. Just as the First Amendment protects speech made on the Internet and the Fourth Amendment protects cell-phone location information, the Second Amendment "is not limited only to those arms that were in existence at the founding." *Rahimi*, 602 U.S. at 691. Still, the Supreme Court has recognized that "cases implicating … dramatic technological changes may require a more nuanced approach." *Bruen*, 597 U.S. at 27. Or, put another way, that cases involving "distinctively modern" conduct "call[] for a more difficult exercise of judgment." *Wolford*, 2026 WL 1825723, at *7. This is such a case.

markets—so it is hard to see how either could have posed a "regulatory challenge[]" for historical legislatures, let alone one that "preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 597 U.S. at 27. And the Winchester repeating rifle, introduced in 1866 and refined in 1873, was not a true semiautomatic firearm—the shooter was required to manipulate a lever forward and then backward between each shot—and was reloaded one round at a time.[18] In other words, AR-15s with large-capacity magazines represent a dramatic technological change over these arms, too. "Their advanced military-like features enable them to inflict catastrophic injuries that bear no similarity to those injuries caused by the comparatively primitive firearms that were widely available in the founding and reconstruction eras." *Lamont*, 153 F.4th at 237.

The plaintiffs' argument that the capabilities and ubiquity of repeating rifles grew *gradually* as America grew—and not as a "dramatic" technological change—overlooks the extent to which incremental innovation, compounded over more than a century, can yield a dramatic technological change over the long run. There need not be a singular, transformative moment in the history of firearm innovation for AR-15s and large-capacity magazines to be "different in form and in kind from arms in common use during the Founding and Reconstruction eras, the relevant periods for assessing the origi-

---

[18] The Act does not ban such firearms. *See* 720 ILCS 5/24-1.9(a)(2) (excluding from the definition of "assault weapon" any "firearm that is manually operated by … lever … action, unless the firearm is a shotgun with a revolving cylinder").

nal understanding of the Second and the Fourteenth Amendments, respectively." *Hanson*, 120 F.4th at 242.

This dramatic technological change, moreover, has given rise to the unprecedented societal concern of mass shootings, especially those with high fatality counts carried out by lone shooters. Whereas the technological limitations of our forebears' arms "prevented a single gunman from using them to unleash a massacre in a matter of seconds," *Lamont*, 153 F.4th at 237, the same assuredly cannot be said for AR-15s and large-capacity magazines. Indeed, the first known mass shooting resulting in at least ten deaths did not occur until 1949. And the frequency of such events has only increased over time. We need not belabor the all too familiar prevalence of these episodes.

Neither of the plaintiffs' counterarguments persuades us otherwise. They emphasize (echoed by the dissenting opinion) the district court's conclusion that "[m]ass murder has been a fact of life in the United States since the mid-nineteenth century," accusing the defendants of overlooking atrocities committed against groups like Native Americans and slaves. But this asserted problem of "mass murder" is framed at too high a level of generality, obscuring distinctions with important consequences for how a legislature might respond. When the Second and Fourteenth Amendments were ratified, mass killings were a "group activity," *Bianchi*, 111 F.4th at 463, relying on "primitive firearms and melee weapons" because individuals lacked "the means to inflict mass casualties on their own," *Lamont*, 153 F.4th at 239. A regulatory response to *that* problem was not to impose a targeted restriction on certain arms, no one of which was principally responsible for the lawlessness; rather, it was to target armed *groups*. And that is

just what Founding- and Reconstruction-era legislatures did. *See* Mark Anthony Frassetto, *Mass Violence and the Second Amendment*, 76 Ala. L. Rev. 43, 54–58 (2024) (collecting statutes prohibiting armed groups). But whereas the firepower needed to carry out a mass killing used to come from an aggregation of people, now it comes from an AR-15 and large-capacity magazines—a problem for which the historical solution is self-evidently unfit. The difference between the shameful history on which the plaintiffs rely and the problem facing modern legislatures therefore weakens the inference we can draw from the lack of historical regulations that are extremely similar to the Act. *See Bruen*, 597 U.S. at 27 (recognizing that nuance is required where "[t]he regulatory challenges posed by firearms today are" different from "those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868"); *cf. Wolford*, 2026 WL 1825723, at *17 (Barrett, J., concurring) (because "the right to bear arms is misused in … ways that were unknown to our forebears but pose an equivalent risk to persons or property," historical antipoaching laws can justify more than merely modern antipoaching laws—they "support the principle that when a State identifies specific places that are prone to particular abuses of the right, it can respond with focused regulations to address the threat" (citation modified)).

The dissenting opinion, moreover, relies almost exclusively on twentieth-century mass shootings to undermine our claim of an unprecedented societal concern. Putting aside that the scale of today's mass-shooting problem is unprecedented even compared to a century ago, twentieth-century incidents cannot undermine the propriety of adopting a more nuanced approach. The conceptual underpinning of the more nuanced approach is straightforward: The strength of the inference a

court can draw from a lack of precise historical precursors is mitigated where "[t]he regulatory challenges posed by fire-arms today are not … the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 597 U.S. at 27. That concept remains coherent only if courts measure changes in technology or society against the time period from which courts may draw historical ana-logues. But we agree with the dissenting opinion that twenti-eth-century analogues cannot sustain a modern firearm regu-lation, so it must also be the case that twentieth-century regu-latory challenges do not undermine the "distinctively mod-ern" nature of the conduct here. *Wolford*, 2026 WL 1825723, at *7. Put another way, because legislative responses to those twentieth-century incidents could not sustain the Act, the in-cidents themselves cannot undercut the unprecedented (in the relevant sense) nature of the societal problem the Act ad-dresses.

The plaintiffs also argue that, even if there is an unprece-dented societal concern of mass shootings, the arms the Act bans are not intrinsic to that problem. The undisputed record evidence undercuts that claim, showing that the presence of assault weapons and large-capacity magazines is strongly correlated with the severity of the societal problem. In a sam-ple of mass shootings with at least four fatalities, 24% in-volved assault weapons and 63% involved large-capacity magazines. Raise the fatality count to six, and assault-weapon and large-capacity-magazine usage rates jump to 53% and 80%, respectively, between 2019 and 2022. Raise it further, to twenty fatalities, and the respective figures climb to 75% and 88% for all incidents between 1991 and 2022. And since Sep-tember 11, 2001, the seven deadliest individual acts of inten-tional criminal violence in the United States have been mass

shootings, six of which used assault weapons and large-capacity magazines that the Act regulates.[19] In short, whatever else may be contributing to America's mass-shooting epidemic, the record makes one thing clear: The more people killed, the more likely it is that the killer used an assault weapon and large-capacity magazines.

Overall, then, it is appropriate to take a more nuanced approach to the historical inquiry. Though we do not see this conclusion as necessary to upholding the Act, it nevertheless reinforces our holding that the Act is consistent with our regulatory tradition. The distinctions between the Act and its antecedents are yet less material in light of the dramatic technological changes and unprecedented societal concerns that have taken root since the Founding and Reconstruction eras.

\* \* \*

In sum, the plaintiffs' request that we find the Act facially unconstitutional and enjoin it entirely falls short twice over. First, and most simply, the plaintiffs did not even address every application of the Act's operative provisions (5/24-1.9(b)–(c) and 5/24-1.10(b)–(c)) and thus cannot show, as Supreme Court precedent requires, that "no set of circumstances

---

[19] The dissenting opinion looks past this record evidence to an online database stating that more mass shooters use handguns than rifles. That database, however, includes all incidents with multiple victims, whether injured or deceased—such as an incident in which a shooter wounded two victims and killed none. While such incidents are undoubtedly serious, the fact that handguns are used more often than rifles for mass shootings thus defined does not undermine our point that AR-15s and large-capacity magazines are more likely to be used as the societal concern becomes more grave—as, in other words, mass shootings cause more casualties.

exists under which the [challenged provisions] would be valid." *Rahimi*, 602 U.S. at 693 (quoting *Salerno*, 481 U.S. at 745). That is enough to deny their claim of facial invalidity and leave the Act's more contested applications for as-applied challenges. Second, though, we also hold that the Act's application to AR-15s and thirty-round rifle magazines is constitutional, supplying a second, independent basis for reversal.

## F. Endorsement Affidavit Requirement

As noted above, the *Federal Firearms Licensees* plaintiffs also challenge the Act's registration requirement. Recall that to effectuate the Act's grandfather clause, the Act required those wishing to continue possessing certain restricted items to provide the Illinois State Police an "endorsement affidavit" containing certain information. 720 ILCS 5/24-1.9(d). Registration was free, simple, and not subject to official discretion; providing basic information about one's firearm license and the firearms in question automatically entitled the registrant to keep them.

We easily (and unanimously) upheld the constitutionality of the registration requirement in *Bevis*, and the record casts no doubt on that conclusion. *See* 85 F.4th at 1202. Registration is free of charge, subject to well-defined standards, and leaves no room for government discretion. It is therefore akin to the sort of "shall-issue" licensing regime that *Bruen* approved in dicta. *See* 597 U.S. at 38 n.9; *id.* at 80 (Kavanaugh, J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice."); *see also Maryland Shall Issue v. Moore*, 116 F.4th 211, 222–23 (4th Cir. 2024) (holding that "shall-issue" licens-

ing regimes are presumptively constitutional under *Bruen*); *McRorey v. Garland*, 99 F.4th 831, 837 (5th Cir. 2024) (same).

### III. Conclusion

We REVERSE the judgments of the district court, and we REMAND the cases with directions to enter judgments for the defendants.

BRENNAN, *Chief Judge,* dissenting. Illinois has banned the best-selling rifle in America and its standard magazine. That ban—part of an extraordinarily broad and strict set of laws—was preliminarily upheld as constitutional in *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023).

Now, with perhaps the most comprehensive trial record in any Second Amendment case to date, this court repeats its error. Our Nation's enduring traditions forbid governments from prohibiting firearms commonly owned for self-defense. Because *the people* have overwhelmingly chosen the AR-15 rifle and its magazine as their weapon of choice, they are protected by the Second Amendment.

Instead, the majority opinion holds that a state may prohibit the possession and sale of AR-15s and 30-round magazines. That conclusion cannot be reconciled with the "common use" test as applied in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and is not supported by the historical record. The district court's permanent injunction should be affirmed. I therefore respectfully dissent.

## I. Background

### A. The Act

At the center of these consolidated appeals is the Protect Illinois Communities Act, Pub. Act 102-1116 (2023) ("the Act"). The Act makes it a crime to manufacture, deliver, sell, import, or purchase an "assault weapon, assault weapon attachment, .50 caliber rifle, or .50 caliber cartridge." 720 ILCS 5/24-1.9(b). With a few exceptions, the Act also makes it unlawful for any person to knowingly "possess an assault weapon." *Id.* § 1.9(c)–(d).

In all, the Act covers nearly 1,000 different firearms. This includes "assault weapon[s]," which encompasses certain semiautomatic rifles and pistols. *Id.* § 1.9(a)(1). A semiautomatic rifle is covered if it "has the capacity to accept a detachable magazine or … may be readily modified to accept a detachable magazine" and has one or more of the following features: a pistol grip or thumbhole stock; any feature capable of functioning as a protruding grip that can be held by the non-trigger hand; a folding, telescoping, thumbhole, or detachable stock; a flash suppressor; a grenade launcher; or a barrel shroud. *Id.* § 1.9(a)(1)(A)(i)–(vi). A semiautomatic rifle with a fixed magazine capacity of greater than 10 rounds is also covered. *Id.* § 1.9(a)(1)(B). As a result, Illinois's ban captures more than 20% of all the types of firearms sold in the United States in 2020.

The Act also outlaws particular models of "assault weapons." *Id.* § 1.9(a)(1)(J). Among those are "all AR types," including AR-15s. *Id.* § 1.9(a)(1)(J)(ii). The AR-15 is one of the most widely owned firearms in the Nation and is the most popular rifle in the country. *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (2025) ("AR-15 rifles, AK-47 rifles, and .50 caliber sniper rifles … are both widely legal and bought by many ordinary consumers."). Millions are in circulation in the United States. Their popularity stems from their self-defense properties. For example, they are easier to aim and control than shotguns and machine guns. And their grips make them safer and easier to aim, particularly for those who are infirm, small-statured, or have limited training. So, it is no surprise that "AR-15s are legal in 41 of the 50 States." *Snope v. Brown*, 145 S. Ct. 1534, 1534 (2025) (Kavanaugh, J., statement respecting the denial of cert.).

Certain pistols and shotguns are also banned under the Act. That includes all semiautomatic pistols with "the capacity to accept a detachable magazine" that have "a threaded barrel," "a second pistol grip," a protruding grip, a barrel shroud, or other features. 720 ILCS 5/24-1.9(a)(1)(C)(i)–(vi). Further, any semiautomatic pistol with a "fixed magazine with the capacity to accept more than 15 rounds" is banned. *Id.* § 1.9(a)(1)(D). All semiautomatic shotguns with a fixed magazine that holds more than five rounds, have a pistol grip, or can accept a detachable magazine, among other features, are also covered. *Id.* § 1.9(a)(1)(F)(i)–(vi).

The Act also prohibits types of magazines. Section 5/24-1.10 covers large-capacity magazines, or magazines with a capacity of "more than 10 rounds of ammunition for long guns and more than 15 rounds of ammunition for handguns." 720 ILCS 5/24-1.10(a)(1). These large-capacity magazines cannot be sold, delivered, manufactured, or purchased. *Id.* § 1.10(b). And their possession is outlawed too, save certain exceptions. *Id.* § 1.10(c)–(d). Illinois prohibited these magazines despite their wide ownership—"easily more than 100 million" exist. *Duncan v. Bonta*, 133 F.4th 852, 902 (9th Cir. 2025) (en banc) (Bumatay, J., dissenting). As the D.C. Circuit recognized over a decade ago, "[t]here may well be some capacity above which magazines are not in common use," but "that capacity surely is not ten." *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011).

## B. Proceedings

In 2023 several groups of plaintiffs challenged the Act as violating their Second Amendment rights. The appeals from these cases were consolidated and heard together in *Bevis v. City of Naperville*, 85 F.4th at 1181–84. Over my dissent, this

court concluded that the Act does not violate the Second Amendment. *Id.* at 1197.

The majority opinion resolved the case on *Bruen*'s first step.[1] *See New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022). "We begin by looking at the 'plain text' of the Second Amendment to see whether the assault weapons and large-capacity magazines … fall within the scope of the 'Arms' that individual persons are entitled to keep and bear." *Bevis*, 85 F.4th at 1192. "Arms," the court concluded, are not weapons "exclusively or predominantly useful in military service." *Id.* at 1194. AR-15s, and the other weapons covered in the Act, were "much more like machineguns and military-grade weaponry." *Id.* at 1195. "Indeed, the AR-15 is almost the same gun as the M16 machinegun," with the only meaningful difference being the AR-15 has semiautomatic fire only. *Id.*

My dissent disagreed with the *Bevis* majority's arbitrary definition of "Arms." "My colleagues read the passages in [*District of Columbia v. Heller*, 554 U.S. 570 (2008)] discussing weapons with military capabilities too broadly, however, placing controlling weight on supporting or explanatory language in that decision." *Id.* at 1222 (Brennan, J., dissenting). Others agreed. "[T]he Seventh Circuit reached its conclusion by conducting a lengthy (and questionable) exegesis of some dicta in *Heller* about 'dangerous and unusual' weapons." William Baude & Robert Leider, *The General-Law Right to Bear Arms*, 99 NOTRE DAME L. REV. 1467, 1502 (2024).

---

[1] The court moved to *Bruen*'s second step "for the sake of completeness." *Id.* at 1197. That treatment is dicta because that appeal was resolved on step one. *Id.* ("[W]e are satisfied that these appeals can be resolved at the first step of the *Bruen* framework.").

The Supreme Court denied certiorari, but Justice Thomas disagreed with the *Bevis* majority. *Bevis*, 85 F.4th at 1175, *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491, 2492 (2024) (Thomas, J., statement). "By contorting what little guidance our precedents provide, the Seventh Circuit concluded that the Second Amendment does not protect 'militaristic' weapons." *Id.* But, despite its "tautological[]" and "unmoored" reasoning, the majority opinion was preliminary. *Id.* at 2492–93. If, he cautioned, "the Seventh Circuit ultimately allows Illinois to ban America's most common civilian rifle, we can—and should—review that decision once the cases reach a final judgment." *Id.*

On remand, the parties developed an expansive and comprehensive trial record. Plaintiffs proffered nearly 200 pieces of evidence. This included live and written testimony from civilians, firearm design and self-defense experts, firearm instructors, weapon experts, and a firearm retailer. For its part, the State submitted expert reports from a firearms expert, a public safety expert, a doctor, and professors of history and political science. In addition, two military experts testified on behalf of the State: Col. Craig Tucker and Lt. Col. (ret.) Jason Dempsey. Dempsey himself owned an AR-15 for self-defense and disapproved of the State's efforts to "outright" ban common firearms. In all, the parties offered initial and rebuttal reports from 24 experts.

The district court heard four days of live testimony. Four experts testified for plaintiffs; two testified for the State. The parties then filed over 400 pages of fact-intensive post-trial briefing. The district court wrote an insightful and comprehensive 160-page opinion, which detailed the history of the

relevant Second Amendment jurisprudence and evaluated a mountain of technical evidence.

The district court concluded that the Act violates the Second Amendment and entered a permanent injunction. First, the court made numerous findings of fact, distinguishing AR-15s from M16s in several ways:

- "[T]he M16 and M4 are designed to fulfill a specific niche; their semiautomatic fire feature permits precise target shooting while their ability to fire in a fully automatic capacity is designed to provide suppression fire in a situation where members of a squad are moving to or from an objective. Fully automatic fire is incredibly inaccurate and impractical, even in a military situation."

- "A machine gun is … extremely difficult, if not impossible," for the ordinary person "to control … or to fix … on a discrete target."

- M16 and M4 have distinct barrels to prevent overheating and receive quality inspections. By contrast, an "AR-15 is, frankly, not at all the same weapon as the M16 rifle or M4 carbine used by the United States military."

- "A semi-automatic rifle does not suffer from the lack of control as is inherent to machineguns and sawed-off shotguns."

- The civilian AR-15 has not been used by any military force.

- Millions of Americans own AR-15s.

The court also found that the 30-round magazines prohibited by the Act have legitimate self-defense purposes. "Every round matters in a self-defense scenario": the more rounds fired, the less time spent reloading, meaning "the difference between life and death for a person defending him or herself in the home." And these are widely owned because they are commonly sold with semiautomatic rifles.[2]

The district court then applied *Heller*'s "dangerous and unusual" test. The "semiautomatic rifles, shotguns, and some of the large-capacity magazines and attachments proscribed by PICA are in common use." In addition, "the AR-15 (and similar copycat weapons) are ideally suited for self-defense in the home." Such weapons can be controlled and aimed effectively, unlike machine guns and sawed-off shotguns. Thirty-round magazines, too, could not be lawfully banned. They are in common use and serve legitimate self-defense purposes.

After concluding that such firearms and magazines are protected, the court moved to *Bruen*'s second step: whether the government can identify a history and tradition of restricting these firearms or relevantly similar weapons. *See Bruen*, 597 U.S. at 24. Acts like a 1746 Massachusetts Bay Colony ban on discharging a firearm or bans on the sale of Bowie knives did not evince a history and tradition of banning weapons commonly owned for self-defense. What is more, historical "prohibitions on the carrying of certain weapons do not amount to a categorical ban of whole classes of firearms." For that reason, the district court concluded that the Act violated the Second Amendment. The State timely appealed.

---

[2] But the district court found .50 caliber rifles and ammunition and grenade launcher attachments served little self-defense utility.

Months later, the Supreme Court denied certiorari in a similar case. *Snope*, 145 S. Ct. at 1534. Three Justices would have granted the petition for a writ of certiorari. Justice Kavanaugh wrote a statement respecting the denial of certiorari. *Id.* at 1534 (Kavanaugh, J., statement respecting the denial of cert.). In his view, Maryland's ban on AR-15s was likely unconstitutional because AR-15 bans are outliers among the states. *Id.* In addition, AR-15s are "analytically difficult to distinguish" from the handguns held protected in *Heller*. *Id.* Although the Court denied certiorari, Justice Kavanaugh called for the Courts of Appeals to assist the Supreme Court's "ultimate decisionmaking on the AR-15 issue." *Id.*

In its opinion permanently enjoining the Act, the district court made findings of fact and conclusions of law. I agree with my colleagues that the court's factual findings here are reviewed for clear error. *See United States v. Griffin*, 806 F.3d 890, 892 (7th Cir. 2015). The clear error standard is "highly deferential" and allows this court to deviate from the district court only when we have a "definite and firm conviction that a mistake has been made." *Id.* (citations omitted). By contrast, all conclusions of law are reviewed de novo. *3M v. Pribyl*, 259 F.3d 587, 597 (7th Cir. 2001).

## II. *Bruen* Step One

The majority opinion correctly declines to recommit to the analysis in *Bevis* on *Bruen* step one—whether the plain text of the Second Amendment covers the AR-15. But for the sake of completeness, I explain why an AR-15 qualifies as an "Arm" covered by the Second Amendment.

### A. *Bevis* Does Not Control

The holding in *Bevis* that AR-15s are not "arms" lurks in the background of these appeals, but it does not bind us. "The Supreme Court has held that legal and factual rulings made as part of a preliminary-injunction analysis are not binding upon panels when they later consider the matter on the merits." *Tully v. Okeson*, 78 F.4th 377, 381 (7th Cir. 2023) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)); *see also Lackey v. Stinnie*, 604 U.S. 192, 201 (2025) ("Likelihood of success" is not "success."). The *Bevis* majority recognized this, repeatedly emphasizing the preliminary status of its holding. *Bevis*, 85 F.4th at 1197. "There thus will be more to come, and we do not rule out the possibility that the plaintiffs will find other evidence that shows a sharper distinction between AR-15s and M16s (and each one's relatives) than the present record reveals." *Id.*

The conclusions offered in support of the holding in *Bevis* have not aged well. For example, it stated, "[t]he M16 has an automatic firing rate of 700 rounds per minute, while the AR-15 has a semiautomatic rate of 'only' 300 rounds per minute" without citation. *Id.* at 1196. But "record sources … give good reason to doubt that figure." *Id.* at 1223 (Brennan, J., dissenting). According to the U.S. Army marksmanship manual, the M16A1 can shoot 45 to 65 rounds per minute in semiautomatic mode and 150 to 200 rounds per minute in automatic mode. And in *Bevis*, "Arm" was defined based on the Supreme Court's "comments about the role of the militia." *Id.* at 1193. That contradicts the holding of *Heller*: the right to keep and bear arms is an *individual* right. *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010). The scope of the Second Amendment "is defined not by what the militia needs, but by what

54                                              Nos. 24-3060 *et al.*

private citizens commonly possess." *Friedman v. City of Highland Park*, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from the denial of cert.). The *Bevis* majority opinion also barely scratched the historical surface. Baude, *supra*, at 1501–02 (criticizing the *Bevis* majority for ignoring caselaw, treatises, legislative precedents and drawing a conclusion not derived from history). We should move past that opinion and follow *Bruen* and *Heller* in the following way.

**B. The Text of the Second Amendment**

*Bruen*'s first step instructs courts to decide whether the Second Amendment's text covers an individual's conduct. 597 U.S. at 24. In other words, are the firearms at issue "Arms?" The answer is yes.

The Act prohibits the possession of AR-15s sold after the law takes effect. That limits the constitutional right to "keep … Arms," as *Heller* defined that right to mean to "have weapons." 554 U.S. at 582. *Cf. Wolford v. Lopez*, No. 24–1046, 2026 WL 1825723, at *9 (2026) ("The plain text of the Second Amendment protects what petitioners want to do: carry handguns for self-defense." (citation modified)). The Act also forbids buying AR-15s. Purchasing and acquiring firearms is a prerequisite to exercising Second Amendment rights. *Ortega v. Grishman*, 148 F.4th 1134, 1143 (10th Cir. 2025) ("[T]he right to bear arms requires a right to acquire arms.").

The AR-15 rifle is an "Arm." *Heller*, relying on historical sources, defined "Arm" to mean "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 554 U.S. at 581. A person fires an AR-15 to protect himself and strike assailants. It is there-

fore an "Arm." *Harrel*, 144 S. Ct. at 2492–93 (Thomas, J., statement respecting denial of cert.) (AR-15 is an "Arm"); *Snope*, 145 S. Ct. at 1535 (Thomas, J., dissenting from denial of cert.) (same); *cf. United States v. Reyna*, 165 F.4th 1056, 1062 (7th Cir. 2026) (deserialized firearms are "Arms").

Following *Heller*, another circuit concluded that a machine gun is an "Arm." *See, e.g.*, *United States v. Bridges*, 150 F.4th 517, 524 (6th Cir. 2025). Others, however, have applied the atextual "common use" test at step one. *Bevis*, 85 F.4th at 1193; *Bianchi v. Brown*, 111 F.4th 438, 460 (4th Cir. 2024) (en banc).

The "common use" test does not belong in *Bruen*'s first step. A firearm is still a firearm, regardless of its popularity. *Bevis*, 85 F.4th at 1209 (Brennan, J., dissenting) ("The nature of an object does not change based on its popularity."). In addition, the "common use" test derives from the historical tradition of regulating "dangerous and unusual" weapons. *Id.* at 1209–10; *Snope*, 145 S. Ct. at 1534 (Kavanaugh, J., statement respecting denial of cert.) ("The Court's later Second Amendment decisions in *Bruen* and *Rahimi* did not disturb the *historically based* 'common use' test." (emphasis added)). Accordingly, the common use test more properly belongs in *Bruen*'s second step, where courts examine the Nation's "historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

Plaintiffs have proved that the Second Amendment's plain text covers their conduct, so it is presumptively constitutionally protected.

### III. *Bruen* Step Two

At *Bruen*'s second step, Illinois has the burden to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* The contemporary restriction must be "relevantly similar" to that historical tradition. *Id.* at 29. When making that determination, it is imperative for a court to analogize at the proper level of generality. If a court takes too narrow a view, the Second Amendment is "trapped in amber" and cannot respond to technological developments. *United States v. Rahimi*, 602 U.S. 680, 691 (2024). But at too broad a generality, any historical regulation can look like a contemporary restriction. For example, both a colonial era ban on storing gunpowder and the District of Columbia's 2000s handgun ban were enacted to keep citizens safe. *But see Heller*, 554 U.S. at 632 ("Nothing about those fire-safety laws undermines our analysis; they do not remotely burden the right of self-defense as much as an absolute ban on handguns."). Thus, I tread carefully not to read historical principles "at such a high level of generality" to "water[] down the right." *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring).

To ensure fidelity to *Bruen* and the Second Amendment, a court looks to the "[w]hy and how" of historical regulations. *Id.* at 692. "[I]f laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id.* "[T]he principles underlying the Second Amendment" guide *Bruen*'s historical tradition step. *Id.*

Although the majority opinion here thinks it unnecessary to review the applicable historical traditions, I do so because

they inform the "dangerous and unusual" test as understood today. Historical analysis reveals three enduring traditions. First, and most importantly, "dangerous and unusual" weapons—those suited for or overwhelmingly used by criminals—could be prohibited. Second, the people of England and the United States closely guarded the right of self-defense. Third, the weapons chosen by the people for self-defense were not outlawed.

### A. The History of the "Common Use" Test

"From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. Today, we know this as the historical tradition of prohibiting "dangerous and unusual weapons." *Id*. at 627. This "dangerous and unusual" test "roughly tracks" *Bruen*'s "why" and "how" inquiry. *Bridges*, 150 F.4th at 534 (Nalbandian, J., concurring in part) (citation modified).

#### 1. Pre-Founding English Regulations

The Second Amendment protects a preexisting right "inherited from our English ancestors." *Heller*, 554 U.S. at 599 (citation omitted). Restrictions on the right to own arms that predate the Second Amendment, then, inform how we understand the original meaning of the Amendment. But those historical restrictions do little to "illuminate the scope of the right" if legal conventions changed in the following years. *Bruen*, 597 U.S. at 34. Thus, courts should give weight only to a "long, unbroken line of common-law precedent" rather than a "short-lived, 14th-century English practice." *Id.* at 35.

Until the late 1600s, England had no standing army or police force. Instead, an Englishman defended himself and his family with his arms. *Bianchi*, 111 F.4th at 484 (Richardson, J., dissenting) (citing JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 2 (1994) ("MALCOLM")). Militia service was also mandatory to respond to domestic and foreign threats. MALCOLM, at 2–3.

At the same time, sovereigns restricted the use of arms for public safety. For example, squires, footmen, and spectators sometimes rioted at jousting and melee tournaments. R.W. HUNT, ET. AL., STUDIES IN MEDIEVAL HISTORY PRESENTED TO FREDERICK MAURICE POWICKE 257, 261–62. (1948). So, in 1260, the Statuta Armorum forbade tournament attendees from bearing lethal weapons, such as "sword, or dagger, or staff, or mace, or stone." Statuta Armorum (The Statutes of Arms), c. 1260. Another problem was roving gangs attacking jurors traveling to jury duty, preventing the King's courts from functioning. David Kopel, *English Legal History and the Right to Carry Arms*, VOLOKH CONSPIRACY (Oct. 31, 2015), https://reason.com/volokh/2015/10/31/english-legal-history-and-the/. In response, a 1351 royal proclamation forbade "any one" from going "armed with haketon, or with plate, or with habergeon [or with sword], or with long dagger, or with any other manner of arms suspected, within the City of London, or within the suburbs." 25 Edw. 3 (1351). The proclamation noted that the "riots, and disputes" "impeded" the "business of our Lord the King" and presented an "alarmed thereat [sic]" to the "great people." *Id.* Such "going armed" laws were passed to "bar[] people from misusing weapons to harm or menace others." *Rahimi*, 602 U.S. at 693.

A similar example is the 1328 Statute of Northampton. The law provided that Englishmen could not "come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure." 2 Edw. 3 c. 3 (1328); *Bruen*, 597 U.S. at 40. But the statute "prohibited people from carrying [weapons] with such ill intent." *Bianchi*, 111 F.4th at 505 (Richardson, J., dissenting). As Blackstone observed, "the Statute codified the preexisting, common-law crime" of "riding or going armed, with *dangerous or unusual weapons*, which would terrify the good people of the land." *Id.* (citation modified).

Of these "dangerous or unusual" weapons, one example was a launcegay, a medieval lance. The lance was "generally worn or carried only when one intended to engage in lawful combat or—as most early violations of the Statute show—to breach the peace." *Bruen*, 597 U.S. at 41. This is why a "going armed" statute prohibited its public carry. *Id.* But at the same time, daggers and knives, often carried for self-defense, were not covered by the Statute. *Id.* at 41–42.

Up to this point, there were no blanket prohibitions on owning classes of weapons. Rather, sovereigns outlawed the public or concealed carry of weapons particularly useful for crime or breaching the peace, like launcegays. Or they prohibited the carrying of certain weapons in common places, like in cities and tournaments. The law focused on who was carrying arms, where they were carried, and how they were being used.

Two hundred years and a Welsh rebellion later, King Henry VIII sought to incorporate Wales into the realm of England. Among several acts passed in 1534, any resident or person living in Wales was forbidden from carrying "any bill, long-bow, cross-bow, hand-gun, sword, staff, dagger, halbert, morespike, spear or any other manner of weapon, privy coat or armour defensive" in certain public areas. 26 Hen. 8, c. 6 (1534). Thus, certain groups believed to be dangerous—like the rebellious Welsh—could have their weapons seized.

Around the same time, small handguns and crossbows were banned. 33 Hen. 8 c. 6 (1542); *Bruen*, 597 U.S. at 42. Two aspects of these laws are notable. First, as *Bruen* recognized, Henry VIII's prohibition stemmed from a concern that "handguns threatened Englishmen's proficiency with the longbow—a weapon many believed was crucial to English military victories." 597 U.S. at 42. Second, the Act stated that crossbows and handguns were being used "to the great [peril] and contynuall feare and daunger of the Kinge most [loving] subjecte." 33 Hen. 8 c. 6 (1542). These weapons engendered public concern, and were thus banned, because they were "concealable" and "frequently employed in crime." MALCOLM, at 9. That is why the Act banned handguns with barrels less than one yard in length. *Id.* at 10. Thus, like the laws prohibiting the public carry of launcegays, Henry's ban proscribed arms overwhelmingly used by or designed for criminals.

Similarly, a 1579 Proclamation outlawed the carry of "*Dagges, Handgunnes, Harquebuzes, Calliuers and Cotes of Defence* (Harquebuzes were early rifles; Dagges were small handguns). 21 Eliz. (1579). That Proclamation noted that such weapons were carried by the "evil disposed, who … do so

commonly carry such offensive weapons, being in time of peace only [meant] for thieves, robbers & murderers." *Id.* (citation modified). Because these weapons, from what I can tell, were used by thieves and robbers, the weapons, including handguns, were banned. But by the 1600s, "the public carry of handguns was no longer widely proscribed." *Bruen*, 597 U.S. at 42. A similar 1616 proclamation banning dagges and pistols was disregarded. *Bianchi*, 111 F.4th at 504 (Richardson, J., dissenting). So, once the arm was widely adopted for lawful purposes, it was not banned.

This takes us to the late 1600s, during which a firearm restriction would have enormous consequences on our understanding of the right to bear arms. For our purposes, the most revealing pre-Founding law was the Game Act of 1671, passed by Parliament but supported by Charles II. 22 & 23 Car. 2, ch. 25 (1671). The Game Act confiscated firearms from wide swaths of the English population. MALCOLM, at 74, 76. "Few acts affected daily life in the countryside as profoundly. It wounded the pride of the more than 90 percent of the population who were forbidden not only to kill a rabbit on their own land but to own a gun for their personal protection." *Id.* at 76. As *Heller* hints, this law was likely pretextual; the Stuart kings intended to disarm Protestants. 554 U.S. at 593. Today, the Game Act of 1671 remains the closest historical analogy to the Illinois Act's blanket ban on possessing certain weapons used for self-defense.

The Game Act was largely reviled. That Act, like the Militia Act of 1662, "caused Englishmen to be extremely wary of concentrated military forces run by the state and to be jealous of their arms." *Id.* at 593; MALCOLM, at 76. This led to assurances from William and Mary in the Declaration of Rights (the

English Bill of Rights) about bearing weapons for self-defense. *Heller*, 554 U.S. at 593. "Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law." *Id.* As Blackstone explained, this enshrined "the natural right of resistance and self-preservation" and "the right of having and using arms for self-preservation and defence." *Id.* at 594 (quoting 1 William Blackstone, *Commentaries* *144). This individual right codified in the English Bill of Rights is "the predecessor to our Second Amendment." *Id.* at 593.

This historical record yields several conclusions. History and tradition allow the government to prohibit the carry or possession of dangerous and unusual weapons. But at the same time, the right of self-defense was recognized and guarded closely—indeed, it was necessary to maintain peace throughout England. So, when the sovereign attempted to outlaw weapons used for self-defense and disarm a significant portion of the populace in the Game Act of 1671, the people pushed back, and they were ensured the right to keep arms for self-defense. That promise is the predecessor to our Second Amendment.

### 2. The Founding

Across the Atlantic, these traditions endured. Regulations on Arms in the colonies mirrored the purposes and limits of their predecessors. Those weapons used overwhelmingly by criminals—"dangerous and unusual weapons"—could be prohibited. Yet the right of self-defense was rigorously safeguarded against sovereign intrusions, and the weapons chosen by the people were not proscribed.

"Many colonial charters expressly guaranteed the right to have arms." *Bianchi*, 111 F.4th at 488 n.9 (Richardson, J., dissenting). But restrictions did exist. A 1686 East New Jersey statute, for example, banned the private wearing of "pocket pistol[s] … daggers or dirks." These arms were banned because "there hath been great complaint by the inhabitants of this Province, that several persons wearing swords, daggers, pistols, dirks … or any other *unusual or unlawful* weapons" caused "several persons in this Province, [to] receive great abuses. An Act Against Wearing Swords, &c., ch. 9, in AARON LEAMING AND JACOB SPICER, GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW JERSEY 290 (2d ed. 1881) (GRANTS AND CONCESSIONS). This prohibition on the concealed carry of pocket pistols "presumably did not by its terms touch the open carry of larger, presumably more common pistols." *Bruen*, 597 U.S. at 48. Two identical statutes from colonial Massachusetts and New Hampshire authorized the arrest of those who "shall ride or go armed Offensively … by Night or by Day, in Fear of Affray of Their Majesties Liege People." *Id.* at 46 (quoting statutes). Considered together, these show "colonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons,'" as England had. *Id.* at 47.

One aspect of the historical record is especially revealing: like others, I have not located a Founding-era statute proscribing the possession of an entire class of weapons. *See, e.g., Bianchi*, 111 F.4th at 506 (Richardson, J., dissenting) ("I am unaware of any laws before the American Founding that deprived citizens of the right to possess certain weapons."); *Bridges*, 150 F.4th at 534 (Nalbandian, J., concurring in part) ("From what we can tell, no American jurisdiction prohibited any kind of weapon in the eighteenth century."); David B. Ko-

pel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. LEGIS. 223, 261 (2024) ("Before, during, and after the Revolution, no state banned any type of arm, ammunition, or accessory. Nor did the Continental Congress, the Articles of Confederation Congress, or the federal government created by the U.S. Constitution in 1787.").[3]

Some, including my colleagues, maintain that AR-15s would be unrecognizable to the Founders. *See Bianchi*, 111 F.4th at 452 ("[AR-15s] are not the modern equivalents of weapons that were commonly possessed and employed for self-preservation by your shopkeeper, or your butcher, or your blacksmith up the road in colonial America."). That suggests the Second Amendment protects only those pistols and muskets known to our Founders. This argument "border[s] on the frivolous." *Heller*, 554 U.S. at 582. And repeating rifles did exist during the Founding. The Belton repeating rifle, circa 1777, fired several rounds before reloading. *Or. Firearms Fed. v. Kotek*, 682 F. Supp. 3d 874, 901–02 (D. Or. 2023). The Girandoni air rifle had a twenty-two-shot magazine capacity. David Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849, 853 (2015). Meriwether Lewis took one on his expedition. *Bevis*, 85 F.4th at 1225 (Brennan, J., dissenting). So, "multi-shot guns predate Colonel Colt by over two centuries." Kopel, *supra*, at 849.

On this point, the majority opinion states that at the Founding, certain knives were more dangerous than that era's firearms, as the latter required users to "carefully reload after

---

[3] At oral argument, the State pointed to a Founding-era New Jersey law banning trap guns. Oral Argument at 22:20–28. I explain below why this is not a categorical ban on a class of weapons.

every shot." To my colleagues, this is evidence that modern semiautomatic weapons present a societal problem unimaginable at the Founding. Yet the majority opinion then acknowledges that repeating firearms were available; for example, that the Girandoni air rifle was "fragile, complex, and impractical." That proto-semiautomatic weapons were available and not banned is evidence that AR-15s may not be prohibited consistent with our historical regulatory tradition. The wide availability of revolvers and semiautomatic pistols is also overlooked by the majority opinion. *See* Kopel, *supra* at 856. And it accords no weight to the absence of categorical bans on any classes of weapons—knives or firearms—when the Second Amendment was enacted.

As tensions flared between the Colonists and British, the right of self-defense became even more important to the citizens of the burgeoning republic. The British would impose stringent gun control measures. David Kopel, *How the British Gun Control Program Precipitated the American Revolution*, 6 CHARLESTON L. REV. 283, 285 (2012). General Gage confiscated gunpowder and destroyed public firearms. *Id.* at 313. By disarming Americans, "the British were attempting to make the practical exercise of the right of personal self-defense much more difficult." *Id.* at 301. These attempts "provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms." *Heller*, 554 U.S. at 594. As a New York newspaper stated, "[i]t is a natural right which the people have reserved to themselves, confirmed by the Bill of Rights, to keep arms for their own defence." *Id.* Reverend John Witherspoon, early President of Princeton and teacher to James Madison, pronounced that the people of England "mean to force us to be absolute slaves," so the colonial legislatures should ensure "all Americans [] provide themselves with

arms … in case they should be reduced to hard necessity of defending themselves from murder and assassination." John Witherspoon, Thoughts on American Liberty, (August 1774) (transcript available at the N.J. state library).

Other dangers at the time required firearms for self-defense. "There were no police forces, and most Americans lived in rural areas, often in homes located miles from the closest neighbor." *Wolford*, 2026 WL 1825723, at *4. Access to firearms was thus imperative to ward off hostile Indians, criminals, or wild beasts. Given these threats, "the right to keep and bear arms was included among the other treasured liberties protected by the Bill of Rights." *Id.*

After the Revolutionary War, "[f]our States adopted analogues to the Federal Second Amendment in the period between independence and the ratification of the Bill of Rights." *Heller*, 554 U.S. at 601. "[A]ll four of these pre-Second Amendment state constitutional provisions … secured an individual right to bear arms for defensive purposes." *Id.* at 602. This included Pennsylvania and Vermont, which "clearly adopted individual rights unconnected to militia service." *Id.* at 601.

This time period—which best illuminates the meaning of the Second Amendment[4]—highlights that the colonies and states banned the carrying of "dangerous and unusual" weapons. *Id.* at 47–48. But no Founding-era law prohibited the possession and ownership of an entire class of weapons. At the same time, the right to own firearms used for self-defense was respected and enshrined in the Constitution for the new Republic.

---

[4] *Bruen*, 597 U.S. at 82–83 (Barrett, J., concurring).

### 3. Post-Founding/Nineteenth-Century Regulations

Courts must not "give[] postenactment history more weight than it can rightly bear." *Bruen*, 597 U.S. at 35. Still, evidence of how the Second Amendment was interpreted during this era can be a "critical tool," particularly if a regular course of practice has "liquidate[d]," or settled, the meaning of the right. *Id.* (quoting *Heller*, 554 U.S. at 605). The three historical trends described above continue in this time period: (1) states regulated "dangerous and unusual" weapons, (2) there were few to no bans on weapons in common use for lawful ends, and (3) self-defense was a cherished, closely guarded right.

States regulated the carry of "dangerous and unusual" weapons. One example is the Bowie knife, which has a long, fixed blade with cross guards to protect the attacker's hand and was often used in fights and duels. The knife was named after Jim Bowie, who used one to kill several men during the infamous Sandbar fight. *See Bianchi*, 111 F.4th at 465. Criminals using Bowie knives led many states to regulate them in some way. From what I could find, Georgia was the only pre-Civil War state to ban their possession.[5] But the ban was promptly held unconstitutional. *Nunn v. State*, 1 Ga. 243 (Ga. 1846). Instead, most states banned the concealed carry of Bowie knives. *Bevis*, 85 F.4th at 1216 (Brennan, J., dissenting).

The majority opinion cites three statutes—two from states and one from a territory—of broad Bowie knife bans. These statutes cannot bear the weight placed on them. They were enacted after 1871, much later than the Second Amendment

---

[5] Act of Dec. 25, 1837, § 1, 1837 Ga. Laws 90, 90 (possession or sale of Bowie knives, pistols, dirks, sword canes, or spears).

and after the ratification of the Fourteenth Amendment. So, their import for constitutional meaning is limited. Even more, it is doubtful that three statutes establish a tradition. *Cf. Bruen*, 597 U.S. at 46 ("[W]e doubt that *three* colonial regulations could suffice to show a tradition.").

Most importantly, these are not the "broad proscription[s]" my colleagues believe them to be. Both the 1871 Texas and the 1889 Arizona (territory) bans allowed the carrying of pistols and knives for self-defense. *See* 1871 Tex. Laws 1st Sess. 25; 1889 Ariz. Sess. Laws 30. That leaves Arkansas's 1881 ban. But the majority opinion cites only one section of that Act. *See* 1881 Ark. Acts 191, § 1. ("That any person who shall wear or carry, in any manner whatever … any pistol of any kind … shall be guilty of a misdemeanor."). As far as I can tell, a different part of the Arkansas Act states it does not apply to possession or public carry: "*Provided, further*, That nothing in this act be so construed as to prohibit any person from carrying any weapon when upon a journey, or upon his own premises." *Id.* An Act to Preserve the Public Peace and Prevent Crime, no. 96, §§ 1–8, 1881 Ark. Acts 191, 191–92 (Mitchell & Bettis). Accordingly, these Bowie knife "bans"—rare and narrow—are far from analogous to Illinois's extraordinarily broad prohibitions. *Cf. Wolford*, 2026 WL 1825723, at *17 (Barrett, J., concurring) (Hawaii cannot broadly restrict the carry of firearms in public when no historical laws did so).

States did not enact laws to limit the possession or carry of Bowie knives because they were extremely dangerous. Rather, they did so because they were commonly concealed and

used by criminals. [6] This is evident from several cases discussing these bans under the right to bear arms. For example, in 1840, William Aymette was convicted for wearing a concealed Bowie knife, violating a Tennessee statute. *Aymette v. State*, 21 Tenn. 154, 155 (Tenn. 1840). The Tennessee Supreme Court drew the boundaries of the right to self-defense. "The Legislature, therefore, have a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens, and which … would not contribute to the common defence." *Id.* at 159. But those arms "usually employed in private broils, and which are efficient only in the hands of the robber and the assassin," may be banned. *Id.* at 158. Because Bowie knives were not used for lawful but criminal purposes, the Supreme Court upheld the conviction. The Louisiana Supreme Court reached the same conclusions when analyzing that state's ban on the concealed carry of Bowie knives and like weapons. Such weapons are "not even designed for any purpose of public defence, and used most frequently by evil-disposed men who seek an advantage over their antagonists, in the disturbances and breaches of the peace which they are prone to provoke." *State v. Smith*, 11 La. Ann. 633, 633 (1856).

For support, the majority opinion cites *Cockrum v. State*, 24 Tex. 394 (1859). There, as my colleagues point out, the Supreme Court of Texas upheld a penalty enhancement for a homicide committed with a Bowie knife. *Id.* at 402. But the court emphasized that the legislature could not prohibit the carry of Bowie knives wholesale, as it would "deter the citizen from its lawful exercise." *Id.* at 402–03. Instead, as the court

---

[6] "The antebellum right to bear arms was fought primarily over the early concealed weapons statutes." Robert Leider, *Our Non-Originalist Right to Bear Arms*, 89 IND. L. J. 1857, 1601 (2014).

stated, its holding is confined to the context of manslaughter and murder: "The legislature has the power to put all cases of manslaughter, committed with deadly weapons, on the same footing with murder." *Id.* at 403.

Next, consider bans on using trap guns. These are loaded guns "intended to go off or discharge itself, or be discharged by any String, Rope or other Contrivance" to protect property. 1771 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10. New Jersey prohibited the "set[ting]" of a trap gun. *Id.*

At the outset, it is questionable whether trap guns are even protectable "Arms." They are not "bearable." After all, "the whole design of the trap gun was to allow a firearm to be discharged *without* a person needing to 'keep' or 'bear' it." *Duncan*, 133 F.4th at 908 (Bumatay, J., dissenting). And even if they are "Arms," they are unhelpful for personal self-defense. Indeed, they fire indiscriminately, possibly even injuring the owner. *Bevis*, 85 F.4th at 1218 (Brennan, J., dissenting).

In sum, prohibitions on Bowie knives and trap guns illustrate how states understood the "dangerous and unusual" test. A weapon could be banned if it was particularly suited for criminality and it was not used for self-defense.

Caselaw from the high courts of Texas, Arkansas, Louisiana, and Georgia also informs our understanding of the "dangerous and unusual" test.

In *State v. Duke*, 42 Tex. 455 (1875), the Supreme Court of Texas evaluated the State's ban on the "keeping and bearing of deadly weapons." *Id.* at 456. That court spoke to which arms received constitutional protection: "The arms which every person is secured the right to keep and bear … must be

such arms as are commonly kept, according to the customs of the people, and are appropriate for open and manly use in self-defense." *Id.* at 458. Because the law excepted carry for self-defense and in the home, the court concluded the statute did not infringe the right to bear arms. *Id.* at 459.

The Supreme Court of Arkansas, when faced with a defendant's criminal indictment for carrying a pistol, emphasized that sovereigns should punish wrongdoers, not strip the populace of the right to self-defense. *Wilson v. State*, 33 Ark. 557, 559 (1878). "If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege." *Id.* at 560. The judgment therefore was reversed and the case remanded for a new trial on self-defense. So too, the Louisiana Supreme Court concluded that citizens had a right to carry arms because "[t]his is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves," *State v. Chandler*, 5 La. Ann. 489, 490 (La. 1850).

Important for this evaluation is *Nunn v. State*, 1 Ga. 243 (1846). Georgia made it a crime "to sell, or offer to sell, or to keep[,] or to have about their persons" Bowie knives, pistols, dirks, sword-canes, spears—not too different from Illinois's Act here. *Id.* at 246. The Supreme Court of Georgia enjoined the ban on carrying pistols openly. *Id.* at 251. That court stated, "[t]he right of the whole people … to keep and bear *arms* of every description, and not *such* merely as are used by the *militia,* shall not be *infringed*." *Id*. The majority opinion disclaims reliance on *Nunn*, despite the Supreme Court in *Heller* concluding that *Nunn* "perfectly captured" the

meaning of the Second Amendment. 554 U.S. at 612. During this period, state courts continued to recognize the importance of self-defense. "In *Nunn* … the Georgia Supreme Court construed the Second Amendment as protecting the '*natural* right of self-defence.'" *Id*.

The most vulnerable members of the public understood better than anyone the importance of self-defense. "Blacks were routinely disarmed by Southern States after the Civil War. Those who opposed these injustices frequently stated that they infringed blacks' constitutional right to keep and bear arms." *Heller*, 554 U.S. at 614. Horrific injustices were committed against black Americans at the time. For example, "members of a white militia … brutally murdered as many as 165 black Louisianians congregating outside a courthouse." *McDonald*, 561 U.S. at 808–09 (Thomas, J., concurring in part) (discussing *United States v. Cruikshank*, 92 U.S. 542 (1876)). Republicans in Congress sought to suppress armed gangs of ex-Confederates from terrorizing the newly freed blacks by passing the Freedmen's Bureau Act of 1866 and the Civil Rights Act of 1866. Both guaranteed blacks the right to self-defense. *Id.* at 771–74. And the co-founder of the NAACP, Ida Wells, wrote, "a Winchester rifle should have a place of honor in every black home, and it should be used for that protection which the law refuses to give." Ida B. Wells-Barnett, *Southern Horrors and Other Writings: The Anti-Lynching Campaign of Ida B. Wells, 1892–1900* 70 (Jacqueline Jones Royster ed., 1997).

Twentieth-century bans do not help inform the "dangerous and unusual" test. In 1934 and 1968, Congress severely restricted the possession of machine guns and similar firearms. *Bevis*, 85 F.4th at 1202. Then, in 1986, machine guns

manufactured after that year were banned. *Id.* But those enactments happened too recently to be considered an enduring national tradition. *See Bruen*, 597 U.S. at 83 (Barrett, J., concurring) (cautioning against a "freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights").

To conclude, this history yields three traditions. First, from England until the late 19th century, self-defense was a natural right, imperative to the functioning of democracy and a safe society. Second, the weapons that could be banned were overwhelmingly used to commit crimes. In particular, England and the early United States focused on easily concealable arms. Such arms are "dangerous and unusual." Third, arms commonly used by the people for self-defense were not banned. And the few times sovereigns attempted to do so, in the 1671 Game Act or by the State of Georgia in 1837, the people and courts pushed back, reaffirming the right to own weapons for self-defense.

### B. The "Dangerous and Unusual" Test Today

As discussed, a "dangerous and unusual" weapon is one particularly suited for and used by criminals and not widely owned for lawful self-defense.[7] This follows *Heller*'s instruction that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes … . That accords with the historical understanding of the scope of the right." 554 U.S. at 625. Thus, the "dangerous and unusual" test and the "common use" test are

---

[7] I do not discuss whether other lawful purposes could protect a firearm, such as hunting or community self-defense, but I do not doubt that is true.

two sides of the same coin: a "dangerous" gun, particularly suited for and used by criminals, is not used "for lawful purposes." And an "unusual" arm is not "in common use." So, the critical inquiry becomes (1) how many of the firearms are in private hands and (2) whether they are overwhelmingly used for self-defense.

That test properly focuses on *the people*. The Second Amendment right is an individual right, as *Heller* held. The Court rejected a test in which judges decide what weapons are necessary for self-defense. "There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police." *Id.* at 629.

All that mattered was that handguns were in common use for a lawful purpose: they "are the most popular weapon chosen by Americans for self-defense in the home." *Id.* So the ban was unconstitutional. *See also* Joel Alicea, Bruen *Was Right*, 174 U. PA. L. REV. 13, 39 (2025) ("*Bruen* describes the rejected form of means-end scrutiny … that involves 'the evolving product of federal judges,' and it contrasts this form of scrutiny with its own approach, in which the balance of means and ends is the 'product of an interest balancing *by the people*.'").

Bowie knife bans illustrate the application of the "dangerous and unusual" test. Suppose a court is deciding for the first time whether such knives can be prohibited. First, Bowie knives were overwhelmingly used by thieves and murderers to terrorize the public. *See Aymette*, 21 Tenn. at 158. People did not choose them "for [the] open and manly use in self-de-

fense." *Duke*, 42 Tex. at 458. The knives are therefore "danger-ous" (or "not used for lawful purposes"). Second, Bowie knives are not "commonly kept, according to the customs of the people." *Id.* They are therefore "unusual" (or not in "com-mon use"). As a result, they can be prohibited.

Or count the number of states that prohibit the firearm at issue. In *Bruen*, two justices concurred, emphasizing that New York's licensing regime was an "outlier" among the states. 597 U.S. at 79 (Kavanaugh, J., joined by Roberts, C.J., concurring) (noting that only six states had such a regime). The same is true with AR-15 bans. "AR-15s are legal in 41 of the 50 States, meaning that the States such as Maryland that prohibit AR-15s are something of an outlier." *Snope*, 145 S. Ct. at 1534 (Ka-vanaugh, J., statement respecting denial of cert.). So, a court can account for how many of the firearms are owned and how many states ban their possession to determine whether a fire-arm is in common use.

The State contends the common-use test is circular. *See also Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015). Take the AR-15 as an example. The Federal Assault Weapons Ban of 1994 prohibited the sale and manufacture of AR-15s. That ban expired in 2004. Then sales of AR-15s sky-rocketed. A test that considers only how many AR-15s are in existence would conclude they are in common use. But had the federal ban not lapsed, AR-15s may not be widely owned, meaning they would not be in "common use," and Illinois could lawfully ban them. In other words, what *can be* banned depends on what *has been* banned.

Counting the number of state bans has the same flaw. If on Monday two states banned AR-15s, then on Tuesday 30 states banned them, then a state ban passed on Wednesday

would be constitutional—an AR-15 ban would no longer be an outlier among the states. Yet that same ban passed on Monday would be unconstitutional.

Two counterarguments spring to mind. First, the *Heller* majority did not find this circularity argument persuasive. In dissent, Justice Breyer observed that if the ban on machine guns were lifted, and they became ubiquitous, "the Court will have to reverse course and find that the Second Amendment *does*, in fact, protect the individual self-defense-related right to possess a machinegun" despite the majority holding that the Second Amendment does not protect machine guns. *Heller*, 554 U.S. at 721 (Breyer, J., dissenting). "There is no basis for believing that the Framers intended such circular reasoning." *Id.* The majority in *Friedman* embraced this argument, 784 F.3d at 409, as did the majority in *Bevis*, 85 F.4th at 1190. But it is not for us to inject the circularity argument back into Second Amendment law. If a majority of the Supreme Court did not adopt that argument in *Heller*, neither should we.

Second, the circularity concern is not as problematic as it appears. Its proponents cite the machine gun as paradigmatic of the problems with a weapons count test. Because machine guns were banned, they have never been in common use and thus can now be banned. *Friedman*, 784 F.3d at 409. But machine guns were available for sale to the public. *United States v. Alsenat*, 174 F.4th 45, 47 (11th Cir. 2026).; David B. Kopel, *Machine Gun History and Bibliography*, 25 Wyo. L. Rev. 45, 89 (2025) (describing how machine guns were advertised as "a machine gun for the home" and to ranchers to fend off "desperadoes"). "For commercial sales to law-abiding citizens, the Thompson submachine gun was a flop, but gangsters loved

it." Kopel, *supra* at 89 (citation modified). And after some time, it became obvious that the American people were not choosing machine guns for self-defense; rather, they were commonly used by gangsters in shootings like the Saint Valentine's Day Massacre.[8] The same happened with Bowie knives. After their invention, their use became widespread in unlawful duels and knife fights. In short, the Constitution looks to the people to decide which weapons are used for self-defense. Those weapons overwhelmingly chosen or particularly suited for criminality are considered "dangerous and unusual."

Another criticism of the "dangerous and unusual" test is that it creates an under-protection problem. If a new firearm is released, a government can act quickly to ban it, and that firearm will never be in "common use" and thus protected. But the "dangerous and unusual" test would not allow for that. When a new firearm is introduced to the market, it will almost always be too early to tell whether it is "dangerous and unusual." To immediately regulate this weapon, the government must proffer evidence that it is being used by criminals, not law-abiding citizens for lawful self-defense. At a minimum, the government must "wait and see" whether and how the public adopts and uses the firearm before it can be banned. That accords with the history of weapons bans, such

---

[8] *See Staples v. United States*, 511 U.S. 600, 626 n.4 (1994) (Stevens, J., dissenting) ("The late 1920s and early 1930s brought … a growing perception of crime both as a major problem and as a national one … Criminal gangs found the submachinegun (a fully automatic, shoulder-fired weapon utilizing automatic pistol cartridges) and sawed-off shotgun deadly for close-range fighting." (citation modified)).

as Bowie knives and machine guns, and respects the right of the people to choose which firearms to use for self-defense.[9]

It may well be that the "common use" test has an aspect of circularity, but that is far from an anomaly in constitutional law. For example, the Fourth Amendment's reasonable expectation of privacy test is circular. *See* Richard A. Posner, *The Uncertain Protection of Privacy by the Supreme Court*, 1979 S. CT. REV. 173, 188. Circularity, then, is an insufficient reason to jettison a constitutional test, particularly one backed by immense historical support.

The majority opinion states: "It is also quite rare for individuals to use [AR-15] rifles in self-defense," and the plaintiffs' "smattering of online articles" are insufficient to show any real burden on the right to self-defense. But this lacks support for many reasons.

Foremost, it incorrectly shifts the burden of proof that the firearms are used for self-defense onto the plaintiffs. After they satisfy their burden on *Bruen* step one, a firearm is "presumptively" protected. *Bruen*, 597 U.S. at 24. So, Illinois must justify its ban on the most popular rifle in America and its magazine. To do so, the State must proffer evidence that AR-15s are "dangerous and unusual." That means Illinois must do more than find historical statutes showing that legislatures had the power to ban such weapons. The State must also show that AR-15s are not in common use for lawful purposes. Illinois must supply the evidence showing that AR-15s are pre-

---

[9] Circularity and new firearms may also be a theoretical problem, not so much a practical problem. Rarely will a weapon enter the market that is entirely new; most are variants of an already legal firearm. *Friedman*, 784 F.3d at 416 n.5 (Manion, J., dissenting).

dominantly used by criminals for illegal purposes. But no such evidence exists in the record.

Even if the burden rested on the plaintiffs—which it does not—at trial they offered extensive evidence that AR-15s are chosen for self-defense. They cited four consumer studies showing that a principal reason consumers purchase AR-15s is for self-defense.[10] And experts explained to the district court that the AR-15 is chosen for its self-defense properties.[11] So, the district court's conclusions that AR-15s are "ideally suited" for self-defense, and that many Americans in fact use them for self-defense, are not clearly erroneous.

This point also reveals a broader concern that the majority opinion cannot be squared with *Heller*. There, the Supreme Court held D.C.'s handgun ban unconstitutional, but it did not require "evidence on the frequency" of handguns actually being used for self-defense, as under the reasoning of the majority opinion. Instead, *Heller* concluded that the Second Amendment protects handguns because they "are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." 554 U.S. at 629. That is, because handguns are owned by millions of people, under *Heller* they are in common use for self-defense. The same is true here. That millions of AR-15s are owned and have obvious self-defense properties means the firearm is in common use for self-defense.

My colleagues also reason that Illinois's Act leaves other weapons available for self-defense. Yet *Heller* rejected this ar-

---

[10] ECF No. 253 at 22, ¶ 87.

[11] *Id.* at 22, ¶¶ 86–87.

gument. "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed." *Heller*, 554 U.S. at 629. Likewise, AR-15s are owned in the millions. So it is "no answer" to say they can be banned because handguns are available.

### C. AR-15s Pass the "Common Use" Test

In applying the "dangerous and unusual" test, courts may start with the "unusual" prong (which, as shown, is the opposite of "common use"). For a firearm to be "unusual," it must be highly unusual in society at large. *Bruen*, 597 U.S. at 47. "Society" refers to today, not at the adoption of the Second Amendment. *Id.* at 48.

To say AR-15s are not in "common use" does not pass the "red face" test. The district court correctly found that "millions of Americans own AR-15s at this very moment."[12] Per the State's political scientist Professor Louis Klarevas, that number is conservative.[13] Even accounting for the AR-15s owned by firearms dealers (which the government argued was around 37.1% of all AR-15s), "there are still *millions* of weapons in circulation in the United States (and, it follows, in Illinois) that the Illinois Government has rendered illegal."[14] The record evidence here well supports these conclusions. Plaintiffs collected several articles discussing how AR-15s are exceedingly popular.[15] Professor Klarevas estimated the

---

[12] ECF No. 253 at 24, ¶ 98; ECF No. 258 at 101.

[13] *Id.*

[14] *Id.*

[15] ECF No. 253 at 21–22, ¶ 85.

number of Americans who own an AR-15 to be around 14.1 to 18.2 million.[16] Indeed, one of the State's witnesses, retired Lieutenant Colonel Dempsey, keeps an AR-15 for self-defense.[17] The district court's finding is well supported in the record and certainly not clearly erroneous.

The Supreme Court agrees that AR-15s are widely owned. "AR-15 rifles, AK-47 rifles, and .50 caliber sniper rifles … are both widely legal and bought by many ordinary consumers." *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (2025); *Garland v. Cargill*, 602 U.S. 406, 430 (2024) (Sotomayor, J., dissenting) (the shooter in the 2017 Las Vegas mass shooting used a "commonly available, semiautomatic rifle[]" with a bump stock attached). Justice Thomas and Justice Kavanaugh recently agreed AR-15s are widely owned and thus in common use. *Snope*, 145 S. Ct. at 1534 (Kavanaugh, J., statement respecting the denial of cert.) ("Given that millions of Americans own AR-15s and that a significant majority of the States allow possession of those rifles, petitioners have a strong argument that AR-15s are in 'common use.'"); *id.* at 1538 (Thomas, J., dissenting from denial of cert.). And if tasers are protected because "[h]undreds of thousands of Tasers and stun guns have been sold to private citizens," AR-15s are certainly protected because millions have been sold to consumers. *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring).

Another measure of "common use" is to examine the number of state prohibitions on an arm. *Bruen*, 597 U.S. at 79 (Kavanaugh, J., concurring) (observing that New York's

---

[16] *Id.* at 24 ¶ 98.

[17] *Id.* at 25 ¶ 100.

"may-issue" licensing regime was an "outlier" because only six states used such a regime). By that metric, AR-15s are also in "common use" because only nine or ten states prohibit them.[18] "AR-15s are legal in 41 of the 50 States, meaning that the States such as Maryland that prohibit AR-15s are something of an outlier." *Snope*, 145 S. Ct. at 1534 (Kavanaugh, J., statement respecting denial of cert.).

The majority opinion, however, does not apply the "common use" test at all. It cites a purported historical tradition of regulating "particularly dangerous weapons" or "weapons whose danger and lethality stand out." To my colleagues, such weapons can be regulated regardless of whether they are in common use for lawful purposes or not.

But the Supreme Court has not adopted or endorsed such a test. The only relevant historical tradition the Court has recognized is the regulation of "dangerous and unusual" weapons—which requires proof that the weapons are both "dangerous" and "unusual." *See Caetano*, 577 U.S. at 411–12 (per curiam); *id.* at 417 (Alito, J., concurring in the judgment). So, my colleagues break fresh ground by defining a new "tradition" that has not been recognized by the Supreme Court.

The next inquiry is whether AR-15s are "dangerous"—the focal point of the majority's analysis. Though all guns are in some sense "dangerous," recall that this is a term of art. Historically, "dangerous" weapons were those particularly suited for criminality or overwhelmingly used by criminals.

---

[18] Colorado enacted S.B. 25-03, which requires that state's residents to obtain a license and receive firearms training before purchasing certain semiautomatic firearms. *See* COLO. REV. STAT. § 18-12-116 (2026).

Sovereigns were particularly concerned with weapons that could be concealed.

AR-15s are widely owned for self-defense. After hearing from firearm instructors as well as self-defense and military experts, the district court concluded that AR-15s are "ideally suited for self-defense in the home." Both "*experts* … and *fact witnesses* attest to the fact that law-abiding citizens choose [AR-15s] for self-defense." The court found that AR-15s are light, short, and have less recoil, making them easier to handle and fire. The district court also heard from self-defense experts who all reported "recoil[,] … lighter weight, shorter barrel, and ergonomic stock and grip" make "AR platform rifles" well suited for self-defense, which is why they are commonly used in popular "defensive carbine course[s]."[19]

Evidence offered by plaintiffs supports the district court's findings. One reason AR-15s are easy to shoot is the manner in which the firearm expels gas, which reduces felt recoil.[20] Reduced recoil also helps keep the muzzle on target, increasing accuracy.[21] And the AR-15's expulsion design removes the need for the shooter to manually reload, meaning the firearm "runs itself."[22] These features are all useful for self-defense.

To my colleagues, AR-15s are more dangerous than handguns. The rifle's ammunition has a higher velocity, and AR-15s are more accurate at longer ranges. The State, for its part,

---

[19] ECF No. 253 at 26–27, ¶¶ 107–09. The FBI Ballistic Research Facility confirmed the same. *See id.* at 26 ¶ 107.

[20] *Id.* at 14, ¶¶ 38–39.

[21] *Id.* at 15, ¶ 41.

[22] *Id.* at 14, ¶ 39.

focuses on range, penetration, and rate of fire to argue that AR-15s are poor self-defense weapons.

But a citizen may prefer an AR-15 over a handgun for self-defense for many reasons. An AR-15 is more accurate than a pistol and easier to aim. David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 403 (1994). And "[i]t would be rather irrational to ban a firearm because it was particularly accurate and, hence, posed a smaller danger of stray shots." *Id*. Those who chose a firearm that does not fire wildly, possibly endangering bystanders, should not be punished. These self-defense benefits rebut the assertion that an AR-15 is unusually dangerous and might suggest the State simply dislikes the weapon. But distaste for a particular firearm cannot justify proscribing it. *Cf. Wolford*, 2026 WL 1825723, at *11 (The Second Amendment does not yield to Hawaii's "spirit of Aloha … any more than it can yield to the spirit of … the Windy City.").

Whether a firearm is useful for self-defense is not a decision for judges. *The people* choose which weapons to own for self-defense. As *Heller* tells us, "There are many reasons that a citizen may prefer a handgun for home defense," but "[w]hatever the reason, handguns are the most popular weapon chosen by Americans for self-defense." *Heller*, 554 U.S. at 629. "Our Constitution allows the American people—not the government—to decide which weapons are useful for self-defense." *Snope*, 145 S. Ct. at 1537 (Thomas, J., dissenting from denial of cert.). Judges are to examine what weapons Americans do own for self-defense. And the people have spoken: AR-15s are the most popular rifle in America, so a prohibition on the possession of that firearm and its magazine is unconstitutional.

Judges do not define the scope of other constitutional amendments, as would follow from my colleagues' position. A judge could not label a particular type of speech as "dangerous" or "lacking value" and thus conclude it is not protected by the First Amendment. Quite the opposite. "The First Amendment protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply misguided." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023) (citation modified). The same applies for the Second Amendment. AR-15s are overwhelmingly purchased and possessed for self-defense. *See Heller*, 554 U.S. at 629. Courts do not evaluate the prudence of that choice, just as they do not assess the value of particular speech.

Finally, the focus of the majority opinion on "particularly dangerous weapons" invites difficult line-drawing problems. AR-15s are very similar to the semiautomatic pistols *Heller* held were protected. "The semiautomatic mechanism in an AR-15 rifle is, in all material respects, the same as in a semiautomatic handgun." *Bevis*, 85 F.4th at 1215 (Brennan, J., dissenting). "That mechanism is gas powered, and the impact of the pin firing the bullet pushes back the lock mechanism, ejects the old shell, and loads the new round from the magazine." *Id.* As a result, "it can be analytically difficult to distinguish the AR-15s at issue here from the handguns at issue in *Heller*." *Snope*, 145 S. Ct. at 1534 (Kavanaugh, J., statement respecting denial of cert.). Variations between AR-15s and handguns in the rate of fire and penetration matter little in a gunfight.

AR-15s are no more suited for criminal activities than a handgun. If anything, "a handgun could be viewed as more

dangerous than an AR-15 rifle because the handgun is less accurate and more concealable." *Bevis*, 85 F.4th at 1215 (Brennan, J., dissenting). By contrast, short-barreled rifles and shotguns are easy to conceal and add "little—if any—functionality to the firearm for lawful use." *United States v. Rush*, 130 F.4th 633, 637 (7th Cir. 2025); *see also Duke*, 42 Tex. at 458 (The right to keep and bear arms "does not include … such pistols at least as are not adapted to being carried concealed."); MALCOLM, at 9 (discussing Henry VIII's ban on concealable firearms "frequently employed in crime"). Under the reasoning in the majority opinion, both Bowie knives and AR-15s would qualify as "particularly dangerous"—but not handguns. That cannot follow as a practical matter and as a matter of history.

### D. Nuanced Approach

As an alternative, the majority opinion invokes the so-called "nuanced approach," which derives from one sentence in *Bruen*: "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." 597 U.S. at 27; *see also Duncan*, 133 F.4th at 869–70. The majority's primary holding does not rest on this "nuanced approach," but I submit this method should not be invoked at all.

The "nuanced approach" is not its own test—it is a truism. A 19th-century law regulating Bowie knives may be compared with a contemporary ban on switchblades, as the knives are similar. That same Bowie knife law, though, cannot be compared to a ban on rocket launchers. To do so, more nuance is necessary, which "undeniably necessitates an exercise of judgment." *Wolford*, 2026 WL 1825723, at *6.

But the application of the "nuanced approach" is too free-wheeling. My colleagues believe that the "unprecedented societal concern of mass killings speedily carried out by lone shooters," facilitated by "dramatic technological change[s] embodied in AR-15s equipped with large-capacity magazines," gives legislatures more leeway to regulate arms that otherwise would be presumptively protected under the Second Amendment. Yet that is not how *Bruen* has been applied. Although courts focus on the Second Amendment's principles, *Rahimi*, 602 U.S. at 692, those principles must be sufficiently narrow to permit reasoning-by-analogy. "[A] court must be careful not to read a principle at such a high level of generality that it waters down the right." *Id.* at 740 (Barrett, J., concurring). Ironically, the "nuanced approach" allows courts to be even less nuanced in drawing historical comparators, directly contrary to the guidance from *Bruen* and *Rahimi*.

Even more, applying that approach here makes it more difficult to reconcile the majority opinion and *Heller*. Semiautomatic handguns today are far more effective than the single-shot, muzzle-loaded firearm that was ubiquitous at the Founding. And many more mass shooters use handguns than rifles—a ratio of roughly 74% using at least one handgun to 33% involving at least one rifle.[23] The assertion that technological changes facilitated the rise of mass shootings cannot justify a ban on AR-15s, because the same logic would require banning handguns. Yet the Supreme Court has told us that a handgun ban violated the Second Amendment. And the

---

[23] Rockefeller Institute of Government, "Mass Shooting Factsheet," SUNY (June 3, 2026), https://rockinst.org/gun-violence/mass-shooting-factsheet/.

Court did so over Justice Breyer's dissent, which would have made new societal concerns a central component of his analysis. *Heller*, 554 U.S. at 681–82, 696–99.

The majority opinion asserts that lone-wolf mass shootings are "unprecedented." It states "the first known mass shooting resulting in at least ten deaths did not occur until 1949." Tragically, however, gun violence in America has a much older pedigree. Documented instances of school shootings date back to at least the 1850s.[24] Mobs with guns often committed serious atrocities, like when members of a white militia murdered as many as 165 black Louisianians during the Colfax massacre. *McDonald*, 561 U.S. at 808 (citing *United States v. Cruikshank*, 92 U.S. 542 (1876)).[25]

In March of 1891, for example, a man armed with a double-barreled shotgun fired upon a crowd of students and faculty in a schoolhouse in Mississippi. He injured fourteen

---

[24] *See* "Serious Case of Shooting—Navigation," N.Y. TIMES 1 (Nov. 3, 1853) (student shoots teacher in Louisville, KY); "Fourth of July North," THE DAILY DISPATCH 2 (July 7, 1858) (escaped perpetrator shot Sabbath School student in Baltimore, MD).

[25] These horrific incidents of racial violence involving guns continued into the twentieth century, including the Ocoee massacre (approximately 35 deaths), the Tulsa massacre (30–300 deaths), and the Rosewood massacre (8 deaths, potentially hundreds injured). On the Ocoee massacre, *see* "A Perfect Storm: The Ocoee Riot of 1920," 93 FLA. HIST. Q. 25, 25–26 (2014); "Ocoee Election Day Violence—November 1920," FLA. OPPAGA 2–4 (2019). On the Tulsa massacre, *see* "Tulsa Race Massacre of 1921," Encyc. Brittanica (June 1, 2026), https://www.britannica.com/event/Tulsa-race-massacre-of-1921. On Rosewood, *see* R. Thomas Dye, "Rosewood, Florida: The Destruction of an African American Community," 19 THE HISTORIAN 605, 608, 614–15, 617 (1997).

people in a "cowardly attempt at wholesale murder."[26] A similar shooting occurred one month later, when a seventy-year-old man shot at a crowd of children on a playground in New York, thankfully killing none but injuring several.[27]

Casualties amassed after the turn of the twentieth century. In 1903, a lone-wolf shooter killed nine and injured twenty-five people with a double-barreled shotgun at a concert in Winfield, Kansas.[28] The 1906 Asheville shooting involved five deaths and at least twelve injuries at the hands of a gunman with a lever-action rifle.[29] And other bloody shootings predated the infamous Saint Valentine's Day Massacre of 1929.[30] Though no lone-wolf shooting resulted in at least *ten* deaths until 1949, *nine* had been killed nearly a half-century earlier.

Mass shootings are horrific, and in no way do I minimize these tremendous losses of life. These examples show that in the wake of these awful incidents, legislatures did not enact

---

[26] "Fourteen Persons Wounded," DAILY ALTA CA. 1 (Mar. 31, 1891).

[27] "Fired into a Group of Children," N.Y. TIMES 2 (Apr. 10, 1891).

[28] "Five are Dead at Winfield," THE WICHITA EAGLE 5 (Aug. 14, 1903); "A Twigg Snaps: Spurned Lover Killed 9 at Kansas Concert in 1903," N.Y. DAILY NEWS 35 (June 19, 2016).

[29] "Harris Slain by Posse," N.Y. TIMES 2 (Nov. 16, 1906).

[30] *See, e.g.*, Randall L. Hall, "A Courtroom Massacre: Politics and Public Sentiment in Progressive-era Virginia," 70 J.S. HIST. 249, 249–50 (2004) (retelling the 1912 Floyd Allen courtroom shootout); "The Wolf Family Murders: A Brutal Crime in Small Town North Dakota," THE LINEUP (Apr. 5, 2018), https://the-line-up.com/the-wolf-family (eight killed by hatchet and double-barreled shotgun); "Chinese Confesses Killing of Ten: Dope Was Cause of Sad Deed," SAN JOSE EVENING NEWS 1 (Aug. 23, 1928) (sawn-off shotgun and axe used to kill eleven).

categorical bans on double-barreled shotguns or lever-action rifles. Instead, they legislated within the parameters of our historical tradition—limiting the carry of firearms in "sensitive places," disarming dangerous individuals, and banning only the most dangerous and unusual weapons with no legitimate self-defense functions. They also harshly punished those who committed lesser acts of violence.[31]

Illinois has many options for stopping or limiting these horrendous attacks. But the enshrinement of constitutional rights "necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636. That includes taking millions of AR-15s out of the hands of law-abiding citizens. The waxing, or we pray the waning, of societal problems does not amend the scope or effect of the Second Amendment.

\*   \*   \*

The Second Amendment protects AR-15 rifles, which easily pass the "dangerous and unusual" test. Millions of AR-15s are owned nationwide, and laws prohibiting AR-15s are "outliers." Nor is the AR-15 "dangerous" because the firearm is widely owned for self-defense, and its features are not particularly useful for criminals.

### IV. The Second Amendment Protects Magazines Banned by the Act

The Act makes it unlawful to "knowingly manufacture, deliver, sell, purchase," or possess a "large capacity ammuni-

---

[31] "If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege." *Wilson*, 33 Ark. at 560.

tion feeding device." 720 ILCS 5/24-1.10(b), (c). A "large capacity ammunition feeding device" is a magazine that holds more than 10 rounds of ammunition for long guns and more than 15 rounds for handguns. *Id.* at (a). The Act places severe restrictions on preexisting owners of such magazines. *Id.* at (d). *Bevis* held that the Act was constitutional because "high-capacity magazines are … military-grade weaponry." 85 F.4th at 1195.

Begin with *Bruen* step one: whether the "Second Amendment's plain text covers" plaintiffs' ability to possess and acquire magazines holding more than 10 rounds. *Bruen*, 597 U.S. at 24. The Constitution not only protects rights. It also protects those things necessary to effectuate the exercise of those rights. Taxing ink burdens the freedom of the press. *Minneapolis Star and Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 582 (1983). Likewise, the Second Amendment not only protects the right to "keep and bear Arms" but the prerequisites for exercising the right. *Ortega*, 148 F.4th at 1143. So too, "the right to maintain proficiency in firearm use [is] an important corollary to the meaningful exercise of the core right to possess firearms." *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011).

Here, the parties disagree. To the State, the question is whether *30-round* magazines are necessary to operate a firearm. By contrast, plaintiffs believe the question is whether *magazines* are necessary.

Plaintiffs have the better argument. Claiming that a 30-round magazine is unnecessary, as the State does, requires knowing the "Platonic ideal of a firearm." *Duncan*, 133 F.4th at 918 (VanDyke, J., dissenting). Said differently, whether a 30-round magazine is necessary to operate a firearm depends

on what a "firearm" is, after being stripped of all necessities. That is not possible to answer. The better question is whether magazines generally are necessary to operate a firearm, which of course they are. Thus, under *Bruen*'s step one, magazines are "Arms" under the Second Amendment.

*Bruen*'s second step requires the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. This takes us to the "dangerous and unusual" arms test. A "dangerous" weapon is one particularly suited for criminality and has little self-defense value. An "unusual" weapon is not commonly owned or commonly regulated.

Large-capacity magazines are not "unusual." The district court on remand found thirty-round magazines are "in common use." That finding is supported by evidence in the record: "50% of consumer detachable rifle magazines have a capacity of more than 10 rounds, totaling 451,393,000."[32] *See also Duncan*, 133 F.4th at 902 (Bumatay, J., dissenting); *Heller*, 670 F.3d at 1261.

Bans on magazines that hold 10 or more rounds are also uncommon among the states. Twelve states and D.C. ban outright possession of magazines with more than a certain number of rounds. *Duncan*, 133 F.4th at 892 n.3 (Bumatay, J., dissenting). Such bans are thus "outliers" and unconstitutional. *See Bruen*, 597 U.S. at 79 (Kavanaugh, J., concurring).

Large-capacity magazines are not "dangerous" because they are widely owned for self-defense and not particularly suited for criminality. The district court found these

---

[32] ECF No. 253 at 33, ¶ 141.

magazines "have legitimate self-defense purposes." "[E]very round matters in a self-defense scenario … Thus, in a critical self-defense scenario, more rounds equals a higher chance of survival." Evidence in the record supports that conclusion. The State's own firearms expert concluded that restricting citizens to a smaller magazine could prove fatal in self-defense situations.[33] The need for more than a handful of rounds in those scenarios is why manufacturers include magazines with more than ten rounds when selling semiautomatic rifles.[34] *See Duncan*, 133 F.4th at 923 (VanDyke, J., dissenting) (providing example in which a thirty-round magazine would have helped fend off a group of assailants). And a large-capacity magazine does not make a firearm more concealable.

Nor is there an enduring tradition of regulating magazines. "At the time the Second Amendment was adopted, there were no laws restricting ammunition capacity." David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849, 864 (2015). The closest regulation to a magazine ban was gunpowder storage laws. But "[f]ire-safety laws do not create a comparable burden to an absolute ban on arms." *Bevis*, 85 F.4th at 1217 (Brennan, J., dissenting); *see also Heller*, 554 U.S. at 632 ("[F]ire-safety laws … do not remotely burden the right of self-defense as much as an absolute ban on handguns."). Indeed, the oldest magazine ban appears to have first been enacted during Prohibition, well into the twentieth century. Kopel, *supra*, at 864.

---

[33] *Id.* at 34–35, ¶ 149.

[34] *Id.* at 33–34, ¶ 143-45.

Throughout our nation's history, states were free to ban magazines. But they did not. In fact, the opposite is true: firearms with large magazines have been immensely popular and common. The Winchester 1866 had a seventeen-round magazine and was widely owned in the West. *Id.* at 869. Indeed, the first firearms with large-capacity magazines existed before the Constitution. *Bevis*, 85 F.4th at 1224–25 (Brennan, J., dissenting) (discussing the Girandoni air rifle). So, although courts should not assume "founding-era legislatures maximally exercised their power to regulate," *Rahimi*, 602 U.S. at 739–40 (Barrett, J., concurring), this enduring tradition strongly suggests large-capacity magazines were viewed as protected because such magazines were well known and still not banned.

Magazines are "Arms" under the Second Amendment's plain text because firearms require magazines to function. Magazines are not "dangerous and unusual" as that test is historically understood. Nor is there a history and tradition of regulating these types of magazines. I would accordingly remand for the district court to evaluate whether the rest of the Act is constitutional.

One last thought: This dissent addresses the district court's conclusion that the Act's ban on the AR-15 and its magazine is unconstitutional. But the Act is breathtaking in its coverage, covering hundreds of different firearms. The district court did not evaluate, or leave open, the constitutionality of the Act's ban on those weapons. I would remand the case for the district court to analyze those portions in full detail. It may well be that portions of the Act are constitutional, but I cannot conclude so without more findings of fact.

## V. Conclusion

Plaintiffs are part of the people who seek to possess and own firearms, so their conduct is presumptively constitutional. Illinois has not shown that its restrictions are consistent with our country's history and tradition of weapons regulations. The most common firearms Illinois banned—the AR-15 and its magazine—are not dangerous and unusual. They are in common use and owned for self-defense. Illinois's ban goes too far and should be enjoined as unconstitutional. I respectfully dissent.